# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

NADIA MURAD, MAHYA ALQASIM, VINAL )
HALAJA, EZZAT KOLO, NORI KHALAF, HAKIM )
OSMAN, KHIDIR IDO, SAMEA )
MERZA, SALEMA MERZA, SALIM )
MERZA, NAWAF SULAIMAN, ABID )
KASSIM, KHUDAIDAH HAVEND, WAHIDA )
HAVEND, NAYYEF ABDO, SAHIRA )
MAJOO, GHAZALAH HESSO, ZERI )
HESSO, KHERO KHALAF, SALEH )
SAFFUK, HAKIMA ANTAR, BARFI )
HAMO, KAMLA IDO, HATIM IDO, HASHIM )
IDO, SALIM IDO, HANAA ABASS, ABLA )
AMY, AISHAN HASSAN, HAJI SAIDO, KHAIRI )
MASTO, KHALAF AMSIKH, ZEIDAN )
KASEM, GULI RASHO, MARYAM )
NAIF, AMEERA NAIF, SABRI ELIAS, HADI )
ZAGLA, LAYLA BARGHASH, ARMAAN )
BARGISH, NADA BARGISH, HAIDER )                    **COMPLAINT**
ELIAS, SAAD FARAZ, ISMAEL MAAJO, EEDA )
HUSSAIN, IBRAHIM ALKHALAF, SAADOON )               **JURY TRIAL DEMANDED**
KHUDIDAH, NASIMA HASKAAN, HUSSEIN )
KHALAF, NADIN ELIAS, NAWROZ )
SULAIMAN, JADAAN KHALAF, KHAIRI )
ZANDINAN, SOZAN AJOL, DAKHEEL )
ZANDINAN, BABEIR KHIBIL, HIBA )
ASSI, AMEEN KHUDIDAH, NASHWAN )
KHUDIDAH, KHUDEDAH MURAD, UMAYAH )
MURAD, MIYO MURAD, ADIL )
MURAD, KHALAF MURAD, MAJOW )
KASO, FAHAD QASSIM, HADI QASSIM, DAVID )
MAJO, KHEDIR QASSIM, ALMAS )
ALHAINTO, IZDIHAR SHEIKH, KHALID )
JUKO, JAD KHURMISH, AYAD )
KHURMISH, HALEEMA KHALAF, SAMIR )
EIZDIN, HUSSEIN EZDEEN, HAZIM )
EZDEEN, HARBI EZDEEN, MAHA )
EZDEEN, ADIB AYZDEN, JOZA SHIKHO, MANJI )
DAHHAR, MADINA ALDAKHI, ADOOL )

ABDI, MIRZA BAKR, YOUSIF BEESO, OMAR )
ISMAIL, AISHAN BASHAR, ORAS OSSO, FAEZA )
OSSO, SHAHNAZ OSSO, FAISAL OSSO, SAM )
LINCOLN, DIYANA KHAIRO, DALIA )
KHAIRO, RANA KHAIRO, KHERO EDO, NAWAF )
KHALAF, ISMAIL KHALAF, HAIFAA )
HAJI, HANAA KHALAF, SHAHAB )
BASHAR, KHOKHI KHUDEEDA, IBRAHIM )
ZANDINAN, MAHER ZANDINAN, DALYA )
ZNDINAN, LAYLA KAREE, HASSAN )
HASSAN, BASAM ALDAKHI, HAYDER )
MURAD, FADWA YOUSIF, GULISTAN )
HAJI, BARAKAT RASHO, KHAWLAH )
MALEKO, KHUDIDAH MALEKO, KOULAN )
MOURAD, NANCY KHALIL, KHOUDEIDA )
SAADOON, SHARIFA KHALIL, MURAD )
MOUSA, KORI AHMED, HUSSEIN )
MAROO, ISAM MAROO, SULTAN )
MAROO, FAEZA MAROO, MADLEEN )
MAROO, ALYA MAROO, HASAN )
FANDI, SARKAWT BADEEL, SALAR )
BADEEL, ANWAR ELIAS, HAMY )
HAMDAN, EEDO KHALAF, SEVI )
MOURAD, KHANSA HASAN, HAIFAA )
OSMAN, HADIA SMOQI, UBAYD )
NAFKOSH, KHUNAF SALAJA, ISAM )
NAFKOSH, SAHAR NAFKHOSH, SARAB )
NAFKOSH, SUAD NAFKOSH, SABRI )
NAFKOSH, I.N., KOLO DAHAR, BARVI )
ALI, DAHHAM HAJI, ISMAEIL HESSO, SARI )
MESKIN, NADIRA BROKA, FALAH )
RASHOKA, HAZIM RASHAWKA, ASHWAQ )
RASHAWKA, KHOKHI RASHAWKA, HALA )
RASHOKA, THAWRA RASHAWKA, HUSSEIN )
ALISSO, LAILA AYUB, SHAIMA )
ABRAHIM, KHANI SHARO, NAIF )
MURAD, JAMAL MURAD, MAYAN )
SMOKI, KHALAF KHALAF, KHALEEL )
KHALAF, HAIDAR HESSO, KHOUNAF )
SHAMMO, KHALED MOURAD, BASHAR )
MOURAD, KAWWAL HASAN, KAMLA )
SHAMMO, LAILA KHOUDEIDA, NAFIYA )
KHOUDEIDA, SARDAR )
ALMAHAMA, NASEEMA DINAI, SABAH )
ZAIDO, FAHAD NAIF, QASIM SAMOQI, SALEH )
SALEH, TAHSEEN OSMAN, SAEED )

KALO, MAZEN SULEIMAN, MUNEFAH                      )
MURAD, SABAH HASAN, AEID HAMO, ALEX               )
ISMAIL, MUHSIN HOLKI, RICKY                       )
NAMER, ASINJA BADEEL, SINOBAR                     )
BADEEL, LAITH SALEEM, SALIH                       )
SAADO, FAKHRI KASSEM, JAMES ABDY, JNDY            )
SMOQI, NADIMA MIRZA, SAMI                         )
SMOQI, SAADOON SMOQI, SULAIMAN                    )
HASAN, KHANI RAFO, HANEEF SMOQI, SAEED            )
ISSA, SHEREN AUSO, SERDAR AUSO, BASIL             )
AUSO, HASSAN ALI, KORI SHARRO, ROSE               )
OSMAN, BASSEH OSMAN, AJAJ                         )
OSMAN, FALAH OSMAN, AMAL                          )
OSMAN, HUSEIN OSMAN, SANAA                        )
OSMAN, SAMERAH OSMAN, SALAH                       )
OSMAN, ISMAEL KHRO, KHAIRI                        )
SHAMMO, WADHHAH ALESOU, KHALID                    )
KHALAF, AZEEZAH ARAB, MAJJO                       )
KHALAF, GHARIB KHEDER, ABRAHIM                    )
QASO, SHEREN QASO, DAWOOD MASTO, NAJI             )
MAJO, MURAD ISMAEL, MAHABAT                       )
ALI, KUILAR JUMAAH, KHALEEL                       )
ASSAF, KHALEEL SULAIMAN, KHUDHUR                  )
ALI, MAYAN ALI, MIYASAR KALO, DALIA               )
KALO, SHAWQI SULAIMAN, ZAIZO                      )
ALI, HUMOOM DARWEESH, ZIRVAN                      )
ALAODE, KHAIRI SMOQY, GHAZAL                      )
SMOQY, HADJI KHEDER, KLESTAN                      )
ALHASAN, SLEMAN SMOQI, KHALID                     )
JENDO, HUSEIN HESSO, SABAH QASIM, NAIF            )
ALSILO, FAWZIYA HAMI, IZDEEN                      )
SMOQY, KHAIRI ALPISHIMAM, FALAH                   )
ALPISHIMAM, FARIS KHETHER, SHIHAB                 )
HAMI, SUAD                                        )
KHALAF, G.A., W.A., J.A., W.S.A., A.A., SAEED     )
BAKR, NISSANI JNDO, TALAL RASHO, PASHA            )
RASHO, ABEER KAREEM, JALAL                        )
RASHO, BASE AWSMAN, NAAM SIMOQY                   )
, NAYIF IBRAHIM, NAWFEE                           )
KHADEEDA, KIRET HAJI, GULI MAHKO, EEDO            )
KHALAF, BARAKAT MAHKO, TURKIA                     )
MAHKO, KOCHAR MHKO, KAMIRAN                       )
CHOKO, OMAR RASHSHO, AMAL                         )
KHEDER, MURAD QIZLY, MISRY ADI, TAALO             )
KHUDHUR, BASEE NASER, FADI                        )
PIRALI, A.P., HADI PIR, ADULA MATO, KHAIRI        )

ELIAS, MAYSOON BORALI, QASIM                  )
PIR, ZAEETON HAJI, HADEEL PIRALI, FARIS       )
PIRALI, KALI PIRALI, BASIMA ALI, ZAEDO        )
ALI, KHALEEL ALI, KHUDHUR DNAI, SHAHA         )
MOHAMMED, SAEED SALO, SAEED                   )
QASIM, TARIQ QASIM, TRKO                      )
OMAR, Y.T., I.T., KAWRY OMAR, AMMAR           )
MATO, BAHAR HAMO, HAZIM                       )
ALDAKHI, SANAN ALDAKHI, KOZI                  )
HUSSEIN, MANDO MTRO, BASIMA                   )
MTRO, SHAFIQ ABDULLAH, SHARRO                 )
KHALAF, HADIYA HADGI, BARAKAT                 )
ALI, ADOULLA MATTO, JIHAD                     )
KHALAF, GHAZAL KASSEM, ABAS                   )
ZAGHLA, SULAIMAN SIDO, RASMIA                 )
KHALAF, NAWAF HASKAN, LAILA                   )
SALEH, JAMAL AL DAKHI, GAWRI AL               )
DAKHI, ALYAS ALDAKHI, NOFA                    )
ISMAEL, RIFAAH HUSSEIN, HAWRI                 )
JNDO, KHANSA KHALAF, ASIA ALI, IBRAHIM        )
ALI, DALAL SEMOQI, PARWEEN                    )
CHIYAN, QASIM GULY, SALIH                     )
RASHKI, WANSA RASHKI, SALAH                   )
OMAR, HANAN OMAR, KUDIDA                      )
SHAMO, GAWRY SHAMO, WANSA                     )
ALDKHI, KHALIL HAKAN, SAM                     )
MIRZA, SHAHAB KHUDEEDA, KEJJAN                )
HESSO, LUIS KOSA, SAIFI SMOUKI, HAJI          )
SMOUKI, MOHSIN HASAN, KHAWLA AL               )
AISSO, HABEEB MTRO, HEIVI                     )
KHALAF, BASEH SHAMO, ROZA                     )
SHAMO, DARWEESH QASIM, KORI                   )
OMAR, KHALEEL SAMO, DAVID                     )
KHALEEL, SURIYAH HAJI, KHEDER                 )
KHEDER, MESER HAJE, SAVEY                     )
KHRO, HUSAYN JOKO, SARAH JOKO, FARES          )
DAHHAR, SHARRO GEBBO, HASSO BAKR, BIZI        )
MISQRI, WLID QARO, ALIAS                      )
ALDAKHI, YUSRA ALDAKHI, ISMAEL                )
HAMMO, NOFA DENA, BANAS DNA, BAKIR            )
MURAD, PAIMAN DNA, JALLAL ISA, JOHN           )
ZALFOW, KHALID HAIDER, HAZIM                  )
AVDAL, SAAD IBRAHIM, SAADO ALI, FATIMA        )
ALI, QASSIM CHOMER, ALIFA                     )
KHALAF, KHUDAYDA ALDAKHI, FAREEDA             )
ALDAKHI, SUAAD SHAMO, KHALAF                  )

SHAMMO, IBRAHIM OSO, KAMO )
SHAMMO, BARACK ABRAHAM, BASIMA )
AUSO, FARIS AUSO, ALAN IBRAHIM, AMSHA )
ALI, KOULI KHALAF, SHIRI KHALAF, TAHSIN )
JIHAN, FARIS BAKR, HASSAN )
ALASSAF, RIHAM JNDO, SALLY )
RASHID, DALSHAD KHUDHUR, LAILA )
HESSO, DEJIN KHIDIR, SULAIMAN )
HAMO, TAWAF MERZA, ZEYED )
KHUDHUR, AMER KHUDHER, KHAIRI )
KHUDHER, DILHER OTHMAN, AHMED )
IBRAHIM, BAHAR MOURAD, GEORGE )
IBRAHIM, HAJAR ALI, ZIYAD FAEEDI, MAZIN )
FAAEDI, KHALEEL HASKAN, ZAHRA HAMO, )
and SAIDO HESSO, )
                                                              )
                    Plaintiffs,                               )
                                                              )
v.                                                            )
                                                              )
LAFARGE S.A., LAFARGE CEMENT )
HOLDING LIMITED and )
LAFARGE CEMENT SYRIA S.A., )
                                                              )
                    Defendants.                               )

v

**INTRODUCTION** ................................................................................................................... 1

**BACKGROUND** ..................................................................................................................... 5

**THE PARTIES AND PRINCIPAL CO-CONSPIRATORS** ............................................... 18

**JURISDICTION AND VENUE** ........................................................................................... 22

**FACTUAL ALLEGATIONS** ............................................................................................... 26

    *I.*    ***ISIS BECOMES THE WORLD'S MOST RUTHLESS TERRORIST GROUP*** ...................... 26

    *II.*    ***ISIS COMMITS GENOCIDE AGAINST THE YAZIDIS*** ................................................ 29
        *a. Yazidis Are An Ethnic And Religious Minority In Northern Iraq* ......................................... *33*
        *b. ISIS Invades Sinjar* ................................................................................................................ *35*
        *c. ISIS Executes Men And The Elderly And Captures Children* ................................................ *36*
        *d. ISIS Enslaves Yazidi Women And Children.* .......................................................................... *37*
        *e. ISIS Publicized Its Genocidal Views That The Yazidis Must Be Destroyed* ......................... *41*
        *f. Some Yazidis Escape To Kurdistan* ........................................................................................ *43*
        *g. ISIS Traps Thousands Of Yazidis On Sinjar Mountain* ........................................................ *44*
        *h. The Yazidi Atrocity Garners Immediate International Attention* ........................................... *45*
        *i. Yazidi Lives Remain Uprooted.* ............................................................................................. *47*

    *III.*    ***DEFENDANTS PARTNER WITH TERRORISTS*** ........................................................ 48

    *IV.*    ***DEFENDANTS SUPPORT ISIS BY MAKING PAYMENTS AND SUPPLYING MATERIALS BEFORE, DURING, AND AFTER THE ATTACKS ON YAZIDIS*** ........................................ 51
        *a. LCS Makes Fixed Monthly "Donations" To Terrorists* .......................................................... *52*
        *b. Lafarge And LCS Pay Terrorists For Access To The Cement Plant* ...................................... *55*
        *c. LCS Pays Terrorists Based On Cement Sold* ......................................................................... *57*
        *d. LCS Purchases Raw Materials From ISIS-Controlled Suppliers* .......................................... *57*
        *e. Lafarge And LCS Enter Into A Long-Term Revenue-Sharing Agreement With ISIS As Their Business Ties Deepen* .................................................................................................................. *60*
        *f. Defendants Sold Cement To ISIS, And Left Cement And Explosive Material For ISIS To Seize* ................ *64*

    *V.*    ***DEFENDANTS KNEW ISIS WAS A BRUTAL TERRORIST ORGANIZATION AND WORKED HARD TO CONCEAL THEIR PARTNERSHIP*** ............................................... 67
        *a. Defendants Partnered With ISIS Despite Its Brutality And Well-Publicized Attacks On The Yazidis* ........... *68*
        *b. Defendants Went To Great Lengths To Conceal Their Conspiracy With ISIS.* ...................... *71*
        *c. After Evacuating The Cement Plant, Defendants Tried To Cover Their Tracks* .................... *74*
        *d. LafargeHolcim Finally Discloses That Defendants Transacted With Terrorists* ................... *77*

    *VI.*    ***DEFENDANTS' PAYMENTS AND COOPERATION SUBSTANTIALLY ASSISTED THE ACTS OF INTERNATIONAL TERRORISM AGAINST THE YAZIDI COMMUNITY*** ................... 78
        *a. ISIS Had A Centralized Financial System Which Financed The Commission Of International Crimes* ....... *78*
        *b. Lafarge's Financial Contributions Were Significant In Light Of ISIS's Low Operational Costs* ............... *80*
        *c. Lafarge's Money Was Channeled To The Leadership Cell, ISIS's Military And Governance Authority* ....... *81*
        *d. Lafarge's Money Was Channeled Through Raqqa, The Center Of ISIS's Military Planning And Human Trafficking Of Yazidis* .................................................................................................. *84*
        *e. ISIS Used Cement And Raw Materials From Defendants' Plant To Shelter Its Fighters And Keep Yazidis In Captivity* ....................................................................................................... *87*

    *VII.*    ***DEFENDANTS' UNLAWFUL CONDUCT HAD A SUBSTANTIAL NEXUS TO NEW YORK AND THE UNITED STATES*** ............................................................................................. 88
        *a. Defendants Purposefully Relied On New York Banks To Clear The U.S. Dollar Transactions They Used To Finance Terrorism* ............................................................................................... *89*
        *b. Defendants Used U.S.-Based Email Providers To Veil Their Terrorist-Financing Scheme* ......... *106*
        *c. Defendants Purposefully Entered Into A Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States* ........................................................................ *108*

***VIII. LAFARGE AND LCS PLEAD GUILTY TO CONSPIRING TO PROVIDE MATERIAL SUPPORT TO TERRORISTS***........................................................................ *114*

**HARM TO PLAINTIFFS' PERSONS, PROPERTY, AND FAMILY AS A RESULT OF ISIS'S TERRORIST ATTACKS**........................................................................ 114

*COUNT ONE: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)*.................................... *115*

*COUNT TWO: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)* .................................. *295*

**JURY DEMAND** ........................................................................................ 297

**PRAYER FOR RELIEF** ............................................................................. 297

**INTRODUCTION**

1.      This Anti-Terrorism Act ("ATA") case is brought on behalf of members of the Yazidi community who are U.S. citizens and were injured by terrorist attacks carried out by the Islamic State in Iraq and Syria ("ISIS").  On August 3, 2014, the entire world watched as ISIS attacked Yazidi villages in northern Iraq, destroying everything in sight and forcing the Yazidis to flee to the barren Sinjar Mountain.  Thousands of Yazidis were murdered and kidnapped.  Many died of starvation and dehydration.  Yazidi women who survived were sold as sex slaves while boys were forced to become child soldiers for ISIS.  Hundreds of thousands of Yazidis ultimately fled to internally displaced persons camps in Kurdistan.  The Yazidis' once idyllic mountainside villages were left abandoned in a sea of rubble.

2.      On October 18, 2022, the Department of Justice ("DOJ") announced its first-ever prosecution of a corporation for conspiring to provide material support to a terrorist organization. According to Deputy Attorney General Lisa O. Monaco, Lafarge S.A. ("Lafarge"), and Lafarge Cement Syria S.A. ("LCS") (with Lafarge Cement Holding Limited ("Lafarge Cyprus"), "Defendants") "partnered with ISIS, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

3.      As part of their guilty plea, Defendants Lafarge and LCS[1] agreed to a 52-page Statement of Facts detailing their unlawful conduct ("Statement of Facts" or "SOF").  These factual admissions established Lafarge and LCS's criminal liability under the ATA, 18 U.S.C. § 2339B(a)(1), and give rise to civil liability under the ATA, 18 U.S.C. § 2333.  The Statement of

---

[1] Plaintiffs have also named Lafarge Cement Holding Limited, a wholly-controlled Lafarge subsidiary, as a defendant. Lafarge merged with Holcim Ltd. in 2015 to become one of the largest cement manufacturers in the world, generating over $32 billion in net sales in 2022.

Facts is incorporated into this Complaint in its entirety.[2]  *See United States v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10.[3]

4.      Lafarge and LCS admitted in the Statement of Facts that they paid nearly $6 million dollars to ISIS and another terror group between August 2013 and October 2014.  Specifically, Lafarge and LCS admitted that they paid $5.92 million to and for the benefit of ISIS and Al-Nusra Front ("ANF") during this period, and that they attempted to conceal these payments.

5.      Of the $5.92 million in payments made to ISIS and ANF, Lafarge and LCS admitted that $3,447,528 was paid directly to ISIS-controlled suppliers.  And their admissions make clear that at least $585,000 of the monthly donations paid to armed groups went directly to ISIS[4]— meaning that they gave more than $4 million to ISIS and ISIS-controlled entities.  Lafarge and LCS also admitted that ISIS secured an additional $3.21 million by selling the cement it took from the Cement Plant when LCS evacuated in September 2014—which adds up to a total of $7.21 million in value for ISIS and ISIS-controlled entities.

---

[2] The Statement of Facts is incorporated except to the extent that it is inconsistent with the facts pleaded in this complaint.  Plaintiffs' investigation has also revealed additional facts beyond those to which Lafarge and LCS have admitted in connection with their guilty plea.  Upon information and belief, the factual admissions in connection with the guilty plea were limited by design and carefully crafted in an effort to avoid civil liability like that threatened by the instant proceedings.  Allegations beyond those in the Statement of Facts are drawn from academic and news reports including about internal documents from Lafarge, Plaintiffs' experiences, testimony from the Yazidi community, and other independent investigations.  Some documents referenced are discussed in *Foley et al. v. Lafarge S.A. et al.*, 23-cv-05691 (E.D.N.Y.), a case related to this one, based on similar acts of the same Defendants.  Counsel has relied on the well-pleaded allegations as made in *Foley*.

[3] In announcing the guilty plea, the DOJ indicated that Lafarge and LCS did not fully cooperate with its investigation.  But Lafarge and LCS agreed in the guilty plea that they "will not dispute the Statement of Facts."

[4] These monthly donations are calculated on the basis that from November 2013 Lafarge and LCS admitted to monthly payments to ISIS of $38,000 and from May 2014 Lafarge and LCS admitted monthly payments to ISIS of $71,400.  SOF ¶¶ 44, 47.  Lafarge and LCS have admitted to making payments to and for the benefit of ISIS until October 2014.  SOF ¶ 19.

6.     But, the total amount of payments that Lafarge gave ISIS and other armed groups around the Cement Plant is actually closer to $15.5 million.[5]  A Lafarge executive himself said that Defendants had given ISIS "ten millions" by mid-2014.[6]  And a publicly available intelligence report also indicates that ISIS in fact secured at least $11.5 million by selling the cement it took from the Cement Plant, on top of the millions of dollars' worth of cement that Defendants sold directly to ISIS.

7.     The DOJ reported that the conspiracy participants, including LCS, its intermediaries, and the terrorist groups, gained approximately $80.54 million through the conspiracy.  The actual amount of revenue for participants may be even higher.  The money and cement Defendants supplied ISIS went directly to ISIS's operations at precisely the time it was committing acts of international terrorism, including the slaughter of innocent people such as the Yazidis.  Meanwhile, according to its plea with the DOJ, Lafarge ultimately made over $70 million in total sales revenue through its conspiracy with ISIS.[7]  On information and belief, ISIS also used Defendants' cement to construct a network of underground tunnels used to shelter its fighters and weapons and transport, trap, and torture hostages including Yazidis.  And when Lafarge evacuated the Cement Plant, ISIS also gained access to tons of raw materials, including supplies of hydrazine, a chemical used to produce explosives.

8.     Documents indicate that Defendants' conspiracy with ISIS was authorized at the specific direction of the companies' highest management levels, including the CEOs of both

---

[5] Press Release, Nadia's Initiative, *Paris Court of Appeals Confirms Charges Against French Multinational Lafarge for Complicity in Crimes Against Humanity Committed by ISIS* (May 22, 2022), https://www.nadiasinitiative.org/news/paris-court-of-appeal-confirms-charges-against-french-multinational-lafarge-for-complicity-in-crimes-against-humanity-committed-by-isis.

[6] *See infra* Part IV(e).  It is unclear from the face of the email to what currency the sender is referring.

[7] SOF ¶ 20.

Lafarge and LCS.  Transactions in furtherance of this criminal conspiracy were purposefully made in U.S. dollars and transferred through and processed in New York.[8]  And Defendants did not take steps to unwind the conspiracy until much later, after the criminal conspiracy was publicly exposed.

9.      At the time of Defendants' dealings with ISIS, the group had long been designated as a Foreign Terrorist Organization ("FTO") by the United States—first as Al-Qaeda and its offshoots and then, on May 15, 2014, by its ISIS name and aliases.[9]  These FTO designations, still in force today, mean that transacting with this group gives rise to criminal and civil liability.  It is a crime under 18 U.S.C. § 2339B(a)(1) to knowingly provide material support to an FTO knowing that the organization has been designated as such.  Similar legal prohibitions and criminal offenses exist under other countries' laws.[10]

10.     Defendants were, of course, well aware of this.  LCS's security advisor observed publicly that "The ISI [Islamic State of Iraq] and later ISIS/ISIL had been listed as a terrorist group since 2004 by the USA, the UN, and the EU."  And internal notes from a September 11, 2013 meeting of Lafarge's Security Committee relayed challenges of dealing with armed militants "classified as terrorists by international organizations and the US."[11]

---

[8] *See infra* Part VII(a).

[9] The U.S. designated Al-Qaida in Iraq ("AQI") as an FTO on October 15, 2004.  On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section I (b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as an alias of Al-Qaida in Iraq.  The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and Al-Sham ("ISIS"); The Islamic State of Iraq and Syria; ad-Dawla Al-Islamiyya fi Al-Iraq wa-sh-Sham; Daesh; Dawla Al Islamiya; and Al-Furquan Establishment for Media Production.  ISIS remains a designated FTO to the present.

[10] It is a crime to fund a proscribed organization under the United Kingdom Terrorism Act, § 15 (2000), European Union Council Framework Decision 2002/475/JHA (2002), French Criminal Code Article 421-2-2 (2001), and U.N. Resolution 54/109 (1999).

[11] SOF ¶ 31.

11.     Defendants were able to conceal their conspiracy with ISIS and its intermediaries for so long because, among other things, they took extraordinary steps to repeatedly and systematically route financial transactions and email traffic in furtherance of the conspiracy through the United States, using U.S. dollars as their currency.  They undertook these activities in the United States purposefully in order to cover their tracks and avoid the scrutiny of Lafarge's French auditors and law enforcement officials.

12.     Because Defendants aided and abetted ISIS's acts of international terrorism and conspired with ISIS and its intermediaries, they must pay compensation to the survivors.  In this civil action under the ATA, U.S. citizens from the Yazidi community harmed by ISIS's acts of international terrorism committed in conspiracy with and aided and abetted by Defendants seek to collect the treble damages and attorney's fees authorized by the ATA for Defendants' violations thereof.

## **BACKGROUND**

13.     On August 3, 2014, the world watched as ISIS launched a brutal, premeditated campaign to destroy the Yazidis, an ethnic and religious minority living in the villages of Sinjar, a mountainous area in north-west Iraq.  Unprepared and undefended, Yazidi families were driven out of their homes with unimaginable barbarity.  Thousands of Yazidi men and women were executed and thrown into mass graves solely because of their religious and ethnic identity.  Young boys were kidnapped and taken to the front lines to become child soldiers or human shields on the battlefield.  Thousands of young women and girls were captured and bought, sold, and traded as slaves to ISIS fighters for sexual abuse on a massive scale.  Many remain missing to this day.

14.     At the time ISIS launched this attack, it was already a designated FTO under U.S. law and was notorious for its brutal crimes, including executing civilians en masse, persecuting

non-Muslim communities, kidnapping and beheading civilians—including U.S. nationals—and killing and maiming children.

15.     ISIS directed its violent campaign throughout the Middle East in order to forcibly acquire land to establish a "caliphate," or Islamist religious empire.   On June 29, 2014, ISIS announced that the caliphate was now to be known as the "Islamic State," and that Abu Bakr Al-Baghdadi had been nominated as its "caliph," or leader.   The caliphate was highly centralized and organized, exercising military authority, exerting fiscal and administrative control, and implementing state-like bureaucratic governance structures in the territories it controlled.

16.     At its peak, the organization had an estimated 40,000 foreign fighters from 110 countries in its ranks in Iraq and Syria.   ISIS took increasing amounts of territory in the area, ultimately controlling land the size of the United Kingdom, encompassing over a third of the territory of both Iraq and Syria, and governing over eleven million people.   The group's reach ultimately extended beyond the region, and it became infamous for committing and inspiring terrorist acts in more than thirty countries around the world.

17.     ISIS's attack on Sinjar in the summer of 2014 forced approximately 400,000 Yazidis to flee for their lives.   Those who could escape directly from their villages went eastwards towards the Kurdistan region of Iraq ("Kurdistan").   Initially, families slept on the streets, piled into school buildings, or sheltered in houses that were still under construction.   Those who had little warning of ISIS's advance packed into cars, got on donkeys, or ran on foot to seek refuge on nearby Sinjar Mountain.   There, tens of thousands of innocent Yazidis were besieged by ISIS without access to food, water, or medical care in the middle of the arid Iraqi summer.   Families faced an awful choice: come down the mountain and be slaughtered, or stay and watch their children and elders die of thirst and hunger.   Descriptions of starving Yazidis flooded news

channels across the world. Hundreds—including infants and young children—perished on the mountain.

18.     Spurred to action by these atrocities, on August 7, 2014—four days after ISIS attacked Sinjar—President Obama announced humanitarian airdrops and targeted U.S. airstrikes on ISIS fighters surrounding the mountain as "a humanitarian effort to help save thousands of Iraqi civilians who are trapped on a mountain . . . facing almost certain death." In explaining the strike to the American people, he noted that "these terrorists have been especially barbaric towards religious minorities, including Christian and Yezidis." He also announced that ISIS had "called for the systematic destruction of the entire Yezidi people, which would constitute genocide" and that "chilling reports describe ISIL militants rounding up families, conducting mass executions, and enslaving Yezidi women."

19.     After tens of thousands of Yazidis had been trapped on Sinjar Mountain for over a week, local Kurdish militias opened a safe corridor so that those who survived could escape to Kurdistan. Those who could access the safe corridor and were physically able began the long walk to Kurdistan, some taking thirty hours, on foot and with minimal provisions. Eventually, after many weeks spent sleeping in the streets, most Yazidis moved into temporary camps in Kurdistan established for internally displaced persons. Almost ten years later, hundreds of thousands of Yazidis still live in these camps without access to education or basic healthcare, unable to return home to the villages that ISIS destroyed.

20.     That same month, August 2014, ISIS began to publicly execute Americans. On August 19, 2014, ISIS executed American journalist James Foley and released a video of the horrific beheading, entitled "Message to America," online. Two weeks later, on September 2, 2014, ISIS released a video of the beheading of Steven Sotloff, another American journalist, titled

"A Second Message to America."  The beheadings were front-page news across the world.  This followed ISIS's practice of kidnapping Americans, including 24-year-old humanitarian worker Kayla Mueller, who was kidnapped in 2013, raped by ISIS leader Abu Bakr Al-Baghdadi, and later killed while in ISIS captivity.

21.     Lafarge was at the time the owner of a cement plant in Jalabiyeh, northern Syria (the "Cement Plant"), which was operated by its subsidiary, LCS.[12]  Unlike other multinational companies, which halted their Syrian operations and fled Syria when the civil war broke out in 2011, Defendants saw opportunity in partnering with the terrorists.  By August 2014, Lafarge had already been sending millions of dollars to armed groups—including by making monthly "donations" to ISIS, paying ISIS based on the volume of cement LCS sold, purchasing raw materials from ISIS-controlled suppliers, and selling cement for ISIS's own use.

22.     To conceal its transactions with terrorists, Defendants worked through intermediaries.  As one LCS security consultant admitted, "it was especially important that the relationship would be handled by [intermediaries], since an exposure of this sort would have been compromising for LCS.  But via [intermediaries], we did in fact contribute to the economy of ISIS."

23.     Indeed, it was precisely in August 2014, when the drumbeat of ISIS's terror was at its loudest, that Defendants finalized a significant deal with ISIS.  In the midst of the horrors being inflicted on the Yazidis, Lafarge entered into a formal long-term revenue-sharing agreement with ISIS[13]—flying in the face of U.S. and international law and aiding and abetting ISIS's crimes against humanity that were displayed daily on their screens.  In doing so, Lafarge ramped up its

---

[12] SOF ¶ 2.
[13] SOF ¶ 86.

financial support for the terror group at the precise time when funding would assist the group's most barbaric activities.

24.     Specifically, on August 5, 2014, just two days after ISIS launched its widely-publicized attack on Yazidi villages and while thousands of Yazidis struggled for their lives on and around Sinjar Mountain, Firas Tlass—who Lafarge used as an intermediary to ISIS—sent Fredric Jolibois, Lafarge's Executive Vice President of Operations, a draft of the proposed revenue-sharing agreement between LCS and ISIS with terms that would give ISIS a fixed percentage of the profits from Lafarge's cement sales.

25.     Emails show that on August 6, 2014, the day after the U.N. Security Council condemned ISIS's "systematic persecution of individuals from minority populations," Jolibois confirmed to Tlass Lafarge's and LCS's agreement to share 10 percent of Lafarge's profits with ISIS in return for ISIS's agreement to stop importation of or tax competitors' cement. Defendants' negotiations with ISIS continued alongside daily news reports of ISIS's barbarity and U.N. reports of a Yazidi genocide in the making.

26.     On August 15, 2014, the U.N. Security Council issued Resolution 2170 condemning "any engagement in direct or indirect trade" with ISIS, "underscoring that these resources will support their future terrorist activities."[14] On or about the same day, an intermediary recommended that Lafarge executives agree to ISIS's revised terms including, amongst other demands, a fixed supply of LCS's cement production and a percentage of the value of LCS's raw

---

[14] The U.N. Security Council also called on all U.N. member states to prohibit all financial and trade relations with ISIS, ANF, and Al-Qaeda, and named individuals subject to travel restrictions, asset freezes, and other measures targeted at Al-Qaeda affiliates. Abu Bakr Al-Baghdadi, ISIS's declared caliph, was not among the six because he had already been listed since 2011. Press Release, United Nations, Department of Public Information, *Security Council Adopts Resolution 2170 (2014) Condemning Gross, Widespread Abuse Of Human Rights by Extremist Groups in Iraq, Syria*, SC/11520 (August 14, 2014) https://press.un.org/en/2014/sc11520.doc.htm.

materials.[15]  Lafarge subsequently accepted these terms in return for ISIS's agreement to, amongst other measures, impose taxes on competitors' cement.[16]  An email sent to Lafarge executives as the deal was being finalized asked: "Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? . . . As long as we are selling and are able to overcome the obstacles, we should continue."[17]  And that is exactly what Defendants did.

27.    Defendants were fully aware throughout their partnership with ISIS that they were transacting with terrorists and that their conduct flagrantly violated U.S. and international law, as their internal documents show.[18]  Indeed, initially, Lafarge's agreements with ISIS were even signed on ISIS letterhead, stamped with ISIS stamps, and referenced LCS by name[19] until Bruno Pescheux, CEO of LCS until July 2014, noted in an email to an employee that "we all have to stop [using] the acronym of an organization which is on terrorist lists."

28.    But Defendants continued conspiring with ISIS because Defendants received crucial benefits in exchange for these payments.  ISIS permitted LCS access to raw materials sourced from the expanding territory and markets under its control, and ISIS agreed to impose costs on competing cement from Turkey to boost Defendants' sales.  ISIS—quite literally—agreed to neutralize Defendants' competition.  Defendants in turn referred to their "profit" as a "cake" and stated they were happy to "share" a slice with ISIS so long as ISIS continued to protect and promote Defendants' interests.[20]

---

[15] SOF ¶ 81.
[16] SOF ¶¶ 83, 86.
[17] SOF ¶ 46.  All citations to written correspondence include original spelling, punctuation, and grammar.
[18] E.g., SOF ¶ 84.
[19] E.g., SOF ¶¶ 36, 88.
[20] SOF ¶ 73.

29.     ISIS was strongest when it was able to maintain control over and expand territory by intimidating, threatening, and killing the people who stood in its way, pitting groups against one another and silencing potential opponents with fear.  ISIS made great efforts to publicize gruesome details of its atrocities, and a key part of its expansion strategy was the development of a reputation as a brutal and ruthless actor with the ability to instill fear in its enemies and anyone else in its path.  Capturing and slaughtering Yazidi civilians under its control and kidnapping and selling women and girls were potent ways for ISIS to expand and maintain its grip on power.  When ISIS committed genocide against the Yazidi community, it grew its own influence and territory and bolstered its infamy.

30.     The greater ISIS's control, the more Lafarge benefitted from the conspiracy.  And the conspiracy was integrally linked to the United States.  Harming and killing foreigners, especially Americans, whom ISIS referred to as "crusaders," was a potent way for ISIS to maintain and expand its grip on power, territory, and markets.  By taking on a global power like the United States and killing Americans, ISIS terrorized its subjects, recruited new followers, and deepened its territorial reach.  And Defendants knowingly benefitted from ISIS's ability to control local markets, allowing them to increase profits.

31.     The United States has long designated Al-Qaeda and its offshoots as FTOs and added ISIS by name and alias on May 15, 2014.[21]  These FTO designations, still in force today, mean that transacting with this group gives rise to criminal and civil liability.  It is a crime under

---

[21] The United States Secretary of State designated Al-Qaeda in Iraq ("AQI") as an FTO on October 15, 2004.  On May 14, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section I (b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as an alias of Al-Qaida in Iraq.  The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and Al-Sham; The Islamic State of Iraq and Syria ("ISIS"); ad-Dawla Al-Islamiyya fi Al-Iraq wa-sh-Sham; Daesh; Dawla Al Islamiya; and Al-Furquan Establishment for Media Production.  ISIS remains a designated FTO to the present.

18 U.S.C. § 2339B(a)(1) to knowingly provide material support or resources to an FTO knowing that the organization has been designated as such.  Similar legal prohibitions and criminal offenses exist under other countries' laws, such as the United Kingdom Terrorism Act, § 15 (2000), European Union Council Framework Decision 2002/475/JHA (2002), and French Criminal Code Article 421-2-2 (2001).

32.    Defendants were, of course, well aware of this.  LCS's security advisor observed publicly that "The ISI [Islamic State of Iraq] and later ISIS/ISIL had been listed as a terrorist group since 2004 by the USA, the UN, and the EU."  And internal notes from a September 11, 2013 meeting of Lafarge's Security Committee relayed challenges of dealing with armed militants "classified as terrorists by international organizations and the US."[22]

33.    Realizing they were brazenly violating the law, Lafarge and its executives tried to cover their tracks.  They interacted with ISIS through intermediaries and paid it using shell companies in the United Arab Emirates.[23]  And when they felt the pressure mounting, they backdated a termination agreement with their intermediary to pretend the relationship had ended.[24] Defendants purposefully availed themselves of the U.S. financial system and email services based in the United States to conceal their illegal activities from their auditors and French law enforcement authorities.  Defendants' executives decided to switch from cash payments to U.S. dollar transfers routed through New York correspondent banks because cash transactions appeared suspicious.[25]  And Lafarge's in-house lawyer instructed employees not to create email records of

---

[21] SOF ¶ 31.
[23] SOF ¶ 97.
[24] SOF ¶ 99.
[25] SOF ¶ 60.

transactions using their business email addresses.[26]  Instead, they used personal email addresses registered in the United States to communicate about their dealings with ISIS.[27]

34.     In their plea deal with the DOJ, Lafarge and LCS admitted to making payments of at least $5.92 million to and for the benefit of ISIS and ANF from at least August 2013 through October 2014.  These payments consisted of at least $816,000 in monthly "donations;" at least $3,447,528 in payments to ISIS-controlled suppliers; and at least $1,654,466 in payments based on the amount of cement LCS sold.[28]

35.     But Defendants' own documents suggest their total payments to terrorist groups were far higher—exceeding $15.5 million according to the ongoing criminal investigation into Lafarge and its executives by French authorities.[29]  By way of example, a July 14, 2014 email written to LCS's CEO refers to even more payments "in addition to the ten millions that we pay directly to them, i.e. to ISIS."  *See infra* Part IV(e).[30]  In addition, Lafarge entered into a written contract in October 2014, drafted to apply retroactively, obligating it to continue to make U.S. dollar payments indefinitely to an intermediary, money destined for terrorists, described *infra* Part V(c).

36.     When ISIS ultimately seized the Cement Plant in September 2014, it took the cement that LCS had produced and left behind.  Though Defendants admitted that ISIS sold the cement at prices that yielded approximately $3.21 million, the amount of cement that ISIS seized

---

[26] SOF ¶ 88.
[27] SOF ¶ 18.
[28] SOF ¶ 19.
[29] Press Release, Nadia's Initiative, *Paris Court of Appeals Confirms Charges Against French Multinational Lafarge for Complicity in Crimes Against Humanity Committed by ISIS* (May 22, 2022), https://www.nadiasinitiative.org/news/paris-court-of-appeal-confirms-charges-against-french-multinational-lafarge-for-complicity-in-crimes-against-humanity-committed-by-isis.
[30] The email communication likely refers only to one type of payment to ISIS at one point in time.  Lafarge made numerous types of payments to ISIS over a lengthy period of time.  *See infra* Part IV.

was likely sold for at least $11.5 million.  The negotiations to sell the cement were conducted with Lafarge's knowledge and with the participation of its intermediary.

37.     Accordingly, the actual value of the funds that Defendants provided to ISIS and ISIS-controlled entities and the profits generated from the sale of cement was likely over $15 million.[31]  And this does not account for the fact that Defendants actually gave ISIS more money than they admitted, or the value of the cement Defendants gave to ISIS before they evacuated the Cement Plant.

38.     The millions of dollars that Lafarge has admitted to paying ISIS and ISIS-controlled entities was enough to fund the attack on Sinjar many times over.  *See supra* ¶¶ 4–5.  ISIS's attack on Sinjar was not a particularly complex military operation—given that it was attacking unarmed civilians, it is estimated that the number of fighters involved in the invasion was only in the hundreds.  And these fighters came cheap.  Just $400 could cover one terrorist's salary for the month.  Even if the invasion of Sinjar required 500 ISIS fighters, their salaries for the entire month of August would have cost only $200,000—barely a dent in the piles of cash that Lafarge paid ISIS.  These attacks were the foreseeable, obvious, and only possible result of doing business with ISIS, a group whose sole purpose was the creation of an Islamic state through the slaughter and violent destruction of other communities.  Terrorist attacks enabled ISIS to maintain and expand its control over territories.  And the more territory and markets ISIS controlled, the greater the co-conspirators' profits.

39.     Defendants' payments were channeled through ISIS's centralized and carefully tracked financial system to fund ISIS's terrorist attacks.  According to a U.N. investigation, ISIS's

---

[31] This comprises $3,447,528 that Lafarge and LCS admitted paying to ISIS-controlled suppliers, an estimated $585,000 in monthly donations to ISIS, and $11,500,000 in alleged cement sales.  *See supra* ¶¶ 4–6.

central treasury provided "vital material and financial support [to ISIS's] ministry of the army, and specifically those units . . . that are alleged to have committed international crimes."

40.     Pursuant to ISIS's practices, 20 percent of the funds provided by ISIS would have been specifically channeled to its Leadership Cell, which was headed by ISIS's founder and leader Abu Bakr Al-Baghdadi, *see infra* Part VI(c), who himself imprisoned, tortured, and raped Yazidi women and girls as well as a young American humanitarian worker named Kayla Mueller.  ISIS's Leadership Cell played a central role in planning ISIS's expansion strategy and armed attacks, like those on Sinjar, and ISIS publicly confirmed that it deployed its "taxes"—money collected from people and businesses in ISIS's territory—to support "[t]he mujahidin [fighters] and [terrorist attacks that it called] jihad."

41.     Lafarge's money was also channeled to Raqqa, the center of ISIS's military planning operations and slave trade.  *See infra* Part VI(d).  Lafarge and LCS have admitted that its employees and representatives travelled to Raqqa, the self-declared capital of the caliphate and administrative headquarters of ISIS, to meet with ISIS representatives and contacts and negotiate payments.[32]  Thousands of women, including Plaintiffs' family members, were taken to Raqqa to be catalogued, sold, and enslaved by ISIS members.  The Raqqa Cell was run by Ali Musa Al-Shawakh, more commonly known as Abu Luqman, who was also a central figure in ISIS's Leadership Cell.  According to news reports, Abu Luqman was in contact with Lafarge and even served on the "shadow board" of the Cement Plant.  Abu Luqman also negotiated access to cement from the Cement Plant that Lafarge left behind for ISIS when its workers fled the plant, in the presence of Lafarge intermediary Amro Taleb.

---

[32] SOF ¶¶ 45, 70.

42.     On information and belief, ISIS also used Defendants' cement to construct its network of underground tunnels, bunkers, cells, and fortifications, which it used to shelter its fighters and weapons from U.S. coalition forces, and to transport, trap, and torture hostages.  In particular, Yazidi women—including a family member of a Plaintiff in this case—describe being held underground in Raqqa, a mere 52 miles from the Cement Plant.  Moreover, when LCS evacuated the Cement Plant, ISIS gained access to tons of raw materials, including supplies of hydrazine, a chemical used to produce explosives.

43.     Defendants' conspiracy with ISIS and its intermediaries had substantial, purposeful connections to the United States.  Defendants' executives knowingly and deliberately relied on the U.S. financial system, causing numerous U.S. dollar-denominated wire transfers to pass through New York banks.  Their reliance on U.S. banks was deliberate and strategic: Defendants called "USD" their "preferred option."[33]  Using U.S. dollars and New York correspondent banks made Defendants' payments look legitimate, avoided sanctions complications associated with conducting banking transactions with persons located in Syria, and, as discussed above, avoided the scrutiny of French auditors and law enforcement.

44.     Criminal prosecution of Lafarge and its executives is ongoing in France.  The French Court of Appeal in Paris stated that "although informed that the actions of ISIS could constitute crimes against humanity, Lafarge . . . decided instead to continue . . . paying several million dollars to [ISIS and other terrorist] groups."[34]  France's Supreme Court also confirmed that "knowingly paying several million dollars to an organisation whose purpose was exclusively

---

[33] SOF ¶ 60.

[34] Press Release, Nadia's Initiative, *Paris Court of Appeals Confirms Charges Against French Multinational Lafarge for Complicity in Crimes Against Humanity Committed by ISIS* (May 22, 2022), https://www.nadiasinitiative.org/news/paris-court-of-appeal-confirms-charges-against-french-multinational-lafarge-for-complicity-in-crimes-against-humanity-committed-by-isis.

criminal suffices to constitute complicity" in the crimes that were committed "regardless of whether the accomplice was pursuing a commercial activity."

45.    As part of its plea agreement with the DOJ in this District, Lafarge and LCS stipulated to a Statement of Facts and made a series of factual admissions establishing their criminal liability under the ATA, 18 U.S.C. § 2339B(a)(1), which also establish their civil liability under 18 U.S.C. § 2333.  Specifically, Lafarge and LCS have admitted that:

- At the direction of Lafarge and LCS's senior management, LCS was making payments to ISIS and ANF from at least August 2013 to October 2014;
- Executives conspired to make periodic payments to ISIS and ANF, including monthly "donations," totaling approximately $816,000;
- LCS paid fees for each truck allowed to pass through ISIS checkpoints;
- LCS purchased raw materials from ISIS-controlled suppliers, with payments totaling approximately $3,447,528;
- LCS made payments to ISIS and other armed groups based on the amount of cement that LCS sold, with payments totaling approximately $1,654,466;
- LCS entered a long-term revenue-sharing agreement granting ISIS ten percent of LCS's cement, twenty-five percent of the value of LCS's raw materials, payments based on the amount of cement sold, and payments for access to the Cement Plant;
- Lafarge's "preferred" method to effect payment was U.S. dollar transactions via intermediary banks in New York City.  *See infra* Part VII(a).

46.    Based on the heinous conduct underlying their guilty plea, Defendants were sentenced to pay almost $778 million in criminal fines and forfeiture to the U.S. government.  But none of this money was earmarked for victims.  Defendants have so far avoided paying any compensation to victims of their conspiracy with ISIS.

47.    Plaintiffs in this action are Yazidis who are U.S. citizens.  Many of them were, or had relatives who were, translators for the U.S. Army and served the United States.  They are farmers, schoolteachers, housewives, and small business owners whose lives were upended on that fateful day in August 2014.  Many of them lived in, owned properties in, and/or had family members living in the areas that came under ISIS attack on or around August 3, 2014.  Others were in the United States during ISIS's attack on Sinjar and had to watch in horror as ISIS attacked their

families, ransacked their homes, and destroyed their community.  Some had to work multiple jobs or drop out of school to send money to their relatives who had fled with nothing but the clothes on their back.

48.     There is not one Yazidi family whose lives were untouched by ISIS's brutality.  The entire population in the Sinjar area was either killed, captured, or displaced.  It is estimated that more than 400,000 Yazidis were forced to flee, with around 200,000  (considered to be more than half the surviving population of Yazidis in the world today) still living in camps in Iraq and Syria.  More than 5,000 Yazidi men and older women were killed.  More than 6,000 women and children were abducted and sold into slavery, some as young as nine years old.  Many of them were raped and gang raped over weeks and months by multiple ISIS fighters.  Over 2,700 Yazidis are still missing today.   Families were torn apart, homes and villages were reduced to ruins, and communities in which Yazidis lived for generations were destroyed.  Ten years later, there has been little reckoning for these crimes, and no compensation or restitution for the victims.

49.     Plaintiffs are entitled to recover for the severe mental anguish, extreme emotional pain and suffering, economic loss, loss of property, and/or loss of their family's society and counsel that they experienced as a result of Lafarge's criminal misconduct.   Not only were these consequences a foreseeable risk of doing business with ISIS, they were the only possible outcome of conspiring with a group whose purpose was solely terrorism.  Defendants aided and abetted the ISIS acts that killed or injured Plaintiffs and their family members, and destroyed their homes and businesses.  Defendants also conspired with ISIS and its intermediaries, making Defendants liable for the attacks that ISIS foreseeably committed in furtherance of their conspiracy.

## THE PARTIES AND PRINCIPAL CO-CONSPIRATORS

50.     Plaintiffs are U.S. citizens who lived in, owned properties in, and/or had family members living in areas invaded and terrorized by ISIS on or around August 3, 2014 or earlier.  As

a result of ISIS's assaults, Plaintiffs were themselves injured or subject to brutal physical and sexual violence, lost family members, or lost their homes and businesses. All experienced extreme pain and suffering. Further details about each Plaintiff are set forth below.

51.     Defendant Lafarge is the parent company of a multinational building materials business, which is organized under the laws of France and headquartered in Paris, France. At pertinent times, Lafarge, together with its subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete, and other building materials at 1,612 production sites in approximately 61 countries, including the United States.[35] Lafarge oversaw and directed the conduct of Lafarge Cyprus and LCS, two subsidiaries that it wholly controlled. LCS made agreements and transactions with ISIS and ANF at the direction of Lafarge's and LCS's senior management. Lafarge executives were informed in detail of LCS's decisions and themselves gave directions to support doing business with the FTOs. As Christian Herrault, Executive Vice President of Operations at Lafarge, wrote in 2017, LCS's "local concessions" to terrorists "were made with the clear and repeated approval" of senior Lafarge leadership.[36] Thus, when allegations below refer to LCS or LCS employees, the described conduct occurred at Lafarge's direction and for Lafarge's benefit.

52.     On July 10, 2015, Lafarge merged with its leading competitor, Holcim Ltd., a Zurich, Switzerland-based building materials business, to create LafargeHolcim.[37] At the time of the merger, LafargeHolcim was the largest cement company in the world.

53.     During all times pertinent to this complaint, Lafarge oversaw and directed the conduct of two subsidiaries it wholly controlled, LCS and Lafarge Cyprus.

---

[35] SOF ¶ 1.
[36] SOF ¶ 16.
[37] LafargeHolcim rebranded itself as Holcim Group in 2021.

a.      **LCS** is a direct subsidiary of Lafarge Cyprus, organized under the laws of Syria and headquartered in Damascus, Syria.  Lafarge indirectly owned 98.7 percent of LCS through four subsidiaries, primary among them Lafarge Cyprus.  From approximately May 2010 to September 2014, Lafarge, through LCS, operated the Cement Plant in the Jalabiyeh region of northern Syria, located near the Turkish border and between the cities of Manbij and Raqqa, Syria.[38]

b.      **Lafarge Cyprus** is the entity through which Lafarge held the majority of its shares in LCS until Lafarge's 2015 merger with Holcim.  It is organized under the laws of Cyprus and headquartered in Cyprus.  Lafarge Cyprus functioned as the corporate instrument through which Lafarge often routed money to LCS and intermediaries, including through international bank transfers that went through New York, and thereby financed Lafarge's payments to ISIS.  Lafarge Cyprus's financing of LCS's transfers was done knowingly, at Lafarge's direction, and with Lafarge's approval.  In 2014, Lafarge Cyprus executed a consulting agreement with Tlass to conceal Defendants' payments to ISIS.

54.     Bruno Lafont is a citizen of France and was Lafarge's Chairman of the Board of Directors and CEO of Lafarge until the completion of the merger with Holcim in 2015.  Upon Lafarge's merger, he became Co-Chair of LafargeHolcim's Board of Directors and served there until May 2017.  He was based at Lafarge's headquarters in Paris, France.

55.     Guillaume Roux is a citizen of the United States and of France and was an Executive Vice President of Lafarge until January 2016.  Roux was also a member of Lafarge's Security Committee, a member of LCS's Board of Directors until January 2016, and its chairman

---

[38] SOF ¶ 2.

from 2008 until July 4, 2013.  Roux was based at Lafarge's headquarters in Paris, France and reported directly to Lafont.

56.     Christian Herrault is a citizen of France and was an Executive Vice President of Operations of Lafarge from approximately 2012 to December 2015.  Herrault supervised Lafarge's operating subsidiaries in numerous countries, including Syria.  Herrault was also a member of Lafarge's Security Committee and, beginning on July 4, 2013, served as Chairman of the Board of Directors of LCS.  Like Roux, who was Executive Vice President of Lafarge and also a member of LCS's Board of Directors, Herrault had a formal role in both Lafarge and LCS's corporate structure.  Herrault was based at Lafarge's headquarters in Paris, France and reported directly to Lafont.

57.     Bruno Pescheux is a citizen of France and was CEO of LCS from approximately 2008 to July 2014.  While CEO of LCS, Pescheux was based at LCS's headquarters in Damascus, Syria before relocating to Cairo, Egypt in 2012 when LCS evacuated its foreign employees in the face of growing unrest around its plant.  He reported directly to Herrault.

58.     Fredric Jolibois is a citizen of France who became CEO of LCS in approximately July 2014 and remained in that role until approximately January 2016.  He reported directly to Herrault until Herrault left Lafarge.

59.     Jean Claude Veillard is a citizen of France and was Vice President of Security for Lafarge from approximately October 2008 until September 2017.  He was based at Lafarge's headquarters in Paris, France.  Veillard was also a member of Lafarge's Security Committee.

60.     Firas Tlass is a citizen and national of Syria and was a minority shareholder in LCS until the Syrian government confiscated his shares in LCS in approximately 2012.  Tlass was paid by LCS, with Lafarge's knowledge and approval, to provide "security" services to LCS, which

included negotiating with various local terrorist groups, including ISIS and the ANF.  Tlass was paid by LCS, with Lafarge's knowledge and approval, to negotiate with and deliver payments to ISIS and ANF.

61.      Amro Taleb is a citizen of Canada and of Syria and a former consultant to LCS who held himself out as a broker capable of sourcing raw materials from ISIS-controlled territories. LCS paid Taleb to negotiate with and pay ISIS for raw materials, with Defendants' knowledge and approval.  After ISIS raided the Cement Plant and shut it down, Taleb attempted to negotiate the sale of the remaining cement, while receiving payments from Defendants.  As Lafarge and LCS's paid consultant, he then visited Lafarge's headquarters in Paris in January 2015 to discuss Defendants' further cooperation and plan to re-open the Cement Plant.

62.      Defendants, through Veillard, Herrault, Pescheux, Jolibois, Roux, Lafont, Tlass, and Taleb, among others, acted in concert with ISIS, for the purpose of furthering their common objectives (Veillard, Herrault, Pescheux, Jolibois, and Taleb are also reported to be indicted in the French criminal proceedings against Lafarge).  They conspired and worked in concert with ISIS with the full knowledge of ISIS's designation as an FTO, its terrorist acts, and its purposeful targeting of Americans and others.

## JURISDICTION AND VENUE

63.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333(d), and 18 U.S.C. § 2338 as a civil action brought by citizens of the United States who have been injured by reason of acts of international terrorism committed by ISIS.

64.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and (d) and 18 U.S.C. § 2334(a).

65.      Lafarge, Lafarge Cyprus, and LCS are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and N.Y. C.P.L.R. § 302.  In the alternative, if the Court concludes that

Defendants are not subject to jurisdiction in any state's courts of general jurisdiction, Lafarge, Lafarge Cyprus, and LCS are subject to personal jurisdiction under Fed. R. Civ. P. 4(k). Jurisdiction under these provisions is appropriate based on the below.

66.     Defendants' conspiracy with ISIS and its intermediaries had a substantial nexus to the United States and to New York, including by virtue of Defendants' and their agents' deliberate, repeated, and systematic use of U.S. dollar transactions and banks in New York to pay, conspire with, and aid and abet terrorists, including via intermediaries.  Defendants' "preferred option" for paying terrorists was to make "bank transfer[s] in USD," because, among other things, it helped avoid detection by Lafarge's auditors and governmental entities.[39]

67.     Specifically, Defendants directed their banks to complete U.S. dollar-denominated wire transfers to support their scheme to fund ISIS, because Defendants' officials knew those directions required the use of New York banks.   Defendants' wire instructions caused their payments to clear in New York, including through one admitted suit-related transaction in this District.[40]  Defendants' executives regularly received specific transaction confirmations alerting them to the particular U.S. correspondent and intermediary banks that routed their transactions. On information and belief, as part of the process of approving these transactions, Defendants regularly requested and received confirmations from their banks notifying them of the New York banks involved in clearing their transfers.  *See infra* Part VII(a).

68.     By routinely, purposefully, and knowingly conducting transactions in U.S. dollar-denominated transactions processed through New York, Defendants purposefully availed

---

[39] SOF ¶ 60.
[40] SOF ¶ 103.

themselves of the benefit of doing business in the United States generally and New York specifically, and thus are subject to personal jurisdiction.

69.     As Defendants knew, their aiding and abetting of and conspiracy with ISIS and its intermediaries enabled ISIS to commit acts of international terrorism, including acts that injured and killed members of the Yazidi community.  Such acts also expanded ISIS's power and territorial control, benefitting Defendants.

70.     In addition, as described further below, Defendants conspired with ISIS and its intermediaries to provide material support to ISIS, a designated terrorist organization, knowing that ISIS would use Defendants' material support to commit acts of violence that would endanger human life and would intimidate or coerce a civilian population, in violation of 18 U.S.C. 2333(a).

71.     In furtherance of the conspiracy, Defendants purposefully made numerous payments to ISIS in U.S. dollars that were wired through New York.  This was done at Lafarge's instruction and with its knowledge, in reliance on the U.S. financial system for efficiency, security, and secrecy.

72.     For example, Lafarge has admitted to making a lump sum wire transfer of $210,000 from its operating account at a financial institution in Paris to intermediary banks in New York City through this District.[41]  The contract pursuant to which that payment was made, and additional agreements made in the course of the conspiracy, required Defendants to make ongoing payments after October 2014.[42]  On information and belief, Defendants did so.

73.     Also in furtherance of the conspiracy, Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate

---

[41] SOF ¶ 103.
[42] SOF ¶ 100.

email addresses, to coordinate and carry out elements of their partnership with ISIS.[43]  U.S.-based email service providers enabled Defendants to conceal their illegal conduct from French auditors and authorities.

74.     Further, Defendants are subject to personal jurisdiction given their participation in a scheme and conspiracy with ISIS and its intermediaries that was directed at the United States. *See infra* Part VII(c).  Lafarge bought protection from and entered a complex conspiracy with ISIS, with the awareness that it was a terrorist group that targeted the United States and American citizens.  As a result of the conspiracy between Defendants and ISIS, ISIS's overt acts targeting the Yazidi community, the international community, the United States, and Plaintiffs are attributable to Defendants.

75.     In 2022, the DOJ brought criminal charges against Lafarge under 18 U.S.C. § 2339B, which prohibits persons from knowingly providing material support or resources to a foreign terrorist organization, and from attempting or conspiring to do so.  Based on conduct that occurred "within the Eastern District of New York and the extraterritorial jurisdiction of the United States," the DOJ charged Lafarge and LCS with conspiring to provide material support to terrorists.[44]  The DOJ further charged that "the defendants were brought into and found in the United States, the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce, and the defendants conspired with a national of the United States."[45]  Based on these contacts with the United States, Lafarge and LCS "admit[ted]

---

[43] SOF ¶ 18.
[44] *United States v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 4 ¶ 1.
[45] *Id.* at ECF No. 10 ¶ 3.

the Court's jurisdiction over the Defendants and the subject matter of" that criminal case.[46]  And the same conclusion follows in this civil suit.

## FACTUAL ALLEGATIONS

## I.  ISIS BECOMES THE WORLD'S MOST RUTHLESS TERRORIST GROUP

76.     In March 2011, after anti-government protests associated with the Arab Spring had spread across the region, Syrian police detained and tortured protestors.  As mass protests erupted across the country, armed militias arose with the goal of overthrowing the Syrian government. Syria quickly descended into a full-scale civil war.

77.     In August 2011, seeing an opportunity among the numerous armed factions battling in Syria, Al-Qaeda in Iraq ("AQI") and Islamic State of Iraq ("ISI") leader Abu Bakr Al-Baghdadi sent AQI operative Abu Muhammad Al-Julani into northeast Syria to organize the network of militant jihadist cells in Syria into one cohesive group.  Al-Julani's Al-Qaeda sub-group in Syria, ANF, wasted no time spreading terror throughout the region.  Its first operation was a massive suicide bombing in Damascus, which killed over forty people in December 2011.

78.     On December 11, 2012, the United States amended the FTO and Executive Order 13224 designations for Al-Qaeda to include ANF, under the following new aliases: Al-Nusrah Front; Jabhat Al-Nusrah; Jabhet Al-Nusra; The Victory Front; and Al Nusrah Front for the People of the Levant.  In its accompanying press release, the Department of State warned that ANF "has sought to portray itself as part of the legitimate Syrian opposition while it is, in fact, an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes."[47]  To date, ANF remains a designated FTO.

---

[46] *Id.* at ECF No. 4 10-2 ¶ 4.
[47] Press Release, U.S. Dep't of State, *Terrorist Designations of the al-Nusrah Front as an Alias for al-Qa'ida in Iraq* (Dec. 12, 2012), https://2009-2017.state.gov/r/pa/prs/ps/2012/12/201759.htm.

79.     The following April, threatened by ANF's and Al-Julani's increasing power, Al-Baghdadi (the Al-Qaeda leader who had originally sent Al-Julani to Syria) declared the formation of Al-Dawlah Al-Islamiyah fi Al-'Iraq wa Al-Sham (The Islamic State of Iraq and Syria, "ISIS"). Al-Baghdadi declared that, under his leadership, ISI and ANF would merge into a single Sunni Islamist organization, ISIS. ISIS's stated goal was to seize control first of Iraq and Syria and then beyond, to form a unified religious state across national boundaries, a "caliphate." ISIS sought to violently impose its religious beliefs on all those who opposed them.

80.     ANF's head, Al-Julani, objected to Al-Baghdadi's declaration, and publicly pledged allegiance to Al-Qaeda leadership. ANF and ISIS then quickly became rivals in the jihadist community, competing for international legitimacy and Syrian and Iraqi territory. Through brute force, ISIS took the upper hand and seized Raqqa and other cities and villages across Syria and Iraq starting in January 2014. ISIS was more successful than ANF, in part because of its extreme brutality and global ambition, but also because of its greater resources, including money, weapons, and fighters. ANF leaders began defecting to ISIS.

81.     Unlike most of the other militant groups fighting in Syria in opposition to the Syrian government, ISIS did not target Syria alone. Its goal, as Defendants knew, was the construction of a self-described "caliphate" or empire. The U.S. government and others categorically rejected any suggestion that ISIS, despite its name, was a "state," that it had any legitimate governmental function, or that it did anything other than propagate terrorist violence. ISIS maintained and expanded its control over civilian populations using violence and fear, rather than legitimate governance. It solidified its control by entering into criminal conspiracies like the one it had with Defendants, and by attacking foreign powers, including the United States. Its acts of mass

terrorism violated international law, including the laws of war, and included kidnapping, human trafficking, rape, and murder.

82.     Many of ISIS's acts were intended to intimidate and silence its opponents.  Its fighters patrolled the streets with weapons and suicide vests.  To sow fear among the local populations, ISIS shot opponents from behind (including children), beheaded them, lit them on fire, and hung them in public squares, as early as 2013.

83.     ISIS also kidnapped and murdered journalists and aid workers from countries around the globe from 2013.  As described further below, their victims were frequently beheaded, sometimes on videos broadcasted online for the world to watch.

84.     According to the U.N. Human Rights Council, ISIS "made calculated use of public brutality and indoctrination to ensure the submission of communities under its control."  Its aim was "to subjugate civilians under its control and dominate every aspect of their lives through terror . . . ."

85.     Thousands of foreign fighters, including Americans convicted in this District,[48] flocked to join ISIS's ranks.  The assurance of marriage and the proffer of sexual slaves was one of the perks ISIS offered foreign enlistees, in addition to a paycheck.  Over 40,000 foreign fighters interested in ISIS's extreme jihadist ideology ultimately joined the group in Iraq and Syria.

86.     Lafarge was aware that foreign fighters and defectors from other terrorist groups were increasing ISIS's ranks.  Its security consultant concluded that the group's membership came at first from Iraqi fighters and ANF defectors, but that as time went on, "jihadi tourists" (as he

---

[48] Press Release, U.S. Attorney's Office for the Eastern District of New York, *High Level Members of ISIS Sentenced to Life in Prison for Material Support to a Foreign Terrorist Organization Resulting in Death* (July 14, 2023), https://www.justice.gov/usao-edny/pr/high-level-member-isis-sentenced-life-prison-material-support-foreign-terrorist.

called them) came to Syria and Iraq to join the group and commit terrorist attacks.  But this did not deter Defendants from entering into a multi-million-dollar deal with its operatives.

87.     To grow as quickly as it did from a small armed group in 2013 to an international terrorist organization with swaths of territory in 2014, ISIS needed money—and a lot of it.  ISIS robbed the resources under its control, including by looting banks, pumping oil and gas to sell on the black market, taxing 'un-Islamic' behavior according to its corrupt codes, and selling humans as sexual slaves.

88.     Capturing cement plants was also an essential part of ISIS's growth plan.  Cement plants were a particularly appealing target for a number of reasons, including that they generated significant revenue from which ISIS could pilfer; they produced the much-needed material to fortify ISIS's tunnels and bunkers; and they contained raw materials that ISIS could use to create explosives.  Between its territory in Syria and Iraq, ISIS ultimately seized five cement plants, which could produce a total of $583 million in annual revenue.  But even before ISIS overran Lafarge's Cement Plant and seized all the materials LCS left behind, Defendants and ISIS had become close partners, pursuing common objectives and generating tens of millions of dollars in profit.[49]

## II.     ISIS COMMITS GENOCIDE AGAINST THE YAZIDIS

89.     On August 3, 2014, ISIS launched a coordinated attack against the Yazidis in Sinjar, Iraq, and began a campaign of violence against this community and other minorities.  Just a few days after the invasion, the U.N. Security Council condemned ISIS's "systematic persecution of individuals from minority populations," recalling that "widespread or systematic attacks directed against any civilian populations because of their ethnic background, religion or belief may

---

[49] It is unclear from the face of the email to what currency the sender is referring.

constitute a crime against humanity." President Obama warned that the well-publicized expulsion and entrapment of Yazidis on Sinjar Mountain could constitute an "act of genocide."

90. ISIS's attack came to be recognized as constituting not only war crimes and crimes against humanity but also genocide, both in the United States and internationally.

91. Genocide is a violation of U.S. law, including 18 U.S.C. § 1091, which makes it illegal to kill or injure a national, ethnic, racial, or religious group. And both U.S. government officials and elected representatives have concluded that ISIS committed this crime against Yazidi victims. On March 17, 2016, Secretary of State John Kerry announced that ISIS had killed Yazidis civilians and enslaved thousands of women and girls, "selling them at auction, raping them at will and destroying the communities in which they had lived for countless generations." He concluded that "[ISIS] is responsible for genocide against groups in areas under its control, including Yazidis"—the first declaration of genocide the U.S. had made in over a decade (since Darfur in 2004). Similarly, both the U.S. Senate and the House of Representatives passed unanimous resolutions finding that "atrocities perpetrated by the Islamic State . . . against religious and ethnic minorities in Iraq and Syria include war crimes, crimes against humanity, and genocide" including of Yazidis.

92. Similarly, a U.N. report concluded in 2016 that ISIS "committed the crime of genocide as well as multiple crimes against humanity and war crimes against the Yazidis," dragging thousands into captivity in Syria, including women and girls as sex slaves and boys as child soldiers, "where they are subjected to almost unimaginable horrors."

93. In 2017 the U.N. Security Council established the U.N. Investigative Team to Promote Accountability for Crimes Committed by Da'esh/ISIL ("UNITAD") to collect evidence of acts that might amount to war crimes, crimes against humanity, and genocide in order to

"creat[e] criminal dossiers for use before national courts."  UNITAD focused on crimes against Yazidis and gathered and analyzed testimonial accounts from thousands of witnesses and victims. It also analyzed digital evidence extracted from captured ISIS devices including facial recognition analysis of photographs and videos; analysis of immigration and medical records, payment logs, and fighter rosters; and forensic analysis of evidence extracted from mass graves.

94.     UNITAD's on-the-ground investigation was led by the incumbent prosecutor of the International Criminal Court, British lawyer Karim Khan KC, and took close to three years to complete.  In May 2021, this U.N. body concluded that there is "clear and convincing evidence that genocide was committed by ISIL against the Yazidi as a religious group" and that "the intent of ISIL to destroy the Yazidi, physically and biologically, is manifest in its ultimatum—applied remorselessly to all members of their community—to convert or die."  UNITAD established that in 2014 "[t]housands were killed pursuant to this ultimatum, either executed en masse, shot as they fled, or dying from exposure on Mount Sinjar" in 2014.  And it has confirmed that "thousands more were enslaved, with women and children abducted from their families and subjected to the most brutal abuses, including serial rape and other forms of unendurable sexual violence" with the intent to "permanently destroy the capacity of [Yazidi] women . . . to have children and build families within the Yazidi community."  Furthermore, UNITAD established that "numerous other international crimes were also committed against the Yazidi community, including extermination, enslavement, sexual violence, forcible transfer, persecution on religious and gender grounds, and conscription of children into an armed group."

95.     Prosecutions of ISIS members in national courts, including in Germany's highest court, have also led to convictions of ISIS members of genocide against Yazidi victims, as well as crimes against humanity, war crimes, murder, and other offenses.

96.     The German Federal Court of Justice, Germany's highest court, has confirmed that the crimes constituted not only terrorism, war crimes, and crimes against humanity but also genocide.  German courts convicted three ISIS members of genocide for their crimes against the Yazidis, finding that "[i]n order to achieve the complete destruction of the Yazidi religion and its members, ISIS fighters intentionally and systematically carried out a centrally planned, organized, and coordinated military attack against the members of the group [in] Sinjar."[50]  German courts have also convicted five other ISIS members of terrorism offenses, crimes against humanity, and war crimes for their involvement in ISIS's crimes against the Yazidis.

97.     In France, where criminal proceedings against Lafarge and its executives are pending, the French Supreme Court cleared the way for a criminal trial against Lafarge for complicity in crimes against humanity and financing of terrorism committed by ISIS and other armed groups in Syria.  In a decision rendered in September 2021, the Criminal Chamber of the Supreme Court held that there was sufficient "serious and corroborating evidence," including minutes of Lafarge's weekly meetings, showing that Lafarge had provided support to ISIS while having "precise knowledge" of the criminal nature of the terrorist group's activities which were "likely to constitute crimes against humanity."[51]  The Supreme Court also found that "knowingly paying several million dollars to an organisation whose purpose was exclusively criminal suffices

---

[50] Judgment of the Higher Regional Court (Oberlandesgericht) of Frankfurt am Main, Genocide to the detriment of the Yazidi religious group ¶ 62 (5th Criminal Chamber Nov. 30, 2021), https://www.eurojust.europa.eu/document/higher-regional-court-frankfurt-am-main-germany-30-november-2021-case-number-5-3-ste-120-4.

[51] Judgment of the Court of Cassation, Criminal Chamber, Appeal No. 19-87.367 (Sept. 7, 2021), https://www.courdecassation.fr/decision/6137092ff585960512dfe635?search_api_fulltext=lafarge&sort=&items_per_page=&judilibre_chambre=&judilibre_type=&judilibre_matiere=&judilibre_publication=&judilibre_solution=&op=&date_du=&date_au=.

to constitute complicity" in the crimes committed by the criminal organization, regardless of whether the accomplice was pursuing a commercial activity.[52]

98.     The Paris Court of Appeal—to which the case was then remanded—followed the Supreme Court's assessment and in May 2022 confirmed the charges of complicity in crimes against humanity and other crimes against Lafarge.  In its analysis, the Court highlighted that ISIS had committed crimes against humanity in Syria, including that it "has denied the right of the Yazidi to exist and justified their destruction according to a concerted plan."[53]  The Court of Appeal concluded that Lafarge not only bought raw materials from ISIS but also cited an internal investigation performed by LafargeHolcim that found that Lafarge had made payments amounting to $15.5 million to local armed groups, including ISIS.[54]  The Court found that "although informed that the actions of ISIS could constitute crimes against humanity, Lafarge, which could have put an end to the activities of LCS by asking it to close the plant, decided instead to continue this activity . . . even if it meant paying several million dollars to its groups."[55]  As such, the Court of Appeal concluded that "there is serious and corroborating evidence of [Lafarge's] participation as an accomplice in these crimes against humanity" because by financing ISIS, the company had knowingly assisted and facilitated the group's crimes.[56]

### a.  Yazidis Are An Ethnic And Religious Minority In Northern Iraq

99.     Yazidis are an ancient ethnic and religious minority group that is principally Kurdish-speaking, and neither Muslim nor Christian.  Before 2014, the Yazidis primarily lived in

---

[52] *Id.*

[53] Amal Clooney, *Paris Court of Appeals Confirms Charges Against French Multinational Lafarge for Complicity in Crimes Against Humanity Committed by ISIS,* Doughty Street Chambers (May 23, 2022), https://www.doughtystreet.co.uk/news/paris-court-appeal-confirms-charges-against-french-multinational-lafarge-complicity-crimes.

[54] *Id.*

[55] *Id*.

[56] *Id.*

Sinjar, an area consisting of around 50 villages around the base of Sinjar Mountain, in the border region of northwestern Iraq and northeastern Syria.  An estimated half a million Yazidi people lived in this region and many made a living by farming or shepherding sheep and goats.  Yazidi families are typically large and tight knit.  Families lived in the same house even as their children grew up and started families of their own.  Extended families usually lived on the same street and often in joint compounds, sharing meals, resources, and income.

100.    Yazidis are part of a small religious group.  Its followers believe in one God whose power on Earth is delegated to seven angels.  The seven angels are led by Malek Taūs, an angel who fell to earth and transformed into a peacock, and who serves as the intermediary between God and the Yazidis.  Many Yazidis decorate their homes, shrines, and graves with images of peacocks and other memorials of important religious figures.

101.    ISIS's theological authorities studied the Yazidis and how they should be treated under ISIS's ideology, and decided Yazidis were "*mushrik*," *i.e.*, pagan or polytheist, judged not to believe in God as worshipped by "*Ahl Al-Kitab*," or the People of the Book.  As a consequence, unlike Jews and Christians, Yazidis were not given the choice to convert or pay a tax and leave when ISIS invaded, but instead were killed or enslaved.

102.    ISIS's official English-language magazine, *Dabiq*, called the Yazidis "devil worshippers" because:

> [t]he Yazidis['] present-day creed . . . entails the worship of Iblīs who they consider to be a fallen but forgiven angel amongst the angels who were ordered to prostrate to Ādam! He alone refused to prostrate to Ādam, and they consider this arrogant disobedience of Allah to be his noblest deed! . . . So they have made Iblīs who is the biggest tāghūt— the symbolic head of enlightenment and piety! What arrogant kufr can be greater than this? . . . It is ultimately ironic that Obama sites [sic] these devil worshippers as the main cause for his intervention in Iraq and Sham. . . .

34

ISIS singled out the Yazidis as the group they wished to destroy, openly proclaiming in their official documents that "Muslims should question [their existence] as they will be asked about it on Judgment Day."

**b. ISIS Invades Sinjar**

103.    The Yazidi summer festival of *Çileya Havînê* falls on August 2 annually.  It marks the fortieth day of summer.  Observant men fast for forty days before the holiday, and worshippers visit Lalesh Temple in Sheikhan, near Sinjar, and dozens of temples in Sinjar to worship and celebrate.  Families and friends visit, bringing cookies and candy, and drink coffee and tea together.  The mid-day meal is followed by a party with drinks or a barbecue on Sinjar Mountain.

104.    This festive scene turned into a nightmare in the early hours of August 3, 2014.  At 2:30 in the morning, ISIS fighters advanced towards Sinjar.  They came in armored jeeps and in the back of pickup trucks, carrying automatic weapons, pistols, and knives.  As they arrived, Yazidi families' cell phones began ringing in quick succession.  Family and friends warned each other that ISIS was coming.  As civilians with no one to protect them, they had only one option: try to escape.  They began to frantically coordinate who had a car with empty seats or a trunk.

105.    Desperate to escape, grandparents, aunts, uncles, and cousins piled into small vehicles, on top of one another, on laps, wedged into the trunk, or hanging from the roof.  Trucks were crammed full of dozens of people, and families were separated as they rushed to escape.  When someone fell off an overcrowded vehicle as ISIS members were chasing, drivers had to make the impossible decision of risking everyone's lives by stopping to help or leaving that person behind.  Those who could not fit in a car ran on foot.  With ISIS coming from the east and the west, there were few options for how to get out and where to go.  ISIS fighters quickly went door-to-door looking for people who were hiding and set up checkpoints to prevent stragglers from escaping.  Elders typically lived with their sons and daughters, but if there was no one strong

enough to carry them, they had to be left behind.  Countless elderly, sick, and disabled Yazidis who had to be left behind have never been found.

### c.  ISIS Executes Men And The Elderly And Captures Children

106.    ISIS rounded up entire families and villages.  ISIS members separated men and boys of fighting age from women, girls, and children.  Men were given two options: convert or die.  Those who refused to convert were shot, their corpses left to rot or thrown in mass graves. Men were often killed in front of their families, or families had to watch as the men were marched off in groups for mass executions.  Survivors describe hearing the gunshots from these massacres.

107.    Boys over the age of 10 or who had reached puberty were deemed too difficult to indoctrinate and were also executed.  Witnesses describe seeing ISIS members inspect the boys' armpits; if they had hair, they were deemed mature enough to be executed with the men.

108.    Over half of all the Yazidis who were executed were in fact children.  The young boys who were kidnapped were forced to train as child soldiers in camps for ISIS's "Cubs of the Caliphate."  They were indoctrinated by ISIS, taught that Yazidism was evil, given Islamic names, and were forced to study Islam and to speak Arabic so that they would forget their mother tongue, religion, and culture.[57]  They were taught about ISIS's so-called "jihad" and the importance of joining ISIS's fight against non-believers, including their own community.  Many boys were subject to physical beatings as part of their training and were forced to watch ISIS propaganda videos of armed battles, beheadings, and suicide missions.  Some were forced into violence against their brothers, or others.  And they were ultimately sent to fight for ISIS on the front lines, where they were used as human shields.  Many are still missing today.

---

[57] Yazidis' native language is Kurmanji.

109.     Sinjar was under siege for almost two weeks, until August 15, 2014.  In Kocho, one of the Yazidi villages, ISIS forced the surviving residents at gunpoint to gather at the local school. Women, girls, and younger boys were held on the upper floor of the two-story building, while men and older boys were confined on the ground floor.  ISIS stripped them of their phones, car keys, money, and any other valuables.  ISIS forced over 400 men and older boys who refused to convert to Islam onto pickup trucks and drove them to various points around the village where a bulldozer had dug holes in the ground.  They shot them all and threw them into mass graves.  Older women were taken to another location, where they were also shot and buried.  Eighteen mass graves have been found in Kocho so far, and over eighty in all of Sinjar.

110.     What happened to plaintiff Ismael Maajo's family is typical of the Yazidi experience.  He was in Turkey during the midsummer holiday when ISIS came to Sinjar, where he and his family lived.  He learned over the phone that his parents and siblings had fled to his uncle's house, where neighbors convinced the family to stay and put a white flag over their door for safety. An hour later, ISIS arrived.  But the white flag did not keep them safe.  The men in the home—Ismael's father, three of his brothers, his half-brother, and a nephew—were lined up outside the home and shot.  One of his brothers survived the shooting and hid under the bodies of his family. He crawled out and escaped to the mountains during the night.  ISIS shoved the others into a makeshift shallow grave.  In total, thirty-two members of Ismael's family were kidnapped.  Nine are still missing, including his mother and siblings.  Ismael himself left Turkey and met the remaining members of his extended family who were able to escape from ISIS to Sinjar Mountain, and from there to Dohuk in Kurdistan, where they lived in an abandoned house.

   **d.  ISIS Enslaves Yazidi Women And Children**

111.     ISIS captured Yazidi young women and girls and made them available to its fighters and members for sexual abuse at a scale unlike anything witnessed in modern times.  Unmarried

women and girls as young as nine were taken to processing centers, where they were registered

and photographed.  ISIS fighters examined the girls, sometimes asking them to show their bodies

and teeth, examining, touching, and commenting on them and then selecting the ones they wished

to purchase as slaves.

112.    Many Yazidi women and girls were sold in "*souk sabaya*," (slave markets), which

were organized and operated by a central Committee for Buying and Selling of Slaves, while others

were sold on online messaging applications such as Telegram.  The price for a Yazidi woman or

girl started at U.S. $200 and depended on factors such as virginity, age, and perceived beauty.

113.    The trade in girls as slaves was highly regulated.  Many of the women were brought

from Iraq to Syria, specifically Raqqa, near the Cement Plant.  There were two now-infamous

holding sites in Raqqa.  One was a building referred to as "the farm" by ISIS members, where

women were separated from one another and auctioned off to fighters.  The other was an

underground prison or security base composed of three fly-infested rooms with overflowing toilets

where hundreds of other women and children were crammed in.  Survivors were directly taken

from buses to underground rooms.  Some survivors describe that the prison was still under

construction, with several floors unfinished; some saw ISIS members bring cement and blocks.

The rooms were too crowded to lie down.  They were given two "meals" per day—one slice of

bread and a ration of cheese to share between two people for breakfast, and plain rice for dinner.

Water was dirty and scarce and sometimes mixed with gasoline.  Some Yazidi survivors described

sometimes feeling dizzy after ingesting food or water and believed ISIS members were drugging

them.

114.    Shortly after the attack on Sinjar, many slaves were first sold directly out of these

group holding sites, where ISIS fighters were able to select and take individuals either because of

their seniority, as a reward for their work, as a substitute for their salary, or in exchange for payment.  Some slaves were also sold through physical slave markets and others via online auctions.  Later, Yazidi women were also sold or exchanged privately.  Raqqa soon became the center of a "thriving trade" in Yazidi women and girls, who were raped, beaten, and moved, often at regular intervals due to changes of "ownership."[58]

115.    Once a Yazidi woman or girl was purchased, the purchasing ISIS member could resell, gift, or will her to other ISIS members.  While in captivity, ISIS members subjected Yazidi women and girls to beatings, verbal abuse, and forced domestic labor, and made them perform Islamic prayers, memorize and recite the Quran, and fast during Ramadan.  ISIS fighters raped the women regularly, sometimes in groups, knowing that for Yazidis sexual intercourse with a non-Yazidi meant expulsion from their religious community.  They denied victims access to adequate food and medicine.  They met victims' attempts to resist with the threat or perpetration of gang rape and beatings.  Some women were forced to bear their rapists' children and were then sold, gifted, or bequeathed to other members of the caliphate.  Many wives of ISIS fighters were also active torturers, forcing Yazidi girls to wear Islamic clothing, pray, do housework, and put makeup on in preparation for rape by their husband or other ISIS fighters who came to their home.

116.    Plaintiff and Nobel Peace Prize Laureate Nadia Murad[59] was 21 years old when ISIS attacked her village, Kocho, on August 3, 2014.  ISIS separated men and boys from women.

---

[58] "The slaves were first sold directly out of the group accommodation, where IS fighters were able to select and take individuals either because of their prominent role, as an award for 'outstanding performance', as a substitute for their salary or in exchange for payment, or through central slave markets and sometimes via online auctions. Later on, Yazidi women were also sold privately . . . A thriving trade in Yazidi women and girls developed in Raqqa. in particular, even shortly after the attack on the Sinjar region.  Rapes, beatings and frequent changes in location within a short period of time due to the change of ownership were commonplace." Judgment of the Higher Regional Court (Oberlandesgericht) of Frankfurt am Main, Genocide to the detriment of the Yazidi religious group ¶ 62 (5th Criminal Chamber Nov. 30, 2021), https://www.eurojust.europa.eu/document/higher-regional-court-frankfurt-am-main-germany-30-november-2021-case-number-5-3-ste-120-4.
[59] Official name Nadia Taha.

The men, including six of Nadia's brothers and eleven of her cousins, were marched away and executed.  Nadia's mother was killed and thrown into a mass grave.  Two of Nadia's young nephews were taken to Tal Afar for military training.  The younger women and girls—including Nadia and her sisters, nieces, and sisters-in-law—were kidnapped.

117.    They were loaded into buses and taken to ISIS's headquarters in Mosul where Nadia was held with hundreds of other Yazidis, beaten, spat on, and burned with cigarettes.  ISIS militants would come to inspect them and take the girls they liked.  An ISIS leader took Nadia and 60 other girls—some as young as ten—to a nearby location where they were offered to other ISIS militants.  The jihadist who took Nadia began to physically abuse and rape her daily, and forced her to wear a face covering and perform Islamic prayers.  As a punishment after a failed attempt to escape, Nadia was hit with a leather whip and raped by six soldiers for hours until she fainted.  Nadia was then taken to several different locations where she was again sexually abused—ultimately by twelve different ISIS men.  She ultimately escaped when her new "owner" left a door unlocked and she ran away one evening, eventually able—with the help of strangers—to cross the border to safety.  UNITAD exhumed the remains of Nadia's mother and identified two of her brothers along with other victims of the Kocho massacre.  Nadia has since been able to bury her two brothers.  Four of Nadia's sisters and eleven of her sisters-in-law were able to escape from ISIS.  But one sister-in-law, one of her nieces, and one nephew remain missing.

118.    The systematic enslavement and sexual abuse of Yazidi women and girls was intended to destroy the group, including by limiting the capacity of women to procreate within the group.  Yazidi women and girls were also told that they could not return to their communities after having lost their "honor," and that their situation in captivity was better than the rejection and certain death they would face from their families.

119.    As early as August 12, 2014, there was widespread general knowledge that ISIS's brutality included kidnapping and selling women into sexual slavery.  For example, the U.N. Special Rapporteur on violence against women, Rashida Manjoo, announced on August 12 that ISIS was assigning or selling women to ISIS as slaves, which she called a crime against humanity. An Iraqi government minister said the country had "striking evidence" of ISIS's crimes including that hundreds of women were being killed and sold.  The U.N. Special Representative of the Secretary-General on Sexual Violence in Conflict, Zainab Hawa Bangura, and the Special Representative of the Secretary-General for Iraq, Nickoly Mladenov, issued a joint statement on August 13 condemning the "atrocious accounts of abduction and detention of Yazidis" and describing "reports of savage rapes [that] are reaching us in an alarming manner."

120.    Over 6,000 Yazidi women and girls were ultimately captured by ISIS, the majority of whom were children.  More than 2,700 are still missing today.

**e.   ISIS Publicized Its Genocidal Views That The Yazidis Must Be Destroyed**

121.    ISIS made no secret of its belief that Yazidis were to be eradicated.  To the contrary, it published a series of official documents describing its intention to terrorize the Yazidi population and target them for murder, sexual slavery, and genocide.

122.    ISIS viewed the destruction of Yazidis as a religious imperative.  Articles published in ISIS's English-language publication, *Dabiq*, preached to "kill the *mushrikin* [polytheists] wherever you find them, and capture them, and besiege them."  ISIS preached the hateful concept that Muslims had to question the continued existence of Yazidis as an ethnic group and religion because they would have to answer for it on Judgment Day.  The killing of Yazidi men was deemed a religious obligation of ISIS members.  Of the religious minorities ISIS terrorized, ISIS gave its followers specific permission only to systematically enslave and rape Yazidi women.  Kayla

Mueller was an exception because she was American—and as a result she was brutalized by the leader of ISIS himself, Abu Bakr Al-Baghdadi.

123. In an article entitled "The Revival of Slavery before the Hour," published in October 2014 in ISIS's magazine *Dabiq*, ISIS differentiated the Yazidis from other non-Muslims, stating that:

> Prior to the taking of Sinjar, [religious] students in the Islamic State were tasked to research the Yazidis . . . Unlike the Jews and Christians, there was no room for [taxes for non-Muslims] payment. Also, their women could be enslaved unlike female apostates who . . . can only be given an ultimatum to repent or face the sword.

124. ISIS's publicly declared ideology not only expressly permitted sexual abuse of Yazidi women and girls, but explicitly encouraged and regulated it. In 2015, ISIS's Research and Fatwa Committee distributed a 15-page pamphlet entitled "From the Creator's Maxims on Captivity and Slavery," which analyzed the religious justification for enslaving infidels in accordance with ISIS's interpretation of Islam and explicitly excluded Christian and Jews. The pamphlet stated that "[t]here is no doubt that the captivity and enslavement of the women of the disbelievers at war and their offspring are among the greatest forms of the honour of Islam and its *Shari'a*" and praised the captivity and enslavement as means of increasing the offspring of the Muslims as "slave girls may give birth." Another publication from the Research and Fatwa Committee, titled "Questions and Answers on Taking Captives," provided guidance to ISIS slave-owners. The pamphlet stated that it is permissible to take a female captive and have forced intercourse with her. It allowed the physical punishment of female captives as a "form of discipline," stated that a girl can be raped before she has reached puberty, and permitted the swapping or selling of girls on the basis that they are merely "property."

125.    It was this warped view that Yazidis were lesser humans that could and should be killed, bought, sold, and abused that spurred ISIS to unleash unimaginable brutality on the community in early August 2014.

**f.   Some Yazidis Escape To Kurdistan**

126.    When ISIS invaded Sinjar on August 3, 2014, Yazidis who managed to survive ISIS's initial advance fled desperately to protect themselves and their loved ones.  Those who had enough warning raced ahead of the ISIS front towards Kurdistan, the northern region of Iraq.  The roads were packed with Yazidis trying to avoid ISIS's gunfire, checkpoints, and collaborators. Families rode in whichever vehicle had space for them, and when cars broke down from the weight of the bodies jammed inside, the younger men would get out to push.

127.    Kurdistan was ill-prepared for the influx of Yazidis, and the towns rapidly filled with hundreds of thousands of fleeing refugees.  Initially, many slept in half-constructed buildings that had partial walls and no roofs.  Entire families slept by the side of the road or piled together in school buildings that were empty for the summer.

128.    Plaintiffs Basima Kurtan and her husband Ahmad Mastto lived in a large town near Sinjar Mountain with their children.  Basima woke up early on August 3 and began preparing breakfast for the family, as she did every day.  She noticed that the roads were full of people shouting and running.  She called the neighbors to ask what was happening.  They told her that ISIS was there and that she had to leave immediately.  Basima and Ahmad, along with their four children and their extended family, piled into a car and began driving toward Sinjar Mountain to escape.  They had no time to gather any belongings.  A relative called and warned them not to go to the mountain, but to go to Kurdistan instead.  They turned the car around, into a firefight between Kurdish fighters and ISIS.  Basima and her daughter still have nightmares about escaping, remembering the bullets that whistled past the car.  With the help of an extra liter of gas stashed in

the car, the family made it to Kurdistan.  They slept in fields for two nights, until locals moved them to an unfinished building.  They stayed there for five months, until the entire family moved to a camp for internally displaced people, where they remained for almost two years.

### g. ISIS Traps Thousands Of Yazidis On Sinjar Mountain

129.    Many Yazidis, however, did not make it to Kurdistan.  Instead, they had only one option: drive or run to Sinjar Mountain, an arid area with daytime temperatures approaching 120 degrees Fahrenheit in the summer.

130.    As many as 50,000 Yazidis scrambled up the mountain to escape.  ISIS chased them as they fled, snipers shooting everyone they could reach.  Some survived, but many were killed on the way up or once they got there, with their bodies left on the road.  ISIS killed the men they caught and captured women and children.  Some who could not run fast enough flung themselves off the mountain ledges, and some women took their own lives, preferring to die than to be captured.  One of Plaintiff Laila Khoudeida's cousins died by suicide by setting herself on fire while on Sinjar Mountain.

131.    The Yazidis were trapped on the mountain with ISIS completely surrounding them for approximately one week, though some were forced to stay longer.  They had no food and no water.  The days were extremely hot, and the nights freezing cold.  Babies died first of dehydration.  Grandparents who had been carried up the mountain fell ill or died as the extreme temperatures continued.  Some pregnant women lost their babies and struggled to keep themselves alive.  Plaintiffs Darweesh Qasim and Kori Omar's two-month-old baby died on Sinjar Mountain.  Many Yazidis who had been shot during the escape succumbed to their injuries.  Older children and adults ate grass and leaves from small shrubs.

132.    Plaintiff Khidhir Ido and his wife lived in Khana Sor, a large town near Sinjar, with their six-month-old baby girl.  On August 3, 2014, Khidhir and his wife were separated, as they

were celebrating Çileya Havînê with their respective families.  Suddenly, he started hearing word that ISIS was coming to Khana Sor.  He, his parents, and his siblings fled to Sinjar Mountain in his father's car.  Through the car window, Khidhir saw ISIS killing members of his village along the way.  His wife fled to the mountain separately with their baby daughter.  Two hours after Khidhir arrived on the mountain he called his wife, but was unable to reunite with her.  Through her tears, Khidhir's wife told him that there was no food, milk, or water for their child.  With nowhere to charge their phones and no service, Khidhir was not able to communicate with his wife for the rest of their time trapped on the mountain.  He believed that she and their daughter had been captured.  He spent those seven days without food, water, or shade, but thought only of his wife and baby.  He was finally able to connect with his wife after those seven days, when his wife found a phone to borrow.  Khidhir's wife told him that people had told her to abandon their baby, but she refused to let go of her until they reached Kurdistan.  Khidhir finally reunited with his family in Kurdistan, where he saw that his daughter had suffered severe burn marks from the heat of the mountain.  He took his daughter to a Kurdish hospital for treatment, but she still has scarring from these burns today.

**h.  The Yazidi Atrocity Garners Immediate International Attention**

133.    Images of this human tragedy were beamed around the world in real-time.  On August 3, 2014—the day ISIS invaded—Agence France Presse English reported that "the Yazidi minority faces a struggle for survival in Iraq" in the face of "Islamic State jihadists" taking over their territory.  The U.N. representative in Iraq declared a "humanitarian tragedy in Sinjar," noting that over 200,000 people had been forced to flee.

134.    That same day, the New York Times reported that "Sunni extremists" had captured three towns, including the town of Sinjar, and "set about their method of conquest, which is as familiar as it is brutal.  They destroyed a Shiite shrine, executed resisters, overran local security

forces and hoisted the black flag of the Islamic State in Iraq and Syria," demanding that residents "swear allegiance to ISIS or be killed."[60]  Newspapers reported kidnappings and executions of Yazidis in the following days.  ISIS itself posted pictures of its fighters patrolling Sinjar's streets on social media.

135.    Yazidis in the United States watched in horror as their villages were destroyed and their families fled for their lives.  Desperate for international support, they protested in their hometowns, including in Lincoln, Nebraska and Austin, Texas.  Some drove overnight to Washington, D.C., where they held a sit-in outside the White House.  They held meetings with President Obama's senior advisors and at the State Department, begging the United States to intervene to help save their community.

136.    On August 7, 2014, President Obama authorized aid drops of water and food for those trapped on the mountain.  That same day, U.S. aircrafts dropped 5,300 gallons of fresh water and 8,000 meals on the mountain.  President Obama also announced that he had authorized airstrikes against ISIS to try to prevent a "massacre."  American planes struck ISIS locations in nearby towns.  Even at this early stage, Obama called the Yazidis' expulsion and entrapment on the mountain a "potential act of genocide."

137.    By August 14, 2014, American airstrikes had cleared enough of a path on the mountain that many Yazidis were able to escape, guided by the local Kurdish militias.  Those who survived walked or hitched rides across the Syrian border and traveled to Kurdistan, finding partially constructed buildings, empty schools, or open fields to stay in.

---

[60] Tim Arango, *Sunni Extremists in Iraq Seize 3 Towns From Kurds and Threaten Major Dam*, N.Y. Times (Aug. 3, 2014), https://www.nytimes.com/2014/08/04/world/middleeast/iraq.html.

138.    This nightmare, which began on August 3, 2014, took place a year after Lafarge started to pay ISIS and ANF, according to Lafarge's own admission, and coincided with Lafarge's biggest deal yet with ISIS itself.

### i.    Yazidi Lives Remain Uprooted

139.    No Yazidi family was left untouched by the atrocities perpetrated by ISIS.  In August 2014—as Lafarge and ISIS finalized the terms of their revenue-sharing agreement—ISIS killed more than 5,000 Yazidis.  ISIS kidnapped over 6,000 others, with the women sold as sex slaves and the boys used as child soldiers.  According to available data, at least 2,700 remain missing.

140.    More than a dozen internally displaced person camps in Kurdistan currently house about 200,000 Yazidis, who have now been there for almost a decade.  Families—including many relatives of Plaintiffs—live in tents, and children born in the nine years since the genocide have known no home other than these tents.  Fires frequently break out due to the camp stoves used for cooking, causing more deaths.  Children languish without proper education opportunities.  Those who fled ISIS, including women who escaped ISIS captivity, continue to suffer from the psychological trauma of what happened to them and lack access to appropriate psychological care, making suicides an unfortunate reality.

141.    Yazidis stay in these internally displaced camps because, although almost a decade has passed since the genocide, they still cannot return home.  ISIS destroyed entire Yazidi villages and towns and demolished dozens of Yazidi temples and shrines.  Homes were destroyed by bombs, and farms and orchards were burned to the ground.  Expensive water pumps, necessary for farming, were carted off to turn into rocket launchers or to sell.  Stores were gutted.  Homes were looted of appliances and furniture, and the houses that were not bombed to the ground were

stripped of their doors and windows.  Yazidis, who typically keep their wealth in gold and money in their homes, lost everything.

142.    ISIS's attack on Sinjar had catastrophic consequences for the lives of thousands of Yazidis, and families will continue to feel those consequences for years and generations to come.

## III.    DEFENDANTS PARTNER WITH TERRORISTS

143.    Before, during, and after the time ISIS was carrying out these brutal attacks on the Yazidis, Defendants were paying and conspiring with ISIS.

144.    In 2007, Lafarge purchased the Cement Plant as part of a deal with Egyptian cement multinational Orascom Cement.  In 2010, Lafarge and LCS completed the construction of the Cement Plant at a cost of $680 million.  When the Cement Plant finally opened for business in May 2010, Lafarge's CEO Bruno Lafont toured the facility with reporters and the French Ambassador to Syria.  Shortly thereafter, the plant began producing 160 truckloads of cement a day, amounting to half a million dollars' worth of daily sales.

145.    At the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey.  To address this issue, in December 2010, Pescheux (LCS's CEO) requested that then-minority shareholder Tlass, a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail imports of competing Turkish cement.[61]

146.    Less than a year later, however, the Cement Plant faced a more existential threat: the civil protests in Syria had erupted into a full-fledged civil war.  In response to this crisis, in September 2011, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products from Syria and from engaging in financial or

---

[61] SOF ¶ 21.

insurance services for such transactions. The United States forbade import of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals. In December 2011, the U.N. Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

147.    As the civil war continued, ISIS and ANF gained control over large swaths of Syria and committed brutal terrorist acts. As expected, the danger of operating in an active warzone, combined with the actions of the European Union, the United Nations, and the United States, prompted a mass exodus of multinational corporations from Syria. For example, in December 2011, two of the largest oil companies in the world—Royal Dutch Shell and Total—announced that they were leaving Syria.[62]

148.    Defendants, by contrast, saw an opportunity in partnering with the terrorists. Even though armed conflict had spread to the area immediately surrounding the Cement Plant, at the specific direction of Lafarge and LCS's highest management levels, including the CEOs of both Lafarge and LCS, the companies doubled down on their $680 million investment. Instead of ending their operations in Syria, they joined forces with the terrorists around them, enabling the terrorists to maintain and expand their control.

149.    Pescheux (LCS's CEO) described the plan to Herrault (Lafarge's Executive Vice President of Operations) as follows:

> [p]reserving the integrity of our physical assets (avoiding the plant to be looted), keeping our personnel ready for the end of the crisis (knowing the huge investment we have made in terms of recruitment and competency development), staying in the market (to keep our distributors' network and to prevent to let Turkish imports flooding North and East of Syria), making some profit to at least repay the interests of the loan and giving some assurance to the lenders.[63]

---

[62] SOF ¶ 24.
[63] SOF ¶ 28.

150.    Lafarge and LCS have admitted that, starting in the summer of 2012, they forged ahead with their plan to make financial payments to various terrorist groups.

151.    On September 23, 2012, Veillard and Tlass met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the Cement Plant.  Tlass recommended that LCS make payments to each of the armed militias based on the quantity of cement produced or according to a monthly fee.[64]

152.    By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF, another Al-Qaeda offshoot, through Tlass.  On November 11, 2012, Tlass notified Pescheux that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we hav now conextion with jabhat al nosra [ANF]."[65]

153.    The situation became more critical in 2013.  By March 2013, armed groups had taken over the area around Raqqa and quickly established checkpoints at access roads to the Cement Plant.[66]

154.    On April 7, 2013, Tlass recommended that LCS executives negotiate a new agreement to pay terrorist groups monthly or by the truckload to ensure continued sales and access to the plant.[67]

155.    Several months later, on August 30, 2013, Pescheux reported to Veillard (Lafarge Vice President of Security) and Herrault: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Tlass] to work on it."[68]

---

[64] SOF ¶ 26.
[65] SOF ¶ 27.
[66] SOF ¶ 29.
[67] SOF ¶ 29.
[68] SOF ¶ 30.

156.    Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations.

157.    For example, in a December 10, 2012 email, Veillard wrote: "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited several Norwegian citizens to fight in Syria."[69]

158.    Similarly, in a March 1, 2013 email, LCS's risk manager warned Pescheux that ANF "follow[s] a global jihadi ideology (similar to al-Qaida)," "are more open to receive foreign fighters," and had "ties to al-Qaeda, exemplified by participating al-Qaida veterans" and the fact that "some of their statements are quickly published in the main al-Qaida news outlet."[70]

159.    Likewise, notes from a September 11, 2013 meeting of Lafarge's Security Committee, which Veillard and Herrault received, stated: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the U.S.  The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."[71]

160.    Despite this knowledge, Defendants decided to dispense with any limits and instead to conspire with the terrorists and facilitate their crimes.

## IV.    DEFENDANTS SUPPORT ISIS BY MAKING PAYMENTS AND SUPPLYING MATERIALS BEFORE, DURING, AND AFTER THE ATTACKS ON YAZIDIS

161.    Defendants proceeded to make millions of dollars in payments and provide key materials to ISIS, even as the group's terror campaign reached its peak.  Lafarge and LCS have admitted that they began making payments to ISIS's predecessor groups in July 2012, and

---

[69] SOF ¶ 27.
[70] SOF ¶ 27.
[71] SOF ¶ 31.

payments directly to ISIS itself when ISIS entered the territory near the Cement Plant in 2013.[72] Lafarge and LCS have admitted to providing almost $10 million of value in funds and cement to ISIS and ANF from August 2013 to October 2014, and of this at least $7.21 million was directly to ISIS and ISIS-controlled entities. *See supra* ¶¶ 4–5. But the actual amount of funding that Defendants gave to armed groups is believed to be at least $15.5 million,[73] even excluding the value of the cement Defendants left for ISIS.

162.     Lafarge provided support to ISIS primarily through six mechanisms:

(a) monthly fixed-rate payments;

(b) a flat fee payment per cement truck travelling back and forth from the Cement Plant;

(c) "bonus" payments based on the amount of cement sold;

(d) payments to ISIS-controlled suppliers for raw materials LCS used to make cement;

(e) benefits and payments based on a long-term revenue-sharing agreement; and

(f) selling and leaving behind cement and raw materials for ISIS to use in its operations.

These payments to ISIS violated 18 U.S.C. § 2339B, the United Kingdom Terrorism Act, § 15 (2000), European Union Council Framework Decision 2002/475/JHA (2002), and French Criminal Code Article 421-2-2 (2001).

### a.   LCS Makes Fixed Monthly "Donations" To Terrorists

163.     As early as July 2012, when armed groups started taking over territory around the Cement Plant, LCS began making fixed monthly payments or "donations" to armed groups to ensure that the plant could continue to operate.[74] By November 2013, Lafarge and LCS executives explicitly confirmed that these donations were being made directly to ISIS. Ultimately, according

---

[72] SOF ¶ 27.
[73] Clooney, *supra* note 53.
[74] SOF ¶¶ 37-38.

to Lafarge and LCS's plea, these payments exceeded $816,000 in monthly "donations" to ISIS and ANF.[75]  Of this, approximately $585,000 went directly to ISIS.  *See supra* ¶¶ 4–5.

164.    These monthly donations were facilitated by Tlass, who acted as an intermediary between Defendants and the various armed groups in the area, including ISIS.[76]  From July 2012, Tlass was receiving between $80,000 and $100,00 per month to distribute to these groups.

165.    By February 2013, at Pescheux's request, Tlass had begun periodically providing lists identifying the armed groups to which he was making payments on Defendants' behalf and the amounts he was paying to the groups each month.  For instance, Tlass advised Pescheux that he was making monthly payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," a reference to ANF.[77]  And the amounts kept increasing.[78]  In a July 2, 2013 email with the subject line "Donations," Pescheux calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds ($155,000 USD) per month.[79]

166.    In an August 5, 2013 email with the subject line "Update on donations," Pescheux wrote to Herrault about "some elements on the donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries.  As discussed in Dubai end of May and as reminded in my recent mail to you and [Roux], these donations are distinct from the monthly remuneration of our partner" Tlass.[80]

---

[75] SOF ¶ 44.
[76] SOF ¶ 38.
[77] SOF ¶ 38.
[78] SOF ¶ 38.
[79] SOF ¶ 39.
[80] SOF ¶ 40.

167.     By at least November 2013, Lafarge and LCS executives explicitly confirmed that Tlass was making fixed monthly payments to ISIS.  In a November 29, 2013 email, Lafarge and LCS executives exchanged a list of "donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries."  The email contained a "List valid from November 1, 2013," which included a monthly payment of five million Syrian pounds ($38,000) for "Daesh (ISIS)." The list showed that the monthly donation payments to all armed groups now totaled 24 million Syrian pounds ($174,000).[81]

168.     On February 4, 2014, Pescheux directed Tlass to limit the monthly payments to armed groups to 20 million Syrian pounds, including limiting assessments on sales to 200 Syrian pounds per ton.  Tlass responded that his representatives were meeting to discuss the payments with ISIS in Raqqa and with ANF in Aleppo.[82]

169.     Following those meetings, Tlass advised LCS to increase payments to the terrorists. As Tlass explained in a March 31, 2014 email pointing out the extent of LCS's investment and the amount of its current profit:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? . . .  As long as we are selling and are able to overcome the obstacles, we should continue . . .
>
> We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection . . .
>
> [I]n this case we have to pay about 300milion SYP [approximately $2.7 million USD] monthly.[83]

170.     Defendants' monthly payments to terrorists allowed it to continue producing and selling cement at the Cement Plant into 2014, earning millions of dollars in profits each month for

---

[81] SOF ¶ 44.
[82] SOF ¶ 45.
[83] SOF ¶ 46.

themselves—and for ISIS.  These payments were not simply to ensure protection, as explained by Tlass in a March 31, 2014 email to LCS executives—"[o]ther factories are paying for protection just to exist, without making the profits we are."[84]

171.    On May 8, 2014, Tlass emailed LCS executives advising that LCS's operations were not impeded by local armed groups, stating "Daesh—PYD—Al Nusra—Abu Issa[85] all we have good relations [with]. . . ."[86]  Defendants maintained "good relations" with the terrorists by paying them ever-increasing amounts.

172.    On September 15, 2014, LCS executives exchanged an email with Tlass's initials as the subject line and containing two attachments.  The first attachment was a document named "List of donations last version.pdf," which listed a monthly payment of 10 million Syrian pounds ($71,400) to "Daesh" [ISIS] as of May 1, 2014.  This represented a doubling of the amount that had been negotiated just six months earlier.  In a second attachment to the email, titled "Evolution of the security donations 2012-2013-2014," Pescheux listed, on top of the total amount of LCS's monthly "donation" payments, an additional "10 MSYP [million Syrian pounds] paid on April 23."[87]

**b.  Lafarge And LCS Pay Terrorists For Access To The Cement Plant**

173.    As ISIS gained more territory, it began to establish armed checkpoints on roads leading to the Cement Plant.[88]  By at least October 2013, Lafarge has admitted it was paying ISIS tolls.[89]

---

[84] SOF ¶¶ 46, 47.
[85] "PYD" refers to the Democratic Union Party in Syria, an armed faction; "Abu Issa" refers to Liwa' Thuwar Al-Raqqa, an armed militia participating in the Syrian civil war.
[86] SOF ¶ 47.
[87] SOF ¶ 47.
[88] SOF ¶ 29.
[89] SOF ¶ 35.

174.     On August 26, 2013, Pescheux emailed Tlass a map of the area around the plant and summarized the "strong improvement . . . [o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib," but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli, [t]here are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna."   Pescheux summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."[90]

175.     The "issue" was not, in their eyes, ISIS's crimes against humanity.  It was ensuring access to and from the Cement Plant so that Defendants could continue their operations at all costs. Tlass responded "no probleme let me work on it today . . . i cal u tomorrow to breef you."  The next day Tlass emailed Pescheux, "We Negotiate with [ISIS] & AL NUSRA I got a News that the situation In the Plant is Very Good."[91]

176.     The situation was "Very Good" because, by October 2013, Lafarge began paying safe-passage money directly to ANF and ISIS, in violation of U.S., French, and international law. In early September 2013, Pescheux asked Tlass for updates regarding truck passage to the east of the plant, and the following month an LCS risk manager reported that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant.  Each cement truck has to pay 150$."[92]

---

[90] SOF ¶ 43.
[91] SOF ¶ 43.
[92] SOF ¶ 35.

177.    Later, ISIS issued vehicle passes to LCS employees to "pass through after the required work.  This is after they have fulfilled their dues to us."[93]  One such example of a vehicle pass, dated April 26, 2014, was issued on ISIS letterhead and sealed with an ISIS stamp.[94]

### c.  LCS Pays Terrorists Based On Cement Sold

178.    Just one month after Lafarge and LCS began paying ISIS for vehicle access to the Cement Plant, they entered into a separate agreement with ISIS to effectively pay ISIS a "bonus" based on how well the Cement Plant was doing.  Concluded on November 6, 2013 and written on ISIS letterhead, this agreement provided that ISIS would be rewarded with 400 Syrian pounds for each transported ton of cement from the Cement Plant.  In exchange, ISIS would ensure the trucks access to the Cement Plant.[95]

179.    LCS provided regular updates to ISIS with the details regarding the amount of cement sold to each of their customers, so that ISIS could ensure that they were receiving their full dues.[96]  These payments complemented the monthly "donations" that Defendants were already paying to ISIS, in violation of U.S. and other laws.

### d.  LCS Purchases Raw Materials From ISIS-Controlled Suppliers

180.    In addition to making regular payments to terrorists, Defendants purchased materials from ISIS-controlled suppliers as part of their conspiracy with ISIS, making, by their own admission, payments to ISIS-controlled suppliers totaling at least $3,447,528.[97]  As ISIS expanded its control over northern Syria, it captured quarries of minerals LCS needed to continue to produce cement.[98]  LCS agreed to purchase raw materials from ISIS-controlled enterprises who

---

[93] SOF ¶ 36.
[94] SOF ¶ 36.
[95] SOF ¶ 36.
[96] SOF ¶ 34.
[97] SOF ¶ 19.
[98] SOF ¶ 19.

paid ISIS based on the amount of their sales to LCS.  Defendants also purchased oil from ISIS-controlled suppliers.[99]

181.    On November 6, 2013, for example, LCS and ISIS entered into a written agreement on ISIS letterhead providing that LCS would purchase pozzolana—a type of volcanic ash used to make blended cement—from ISIS for 1,300 Syrian pounds per ton.[100]

182.    Lafarge conducted much of these negotiations for raw materials through intermediary Taleb, who had previously assisted LCS with environmental consulting.  In late 2013, Taleb explained to LCS's board that he wished to discuss "[t]he security issue of Lafarge . . . in Syria.  I build up strong relationships with civilian and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of . . . Lafarge. . . ."  Taleb repeatedly and explicitly identified ISIS as the seller of the raw materials that he brokered.[101]

183.    For example, in a September 24, 2013 email about a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," Taleb informed LCS executives that LCS had already agreed to accept pozzolana sold by ISIS and stated "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state very senstive about this issue."[102]

184.    In a separate email chain a few days later, Pescheux disputed the intermediary's assertion that LCS had already agreed to purchase the materials, but nevertheless responded that "[a]fter my mail, our Purchasing team has contacted the contractor and the price is confirmed.  We

---

[99] SOF ¶ 54.
[100] SOF ¶ 48.
[101] SOF ¶ 49.
[102] SOF ¶ 49.

will place an order early next week for a limited quantity (probably around 5,000 tons) as we need to see how it will work.  If it is OK we will increase the quantity."[103]

185.   As another example, in a September 28, 2013 email, Taleb declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS and Soon for Kurdish. You ll get letter for that .  So far im on LCS side but please Im asking kindly to have my Fees."[104]

186.   Defendants' executives understood that transacting with ISIS in this manner was illegal.

187.   In a December 7, 2013 email, Pescheux informed Herrault that the following activities likely violated Syrian government regulations: "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities."  Nonetheless, Pescheux determined that these activities were "needed for business continuity."[105]

188.   According to news reports, an internal investigation performed by PricewaterhouseCoopers found that Defendants paid intermediary Ahmed Jamal $1,158,885 for supplies of pozzolana and heavy oil; Mohammad al Taweel Bn Ibrahim $1,319,853 for pozzolana, and sixteen additional suppliers $3,300,849 for other supplies.

189.   So, with Defendants' blessing, intermediaries negotiated deals in which Defendants purchased raw materials that they used to operate the Cement Plant, including coal, fuel, sand, and pozzolana from ISIS-controlled entities.[106]

---

[103] SOF ¶ 49.
[104] SOF ¶ 49.
[105] SOF ¶ 50.
[106] SOF ¶¶ 51, 52.

190.   In early 2014, LCS agreed to purchase massive amounts of material from ISIS-controlled suppliers, including 100,000 tons of pozzolana at 1,650 Syrian pounds per ton; another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton; 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton; another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton; 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton; and an option for 35,000 additional tons of dirt fuel at the same price, as well as yellow sand and coal.  Pescheux reported these planned transactions to Defendants' executives and, on February 16, 2014, wrote to Herrault that the "situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil."[107]

### e.  Lafarge And LCS Enter Into A Long-Term Revenue-Sharing Agreement With ISIS As Their Business Ties Deepen

191.   ISIS's violence and lawlessness also provided an opportunity to increase their footprint in the local cement market in a way that Defendants' executives had dreamed.  Lafarge had previously lost sales to cheaper, competing cement imported from Turkey into Syria.  ISIS's disregard for the law and its totalitarian control provided a chance for Lafarge to finally increase its standing in the market.  If ISIS could block or tax cement imported from Turkey into Syria, LCS's revenue would go up, and so too would ISIS's share of the revenue.  It is with this goal in mind that, in 2014, Defendants set out to enter into a revenue-sharing agreement to incentivize ISIS to act in LCS's economic interest.[108]

192.   Lafarge's top executives were aware of and approved Defendants' negotiations with ISIS.  In July 2014, Tlass wrote in the course of a negotiation with ISIS in Dubai: "yesterday we

---

[107] SOF ¶ 54.
[108] SOF ¶ 73.

started negotiations to reach a fix agreement with the ISIS and the highest authorities . . . I told them the final decision would come from Paris, neither from the factory nor from me."

193.    Initially, Pescheux proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement."  Such a toll would allow ISIS to gain revenue while simultaneously "reduc[ing] the attractiveness of Turkish cement.  It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."[109]

194.    However, Lafarge and LCS executives were concerned that this toll would not prove enough of an incentive.  According to a July 23, 2014 email that Herrault (Lafarge's Executive Vice President of Operations) wrote to Pescheux and Jolibois (LCS's outgoing and incoming CEOs), LCS's profit should be thought of as a "cake" that could be shared with ISIS:

> We have to maintain the principle that we are ready to share the "cake," if there is a "cake."  To me, the "cake" is anything that is a "profit", after the amortization and before financial expenses.
> Therefore, a tax by the ton is the only one that would make sense in this context.
> If we get a fixed tax, unless it's just a symbolic one, it would not make sense because they won't have a vested interest to have the plant run well.[110]

195.    A July 14, 2014 Gmail message from Tlass to Pescheux discussed these "negotiations with ISIS," proposed providing ISIS with a "monthly statement," and sought input from Pescheux about how much Lafarge's distributors should pay the terrorists "in addition to the ten millions that we pay directly to them, i.e. ISIS."[111]

---

[109] SOF ¶ 69.
[110] SOF ¶ 73.
[111] It is unclear from the face of the email to what currency the sender is referring.

196.    Negotiations continued throughout the summer, when ISIS invaded Sinjar, and into the fall of 2014.  In August 2014, Tlass emailed Jolibois, LCS's new CEO, to inform him that ISIS wanted another monthly fee in addition to an assessment on each ton of cement sold:

> Negotiations with ISIS are complex and not easy at all.  In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.[112]

197.    Jolibois responded: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price."  In response, Tlass said that ISIS was prepared to stop importation of Turkish cement if a revenue sharing agreement was concluded.[113]

198.    On August 5, 2014, just two days after ISIS launched its widely-publicized attack on Yazidi villages and while thousands of Yazidis were trapped without water or food on Sinjar Mountain, Tlass sent Jolibois a draft of the proposed revenue-sharing agreement between LCS and ISIS.[114]  The next day, Jolibois confirmed Lafarge's and LCS's agreement to share ten percent of Lafarge's profits with the terrorist group, in return for ISIS's agreement to take out the competition by stopping importation of Turkish cement in areas under its control or taxing those areas at a rate equivalent to or higher than the Cement Plant, as well as other benefits.  As Jolibois put it:

> As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:
>
> o  ISIS will receive the payment of 750SP/ton, by customers, every two weeks
> o  ISIS ensure the security and the free movement of our customers and suppliers vehicles as well as our employees

---

[112] SOF ¶ 76.
[113] SOF ¶ 77.
[114] SOF ¶ 78.

> o ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.
> o The agreement is valid until February 5th, 2015.
>
> I hope the agreement to be signed today, and sales to restart tomorrow.
> ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.[115]

199.   The next day, as accounts of ISIS's barbarity in Sinjar dominated global headlines,

Jolibois announced to Herrault:

> I just finalized with Firas this morning:
> ISIS 750 SP/ton, to be paid every 15 days by distributors; fixed portion to be reviewed (today 10M), but should not increase becauseit is against the Sharia Law; the distributors are ok and ready.

200.   Despite agreeing to terms, ISIS continued to demand more concessions.  On or

about August 15, 2014, Tlass informed Jolibois that

> Da'ysh [ISIS] have changed their mind and began to negotiate that they want 10% of the cement, and they want them as cement, in addition to that, they want 25% out of the value of our raw materials according to the bills . . .
>
> They will take S.P1500 for each ton sold in their areas . . . And in addition, they take 15 millions monthly as charges of the pass of workers and raw materials. . . .[116]

201.   Even though ISIS had increased their demands, Lafarge was willing to comply,

calculating their "operational margin" with the increased concessions ISIS wanted.[117]

---

[115] SOF ¶ 79.
[116] SOF ¶ 81.
[117] SOF ¶ 76.

202.     Defendants ironed out a final revenue-sharing agreement with ISIS on or about August 20, 2014—after consulting with Lafarge's in-house counsel.[118]

203.     The executives involved in the negotiations with ISIS updated Lafarge's Executive Committee during a meeting on August 27, 2014.  The notes from the meeting reflect ISIS's agreement to, instead of block Turkish cement, impose costs on Turkish cement that were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports."[119]   Thus, ISIS agreed to increase Defendants' competitiveness in the local cement market.

204.     Lafarge's senior management also knew that Defendants' partnership with ISIS was illegal under U.S. law and would have consequences in the United States.  As Lafarge Chairman Bruno Lafont said: "we have to make sure that what we do is risk free (also vis-à-vis the U.S)."[120]   In response, Herrault replied that "the best protection is to keep the plant in operation, sales have resumed, we are maintaining contact with everyone."[121]

205.     Lafarge had now solidified its shared objectives with ISIS.  Each co-conspirator, including Defendants, intermediaries, and ISIS, would benefit from ISIS's violent rise to power, which placed it in a position to control the local cement market to their mutual advantage.

   **f.   Defendants Sold Cement To ISIS, And Left Cement And Explosive Material For ISIS To Seize**

206.     Defendants did not hand only money to ISIS.  They also sold ISIS cement—even before ISIS took over the Cement Plant.  In a 2014 email to Jolibois, an LCS risk manager said ISIS was "looking for distributors in Syria like ours" for 150,000 tons of cement, and Defendants

---

[118] SOF ¶ 85.
[119] SOF ¶ 86.
[120] SOF ¶ 86.
[121] SOF ¶ 86.

memorialized in an internal company note that ISIS was seeking such cement for its "personal consumption" rather than for "market." News reports confirm that Lafarge and LCS agreed to ISIS's request for cement: a former LCS employee also stated in an interview that when the terrorists "needed cement to build their tunnels and trenches," an LCS "manager would give it to them." And ultimately under the long-term revenue-sharing agreement, LCS agreed to give ISIS a fixed supply of cement in addition to a percentage of its revenues. *See supra* ¶¶ 200–01.

207. The same LCS employee suspected that there was "not a simple business relationship between a company offering cement and terrorist groups that needed money and cement for their defensive positions and tunnels." Defendants "could do anything. They had deals with ISIS."

208. A former French intelligence analyst also testified that Defendants sold cement to ISIS in Syria. This was reflected in periodic sales reports that an LCS sales manager sent to Pescheux, stating "it was not our problem that Daesh received our cement." In words of a France-based legal expert and researcher, "ISIS needed primary resources provided by whatever actor. Lafarge was one of them."

209. In addition to the supply of cement that LCS sold ISIS, when LCS evacuated the Cement Plant in September 2014, ISIS came into another windfall of cement, as well as explosive materials such as hydrazine that are used in the manufacture of cement.

210. On September 10, 2014, President Obama outlined a strategy for the United States to lead an international coalition to defeat ISIS. In the following days, ISIS advanced on the Cement Plant with an eye towards complete control of the region. Even in the face of this grave threat from ISIS, Lafarge and LCS executives wanted to continue with the conspiracy. Jolibois argued strenuously against shutting down the Cement Plant, saying that if LCS suspended

operations "for the next few months until after the completion of the merger [with Holcim] we will surely be watched closely when we seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years."[122]

211.    Likewise, on September 12, 2014, Veillard sent an email to Herrault saying, "I think it's imperative to maintain the plant in working order and to be able to restart quickly."  Veillard went on to say, "[i]t seems to me that this option is totally doable. . . ."[123]

212.    The Lafarge and LCS executives' desire to remain in the area despite ISIS's control, coalition airstrikes, and danger to their employees meant that they did not implement a safe evacuation plan for their local staff nor take steps to prevent the plant's operations and explosive raw materials from falling into terrorists' hands.  When ISIS informed employees early in the morning of September 18, 2014 that it intended to advance on the plant, Jolibois abandoned these locals to their fate, ordering them to "prepare mattresses, food, water, sugar" and to shelter in the plant's electrical tunnels rather than evacuate.  The employees eventually tried to flee by hitching rides with the fleeing canteen vendors and on local buses.  But it was too late: ISIS kidnapped four employees during its advance.

213.    When they left, LCS employees left the plant entirely operational.  All start-up technology and hard drives were left in place, and one diesel generator was still running.  Lafarge could have shut down the plant's operating computers remotely, but chose not to.

214.    ISIS completed its seizure of the Cement Plant on September 19, 2014, and promptly released propaganda videos showing its militants at the plant.[124]

---

[122] SOF ¶ 92.
[123] SOF ¶ 93.
[124] SOF ¶ 95.

215.    In the Cement Plant, ISIS took what it wanted.  ISIS seized the cement that LCS had produced in furtherance of the conspiracy, and ISIS ultimately sold that cement for what Lafarge and LCS's plea deal admitted was approximately $3.21 million.  The actual value of ISIS's seizure of the Cement Plant was much higher.  According to publicly available French intelligence reports and media reports, the value of the Cement Plant at the time that ISIS seized it was approximately $25 million.

216.    As reported in the press and explained more fully below, *infra* Part VI(e), "With the supplied cement, [ISIS] reportedly constructed fortified shelters and tunnel networks against the U.S.-led coalition.

217.    And ISIS seized raw materials at the Cement Plant, including hydrazine, a chemical that ISIS could use to produce explosives for terrorist attacks.  Defendants' intermediary Taleb was present for some of the negotiations for the disposition of these remaining materials, which by December 2014 had already yielded approximately $11.5 million.  Thus, according to French intelligence, following October 2014, "the dismantling of the Lafarge plant in Syria continues to the financial benefit of both Daesh [ISIS] and the businessmen involved."  In December 2014, Taleb visited Lafarge's headquarters in Paris to explain the ongoing negotiations relating to materials left at the plant.

218.    Of the five cement plants ISIS seized in its campaign in Iraq and Syria, Lafarge's Cement Plant was by far the largest—its production capacity was more than twice as much as that of ISIS's second largest plant.

## V.    DEFENDANTS KNEW ISIS WAS A BRUTAL TERRORIST ORGANIZATION AND WORKED HARD TO CONCEAL THEIR PARTNERSHIP

219.    From the beginning of their relationship with ISIS, Defendants were aware that ISIS was a brutal terrorist group that had been designated as a foreign terrorist organization by the

U.S. initially as part of Al-Qaeda and later under the name ISIS in 2014.  And yet they knowingly entered into a partnership with ISIS.  As ISIS's brutality deepened and the rest of the world recoiled from the horror of the attack on the Yazidis, Defendants deepened their conspiracy with a group whose sole purpose was criminal.  Throughout the period that they supported ISIS, Defendants knew that their conduct was illegal, so they were careful to try to hide their partnership from ever coming to light.

### a. Defendants Partnered With ISIS Despite Its Brutality And Well-Publicized Attacks On The Yazidis

220.    ISIS was notorious for its brutality, and its crimes were well-publicized.  From mid-2013, news reports began circulating describing ISIS's mass killings and hostage-taking.[125]  In October 2013, Reuters described ISIS's involvement in mass killings of civilians.[126]  That same month, the New York Times reported on ISIS's public executions, and described videos of armed fighters shooting "infidels" forced to kneel by the side of the road.[127]  And the BBC described innocent civilians being detained, handcuffed and blindfolded, and tortured by ISIS the following month.[128]

221.    Defendants were well aware of ISIS's brutality and the fact that they had been designated a terrorist organization at this time.  In fact, in 2013, several months after U.S. journalist James Foley was initially captured by ISIS, advocates for Foley approached LCS to ask for LCS's

---

[125] *See, e.g.*, *Syrian Rebels 'Executed' Alawite Villagers, HRW Says*, France24 (Nov. 10, 2013), https://www.france24.com/en/20131011-syrian-rebels-executed-67-alawite-villagers-hrw-rights-watch.

[126] Oliver Holmes, *Syrian Rebels Killed 190 Civilians in August Dawn Raid: HRW*, Reuters (Oct. 13, 2013), https://www.reuters.com/article/us-syria-crisis-killings-idUSBRE99A03520131011.

[127] Ben Hubbard, *Qaeda Brand in Syria Pursues Its Own Agenda*, N.Y. Times (Oct. 1, 2013), https://www.nytimes.com/2013/10/02/world/middleeast/in-pushing-its-own-agenda-for-syria-a-qaeda-franchise-turns-rebels-into-enemies.html.

[128] Lina Sinjab, *Al-Qaeda's Brutal Tactics in Syria Force Out Moderates,* BBC News (Nov. 27, 2013), https://www.bbc.com/news/world-25109708.

68

assistance in negotiating for Foley's freedom.  LCS executives repeatedly referred to ISIS as "jihadists" in internal emails and conceded that that they were negotiating with terrorists.[129]

222.    As noted by the French Supreme Court in the context of the ongoing criminal proceedings against Lafarge in France:

> The Investigating Chamber also noted that the terrorist nature of the IS could not have been unknown to Lafarge, which was informed of the situation in Syria through the minutes of the weekly meetings of the Syria Safety Committee, and specified that at the meeting of 12 September 2013, it was stated that since July, logistical flows and staff movements have been disrupted, and sometimes even blocked, by the Islamists, AN[F] and ISIS[,] . . . that the presence of these Islamist groups constitutes a threat for us . . . [and] that it is becoming increasingly difficult to operate without having to negotiate directly or indirectly with these networks classified as terrorists by international organisations and the United States."[130]

223.    Defendants continued to provide support to ISIS even as the news unfolded of the atrocities committed against the Yazidis, which stunned the world and drew immediate condemnation from governments and international authorities.  On August 5, 2014, the U.N. Security Council condemned ISIS's "systematic persecution of individuals from minority populations."  On August 7, 2014, the United States began airstrikes against ISIS in Iraq to break ISIS's siege on Sinjar Mountain, and President Barack Obama made a speech explicitly addressing ISIS's crimes and stating that the "systematic destruction of the entire Yezidi people" called for by ISIS could constitute genocide.  A group of U.N. experts reported violations and warned of potential genocide and grave danger for the Yazidis on August 12, 2014, and on August 15, 2014, the U.N. Security Council issued a resolution condemning ISIS, ANF, and all other Al-Qaeda

---

[129] SOF ¶¶ 31, 54, 93.
[130] Judgment of the Court of Cassation, Criminal Chamber, Appeal No. 19-87.367 at ¶¶ 40, 76 (Sept. 7, 2021), https://www.courdecassation.fr/decision/6137092ff585960512dfe635?search_api_fulltext=lafarge&sort=&items_per_page=&judilibre_chambre=&judilibre_type=&judilibre_matiere=&judilibre_publication=&judilibre_solution=&op=&date_du=&date_au=.  *See also* ¶ 76.

affiliates and calling on U.N. members to prohibit all financial and trade relations with the groups. In September 2014, the Unites States began strikes against ISIS in Syria.

224.     Lafarge was paying close attention to ISIS's acts and the reaction of the international community during this period.  On August 18, 2014, the same day that the United States placed ISIS and ANF members on its list of Specially Designated Global Terrorists, Veillard emailed Herrault and Jolibois with the subject heading "terrorist watch list," notifying them of the designation.[131]

225.     Notwithstanding ISIS's heinous acts—including the genocidal campaign against the Yazidis and the televised murder of Americans—the designation of ISIS as a terror group by the U.S., and the international community's universal condemnation of the terrorist group, Defendants not only continued, but in fact deepened their conspiracy with ISIS—ironing out a final revenue-sharing agreement with ISIS right at the time when the crimes against Plaintiffs reached its peak of barbarity in August 2014.

226.     On August 6, 2014 three days after the terrorist attacks against the Yazidis began, Lafarge and LCS executives signaled their agreement to enter into the long-term revenue-sharing agreement with ISIS.[132]  On August 15, 2014, less than two weeks after the genocide had started, on the day of the massacre in Kocho, and while thousands of Yazidis were still trapped on Sinjar Mountain, Lafarge and LCS committed to even more generous revenue-sharing terms with ISIS— hugely increasing their support at the height of the suffering inflicted on the Yazidis.[133]

---

[131] SOF ¶ 84.
[132] SOF ¶ 79.
[133] SOF ¶¶ 81, 83.

**b. Defendants Went To Great Lengths To Conceal Their Conspiracy With ISIS**

227.   Defendants' support for ISIS directly and via intermediaries allowed them to manipulate the cement market and increase profits.  But it also made them complicit in ISIS's crimes.  So, the conspiracy was not without risks.  Fully aware that paying millions of dollars to terrorists violated several jurisdictions' laws, including those of the United States, Defendants and their agents and co-conspirators took numerous steps to conceal their partnership with ISIS.

228.   First, Defendants' executives ensured that any documents regarding these terrorist payments did not contain the word "Lafarge" and stopped referencing ISIS by name as well.  For example, on September 16, 2013, Pescheux instructed Tlass that "the name of Lafarge should never appear for obvious reasons in any documents of this nature," referring to checkpoint passes from ISIS.[134]  He continued: "Please use the words Cement Plant if you need but never the one of Lafarge."[135]  After a period during which Lafarge was entering into agreements and exchanging documents on ISIS letterhead, Pescheux also sent an internal email instructing several LCS employees that "we all have to stop [using] the acronym of an organization which is on terrorist lists" and instead use code words, indicating that he was both aware of and concerned about disclosing Lafarge's support for FTOs.

229.   Similarly, on September 4, 2014, Jolibois, LCS's incoming CEO, complained to Tlass about documents that specifically referred to "Lafarge" by name: "The name Lafarge and the fact that Lafarge 'paid' appears on the laissez-passer passes issued by ISIS.  This is completely against our agreement with ISIS . . . Could you look into solving this issue?"  Tlass agreed that "we have to change the name or have an alias. . . ."[136]

---

[134] SOF ¶ 32.
[135] SOF ¶ 33.
[136] SOF ¶ 87.

230. Second, and relatedly, Defendants had intermediaries—rather than Lafarge or LCS executives—engage directly with ISIS and other terrorist groups. As one of LCS's security consultants put it, "it was especially important that the relationship would be handled by [Tlass's] middlemen, since an exposure of this sort would have been compromising for LCS."

231. Defendants also took steps to conceal the payments they made to these intermediaries. In fact, Lafarge and LCS executives directed Tlass and Taleb to submit invoices that did not reference their own names or the names of their companies, and that instead referenced payments for donations, unspecified professional fees, or personal expenses.[137] For example, on December 13, 2012, Pescheux emailed Tlass and directed that any future invoice should not be on Tlass's company's letterhead, but instead should be on that of a company outside of Syria.[138]

232. Third, in connection with their efforts to conceal payments and falsify records, Defendants purposely availed themselves of the U.S. financial system to funnel U.S. dollars to straw-man companies outside Syria and Iraq. LCS executives made clear that they preferred to transact through U.S. dollar bank transfers. On June 30, 2013, Pescheux emailed Tlass: "[W]e cannot continue the way we are settling the turnover invoices. Our preferred option would be the one we told you last October: a bank transfer in USD to the account of a duly registered company," as opposed to a direct payment to Tlass in cash, which would appear more suspicious.[139] Thus, Defendants instructed Tlass, their terrorist intermediary, to create a new corporate entity outside of Syria, Cyprus, or France so that Defendants could surreptitiously transact in U.S. dollars— transactions that Defendants intended to transfer, clear, and be processed through New York. *See infra* Part VII(a).

---

[137] SOF ¶ 55.
[138] SOF ¶ 57.
[139] SOF ¶ 60.

233.    A February 2, 2014 "External Support Agreement" between LCS and a new company created by Tlass in the United Arab Emirates confirmed that payments should be made in U.S. dollars.[140]  LCS agreed to pay the new company "a monthly remuneration of 75.000USD" to channel payments to armed groups, including ISIS.[141]

234.    Lafarge and LCS executives made similar efforts to disguise the nature of payments to Taleb, including by directing that payments reference only environmental consulting and be made using U.S. dollars.  For example, on January 12, 2014, Pescheux emailed Taleb:

> Prepare an invoice from [Taleb's company], send to me by email and bring the original next week, for an amount of 4,402 USD just with "Environmental consultancy services for the months of October, November and December 2013" as a justification.[142]

235.    A few weeks later, on February 5, 2014, Pescheux again required that payments reference only environmental consulting and be made in U.S. dollars:

> If you want to have a chance to get paid for pozzolana and HFO, you have to prepare an invoice following my instructions and not your imagination.
> So you have to issue an invoice mentioning only:
> Consultancy services performed up to January 31,2014 for a total amount of 4,836 USD.[143]

236.    On February 13, 2014, Taleb sent Pescheux the invoice "[b]ase[d] on your instruction."  The invoice, payable in U.S. dollars to the intermediary's company, purported to be for "[c]onsultancy services."[144]

---

[140] SOF ¶ 61.
[141] SOF ¶ 61.
[142] SOF ¶ 63.
[143] SOF ¶ 64.
[144] SOF ¶ 65.

237.    International financial transactions denominated in U.S. dollars, unlike transactions denominated in Syrian pounds, are cleared through U.S.-based financial institutions located in New York.  *See infra* Part VII(c).

238.    In addition, as another way to conceal their partnership with ISIS from French auditors and law enforcement authorities, Lafarge and LCS executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to coordinate and carry out elements of their conspiracy.[145]

239.    LCS's own legal counsel instructed LCS's CEO not to create business records concerning the company's illegal terrorist financing.  On September 8, 2014, in connection with a discussion about documents received from ISIS, Jolibois wrote to Veillard, "Thank you for sharing this information with [Herrault], I don't want to write to him about this topic at his professional address (as recommended by [in-house counsel])."[146]  Lafarge executives used Gmail accounts to communicate about the conspiracy, and thus avoided leaving incriminating evidence on corporate email servers located in France that would be available to French auditors, regulators, and law enforcement officials.

### c.  After Evacuating The Cement Plant, Defendants Tried To Cover Their Tracks

240.    After Defendants' employees fled the Cement Plant in fear for their lives, and as the international community stepped up its multi-front action against ISIS, Defendants took further steps to conceal their conspiracy with ISIS.  They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that Tlass's relationship with LCS had been terminated before he conducted negotiations with ISIS in August and September 2014.[147]

---

[145] SOF ¶ 18.
[146] SOF ¶ 88.
[147] SOF ¶ 96.

241.   Specifically, on September 29, 2014, Tlass informed Herrault and Jolibois that, in response to their prior requests, Tlass had opened a bank account in Dubai in the name of a new company that was not publicly linked to Tlass ("Tlass NewCo").[148]

242.   On October 9, 2014, Jolibois sent an internal email to Pescheux and Lafarge's in-house counsel with the subject "New contract for [Tlass]" and saying that LCS owed Tlass two monthly fees each for $75,000 for "services in July and August" plus reimbursement of 60,000 USD that was "already paid by [Tlass] to PYD"—meaning ISIS and other armed groups—ultimately totaling "210kUSD."   Jolibois further wrote that the in-house lawyer "would like to terminate the previous contract [with Tlass] on the date of 18th August to show evidence of company reaction to U.N. resolution, and to get a new contract to start from September 1st, 2014." The "U.N. resolution" to which Jolibois was referring was the August 15, 2014 Security Council resolution condemning ISIS, ANF, and Al-Qaeda and calling on U.N. members to prohibit all financial and trade relations with the groups.   In a subsequent email on October 14, Herrault clarified Lafarge would not pay Tlass without a new backdated contract.[149]

243.   Jolibois then sent an email to Tlass with the subject line "Agreement for Regional Security Consulting Services," which attached copies of: (1) the new consulting agreement between a holding company created by LCS ("LCS NewCo") and Tlass NewCo, and (2) the backdated Termination Agreement between LCS and Tlass NewCo that made it seem like the original arrangement was terminated in mid-August 2014.[150]

244.   In his cover email, Jolibois explained that the new consulting agreement was "written in such a way as to" take "into account the compensation for termination of the previous

---

[148] SOF ¶ 97.
[149] SOF ¶ 98.
[150] SOF ¶ 100.

contract (210k USD for 202k USD which are actually due)."[151]  A $210,000 lump sum payment compensated ISIS intermediary Tlass for work he had already performed negotiating an agreement with ISIS and reimbursed him for making fixed monthly "donation" payments to terrorist groups, including ISIS.[152]

245.    The Termination Agreement with Tlass was backdated to August 18, 2014.  But the metadata of the backdated Termination Agreement indicates that the document was not drafted by Lafarge's in-house lawyer until October 3, 2014, two weeks after LCS had evacuated the Cement Plant.[153]

246.    On October 23, 2014, after the parties signed the new consulting agreement and the backdated Termination Agreement, Tlass sent an invoice for $210,000.  Lafarge paid the $210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to Tlass NewCo's account at a financial institution in Dubai.  *See infra* Part VII(a).[154]

247.    On information and belief, the additional U.S. dollar payments due under the new Consulting Agreement were paid after October 2014 in the same manner.

248.    In addition to the lump sum payment to compensate for work already performed, Defendants continued to pay their intermediaries to work with ISIS.  Those payments for ISIS, including to or through Tlass, continued after Lafarge left the Cement Plant; the new consulting

---

[151] SOF ¶ 100.
[152] SOF ¶ 37.
[153] SOF ¶ 101.
[154] SOF ¶¶ 102, 103.

agreement with Tlass required that Defendants give him monthly payments of $30,000 on a going-forward basis.[155]

249.    After the Cement Plant was seized, intermediary Taleb was reportedly liaising with ISIS in its efforts to sell the remaining cement in the plant and restart operations.  According to a publicly available French intelligence report summarizing a meeting between ISIS, Turkish businessmen, and Taleb in December 2014, ISIS had already at that point sold over 65,000 tons of cement, worth $6.5 million, and was in negotiations to sell an additional $5 million of the cement left at the plant.

**d.  LafargeHolcim Finally Discloses That Defendants Transacted With Terrorists**

250.    In July 2015, after over a year of negotiations, Holcim completed its merger with Lafarge, combining the two largest building materials companies in the world.  The payments to terrorists were not disclosed to Holcim or its representatives during pre-acquisition due diligence meetings.[156]  Lafarge executives who had approved of Lafarge's payments to ISIS remained in leadership positions in the newly formed company, LafargeHolcim.

251.    On February 19, 2016, a website run by a Syrian opposition group reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS.  The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.[157]

252.    On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging for the first time that Lafarge and LCS made payments to terrorists, admitting that "in late 2011, the plant became increasingly subject to

---

[155] SOF ¶ 100.
[156] SOF ¶ 105.
[157] SOF ¶ 108.

disruption by local armed groups," that "LCS used intermediaries to avoid direct contact with these armed groups," and that "LCS made and continued to make payments to such intermediaries in furtherance of operations."   LafargeHolcim admitted that "LCS management kept Lafarge SA well-informed of developments," noting that "the combination of war zone chaos and the 'can do' approach to maintain operations in these circumstances may have caused those involved to seriously misjudge the situation and neglect to focus sufficiently on the legal and reputational implications of their conduct."[158]

## VI.   DEFENDANTS' PAYMENTS AND COOPERATION SUBSTANTIALLY ASSISTED THE ACTS OF INTERNATIONAL TERRORISM AGAINST THE YAZIDI COMMUNITY

### a.   ISIS Had A Centralized Financial System Which Financed The Commission Of International Crimes

253.    Like Lafarge and its subsidiaries, ISIS exercised deep control over its activities and finances in the territories it controlled.  ISIS collected money from businesses and individuals in the territories under its control and directed it towards its centralized financial system, which in turn was used to finance ISIS's terrorist attacks across its declared "caliphate," including genocide in Sinjar.

254.    Lafarge did not only pay into the protection racket ISIS enforced.  It sought to partner as closely as possible with ISIS, pay percentages of its sales to ISIS, purchase materials from ISIS, sell its cement to ISIS, and ultimately enter an agreement for ISIS to obstruct competition in exchange for a slice of the Cement Plant's profit.  In return, ISIS offered Defendants the opportunity to increase profits as ISIS was consolidating territorial power through its terrorist attacks.

---

[158] SOF ¶ 110.

255.    Funds from businesses and individuals in its territory—such as the money Lafarge willingly handed over—were one of ISIS's most critical sources of funding.  The $7.21 million from Defendants to ISIS and ISIS-controlled entities materially enhanced ISIS's ability to expand or sustain its power and territorial control by committing the terrorist attacks described above, as Defendants knew but chose to disregard.  *See supra* ¶¶ 4–5.  The cost of ISIS's individual attacks and salaries for their fighters paled in comparison to the funding provided to those groups by Defendants.

256.    The U.N. Security Council reported that ISIS's "core leadership" in Syria and Iraq exercised "systematic financial direction" over its provinces' funding" and a U.N. investigation confirmed ISIS's "centralized, top-down approach to the administration of [ISIS's] territory." Similarly, terrorism scholars Dr. Colin Clarke, Director of Research at The Soufan Group, and Dr. Phil Williams, Professor Emeritus at the University of Pittsburgh, explain that "[m]uch like its predecessor, AQI, [ISIS] . . . adopted a top-down approach that maintained hierarchical control over and a high degree of accountability for its financial assets."

257.    Such systematic financial direction ensured that Defendants' money in Syria could support ISIS's terrorist attacks in other areas in which it operated.  In August 2014, ISIS bulldozed a path through the berm along the Iraq-Syria border to create a new road and proclaimed, "We are one state, the Islamic State," waving its stark black flag.  With the dissolution of the national boundaries between Iraq and Syria, resources, fighters, and families flowed both ways across the border, supported by ISIS's central treasury to further ISIS's terrorist goals.  Defendants' money was no exception.

258.    Bayt Al-Mal ("Treasury") was the core department responsible for the collection, management, and distribution of ISIS funds.  It was through this central treasury that ISIS funded

its attacks on innocent civilians. According to a U.N. investigation, the Treasury provided "vital material and financial support" to ISIS's Diwan Al-Jund ("Military Ministry"), and "specifically those units . . . that are alleged to have committed international crimes." The Treasury was central to ISIS's day-to-day operations and implementation of its objectives, including its terrorist attacks.

**b. Lafarge's Financial Contributions Were Significant In Light Of ISIS's Low Operational Costs**

259. Lafarge pled guilty and admitted to giving ISIS and linked groups $5.92 million. And Lafarge admitted in its plea deal that the value of the cement that ISIS seized generated $3.21 million. So even by Lafarge's own admission, ISIS and other terrorist groups received almost $10 million dollars from Defendants in cash and profit from cement, and of this, $7.21 million went to ISIS and ISIS-controlled entities. The actual amount of money that ISIS received from the funds provided by Lafarge and sale of cement left in the Plant from Lafarge is likely over $15 million. *See supra* ¶ 37. Lafarge placed money in ISIS's hands at exactly the time ISIS was consolidating its power in Iraq, culminating in its takeover of Mosul in June 2014 and invasion of Sinjar in August. Lafarge had to funnel large amounts of money into LCS, including to pay ISIS. In June 2014, for example, LCS received $11 million from Lafarge via Lafarge Cyprus to fund its operations.

260. ISIS fighters received a base pay of $200-400 per month. Five-thousand dollars to ISIS could have covered a dozen terrorists (at $400 per fighter) and equipment for a month. Five-thousand dollars was sufficient to purchase dozens of bomb components or finance multiple attacks. So, the income generated from Lafarge was enough to fund the attack on Sinjar many times over. The number of ISIS fighters who overtook Sinjar is estimated to have only been in the hundreds, since they faced no organized resistance. The 20 million Syrian pounds ($142,800)

Lafarge paid ISIS through Tlass alone in May 2014 would have paid for over 350 ISIS fighters' salaries for the entire month of August.

261.    In August 2014, when ISIS invaded Sinjar and launched its genocidal campaign against the Yazidis, ISIS had already received large amounts of funding from Lafarge.  And just days after ISIS began its genocide—despite extensive coverage of the atrocities committed against the Yazidis—Lafarge committed to *increasing* the amount of funding that ISIS could generate by giving ISIS a share of its profits, i.e. the "cake," under a long-term revenue-sharing agreement. *See supra* Part IV(e).

262.    In the ongoing criminal case against Lafarge and eight of its executives in France, French criminal investigators reportedly allege that the "amount and duration" of Lafarge's multi-million-dollar payments to ISIS in Syria allowed ISIS to "plan and carry out violent operations in the area and abroad."  The French Supreme Court affirmed the charge of complicity in crimes against humanity as well as terrorism charges against Lafarge, finding that there was sufficient "serious and corroborating" evidence that Lafarge provided support to ISIS while having "precise knowledge" of the nature of the group's activities, "likely to constitute crimes against humanity." U.S. prosecutors agreed that Lafarge knowingly and willingly supported terrorism, with Deputy Attorney General Monaco stating that "through their support and funding, Lafarge enabled the operations of a brutal terrorist organization."

### c.    Lafarge's Money Was Channeled To The Leadership Cell, ISIS's Military And Governance Authority

263.    In accordance with ISIS's standard practices, it is likely that 20 percent of the funds Lafarge admitted to providing to ISIS would have gone to Al-Baghdadi and ISIS's leadership.  The Leadership Cell and Al-Baghdadi in turn played a key role in planning and ordering the genocide

in Sinjar as well as attacks that harmed many others, including the murders of U.S. citizens Stephen Sotloff, James Foley, and Kayla Mueller.

264.    ISIS's Leadership Cell, was, during relevant periods, a leadership group that approved and disseminated new ISIS membership, expansion plans, and strategy.    ISIS's Leadership Cell was composed of Al-Baghdadi and several advisors.   It ensured that all major ISIS actions were in accordance with Islamic law and ISIS's overall strategy.    The U.N. has described that "a network of senior ISIL leadership . . . acted as trusted financiers, diverting ISIS wealth . . . and aiding and abetting the commission of the crime against humanity of persecution."   The Leadership Cell was the "primary decision-making organ . . . of the ISIL so-called caliphate[,] . . . closely oversaw the organization's finances and had authority over military disbursements, including . . . for procurement of arms and supplies."

265.    ISIS's predecessor, ISI, had a funding structure that required that 20 percent of all income derived from its taxation went to Al-Baghdadi and his Leadership Cell for use in planning and committing attacks, and ISIS continued the same practices.   According to terrorism scholar Brian Fishman, the "provinces," or geographic areas under ISI's control, "carefully tracked both revenue and expenditures and passed 20 percent of their income to the national-level ISI [Al-Baghdadi and the group's leadership], which redistributed the funds as needed."   ISIS was a remarkably centralized group, with multiple sources, including ISIS's magazine Dabiq and a guide to its "tax" practices, demonstrating that ISIS's leadership demanded payments from areas under its control based on its interpretation of Islamic law.   This interpretation specified that 20 percent of goods such as spoils of war and underground or mineral wealth be paid to ISIS's central funds. Non-Muslims permitted to remain in ISIS territory paid greater amounts than Muslims under ISIS's control.   Thus, it is likely that at least 20 percent of the funds Lafarge and LCS have admitted

to paying ISIS went to Al-Baghdadi and the Leadership Cell to plan and execute attacks, including those acts that harmed Plaintiffs.

266.    The 20 percent rule applied not only to finances collected by ISIS, but also to human beings who ISIS captured.  As explained by the U.N. Commission of Inquiry, "ISIS made eighty percent of the women and girls available to its fighters for individual purchase, the apportioning being drawn directly from religious interpretation . . . The remaining twenty percent [were] held as collective property of ISIS [leadership] and were distributed in groups to military bases throughout Iraq and Syria."  In fact, ISIS leaders were personally involved in the enslavement, torture, and sexual abuse of Yazidi women and girls, and Al-Baghdadi in particular held Yazidi women enslaved at his residence and sexually abused them.

267.    Because of its role as a religious, governmental, and military authority, the Leadership Cell likely approved: (1) payments and support to fighters and their families who emigrated to ISIS territory; (2) the strategy of expansion into Sinjar; (3) strategies and tactics to target the Yazidi community; (4) the terrorist attack on the Yazidi community; (5) the plundering and destruction of Yazidi homes and businesses to further fuel ISIS's operations; (6) the enslavement and torture of Yazidi women and children in accordance with ISIS's warped view of Islam; (7) the creation and management of markets where Yazidi women were enslaved and sold; and (8) the forced conversion, enslavement, and conscription of boys to use as child soldiers.  German courts have indeed concluded that it was "inconceivable" that such a large-scale attack against the Yazidis in Sinjar could be carried out without the involvement of ISIS's caliph and senior leadership, "considering the strictly hierarchical organizational structure of ISIS."  Lafarge's funds therefore would have contributed directly to the horrific abuses inflicted upon the Yazidi community, including Plaintiffs, and Lafarge moreover

increased its support to ISIS while knowing that it was a criminal offense to do so, and knowing

about ISIS's highly publicized ongoing abuses.

### d. Lafarge's Money Was Channeled Through Raqqa, The Center Of ISIS's Military Planning And Human Trafficking Of Yazidis

268.    The closest major city to the Cement Plant was Raqqa, which was also ISIS's self-declared capital and one of the first cities to fall to opposition groups during Syria's civil war.  As ISIS gained territory in 2014, Al-Baghdadi declared that Raqqa would be the seat of his state, due to its proximity to both Iraq and Syria.

269.    Thereafter, Raqqa became critical to planning ISIS's outwards expansion, and ISIS's leadership, strategy, and governance policy were developed in Raqqa.  A Pentagon spokesperson confirmed that ISIS "leaders" and "'bureaucrats'" who served as "the administrative backbone of [ISIS's] militant organization" were based in "the Islamic State group's self-declared capital of Raqqa."  U.S. Secretary of State John Kerry stated in 2015 that Raqqa was "the core where they're planning these things"—that is, where ISIS planned its attacks.  A Pentagon spokesperson likewise confirmed that ISIS's militant administration and leadership were based in Raqqa.  As described by the Commander of U.S. Central Command, Raqqa was "where [ISIS's] plotting takes place . . . Raqqa is recognized as the financial, leadership and external ops center of the Islamic State."

270.    Given the proximity to the Cement Plant and the role of Raqqa as the center of the ISIS bureaucracy, Lafarge negotiated and partnered with representatives in Raqqa to maintain and strengthen operations at the Cement Plant.  Lafarge has admitted that LCS's former risk manager went to Raqqa to meet with individuals connected to ISIS's leadership to negotiate terms for its

deals with the terror group,[159] and that Tlass reported to Lafarge executives on meetings between his representatives and ISIS's representatives in Raqqa.[160]  LCS's former procurement manager similarly negotiated to buy pozzolana from a Raqqa-based supplier who signed emails with his title, "The Emir of the Investment Office in the Islamic State in Iraq and Sham.  The Wilayat [Province] of al-Raqqa."[161]

271.    ISIS's governor of Raqqa was Ali Musa Al-Shawakh, known as Abu Luqman, from early 2014 until his death in an airstrike in 2018.  Abu Luqman had been a powerful ANF terrorist but then switched his allegiance to ISIS and recruited several hundred ANF fighters to join ISIS's ranks in Raqqa.  He served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell.  Abu Luqman was also head of ISIS's Directorate of General Security, which was responsible for intelligence gathering, detentions, state security, and external intelligence.  He is accused of planning ISIS's massive terrorist attacks in Paris and of supervising foreign hostages.

272.    Lafarge, through intermediaries and with knowledge and intent, directly conspired with Abu Luqman.  Public reports state that Abu Luqman served on a "shadow board" of the Cement Plant, and that he controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.  In December 2014, Abu Luqman himself was present, alongside Lafarge's agent Taleb, to facilitate ISIS's barter of remaining materials in Lafarge's factory, worth $11.5 million, to buyers including Turkish businessmen.  The next month, at Defendants' expense, Taleb visited Lafarge's headquarters in Paris to report on the ongoing negotiations with Abu Luqman for ISIS to re-open the plant under Lafarge's supervision.

---

[159] SOF ¶ 70.
[160] SOF ¶ 45.
[161] SOF ¶¶ 52, 53.

273.    On information and belief, the local ISIS leadership in Raqqa helped plan for and train the fighters who launched the attack on the Yazidi community and siege of Sinjar Mountain. The Raqqa Cell was critical to determining when and how to recruit or accept additional members, where to expand, and how to commit attacks in Raqqa and its surrounds by (1) vetting, recruiting, and establishing new ISIS "provinces," including all geographic expansion; (2) serving as the "bridge" between ISIS's Leadership Cell and the local cells on the ground in other locations; and (3) supplying logistical, training, and financial support for ISIS's military attacks.  The Raqqa Cell provided funds, fighters, training, resources, propaganda, and aid to ISIS fighters across its territory.

274.    Raqqa was also a key location in ISIS's Yazidi slave trade.  A large number of Yazidis were brought into Syria, specifically Raqqa, and held captive, catalogued, and sold as slaves.  Plaintiffs in this case describe family members being taken there after being captured in 2014.  Many Yazidi women and girls who were forcibly transported from different locations in Sinjar to Raqqa's holding sites and underground prisons were gathered, registered, photographed, and sold into slavery from there, including from slave markets.

275.    Because of its role as the local government, the Raqqa Cell likely would have had to approve in Raqqa and surrounding areas (1) the cataloguing, captivity, and sale of Yazidis as "slaves," or human trafficking victims; (2) the confinement and treatment of Yazidis held captive; and (3) the human trafficking market.  For these reasons, the Raqqa Cell not only played a key role in the attack on Sinjar, but also in the massive number of Yazidis being captured, sold, and tortured in Syria.

e. **ISIS Used Cement And Raw Materials From Defendants' Plant To Shelter Its Fighters And Keep Yazidis In Captivity**

276.     A key part of ISIS's military strategy was the construction of underground tunnels and bunkers which could be used to hide from airstrikes, launch military offensives, and enslave and torture prisoners.  ISIS built these extensive underground networks in Syria and Iraq, including in areas around Raqqa and Mosul.  These underground networks were sophisticated shelters equipped with sleeping quarters, electricity for lights and fans, and medical supplies, built so that fighters could evade airstrikes, move freely underground, and store weapons without being detected by coalition forces or aerial imagery.  When Kurdish forces took back the city of Sinjar from ISIS in late 2015, they uncovered an extensive tunnel and bunker system described by one Kurdish commander as "like a network inside the city."  This network of tunnels enabled ISIS to remain in Sinjar and surrounding villages far longer than it could have out in the open, extending its occupation and ensuring the destruction of Yazidis' homes and property there.

277.     In addition to using these underground warrens for military advantage, ISIS also used its underground networks to hide and terrorize hostages, including captured Yazidis.  A 2016 report by the U.N. describes interviews of Yazidi women who were among the hundreds captured and held in Raqqa in "underground locations, such as in tunnels, for four to five months, without access to natural light, drinking water, or proper food."  One plaintiff in this case, Plaintiff Nawaf Sulaiman, describes his sister being taken to Raqqa and held underground for two years before finally being able to escape.

278.     On information and belief, ISIS used the cement it secured from Lafarge, including pursuant to the long-term revenue-sharing agreement, *see supra* Part IV(e), to build and reinforce this network of underground tunnels and bunkers.  These tunnels were fortified to withstand coalition airstrikes above ground—requiring high-grade cement that only sophisticated factories

like the one operated by LCS could provide.  LCS's cement sales, approved by Lafarge, thus directly supported ISIS's terrorist operations and ability to hold Yazidis in captivity and slavery.

279.    LCS did not only sell cement directly to ISIS for use in its operations.  Upon LCS's hasty evacuation of the Cement Plant in September 2014, ISIS also took massive amounts of cement—$3.21 million dollars' worth according to Lafarge's plea deal, but reportedly upwards of $11.5 million—from the plant.  ISIS also gained access to LCS's abandoned stockpile of hydrazine, among other materials.  Used to run production machinery at the Cement Plant, this highly toxic chemical can also be used as rocket fuel or to make explosives.  Because these materials were not properly secured, tons of hydrazine remained at the Cement Plant to be seized by ISIS and could be used to further its terrorist attacks.

## VII.    DEFENDANTS' UNLAWFUL CONDUCT HAD A SUBSTANTIAL NEXUS TO NEW YORK AND THE UNITED STATES

280.    Defendants depended on connections to the United States to run their terrorist-financing scheme, knowingly exploiting New York's banking system to conduct numerous U.S. dollar wire transfers they caused to clear through New York banks.  Their reliance on U.S. banks was critical: Defendants considered "USD" their "preferred option."[162]  They deliberately routed those payments through New York banks to make payments look legitimate, ensure that ISIS received its preferred currency, avoid depreciation in the value of the Syrian pound, and evade review by French auditors and regulators.  Defendants knew and depended on the legitimacy, speed, and reliability of New York's banking system and used it for these reasons.

281.    Likewise, Lafarge used U.S. email providers, primarily Gmail, to plan and execute their criminal assistance to terrorists outside of ordinary corporate record keeping.  On the advice

---

[162] SOF ¶ 60.

of their own corporate counsel, they avoided using their company email addresses to plan and execute their conspiracy with ISIS. By sending their emails through the United States, Defendants impeded French law enforcement, which was the authority most likely to uncover the scheme and criminally charge their executives. Lafarge's use of a U.S. service provider to coordinate its conspiracy enabled it to benefit from U.S. infrastructure, U.S. engineering, and U.S. law.

282. The conspiracy was inherently tied and integrally linked to the United States. ISIS recruited many Americans to its ranks, and Defendants' conspiracy with ISIS involved executives who were U.S. nationals. The conspiracy included overt acts in furtherance of the conspiracy targeting the United States, including through public statements against the United States and kidnappings, public executions, rapes, and other violent acts against Americans. When ISIS targeted the United States, and publicly executed Americans as a key terror tactic, it increased its perceived power regionally and globally, increasing its ability to hold its territory and to expand.

### a. Defendants Purposefully Relied On New York Banks To Clear The U.S. Dollar Transactions They Used To Finance Terrorism

283. Defendants intentionally used the U.S. financial system and caused wire transfers to clear through New York banks, thereby purposefully availing themselves of New York's banking system. Specifically, Defendants directed their banks to complete U.S. dollar-denominated wire transfers to support its scheme to fund ISIS, and their officials knew those directions required the use of New York banks. Defendants' wire instructions caused their payments to clear in New York, including through one admitted transaction related to this suit in this District.[163]

284. Defendants' payments to terrorists relied on correspondent banks located in New York. Correspondent, or intermediary, banks are the conduit for a financial transaction when a

---

[163] SOF ¶ 103.

sender's bank cannot perform a direct transfer in the desired currency with the recipient bank. Almost all correspondent banks that perform U.S. dollar transactions are located in New York, which allows them to use the U.S. Clearing House Interbank Payments System ("CHIPS"). CHIPS estimates that in 2015, it was responsible for processing over 95 percent of cross-border transactions denominated in U.S. dollars. On information and belief, Defendants' transactions relied on CHIPS to clear international U.S. dollar transfers among its international banks.

285. Defendants preferred transacting almost entirely in U.S. dollars, both because U.S. dollars were protected from the rapid depreciation of the Syrian pound and because the international transactions through the U.S. banking system masked the true purpose and intent of their transfers. On information and belief, there have been at least twenty-three relevant transactions related to Defendants' terrorist-funding scheme that were denominated in U.S. dollars, although this is only a list of transactions available without discovery.

286. On information and belief, Defendants made at least nine U.S. dollar-denominated upstream payments (payments from a Lafarge entity to LCS) and at least fourteen U.S. dollar-denominated downstream payments (payments from LCS to an intermediary) through the New York banking system. Upstream payments were the ones that Lafarge made, typically through Lafarge Cyprus, to send LCS money for operating expenses—which included payments to terrorists. *See infra* ¶¶ 290-291). Lafarge made downstream payments to Tlass and Taleb so that they could pay armed groups such as ISIS and ANF on Lafarge's behalf. The chart below depicts each payment:

| Date | Category | Sender | Recipient | USD Amount |
|---|---|---|---|---|
| 4/28/2011 | Upstream | Lafarge Cyprus | LCS | $20,000,000 |
| 7/31/2011 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| 8/25/2011 | Upstream | Lafarge Cyprus | LCS | $10,000,000 |

| Date | Category | Sender | Recipient | USD Amount |
|---|---|---|---|---|
| 8/25/2011 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| 3/18/2012 | Upstream | Lafarge Cyprus | LCS | $10,000,000 |
| 9/27/2012 | Upstream | Lafarge Cyprus | LCS | $16,500,000 |
| 12/27/2012 | Upstream | Lafarge Cyprus | LCS | $15,500,000 |
| July 2013 | Downstream | LCS | Tlass | $75,000 |
| August 2013 | Downstream | LCS | Tlass | $75,000 |
| September 2013 | Downstream | LCS | Tlass | $75,000 |
| 9/30/2013 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| October 2013 | Downstream | LCS | Tlass | $75,000 |
| November 2013 | Downstream | LCS | Tlass | $75,000 |
| December 2013 | Downstream | LCS | Tlass | $75,000 |
| January 2014 | Downstream | LCS | Tlass | $75,000 |
| February 2014 | Downstream | LCS | Tlass | $75,000 |
| February 2014 | Downstream | LCS | Taleb | $4,836 |
| March 2014 | Downstream | LCS | Tlass | $75,000 |
| April 2014 | Downstream | LCS | Tlass | $75,000 |
| May 2014 | Downstream | LCS | Tlass | $75,000 |
| June 2014 | Downstream | LCS | Tlass | $75,000 |
| 6/10/2014 | Upstream | Lafarge Cyprus | LCS | $11,000,000 |
| 10/23/2014 | Downstream | Lafarge Cyprus | Tlass | $210,000 |

287.    On information and belief, the nine upstream payments, totaling $98 million, were disbursements made under an April 7, 2011 loan agreement between Lafarge Cyprus and LCS to give LCS operational funding, including money used to pay terrorists.  Lafarge's General Counsel and Corporate Secretary signed the loan agreement on Lafarge Cyprus's behalf and oversaw the first seven disbursements and Lafarge's Assistant General Counsel oversaw the final two disbursements.  Lafarge Cyprus funded LCS at Lafarge's direction and subject to its control.  Indeed, Lafarge admitted it was responsible for the October 23, 2014 payment to Tlass, although

Lafarge structured that payment as nominally originating from Lafarge Cyprus.[164]   The other Lafarge Cyprus payments above similarly occurred at Lafarge's direction.  Lafarge Cyprus sent the upstream payments in part by wiring U.S. dollars into accounts LCS maintained with Bank Audi in Lebanon and Syria.  LCS in turn paid out the U.S. dollars to pay Taleb and Tlass to dole out to the terrorist groups with whom Lafarge conspired.  Lafarge Cyprus's payment method was the best way for LCS to seek to evade sanctions and other legal prohibitions on financial transfers to Syria.

288.   When Lafarge decided to make an $11 million disbursement on June 10, 2014 through Lafarge Cyprus, it had long known LCS was making payments to terrorists including ISIS through intermediaries—it was doing so with Lafarge executives' oversight and approval.  It also knew LCS was paying Tlass $75,000 USD monthly to compensate him for negotiating with ISIS. Lafarge still decided to pay LCS an additional $11 million in what an email from its treasury manager called "fresh cash"—i.e., cash for terrorists.

289.   All but one of the fourteen downstream payments were payments LCS made to Tlass to enable his payments to ISIS and ANF; the remaining payment was a $4,836 payment to Taleb, also an ISIS fixer.  *See supra* ¶ 235-36.  With regard to the $75,000 monthly payments that LCS made to Tlass, Lafarge's agreement with Tlass provided that Tlass would "retain $50,000 and the remaining $25,000 would be disbursed to armed groups."[165]  The amounts were purposefully in U.S. dollars for the purposes of stability and concealment described above.  The final payment of $210,000 included $150,000 to cover Tlass's monthly stipend from July and August 2014.  On information and belief, U.S. dollar payments, which were required under the contract Defendants

---

[164] SOF ¶¶ 102-03.
[165] SOF ¶ 61.

negotiated with Tlass, and which were also paid to intermediary Taleb, continued after October 2014 as Defendants continued to try to regain control of the Cement Plant into and after early 2015.

290.    The earlier upstream payments were likewise linked to Defendants' terror-financing scheme through their intermediary Tlass.  Beginning in or around 2010, Lafarge and LCS began paying Tlass in monthly installments under a "local project support agreement."  By then, Tlass was a known fixer for the Assad regime, which was part of the reason why Lafarge hired him and placed him on its board.  Tlass's close ties to the regime connected Defendants to the Syrian government.  The Assad regime was then a notorious terrorist sponsor that provided substantial support to ISIS and ANF's predecessor, AQI.  While Defendants were partnering with one of the regime's most infamous fixers, Syria was openly aiding AQI (and later ISIS) through money, recruiting, training, and safe haven.  As "[n]umerous courts" have found after considering the evidence, "Syria supported ISIS and its predecessor organizations."[166]  Defendants' U.S. dollar financing thus was linked to Syrian-sponsored terrorism from the outset.

291.    While the specific identity of the terrorists Tlass supported on Lafarge's behalf evolved, Lafarge and LCS continuously paid Tlass in U.S. dollars to maintain good relations with violent Syrian groups.  Those efforts focused at first on the Assad regime and AQI, and later evolved to include ISIS and ANF, reflecting a continuous course of conduct dating back to at least 2010.  When Defendants started using the U.S. banking system to cover LCS's payments to Tlass in 2011, therefore, it knew it was paying him to maintain LCS's relationships with Syrian terrorist networks.  Lafarge's decision to extend that strategy to ISIS and ANF in 2013 and 2014 was a foreseeable outgrowth of the same strategy and conduct.

---

[166] *Fields v. Syrian Arab Republic*, No. 18-1437, 2021 WL 9244135, at *3 (D.D.C. Sept. 29, 2021).

292.     Lafarge's U.S. dollar transactions almost certainly cleared through CHIPS, and thus through New York banks.  Participating in the clearing system requires U.S. presence, in part to ensure that U.S. law will govern cross-border U.S. dollar transactions, and most banks able to conduct such cross-border transactions are based in New York.

293.     On information and belief, Defendants' U.S. dollar transactions followed the norm and were sent via New York's banking system.  This allegation is based on the specific banks Defendants used to effectuate these transactions and on at least three examples of transactions that Lafarge and Lafarge Cyprus specifically cleared through New York (beyond the one transaction to which it has admitted).

294.     Defendants relied predominantly on three bank branches in funding their payments to terrorists: Bank Audi (Lebanon), Bank Audi (Syria), and BNP Paribas (Egypt).  The use of these banks supports the allegation that Defendants purposefully cleared their U.S. dollar transactions through New York due to their correspondent bank relationships with New York banks.

295.     LCS held accounts with Bank Audi SAL ("Bank Audi Lebanon") that it used to make many of its payments to Tlass and Taleb and to receive upstream funding from Lafarge and Lafarge Cyprus.  Bank Audi Lebanon was based in Beirut and operated as the Lebanese branch of Bank Audi, a multinational bank.  Bank Audi Lebanon maintained U.S. dollar correspondent accounts at least at the following New York banks, all of which Bank Audi has publicly acknowledged:

| No. | Correspondent U.S. Bank Relationship in New York | Correspondent U.S. Bank SWIFT Code[167] |
|---|---|---|
| 1 | Standard Chartered Bank – NY | SCBLUS33XXX |
| 2 | JPMorgan Chase Bank, N.A. | CHASUS33XXX |
| 3 | The Bank of New York Mellon | IRVTUS3N |
| 4 | HSBC – NY | MRMDUS33XXX |
| 5 | Citibank, N.A. | CITIUS33XXX |

296.    Bank Audi Lebanon does not have independent dollar clearing capabilities.  It processed Defendants' U.S. dollar transactions through the New York banking system by routing their funds through Bank Audi's correspondent accounts with these New York banks, including but not limited to JPMorgan Chase's New York branch.

297.    Bank Audi Lebanon's standard settlement instructions support the conclusion that Defendants' transactions relied on New York correspondent accounts.  Standard settlement instructions detail the accounts a financial institution will use to complete transactions depending on the currency the institution's customer selects.  Before the relevant time frame, Bank Audi published its standard settlement instructions in the *Banker's Almanac*, an authoritative and publicly available compendium of international banking information.  Those instructions, available to Defendants, specified that Bank Audi Lebanon typically settled U.S. dollar wire transfers through its correspondent accounts at "The Bank of New York, New York" and "JPMorgan Chase Bank, National Association, New York."

298.    On information and belief, from 2011 through 2015, LCS used Bank Audi Syria S.A. ("Bank Audi Syria") as Bank Audi's branch in Damascus.  On information and belief, at all

---

[167] Some of these accounts were used for Eurodollar-related transactions that flowed through the U.S. banking system. On information and belief, Defendants likely used the same correspondent accounts to facilitate their U.S. dollar-denominated transactions or used other correspondent accounts at the same banks to facilitate such transactions.

relevant times, Bank Audi Syria faced significant obstacles conducting cross-border U.S. dollar-denominated transactions due to applicable U.S. sanctions.  So, LCS relied on its U.S. dollar accounts at Bank Audi Lebanon instead for U.S. dollar transactions.

299.    On information and belief, on or about 2013, Lafarge and Lafarge Cyprus also instructed LCS to open an Egyptian bank account in the name of Lafarge's Egyptian subsidiary, Lafarge Middle East & Africa Building Materials, which Lafarge internally called "LMEA."  On information and belief, LCS opened this LMEA account at BNP Paribas's branch in Cairo.  LCS regularly used its "LMEA Account" to make and receive U.S. dollar payments, including by making a July 2013 payment of $75,000 from LCS to Tlass.  Lafarge funded the Account, via Lafarge Cyprus in U.S. dollars as needed, for LCS's benefit.  On information and belief, Defendants used this account to make many suit-related U.S. dollar payments, including transactions not listed among the 23 in the table above.

300.    Like Bank Audi, BNP Paribas's subsidiaries clear their U.S. dollar transactions through New York.  According to its 2012 Patriot Act certification, BNP Paribas's subsidiaries, including its Egyptian branch, relied on "correspondent banks in the United States."  BNP Paribas's global Corporate and Investment Banking Group, of which the LMEA Account was a part, regularly relied on U.S. banks to clear its U.S. dollar transactions.  Due to a highly publicized U.S. enforcement action in mid-2014, BNP Paribas was forced to suspend U.S. clearing operations for a year.  As a prominent French newspaper noted in reporting on that action, BNP Paribas recognized that its U.S. dollar transactions for sanctioned entities exposed it to U.S. criminal penalties, because when "any dollar transfer passes through the United States to be cleared by the

American financial system, [that] dollar transaction is automatically governed by U.S. law."[168]  On information and belief, BNP Paribas's Egyptian branch cleared U.S. dollars the same way until that suspension.

301.    BNP Paribas's standard settlement instructions confirm that Defendants' transactions using the LMEA Account cleared in New York.  Like Bank Audi, BNP Paribas published its standard settlement instructions in the *Banker's Almanac*.  Before the relevant time frame, BNP Paribas Egypt advertised its "Correspondent Banking" service and identified "BNP Paribas SA" as its "correspondent" bank in "New York."  The standard settlement instructions likewise specified that BNP Paribas Egypt typically settled U.S. dollar wire transfers for its customers through its correspondent account with "BNP Paribas SA, New York."

**Examples Of Defendants' Transactions Through New York**

302.    Plaintiffs are aware, on information and belief, of at least three transactions related to Defendants' terrorist-financing scheme that Defendants specifically cleared through New York banks.  These examples were found without discovery.  The details of such transactions rest within Defendants' exclusive control, so it is expected that many more examples will be available through discovery:

| Date | USD Amount | Originating Bank / Originator | Beneficiary Bank / Beneficiary | New York Correspondents |
|---|---|---|---|---|
| 8/25/2011 | $5,000,000 | Citibank Dubai / Lafarge Cyprus | Bank Audi / LCS | Citibank New York JP Morgan Chase |
| 8/25/2011 | $10,000,000 | Citibank Dubai / Lafarge Cyprus | Bank Audi / LCS | Citibank New York JP Morgan Chase |
| 10/23/2014 | $210,000 | (Forthcoming) – (France) / Lafarge Cyprus | (Forthcoming) – Dubai / Tlass | (Forthcoming) – New York |

---

[168] Veronique Chocron, *Embargo Américain: La Banque Française S'attend à Payer une Amende* (American Embargo: The French Bank Expects to Pay a Fine), Les Echos (Nov. 21, 2013), https://www.lesechos.fr/2013/11/embargo-americain-la-banque-francaise-sattend-a-payer-une-amende-331866 (translated from French).

303.    When Lafarge chose to make these payments through Lafarge Cyprus, it purposefully reached into New York to complete the transactions.  For example, with the October 23, 2014 payment for Tlass's negotiations with ISIS, Jolibois directed Tlass to issue a $210,000 invoice from a Dubai shell company.  On information and belief, Lafarge paid the invoice by directing its Parisian bank to initiate a wire transfer on behalf of Lafarge Cyprus, which sent funds through New York correspondent banks—including at least one in this District—to Tlass's bank account in Dubai.  On information and belief, and part and parcel with their efforts to conceal their conduct, Defendants knew and intended that this transaction would use the U.S. financial system and to clear through New York.[169]

304.    Given that these transactions formed part of a common course of conduct involving U.S. dollars, Defendants likely used the same (or similar) New York banks to route other U.S. dollar transfers through New York.  In general, customers and their banks follow similar routing processes to complete similar transactions in the same timeframes for the same currencies.  Given that standard practice, and the other allegations above, including that the use of such transactions was the method chosen to conceal the conspiracy, these three examples are likely merely illustrative of Defendants' broader practice of using New York banks to complete the U.S. dollar transactions in which they systematically engaged as part of the conspiracy.  Indeed, it is implausible that Defendants used New York banks for just these three transfers and not any of the myriad similar transactions alleged herein.

---

[169] The other two transactions, made in 2011, also supported LCS's operations in Syria, including payments to Tlass.  *See supra* ¶ 290.

**Defendants' Use Of New York Banks Was Material To Their Scheme**

305.     Using U.S. dollars made the conspiracy with ISIS easier and more efficient for participants, and more difficult for outsiders to detect.  While ISIS was not always paid in U.S. dollars, this was ISIS's and Defendants' preferred currency.[170]  Defendants' regular and deliberate use of U.S. dollar transactions, which in turn depended on their access to the New York banking system, was vital to the scheme's concealment and success.  Their conscious choice to use U.S. dollars and New York banks offered at least three benefits.

306.     First, using U.S. dollars and U.S. banks helped Lafarge conceal their payments from outside auditors, regulators, and law enforcement officials.  Concealment was of paramount importance, given the stringent U.S. and international sanctions targeting Syria at the time and the illegality of payments to terrorists.  Lafarge's Syrian operations faced significant financial scrutiny.  The use of U.S. dollars helped Defendants avoid the scrutiny of LCS's external auditors.  Transactions in Syrian pounds raised red flags among regulators, auditors, and bank-compliance departments, while U.S. dollars were associated with legitimate cross-border transactions, particularly when routed to companies outside Syria.  Lafarge's executives thus "preferred" Lafarge's payments for ISIS be made in "bank transfer[s] in USD," to give its wire transfers the imprimatur of legitimacy associated with U.S. dollar transactions.

307.     On information and belief, Lafarge funneled payments through a web of 54 different bank accounts (mostly at Bank Audi), including several Pescheux routed through a personal account he could keep off Lafarge's books.  Using such a large number of accounts made it even more difficult for others to detect the scheme.  The excessive number of bank accounts,

---

[170] SOF ¶ 60.

which Defendants actively created, demonstrates a broader point: secrecy was vital, and Defendants were affirmatively involved in the financial machinations that enabled their scheme.

308.    By routing their payments through New York, Defendants maximized the effectiveness of their terrorist funding.  New York is the global hub of cross-border U.S. dollar transfers for good reason: Companies that wire their U.S. dollars through New York gain from the legitimacy, reliability, and speed offered by New York clearing.  Transacting through other clearing centers in Tokyo, Hong Kong, Singapore, and Manila is theoretically possible, but requires extra cost and time and raises questions about why the transaction is exceptional—operational risks that New York clearing avoids.

309.    Had Defendants attempted to route their U.S. dollar payments differently, the payments would have stood out as unusual, risking the very type of outside attention from auditors and regulators Defendants were striving to avoid.  Defendants knew that attempting to route U.S. dollar transactions through non-New York centers was inadvisable.  In or around 2012, U.S. sanctions began impeding the ability to route U.S. dollars in and out of Syria.  On information and belief, New York banks began refusing to process transactions they knew were for LCS or other Syrian actors.  In 2013, when Taleb complained about LCS's lack of prompt payment, LCS employees said that New York correspondent banks were refusing to process their transactions and tried to find other banks to complete the payment, creating further delays and expense.

310.    In response, Defendants structured transactions that would use the New York banking system to appear as though they were going somewhere other than Syria, for example through the LMEA Account in Egypt.  Defendants told Tlass to create a Dubai company for Lafarge Cyprus's payment to avoid Syrian contacts, and he did so.  These bank account locations

enabled Defendants to route their U.S. dollar payments through New York banks but still get money into Syria, and it was faster and more reliable than the alternatives.

311.    Second, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk and the plummeting value of the Syrian pound.  At the beginning of 2012, the Syrian pound was trading against the U.S. dollar at roughly 54:1.  By the end of 2014, it had depreciated to roughly 180:1—losing more than two-thirds of its value.  This made Syrian pounds unappealing for any long-term deal.  Indeed, Tlass demanded that Lafarge pay his monthly fee in U.S. dollars in part because the Syrian pound was losing value so rapidly as to become effectively worthless.

312.    ISIS's and ANF's preferred currency was also the U.S. dollar.  U.S. currency made the conspiracy flow.  Real-time public reports linked ISIS's fundraising and recruiting success to its stockpile of U.S. dollars, which is how ISIS fighters wanted to be paid.  As Business Insider reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money.  After joining [ISIS], people are paid in US dollars instead of Syrian [pounds] . . . ISIS members receive additional incentives to fight for the group.  "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said].  "It cost $50 per month.  [ISIS] paid for the house, the electricity.  Plus, I was married, so I got an additional $50 per month for my wife.  If you have kids, you get $35 for each.  If you have parents, they pay $50 for each parent.  This is a welfare state."

313.    ISIS preferred U.S. dollars for goods it sold and to pay its fighters.  According to the Independent, ISIS "promoted the idea that it was hitting the US economy by issuing its own currency but the organisation on the ground is doing exactly the opposite, having built a financial system entirely dependent on the US dollar."

314.    For the reasons above, had Defendants not chosen to reach into New York and use New York banks to transact in U.S. dollars, their scheme of sending payments to ISIS would have been less effective, more expensive, and harder to conceal.  Hiding it meant it could continue and grow.

## Defendants' Use Of New York Banks Was Purposeful, Knowing, And Intentional

315.    Defendants' use of New York banks was deliberate.  U.S. dollars were critical to Defendants' scheme with ISIS and its intermediaries.  Needing a safe, effective, and opaque means to transfer their cash, Defendants purposefully chose New York.

316.    Defendants' executives were aware of how Defendants' money was transferred quickly and effectively to and from LCS.  A Lafarge email discussing its June 2014 loan to LCS demonstrates the degree of that involvement.  In that email, Lafarge's treasury managers discussed the need for Lafarge (through Lafarge Cyprus) to "increase its outstanding subordinated shareholder loan" to LCS by "US$12m to give LCS a small buffer" to cover its ongoing U.S. dollar shortfalls.  In that discussion, Lafarge employees demonstrated an awareness of how to route the money.  As the same email explained, the wire-transfer "process must start in the few coming days due to time needed to channel the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria."  The reference to "Lebanon," on information and belief, referred to LCS's account at Audi Bank Lebanon.  Lafarge was thus aware of Bank Audi's correspondent-banking policies, and it sought to guard against the risk that using New York correspondent accounts would expose it to prosecution for violating U.S. sanctions.

317.    The steps Defendants took to conceal their transactions confirm that their use of New York banks was deliberate, including by using an "LMEA Account" in Egypt and ordering

Tlass to open an account in Dubai.  Both of these accounts were intended to trick U.S. banks into completing transfers to circumvent U.S. sanctions against transactions in Syria and to conceal payments from French auditors and law enforcement officials.  They made sense only if Defendants were actively seeking to use the New York clearing system.

318.    Defendants' executives also regularly and purposefully received specific transaction confirmations alerting them to the particular New York correspondent and intermediary banks that routed their transactions.  On information and belief, these confirmations typically took the form of SWIFT MT103 messages.  SWIFT, which stands for the Society for Worldwide Interbank Financial Telecommunication, is the standard communications system for sending cross-border wire-transfer messages between financial institutions.  An MT103 (or Message Type 103) is a standard message confirming the details of an executed transaction.  Fields 53, 54, and 56 in an MT103 typically disclose the correspondent and intermediary banks involved.  On information and belief, Lafarge (acting through Lafarge Cyprus) and LCS regularly requested and received SWIFT confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions.  On information and belief, Pescheux specifically approved at least one of the 2011 New York-cleared transactions alleged above, after personally requesting the SWIFT confirmation disclosing that JPMorgan Chase's and Citibank's New York branches were involved in routing the transaction.

319.    Defendants paid and were therefore alerted to banking fees for the New York banks that cleared their transactions.  Correspondent and intermediary banks typically charge a fee for each wire transfer that they process, which can be paid in three ways; the specific payment mechanism is typically reported at Field 71A of the SWIFT MT103.  Option one—denoted by "OUR"—has the originator cover the fees separately, on top of the amount transferred.  For

example, on information and belief, the SWIFT message for the $10 million U.S. dollar upstream payment denoted above, *supra* ¶ 291, used the "OUR" option in Field 71A, meaning that Lafarge Cyprus separately paid JP Morgan Chase's fees to compensate it for its New York clearing services. Option two, denoted by "BEN," covers the fees by deducting them from the amount transferred. Option three, denoted by "SHA," is a mix of the two.  In each scenario, the sender wires the money to the intermediary or correspondent bank to compensate that bank for the service of processing the transaction.  Thus, when Defendants effectuated U.S. dollar transactions to pay terrorists and their intermediaries, they knowingly elected how to pay those New York banks for the service. Defendants—not their originating banks—covered the payment of these fees into New York.

320.    Defendants' banks publicly advertised that they routed U.S. dollar transactions through New York on their websites.  Bank Audi's public marketing also alerted Defendants to the New York connection.  Specifically, Bank Audi's "Worldwide Correspondents" website disclosed that its U.S. dollar transactions relied on banks in the "U.S.A." and "N.Y.":



321.    Even the Syrian government alerted Defendants that their U.S. dollar transactions went through New York.   In February 2006, the Syrian government issued Circular Number 810/15, requiring that all foreign currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros, specifically to avoid U.S. dollar clearing by New York banks.   That decision, of which Defendants were aware, reflected the widespread understanding in Syria that any U.S. dollar transaction goes through U.S. banks.

322.    Client alerts published by Lafarge's outside counsel also alerted Defendants that their transactions used the U.S. banking system.   While Shearman & Sterling LLP was advising Lafarge, it published a non-privileged client alert warning all its clients, including Lafarge, that the United States Department of Justice and Securities and Exchange Commission's guidance indicated an "expansive assertion of territorial jurisdiction over non-U.S. defendants," including over "overseas financial transactions involving US dollars," because "virtually all such transactions clear through correspondent banking accounts in the U.S."   While Baker & McKenzie represented Lafarge, it alerted its clients about the same guidance, namely that "a wire transfer from or to a U.S. bank or otherwise using the U.S. banking system" may create jurisdiction in the U.S. based on the "use of correspondent bank accounts."

323.    Finally, decades of media reports about CHIPS and correspondent banking also alerted Defendants that their U.S. dollar transactions used New York banks, as far back as articles in the *American Banker* in 1989,[171] *Los Angeles Times* in 1991,[172] *Australian Financial Review* in 2002,[173] *The Mail on Sunday* in 2004 (quoting a source as saying "[c]urrently, if you want to pay

---

[171] *Glossary Of Computer Technology Terms,* American Banker, Feb. 1, 1989, at 10, 1989 WLNR 1319450.

[172] Glas Frantz, *Lax Rules Blamed in Bank Schemes*, Los Angeles Times (Apr. 28, 1991), 1991 WLNR 3887729.

[173] John Breusch, *US Patriot Law Could Involve Local Banks*, Australian Financial Review (Feb. 12, 2002), 2002 WLNR 15725873.

United States dollars from bank A to bank B, that transaction has got to go via New York."),[174] *Newsweek International* in 2006,[175] *The Economist* in 2013,[176] and *Gulf News* in 2014.[177]  Thus, Lafarge officials, who ran the largest and most sophisticated construction material multinational in the world, advised by top U.S. law and consultancy firms, were aware of this issue, which had become common knowledge through the media.

**b. Defendants Used U.S.-Based Email Providers To Veil Their Terrorist-Financing Scheme**

324.    To evade detection of their conspiracy with terrorist groups, Defendants also reached into the United States to use U.S.-based email services, reaping the benefit of their email providers' U.S. presence.  Those U.S.-driven benefits also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists.

325.    Lafarge's executives were explicitly instructed by their counsel to use personal email addresses rather than their corporate accounts.  These email addresses were primarily Gmail accounts.  On information and belief, Defendants sent and received hundreds of scheme-related communications through these and other such accounts:

| Account Owner | Role of Account Owner | Email Address |
|---|---|---|
| Bruno Pescheux | CEO of LCS until July 2014 | brunopescheux@gmail.com |
| Firas Tlass | Defendants' agent and intermediary who paid ISIS on their behalf | Firastlass01@gmail.com |
| Mamdouh al-Khaled | LCS Purchasing Manager | Mamdouh.lafarge@gmail.com |
| Hassan al-Saleh | LCS Plant Manager | Hassan.cement65@gmail.com |

---

[174] John Mushayavanhu (Vice Chairman of Bankers Association of Zimbabwe), *quoted in Zimbabwe: Local Forex Clearance System Expected Soon*, allAfrica (Apr. 10, 2009), https://allafrica.com/stories/200904100724.html.
[175] Christian Caryl et al., *Pocketbook Policing: Washington Has Finally Found A Strategy That Is Putting Real Pressure On The Regime—Going After Its Sources Of Cash, All Across The World*, Newsweek Int'l (Apr. 10, 2006), 2006 WLNR 5632771.
[176] Economist, *Digital Currencies: A New Specie*, Economist (Apr. 13, 2013), 2013 WLNR 8890628.
[177] Babu Das Augustine, *UAE To Sign FATCA Agreement Soon*, Gulf News (Mar. 13, 2014), 2014 WLNR 6929583.

| Ahmad Jamal | ISIS representative who supplied materials to LCS | Ahmad.jamal1966@gmail.com |
|---|---|---|

326.    Carrying out a criminal conspiracy via Gmail, rather than corporate email, matched standard practice among terrorists and their funders, who rely on cheap and easily available technologies that are anonymous, such as Gmail.  Defendants' use of Gmail relied on extensive U.S. infrastructure.  Google operated the majority of its data centers in the United States, which enabled Defendants' conspiracy-related emails to reach their destinations securely and reliably, including through regular backups, and to be concealed from Defendants' auditors and French law enforcement authorities.

327.    Defendants and their agents agreed to numerous U.S. contacts by agreeing to use and regularly using their U.S.-based Gmail accounts.  They reached into the United States to make a contract with a U.S. company, by agreeing to Google's Terms of Service, which in 2013 made clear that Gmail was "provided by Google, Inc. ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States" and regulated by the "laws of California, U.S.A. . . ."  They also sent and received data and services from Google in the United States.  Thus, when Defendants signed up for Gmail and used it to carry out their scheme, they knew they were paying an American company for the American service they were using.  Rather than sending a wire transfer delivering cash to their U.S. counterparty, they delivered their data.

328.    Because Gmail is based in the United States and operates under U.S. law, it is more difficult for foreign prosecutors and regulators to access.  U.S. law at the time constrained releases of customer data to foreign governments, making the evidence nearly impossible for European law enforcement to access.  Had Defendants chosen to use non-U.S.-based email, such as their corporate account or a free European email service, their communications would have been more

susceptible to access by French regulators and law enforcement, and this may have heralded the end of the scheme.

### c. Defendants Purposefully Entered Into A Conspiracy With ISIS, Pursuant To Which ISIS Engaged In Acts That Targeted The United States

329.    It is undisputed that Defendants conspired with ISIS via intermediaries by means of conduct and agreements impacting the United States.  That is the primary basis for Lafarge and LCS's guilty plea.

330.    Defendants used ISIS's grip on territory to their benefit: ISIS was a good business partner for Lafarge.  And Lafarge's willingness to pay ISIS gave ISIS a unique opportunity to increase market share, expand operations, and commit more terrorist attacks.  Lafarge gained the ability to do what it had not done before: partner with an armed force that ruled by force, not law, and was willing to neutralize the competition.  This allowed Lafarge to increase the profits that it would then share with its terrorist partner.

331.    For the co-conspirators to continue to profit, ISIS needed to remain in control, expand its reach over territories and markets, and continue to tax and intimidate LCS's competitors.  ISIS's constant violence, in turn, backed up its credible threat.  Violence was crucial to the racket, because it made the population believe ISIS's willingness to back up its threats.  When Defendants participated in ISIS's extortion and protection racket, it joined and relied upon a conspiracy that was explicit in its purpose of making money through the perpetuation of terrorist violence—even more the case when Defendants entered into a direct revenue-sharing agreement with ISIS.

332.    Unsurprisingly, and in line with its express statements, ISIS engaged in numerous overt acts both in and expressly aimed at the United States to further its terrorist aims.  ISIS's global ambition and historical roots in Al-Qaeda meant that targeting the United States and

American citizens was one of its principal goals.  These attacks ramped up as Defendants increased their payments, holding Americans captive and killing American hostages in gruesome video messages broadcast around the world and directed explicitly to the United States.  As Deputy Attorney General Monaco stated in connection with Lafarge and LCS's guilty plea, during Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families whose loved ones were brutally murdered by ISIS."

333.    Defendants only redoubled their efforts to work with ISIS as American forces conducted air strikes against ISIS to stop its siege of Yazidis in August 2014 and after ISIS publicly beheaded American journalists.  ISIS publicly celebrated its horrific acts and was open about the fact that, before and during the conspiracy, it was targeting the United States.  ISIS leaders "threatened America and our allies," according to President Obama, who announced this after ordering air strikes to counter ISIS in Iraq and Syria to "save the lives of thousands of innocent men, women, and children," including Yazidis.

334.    ISIS was outspoken about its intent to commit acts of terrorism against the United States, as well as its intentional recruitment from the United States.  In July 2012, Al-Baghdadi, ISIS's founder and leader, threatened to strike at the "heart" of America, proclaiming that the United States "will soon witness how attacks will resound in the heart of your land, because our war with you has now started."  In January 2014, Al-Baghdadi announced to Americans: "Soon we will be in direct confrontation."  And in June 2014, Al-Baghdadi threatened Americans: "You should know, you defender of the cross, that getting others to fight on your behalf will not do for you in Syria as it will not do for you in Iraq," and that "soon enough, you will be in direct confrontation—forced to do so, God willing.  And the sons of Islam have prepared themselves for

this day. So wait, and we will be waiting, too." The threat to U.S. citizens was well known. On June 27, 2014, U.S. senators observed publicly that "[t]he conflict in Syria has deteriorated and spread so dangerously that it is now the source of direct threats to the United States" and that "[t]he leader of ISIS, Abu Bakr al-Baghdadi, has already stated his ambitions to attack the U.S. homeland."

335.  The threats to American citizens proved all too real. In August 2014, ISIS broadcasted its beheading of U.S. journalist James Foley and threatened the life of Steven Sotloff if President Obama did not end military operations in Iraq. Tellingly, the beheading videos of both Foley and Sotloff were titled "Message to America" and "A Second Message to America," respectively. ISIS stated that its killing of Sotloff was "the consequence of arrogance and transgression which all US citizens are responsible for" and "retaliation for the numerous Muslims killed in Iraq by the U.S. American airstrikes." Defendants nonetheless pressed ahead with making payments to ISIS.

336.  Likewise, in October 2014, ISIS published in its English-language publication an article entitled "Indeed, Your Lord is Ever Watchful," in which it explicitly spelled out ISIS's anti-American objectives, stating, for example:

> O America, O allies of America, and O crusaders, know that the matter is more dangerous than you have imagined and greater than you have envisioned . . . O Obama, O mule of the Jews, you are vile. You are vile. You are vile. And you will be disappointed, Obama. Is this all you were capable of doing in this campaign of yours? Is this how far America has reached in incapacity and weakness? Are America and its allies from amongst the crusaders and atheists unable to come down to the ground? . . .

> O Allah, America, France, and their allies transgressed against us. They came with their legions to fight us out of their enmity for your religion . . . We have no way to deal with their airplanes. O Allah, you have said what is true, 'So do not weaken and do not grieve, and you will be superior if you are [true].'

337.    A leading terrorism expert testified before the Subcommittee on Counterterrorism and Intelligence of the House Committee on Homeland Security that the "U.S. military has ostensibly become a primary target for the Islamic State."

338.    The United States' status as global superpower meant that victimizing Americans and killing American soldiers was an especially effective way to convey ISIS's authority.  Brutally killing American citizens "send[s] a message to American . . . people," and the world, of ISIS's power.[178]

339.    Given the United States' unique military ability, ISIS's attacks on U.S. citizens and their families, including Plaintiffs, in Syria, Iraq, and elsewhere were an important part of Lafarge's conspiracy with ISIS.  Attacks on American interests, or that enmeshed the United States in further conflict, had symbolic value and allowed ISIS to tout that it could beat the most powerful military in the world.

340.    The United States has convicted ISIS terrorists based on their targeting of the United States.  On September 2, 2021, former British citizen Alexanda Amon Kotey pleaded guilty in the Eastern District of Virginia to an eight-count indictment for his participation in ISIS's hostage-taking and terrorist activities, which consisted of one count of conspiracy to commit hostage taking resulting in death; four counts of hostage taking resulting in the deaths of four Americans (Foley, Sotloff, Kayla Mueller, and Abdul-Rahman (Peter) Kassig); one count of conspiracy to murder U.S. citizens outside of the United States; one count of conspiracy to provide material support or resources to terrorists resulting in the deaths of U.S., British, and Japanese nationals; and one count of conspiracy to provide material support or resources to a designated

---

[178] Daniel Byman, *Al Qaeda, The Islamic State, And The Global Jihadist Movement: What Everyone Needs To Know* 175-77 (Oxford Univ. Press 2015).

FTO resulting in the deaths of U.S., British, and Japanese nationals.  Kotey was sentenced to eight concurrent terms of life imprisonment on April 29, 2022.

341.    On April 14, 2022, a federal jury in the Eastern District of Virginia convicted Kotey's co-conspirator, former British citizen El Shafee Elsheikh, for his participation in the same ISIS terrorism scheme.  Elsheikh was the highest-ranking ISIS fighter to have ever faced a jury trial in the United States, following leadership in a scheme that ultimately involved the captivity of at least 26 hostages in Syria, including the four American citizens who were killed.  According to the DOJ, these Americans were subjected to a "prolonged pattern of physical and psychological violence . . . that was meant as an effort to subdue the hostages.  These actions were also intended to compel the victims' family members and their governments to pay large monetary ransoms for their release, in addition to compelling the U.S. government and other governments to agree to other terms and conditions for the victims' return."  Thirty-five witnesses at the trial presented evidence covering the period from November 2012 through February 7, 2015 of Elsheikh's participation in torturing the hostages, including a Yazidi woman who was held as a slave alongside Mueller.  Elsheikh was sentenced to eight concurrent terms of life imprisonment without the possibility of parole on August 19, 2022.

342.    Other ISIS members have been tried and convicted in this District.  For example, in 2013, Mirsad Kandic traveled from Brooklyn to a city outside of Aleppo, Syria to work directly with ISIS leadership.  Kandic managed ISIS social media accounts and recruited thousands to ISIS, including from New York.  In 2022, Kandic was convicted of five counts of providing material support to ISIS and one count of conspiracy to do the same.  Likewise, Ruslan Maratovich Asainov, a U.S. citizen from Bay Ridge, New York was convicted in the Eastern District of New York for providing material support to ISIS.  Asainov fought with ISIS as a sniper from 2013 until he

surrendered in 2019. He ran a private chat group for ISIS members to sell and trade weapons called "Khilafah (Caliphate) Market," which included Raqqa governor Abu Luqman as a member. *See supra* Part VI(d).

343.    ISIS also reached into the United States to further the conspiracy. Al-Qaeda in Iraq, ANF's and ISIS's predecessor, threatened the United States numerous times, as did ISIS leaders. ISIS also recruited heavily from the United States, including from this District, drawing approximately 300 U.S. citizens who joined or attempted to join its ranks, with a small number of them ascending to senior positions within the terrorist group. Its members sent and received money from U.S. citizens for attacks in the U.S., Syria, and Iraq. ISIS propaganda officials tried to use events in Ferguson, Missouri and Baltimore, Maryland as recruiting tools.

344.    Defendants knew all of this, as confirmed by their emails. "[W]e should not forget that ISIS is a terrorist movement," Jolibois admonished Herrault in the course of a negotiation.[179] Defendants were also aware that the U.S. government had designated ANF and ISIS as FTOs. Defendants were familiar with the history of Al-Qaeda in Iraq and around the world, through their security consultant and intermediaries such as Tlass. Attacks on Americans and others took place while Lafarge was actively handing millions of dollars to ISIS and were an easily foreseeable— and indeed inevitable—result of entering into a deal with a group whose sole purpose was to subject non-Muslims to brutal terrorist rule and, in the case of Yazidis, to genocidal destruction.

345.    ISIS's overt acts targeted the United States and U.S. citizens. Lafarge bought protection from and entered a complex conspiracy with ISIS and its intermediaries, with the awareness that they were terrorist-classified groups. Lafarge conspired with full knowledge of their terrorist acts, including their targeting of the United States and U.S. citizens, in order to

---

[179] SOF ¶ 82.

control markets and increase profits.  As a result of the conspiracy between Defendants, intermediaries, and ISIS, ISIS's overt acts targeting the United States and U.S. citizens, including Plaintiffs and their loved ones, are attributable to Defendants.

## VIII. LAFARGE AND LCS PLEAD GUILTY TO CONSPIRING TO PROVIDE MATERIAL SUPPORT TO TERRORISTS

346.    On October 18, 2022, the DOJ announced that Lafarge and LCS pleaded guilty to a one-count criminal information in the Eastern District of New York charging them with conspiring to provide material support to ISIS and ANF in violation of 18 U.S.C. § 2339(B)(a)(1). It was the first time the DOJ had ever brought such charges against a company.

347.    U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial penalties, including criminal fines and forfeiture totaling $777.78 million.  At the conclusion of the sentencing hearing, Judge Kuntz said: "This case impacts global communities.  This case impacts the national security of the United States.  This case impacts the victims of terrorist acts perpetrated by ISIS and ANF.  And ultimately, this case is about what Lafarge and LCS did that brought us here today."

348.    Assistant Attorney General Matthew G. Olsen of the DOJ's National Security Division said: "The defendants routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations—ISIS and al-Nusrah Front in Syria—at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."  He continued: "There is simply no justification for a multi-national corporation authorizing payments to designated terrorist organizations."

## HARM TO PLAINTIFFS' PERSONS, PROPERTY, AND FAMILY AS A RESULT OF ISIS'S TERRORIST ATTACKS

349.    ISIS's terrorism campaign against the Yazidis in August 2014 caused unimaginable pain and suffering to the Yazidi community all around the world.  Left with nothing in Iraq, many

Yazidis who were directly victimized by ISIS immigrated to the United States on Special Immigrant Visas for helping the U.S. military, principally as interpreters. Others were granted refugee status on the basis of persecution or a well-founded fear of persecution on account of race, religion, nationality, or membership in a particular social group, and have since become citizens. Yazidis who had come to the United States prior to the genocide watched in horror as their families fled for their lives. These Yazidis, who are all U.S. citizens, have experienced extreme trauma, lost their family members, lost the jobs and businesses they used to support extended families, and lost their homes.

### Nadia Murad[180]

350.    Plaintiff Nadia Murad is a citizen of the United States and domiciled in the District of Columbia.

351.    Plaintiff Nadia Murad has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

352.    In particular, on or about August 3, 2014, during ISIS's invasion of Sinjar, Iraq, ISIS killed Plaintiff Nadia Murad's family, including her mother, brothers, and cousins, in mass executions. Three of Plaintiff Nadia Murad's brothers and one nephew were shot but survived the massacre and were able to escape. ISIS captured and enslaved Plaintiff Nadia Murad and her female relatives, including her sisters, nieces, and sisters-in-law. During captivity, Plaintiff Nadia Murad was physically, mentally, and sexually abused by twelve different ISIS militants until she was able to escape. Two of Plaintiff Nadia Murad's nieces died in ISIS's captivity. Plaintiff Nadia Murad's sisters were able to escape from ISIS, but one of her sisters-in-law and one of her nieces

---

[180] Official name Nadia Taha.

are still missing.  ISIS also captured Plaintiff Nadia Murad's nephews, one of whom is still missing.

353.    ISIS looted and destroyed Plaintiff Nadia Murad's real and personal property.

354.    As a result of ISIS's invasion, Plaintiff Nadia Murad has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of her family's society and counsel, and/or loss of property.

**Mahya Alqasim**

355.    Plaintiff Mahya Alqasim is a citizen of the United States and domiciled in the state of New York.

356.    Plaintiff Mahya Alqasim has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

357.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Mahya Alqasim, her husband, and their children fled their home towards Sinjar Mountain.  They were captured by ISIS en route to the mountain and taken to Syria.  Plaintiff Mahya Alqasim's husband was killed by ISIS and Plaintiff Mahya Alqasim and her children were in captivity for approximately nine months.  While they were in captivity, Plaintiff Mahya Alqasim and her children were moved to various locations, including Kocho and Mosul, and witnessed other Yazidis being killed, dying by suicide, and being sold into slavery.  Plaintiff Mayha Alqasim hid her children and tried to make herself look physically unattractive to avoid being sold into slavery.  After approximately nine months, Plaintiff Mayha Alqasim and her children were able to escape from ISIS captivity.  Her son escaped first, by jumping out of a building window, and the rest of the family then fled through the front door.  ISIS killed Plaintiff Mayha Alqasim's brother, and her stepfather died from heart complications after hearing the news of her brother's death.

358.     ISIS looted and destroyed Plaintiff Mahya Alqasim's real and personal property.

359.     As a result of ISIS's invasion, Plaintiff Mahya Alqasim has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Vinal Halaja**

360.     Plaintiff Vinal Halaja is a citizen of the United States and domiciled in the state of Arizona.

361.     Plaintiff Vinal Halaja has suffered severe injuries as a result of ISIS's campaign targeting Yazidis in Iraq.

362.     On or about August 3, 2014, during ISIS's invasion of Sinjar, Iraq, ISIS captured Plaintiff Vinal Halaja, her mother, brothers, sisters, and cousins.  Plaintiff Vinal Halaja's sister was sold when they were in Tel Afar, and another of Plaintiff Vinal Halaja's sisters and her sister-in-law were taken to Syria to be sold.  Plaintiff Vinal Halaja managed to stay with her mother and avoid being sold by cutting off her hair and acting as if she was mentally ill every time ISIS came to take women to sell.  Eventually, Plaintiff Vinal Halaja and her mother were released by ISIS.  Plaintiff Vinal Halaja's sisters have since managed to escape from ISIS captivity, but the whereabouts of her brothers are still unknown.  Her cousins were taken by ISIS and forced to convert to Islam.  Two of Plaintiff Vinal Halaja's uncles were also captured by ISIS.

363.     ISIS looted and destroyed Plaintiff Vinal Halaja's real and personal property.

364.     As a result of ISIS's invasion, Plaintiff Vinal Halaja has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Ezzat Kolo**

365.    Plaintiff Ezzat Kolo is a citizen of the United States and domiciled in the state of Georgia.

366.    Plaintiff Ezzat Kolo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

367.    In particular, on or about August 3, 2014, during ISIS's invasion of Sinjar, Iraq, ISIS captured Plaintiff Ezzat Kolo's parents, brothers, and their families.  A number of Plaintiff Ezzat Kolo's family members were transferred to Syria.  ISIS released Plaintiff Ezzat Kolo's parents, but his brothers, nieces, and nephews are still in captivity.  Plaintiff Ezzat Kolo's other siblings fled to Sinjar Mountain when ISIS invaded their hometown and were trapped there until they were able to escape to Kurdistan.

368.    ISIS looted and destroyed Plaintiff Ezzat Kolo's real and personal property.

369.    As a result of ISIS's invasion, Plaintiff Ezzat Kolo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Nori Khalaf**

370.    Plaintiff Nori Khalaf is a citizen of the United States and domiciled in the state of Nebraska.

371.    Plaintiff Nori Khalaf suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

372.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nori Khalaf and his family fled to Sinjar Mountain, where they were trapped until

they were able to escape to Kurdistan.  While fleeing, Plaintiff Nori Khalaf was held at gunpoint by ISIS.  ISIS captured and held Plaintiff Nori Khalaf's cousin and her daughter for three years.

373.    ISIS looted and destroyed Plaintiff Nori Khalaf real and personal property.

374.    As a result of ISIS's invasion, Plaintiff Nori Khalaf has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Hakim Osman**

375.    Plaintiff Hakim Osman is a citizen of the United States and domiciled in the state of Nebraska.

376.    Plaintiff Hakim Osman has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

377.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hakim Osman fled to Kurdistan with his parents and siblings.  ISIS captured Plaintiff Hakim Osman's uncle, aunt, and their children.  His uncle and cousin are still missing.  Plaintiff Hakim Osman now suffers from nightmares and flashbacks following the invasion.

378.    ISIS looted and destroyed Plaintiff Hakim Osman's real and personal property.

379.    As a result of ISIS's invasion, Plaintiff Hakim Osman has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Khidhir Ido**

380.    Plaintiff Khidir Ido is a citizen of the United States and domiciled in the state of Nebraska.

381.   Plaintiff Khidhir Ido has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

382.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khidhir Ido fled to Sinjar Mountain with his family, including his parents and some of his siblings, where they were trapped until they were able to escape to Kurdistan.  During the escape, Plaintiff Khidhir Ido lost contact with his wife and baby for several days, and they were only reunited in Kurdistan.  Plaintiff Khidhir Ido's baby daughter developed serious injuries while on the mountain for which she received hospital treatment.

383.   ISIS looted and destroyed Plaintiff Khidhir Ido's real and personal property.

384.   As a result of ISIS's invasion, Plaintiff Khidhir Ido has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Samea Merza, Salema Merza, and Salim Merza**

385.   Plaintiffs Samea Merza, Salema Merza, and Salim Merza are citizens of the United States.  Plaintiff Samea Merza is domiciled in the state of Washington, and Plaintiffs Salema Merza and Salim Merza are domiciled in the state of Nebraska.  Plaintiffs Samea Merza, Salema Merza, and Salim Merza are siblings.

386.   Plaintiffs Samea Merza, Salema Merza, and Salim Merza have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

387.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Samea Merza fled to Kurdistan with her mother and siblings.  Plaintiffs Salema Merza and Salim Merza, who were in Kurdistan at the time of the invasion, fearfully followed

their family's journey as they fled.  ISIS captured over sixty of Samea Merza, Salema Merza, and Salim Merza's relatives, most of whom are still missing.  Their uncle died on Sinjar Mountain.

388.    ISIS looted and destroyed Plaintiffs Samea Merza, Salema Merza, and Salim Merza's real and personal property.

389.    As a result of ISIS's invasion, Plaintiffs Samea Merza, Salema Merza, and Salim Merza have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Nawaf Sulaiman

390.    Plaintiff Nawaf Sulaiman is a citizen of the United States and domiciled in the state of Nebraska.

391.    Plaintiff Nawaf Sulaiman has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

392.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nawaf Sulaiman's daughter and siblings fled Sinjar.  Plaintiff Nawaf Sulaiman fearfully followed his family's journey as they fled.  Plaintiff Nawaf Sulaiman's daughter fled to Sinjar Mountain and was trapped there until she was able to escape to Kurdistan.  ISIS captured one of Plaintiff Nawaf Sulaiman's sisters along with her husband and son.  ISIS kept this sister in a cell underground for two years in Syria, killed her husband, and forced her son to become a child soldier until they were able to escape.  Another of Plaintiff Nawaf Sulaiman's sisters died from a stroke right after she reached safety.  Two of Plaintiff Nawaf Sulaiman's nieces are still missing.

393.    ISIS looted and destroyed Plaintiff Nawaf Sulaiman's real  and/or personal property.

394.     As a result of ISIS's invasion, Plaintiff Nawaf Sulaiman has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Abid Kassim

395.     Plaintiff Abid Kassim is a citizen of the United States and domiciled in the District of Columbia.

396.     Plaintiff Abid Kassim has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

397.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Abid Kassim's family, including his parents, brothers, sisters, and their families, fled to Kurdistan.  Plaintiff Abid Kassim fearfully followed his family's journey as they fled.

398.     ISIS looted and destroyed Plaintiff Abid Kassim's real and personal property.

399.     As a result of ISIS's invasion, Plaintiff Abid Kassim has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Khudaidah Havend and Wahida Havend

400.     Plaintiffs Khudaidah Havend and Wahida Havend are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khudaidah Havend and Plaintiff Wahida Havend are married.

401.     Khudaidah Havend and Wahida Havend have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

402.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khudaidah Havend's siblings and their families fled to Kurdistan. Plaintiff Khudaidah Havend's brother remained in Sinjar and later fled to Sinjar Mountain, where he was trapped until he was able to escape to Kurdistan. Plaintiff Khudaidah Havend fearfully followed his family's journey as they fled.  ISIS killed Plaintiff Khudaidah Havend's uncle.  Plaintiff Wahida Havend's family, including her mother, siblings, and their families, fled to Kurdistan. Plaintiff Wahida Havend fearfully followed her family's journey as they fled.  Plaintiff Wahida Havend's extended family, including her uncle, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Her uncle had a stroke and died days after fleeing to Kurdistan.  Plaintiff Wahida Havend gave birth two days after ISIS's invasion via Cesarean section.  She now suffers severe headaches and blood clots following the invasion and still requires medical monitoring.

403.     ISIS looted and destroyed Plaintiffs Khudaidah Havend and Wahida Havend's real and personal property. As a result of ISIS's invasion, Plaintiffs Khudaidah Havend and Wahida Havend have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Nayyef Abdo**

404.     Plaintiff Nayyef Abdo is a citizen of the United States and domiciled in the state of Nebraska.

405.     Plaintiff Nayyef Abdo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

406.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nayyef Abdo's parents, grandmother, siblings, and their families fled to Sinjar

Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Nayyef Abdo's sister-in-law was pregnant during the journey.  Plaintiff Nayyef Abdo fearfully followed his family's journey as they fled.  While on Sinjar Mountain, Plaintiff Nayyef Abdo's grandmother died.  Plaintiff Nayyef Abdo's brother subsequently died.  Plaintiff Nayyef Abdo's great-uncle was killed by ISIS while trying to save Yazidi girls who were attacked by ISIS.  Three of Plaintiff Nayyef Abdo's cousins were later killed by IEDs planted by ISIS.

407.    ISIS looted and destroyed Plaintiff Nayyef Abdo's real and personal property.

408.    As a result of ISIS's invasion, Plaintiff Nayyef Abdo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Sahira Majoo**

409.    Plaintiff Sahira Majoo is a citizen of the United States and domiciled in the state of Nebraska.

410.    Plaintiff Sahira Majoo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

411.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sahira Majoo's mother and siblings fled to Kurdistan.  Plaintiff Sahira Majoo and her husband at the time had already travelled to Kurdistan in June of 2014.  Plaintiff Sahira Majoo fearfully followed her family's journey as they fled.  Plaintiff Sahira Majoo's father and uncles, one of whom had special needs, stayed behind to help her grandmother flee.  ISIS captured her father and uncles as they fled to Sinjar Mountain.  They are still missing.

412.    ISIS looted and destroyed Plaintiff Sahira Majoo's real and personal property.

413.    As a result of ISIS's invasion, Plaintiff Sahira Majoo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Ghazalah Hesso and Zeri Hesso**

414.    Plaintiffs Ghazalah Hesso and Zeri Hesso are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Zeri Hesso is Plaintiff Ghazalah Hesso's mother.

415.    Plaintiffs Ghazalah Hesso and Zeri Hesso have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

416.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Zeri Hesso's husband's family (Plaintiff Ghazalah Hesso's father's family), and Plaintiff Zero Hesso's siblings and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Ghazalah Hesso and Zeri Hesso fearfully followed their family's journey as they fled.

417.    ISIS looted and destroyed Plaintiffs Ghazalah Hesso and Zeri Hesso's real and personal property.

418.    As a result of ISIS's invasion, Plaintiffs Ghazalah Hesso and Zeri Hesso have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khero Khalaf**

419.    Plaintiff Khero Khalaf is a citizen of the United States and domiciled in the state of Nebraska.

420.     Plaintiff Khero Khalaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

421.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khero Khalaf's family, including his uncle and cousins, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Khero Khalaf fearfully followed his family's journey as they fled.  Plaintiff Khero Khalaf's cousin was killed by ISIS as he fled, and his nephew was injured.  ISIS captured Khero Khalaf's cousin and his cousin's wife and children.  His cousin was killed, and some members of the family are still missing. Plaintiff Khero Khalaf's father struggled with declining health, experiencing two heart attacks before passing away after a third heart attack.

422.     ISIS looted and destroyed Plaintiff Khero Khalaf's real and personal property.

423.     As a result of ISIS's invasion, Plaintiff Khero Khalaf has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Saleh Saffuk and Hakima Antar**

424.     Plaintiffs Saleh Saffuk and Hakima Antar are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Saleh Saffuk and Plaintiff Hakima Antar are married.

425.     Plaintiffs Saleh Saffuk and Hakima Antar have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

426.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Saleh Saffuk and Hakima Antar's families, including Plaintiff Hakima Antar's parents, siblings, uncles, aunts, and cousins and Plaintiff Saleh Saffuk's uncles and their families, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.

Plaintiffs Saleh Saffuk and Hakima Antar fearfully followed their families' journeys as they fled. ISIS captured eighteen members of Plaintiff Saleh Saffuk's family, and two of his cousins are still missing.  Plaintiff Saleh Saffuk now suffers from severe insomnia following the invasion.

427.    ISIS looted and destroyed Plaintiffs Saleh Saffuk and Hakima Antar's real and personal property.

428.    As a result of ISIS's invasion, Plaintiffs Saleh Saffuk and Hakima Antar have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Barfi Hamo, Kamla Ido, and Hatim Ido

429.    Plaintiffs Barfi Hamo, Kamla Ido, and Hatim Ido are citizens of the United States and domiciled in the state of Nebraska.  Plaintiffs Kamla Ido and Hatim Ido are Plaintiff Barfi Hamo's children.

430.    Plaintiffs Barfi Hamo, Kamla Ido, and Hatim Ido have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

431.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Barfi Hamo and Kamla Ido fled to Kurdistan together with Plaintiff Kamla Ido and Hatim Ido's father, grandmother, some siblings, and their families.  Plaintiff Hatim Ido fearfully followed his family's journey as they fled.  Plaintiffs Kamla Ido and Hatim Ido's grandmother died of a heart attack shortly after arriving in Kurdistan.

432.    ISIS looted and destroyed Plaintiffs Barfi Hamo's, Kamla Ido's, and Hatim Ido's real and personal property.

433.     As a result of ISIS's invasion, Plaintiffs Barfi Hamo, Kamla Ido, and Hatim Ido have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Hashim Ido**

434.     Plaintiff Hashim Ido is a citizen of the United States and domiciled in the state of Nebraska.

435.     Plaintiff Hashim Ido has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

436.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hashim Ido fled to Sinjar Mountain with his parents, grandmother, and some of his siblings, where they were trapped until they were able to escape to Kurdistan.

437.     ISIS looted and destroyed Plaintiff Hashim Ido's real and personal property.

438.     As a result of ISIS's invasion, Plaintiff Hashim Ido has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Salim Ido**

439.     Plaintiff Salim Ido is a citizen of the United States and domiciled in the state of Nebraska.

440.     Plaintiff Salim Ido has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

441.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Salim Ido and his wife, parents, and some of his siblings fled to Sinjar Mountain,

where they were trapped until they were able to escape to Kurdistan.  Plaintiff Salim Ido's grandmother died from a heart attack shortly after arriving in Kurdistan.

442.    ISIS looted and destroyed Plaintiff Salim Ido's real and personal property.

443.    As a result of ISIS's invasion, Plaintiff Salim Ido has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Hanaa Abass**

444.    Plaintiff Hanaa Abass is a citizen of the United States and domiciled in the state of Nebraska.

445.    Plaintiff Hanaa Abass has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

446.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, members of Hanaa Abass's family, including her parents, brothers, and sisters fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Hanaa Abass fearfully followed her family's journey as they fled.  Plaintiff Hanaa Abass's uncle and his family were trapped in Sinjar for days, surrounded by ISIS terrorists, until they were able to flee to Sinjar Mountain, and then to Kurdistan.

447.    ISIS looted and destroyed Plaintiff Hanaa Abass's real and personal property.

448.    As a result of ISIS's invasion, Plaintiff Hanaa Abass has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Abla Amy**

449.    Plaintiff Abla Amy is a citizen of the United States and domiciled in the state of Nebraska.

450.    Plaintiff Abla Amy has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

451.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Abla Amy's family, including her mother, father, sisters, brothers, and their families, fled to Turkey.  Plaintiff Abla Amy fearfully followed her family's journey as they fled.  Plaintiff Abla Amy's sister and four of her children, along with Plaintiff Abla Amy's cousins, died while crossing the sea to flee to Europe.  Plaintiff Abla Amy's niece is now partially paralyzed.

452.    ISIS looted and destroyed Plaintiff Abla Amy's real and personal property.

453.    As a result of ISIS's invasion, Plaintiff Abla Amy has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Aishan Hassan and Haji Saido**

454.    Plaintiffs Aishan Hassan and Haji Saido are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Aishan Hassan is Plaintiff Haji Saido's mother.

455.    Plaintiffs Aishan Hassan and Haji Saido have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

456.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Aishan Hassan and her family, including her husband and children, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Haji

Saido fearfully followed his family's journey as they fled.  Plaintiff Haji Saido now suffers from conversional disorder and post-traumatic stress disorder following the invasion.

457.    ISIS looted and destroyed Plaintiff Aishan Hassan and Haji Saido's real and personal property.

458.    As a result of ISIS's invasion, Plaintiff Aishan Hassan and Haji Saido have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Khairi Masto**

459.    Plaintiff Khairi Masto is a citizen of the United States and domiciled in the state of Texas.

460.    Plaintiff Khairi Masto has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

461.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khairi Masto's parents and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Khairi Masto fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Khairi Masto's sister and her children, and his aunt, uncle, and cousin.  Plaintiff Khairi Masto's uncle and cousin are still missing.

462.    ISIS looted and destroyed Plaintiff Khairi Masto's real and personal property.

463.    As a result of ISIS's invasion, Plaintiff Khairi Masto has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khalaf Amsikh and Zeidan Kasem**

464.     Plaintiffs Khalaf Amsikh and Zeidan Kasem are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khalaf Amsikh is Plaintiff Zeidan Kasem's father.

465.     Plaintiffs Khalaf Amsikh and Zeidan Kasem have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

466.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, members of Plaintiffs Khalaf Amsikh and Zeidan Kasem's family, including Plaintiff Khalaf Amsikh's mother, siblings, daughter, and her family fled to Sinjar Mountain, where they were trapped until they were able to escape to Syria and then Kurdistan.  Plaintiffs Khalaf Amsikh and Zeidan Kasem fearfully followed their family's journey as they fled.  ISIS captured Plaintiffs Khalaf Amsikh and Zeidan Kasem's cousins, some of whom are still missing.  Plaintiff Zeidan Kasem now suffers from anxiety and difficulty sleeping, for which he receives treatment, including medication, following the invasion.  Plaintiff Khalaf Amsikh's mother and sister have since died in Kurdistan.

467.     ISIS looted and destroyed Plaintiffs Khalaf Amsikh and Zeidan Kasem's real and personal property.

468.     As a result of ISIS's invasion, Plaintiffs Khalaf Amsikh and Zeidan Kasem have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Guli Rasho, Maryam Naif, and Ameera Naif**

469.     Plaintiffs Guli Rasho, Maryam Naif, and Ameera Naif are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Guli Rasho is Plaintiffs Maryam Naif and Ameera Naif's mother.

470.     Plaintiffs Guli Rasho, Maryam Naif, and Ameera Naif have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

471.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Guli Rasho, Maryam Naif, and Ameera Naif, and Plaintiff Guli Rasho's other children, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Guli Rasho's grandmother could not physically flee from ISIS and has not been located following ISIS's invasion.  Plaintiff Ameera Naif, who was nine years old when ISIS invaded her hometown, now suffers from anxiety, depression, post-traumatic stress disorder, and attention-deficit/hyperactivity disorder following the invasion.

472.     ISIS looted and destroyed Plaintiffs Guli Rasho, Maryam Naif, and Ameera Naif's real and personal property.

473.     As a result of ISIS's invasion, Plaintiffs Guli Rasho, Maryam Naif, and Ameera Naif have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Sabri Elias**

474.     Plaintiff Sabri Elias is a citizen of the United States and domiciled in the state of Texas.

475.     Plaintiff Sabri Elias has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

476.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sabri Elias's wife, mother, and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Sabri Elias fearfully followed his

family's journey as they fled.  ISIS captured Plaintiff Sabri Elias's wife and brother, though they were later able to escape.  Plaintiff Sabri Elias's brother was injured by ISIS.

477.     ISIS looted and destroyed Plaintiff Sabri Elias's real and personal property.

478.     As a result of ISIS's invasion, Plaintiff Sabri Elias has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Hadi Zagla and Layla Barghash**

479.     Plaintiffs Hadi Zagla and Layla Barghash are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Hadi Zagla and Plaintiff Layla Barghash are married.

480.     Plaintiffs Hadi Zagla and Layla Barghash have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

481.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Hadi Zagla and Layla Barghash fled to Sinjar Mountain with their families, including their parents and children, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Layla Barghash's brother and two of her cousins were killed by ISIS.  ISIS captured some of her other cousins, though they were later able to escape.

482.     ISIS looted and destroyed Plaintiffs Hadi Zagla and Layla Barghash's real and personal property.

483.     As a result of ISIS's invasion, Plaintiffs Hadi Zagla and Layla Barghash have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Armaan Bargish and Nada Bargish**

484.    Plaintiffs Armaan Bargish and Nada Bargish are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Armaan Bargish and Plaintiff Nada Bargish are married.

485.    Plaintiffs Armaan Bargish and Nada Bargish have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

486.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Armaan Bargish and Nada Bargish fled to Sinjar Mountain with Plaintiff Armaan Bargish's mother, brothers, sisters, and their families, where they were trapped until they were able to escape to Kurdistan.  ISIS killed Plaintiff Nada Bargish's brother and two of her cousins, all of whom were also Plaintiff Armaan Bargish's cousins.  ISIS captured Plaintiff Nada Bargish's sister and some of her cousins, though they were later able to escape.  ISIS also captured Plaintiff Nada Bargish's father and cousins and Plaintiff Armaan Bargish's uncle, but later released them. Plaintiff Nada Bargish's mother and father died from illness following her brother's death.

487.    ISIS looted and destroyed Plaintiffs Armaan Bargish and Nada Bargish's real and personal property.

488.    As a result of ISIS's invasion, Plaintiffs Armaan Bargish and Nada Bargish have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Haider Elias**

489.    Plaintiff Haider Elias is a citizen of the United States and domiciled in the state of Texas.

490.     Plaintiff Haider Elias has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

491.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Haider Elias's mother, brothers, and sisters fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Haider Elias fearfully followed his family's journey as they fled.  Plaintiff Haider Elias's brother and two of his cousins were shot and killed by ISIS.  His sisters and cousins were captured by ISIS, though they were later able to escape.  Plaintiff Haider Elias's father was also captured by ISIS, until he was able to escape and join his family on Sinjar Mountain.  Plaintiff Haider Elias's father and mother died following the invasion.

492.     ISIS looted and destroyed Plaintiff Haider Elias's real and personal property.

493.     As a result of ISIS's invasion, Plaintiff Haider Elias has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Saad Faraz**

494.     Plaintiff Saad Faraz is a citizen of the United States and domiciled in the state of Nebraska.

495.     Plaintiff Saad Faraz has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

496.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saad Faraz fled to Kurdistan with his family.  Plaintiff Saad Faraz's brother suffered from a head injury while fleeing from ISIS.

497.     ISIS looted and destroyed Plaintiff Saad Faraz's real and personal property.

498.     As a result of ISIS's invasion, Plaintiff Saad Faraz has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Ismael Maajo**

499.     Plaintiff Ismael Maajo is a citizen of the United States and domiciled in the state of Nebraska.

500.     Plaintiff Ismael Maajo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

501.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, members of Plaintiff Ismael Maajo's family, including his parents, brothers and sisters, and their families, fled to his uncle's home near Sinjar Mountain.  There, ISIS found and attacked them, killing Plaintiff Ismael Maajo's father, brothers, stepbrother, and nephew.  ISIS captured over thirty other members of Plaintiff Ismael Maajo's family.  Approximately nine of Plaintiff Ismael Maajo's family members are still missing.  Plaintiff Ismael Maajo was in Turkey at the time of ISIS's invasion and fearfully followed his family's journey as they fled to Kurdistan, where he then met them.

502.     ISIS looted and destroyed Plaintiff Ismael Maajo's real and personal property.

503.     As a result of ISIS's invasion, Plaintiff Ismael Maajo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Eeda Hussain and Ibrahim Alkhalaf**

504.     Plaintiffs Eeda Hussain and Ibrahim Alkhalaf are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Eeda Hussain and Plaintiff Ibrahim Alkhalaf are married.

505.     Plaintiffs Eeda Hussain and Ibrahim Alkhalaf have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

506.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Eeda Hussain's family, including her parents, brothers, and sisters, fled to Sinjar Mountain.  Plaintiff Ibrahim Alkhalaf's family, including his sisters, brothers, and uncles, also fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Eeda Hussain and Ibrahim Alkhalaf fearfully followed their families' journeys as they fled.  Plaintiff Ibrahim Alkhalaf's sister and her newborn baby almost died on Sinjar Mountain.  ISIS detained Plaintiff Eeda Hussain's family in their car when they attempted to flee, but they eventually escaped to Kurdistan.  Plaintiff Eeda Hussain now suffers from anxiety attacks following the invasion, for which she has had to be hospitalized.

507.     ISIS looted and destroyed Plaintiffs Eeda Hussain and Ibrahim Alkhalaf's real and personal property.

508.     As a result of ISIS's invasion, Plaintiffs Eeda Hussain and Ibrahim Alkhalaf have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Saadoon Khudidah**

509.     Plaintiff Saadoon Khudidah is a citizen of the United States and domiciled in the state of Indiana.

510. Plaintiff Saadoon Khudidah has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

511. In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saadoon Khudidah's parents, brothers, and sisters fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan. Plaintiff Saadoon Khudidah fearfully followed his family's journey as they fled. Plaintiff Saadoon Khudidah's father suffered a stroke in Kurdistan and has had to take medication following the invasion. Several of Plaintiff Saadoon Khudidah's cousins were killed by ISIS.

512. ISIS looted and destroyed Plaintiff Saadoon Khudidah's real and personal property.

513. As a result of ISIS's invasion, Plaintiff Saadoon Khudidah has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Nasima Haskaan**

514. Plaintiff Nasima Haskaan is a citizen of the United States and domiciled in the state of Indiana.

515. Plaintiff Nasima Haskaan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

516. In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nasima Haskaan, her sister, brothers, and their families fled to Kurdistan. Plaintiff Nasima Haskaan's mother and two brothers walked to Syria. Plaintiff Nasima Haskaan's mother now suffers from high blood pressure and diabetes following the invasion and can no longer care for herself.

517. ISIS looted and destroyed Plaintiff Nasima Haskaan's real and personal property.

518.     As a result of ISIS's invasion, Plaintiff Nasima Haskaan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Hussein Khalaf

519.     Plaintiff Hussein Khalaf is a citizen of the United States and domiciled in the state of Virginia.

520.     Plaintiff Hussein Khalaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

521.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hussein Khalaf family, including Plaintiff Hussein Khalaf's sisters, their families, and his cousins, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Hussein Khalaf fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Hussein Khalaf's cousin and his family, though they were later able to escape.  One of Plaintiff Hussein Khalaf's cousins and her daughter were injured by a bomb.  Plaintiff Hussein Khalaf now suffers from depression following the invasion.

522.     ISIS looted and destroyed Plaintiff Hussein Khalaf's real and personal property.

523.     As a result of ISIS's invasion, Plaintiff Hussein Khalaf has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Nadin Elias

524.     Plaintiff Nadin Elias is a citizen of the United States and domiciled in the state of Virginia.

525.     Plaintiff Nadin Elias has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

526.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nadin Elias's family, including her sisters-in-law, aunts, uncles, and their families fled to Kurdistan.  Plaintiff Nadin Elias fearfully followed her family's journey as they fled. Plaintiff Nadin Elias continues to suffer from severe emotional distress following the invasion.

527.     ISIS looted and destroyed Plaintiff Nadin Elias's real and personal property.

528.     As a result of ISIS's invasion, Plaintiff Nadin Elias has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.


**Nawroz Sulaiman and Jadaan Khalaf**

529.     Plaintiffs Nawroz Sulaiman and Jadaan Khalaf are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Nawroz Sulaiman and Plaintiff Jadaan Khalaf are married.

530.     Plaintiffs Nawroz Sulaiman and Jadaan Khalaf have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

531.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Nawroz Sulaiman and Jadaan Khalaf fled to Kurdistan with Plaintiff Jadaan Khalaf's mother, brothers, and their families.

532.     ISIS looted and destroyed Plaintiffs Nawroz Sulaiman and Jadaan Khalaf's real and personal property.

533.     As a result of ISIS's invasion, Plaintiffs Nawroz Sulaiman and Jadaan Khalaf have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khairi Zandinan**

534.     Plaintiff Khairi Zandinan is a citizen of the United States and domiciled in the state of Nebraska.

535.     Plaintiff Khairi Zandinan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

536.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khairi Zandinan's family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Khairi Zandinan fearfully followed his family's journey as they fled.  Plaintiff Khairi Zandinan's grandfather was left behind and his body was never found.  ISIS killed approximately ten members of Plaintiff Khairi Zandinan's extended family.  Plaintiff Khairi Zandinan's nephew and brother-in-law were shot by ISIS but managed to escape when ISIS members thought they were dead.  ISIS members poured gas over Plaintiff Khairi Zandinan's sister and her children to burn them alive, but then left before setting them alight.  ISIS kidnapped Plaintiff Khairi Zandinan's 13-year-old niece, and she is still missing.

537.     ISIS looted and destroyed Plaintiff Khairi Zandinan real and personal property.

538.     As a result of ISIS's invasion, Plaintiff Khairi Zandinan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Sozan Ajol

539.     Plaintiff Sozan Ajol is a citizen of the United States and domiciled in the state of Nebraska.

540.     Plaintiff Sozan Ajol has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

541.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sozan Ajol's mother, siblings, and their families fled Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Sozan Ajol fearfully followed her family's journey as they fled.  Plaintiff Sozan Ajol's father could not make the journey and is presumed dead.

542.     ISIS looted and destroyed Plaintiff Sozan Ajol's real and personal property.

543.     As a result of ISIS's invasion, Plaintiff Sozan Ajol has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Dakheel Zandinan

544.     Plaintiff Dakheel Zandinan is a citizen of the United States and domiciled in the state of Nebraska.

545.     Plaintiff Dakheel Zandinan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

546.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Dakheel Zandinan fled to Wardia with his parents, brothers, wife, and children. Plaintiff Dakheel Zandinan and his family were stopped at an ISIS checkpoint into Wardia, where ISIS members stole their jewelry and their car and directed them to continue into Wardia.  ISIS

gathered the men and children who were twelve and older into a group.  Plaintiff Dakheel Zandinan hid with his children and did not go to the group, for fear of ISIS recognizing him as an interpreter for the U.S. Army.  After escaping from ISIS, Plaintiff Dakheel Zandinan and his family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.

547.   ISIS stopped Plaintiff Dakheel Zandinan's sister, her husband, and her children at a farm outside of Wardia, where they shot Plaintiff Dakheel Zandinan's sister's husband as he ran, captured Plaintiff Dakheel Zandinan's sister's daughter, and poured gasoline on Plaintiff Dakheel Zandinan's sister and her other children.  Plaintiff Dakheel Zandinan's sister and some of her children managed to escape from ISIS's captivity, but her daughter is still missing.  Plaintiff Dakheel Zandinan's grandfather did not flee, and his body has not been found.  Plaintiff Dakheel Zandinan's wife now suffers from nightmares following the invasion.

548.   ISIS looted and destroyed Plaintiff Dakheel Zandinan's real and personal property.

549.   As a result of ISIS's invasion, Plaintiff Dakheel Zandinan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Babeir Khibil, Hiba Assi, Ameen Khudidah, and Nashwan Khudidah**

550.   Plaintiffs Babeir Khibil, Hiba Assi, Ameen Khudidah, and Nashwan Khudidah are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Hiba Assi and Plaintiff Babeir Khibil are married.  Plaintiffs Ameen Khudidah and Nashwan Khudidah are their children.

551.   Plaintiffs Babeir Khibil, Hiba Assi, Ameen Khudidah, and Nashwan Khudidah have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

552.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Babeir Khibil, Hiba Assi, Ameen Khudidah, and Nashwan Khudidah's family, including Plaintiff Hiba Assi's mother, brother, and sister, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Babeir Khibil, Hiba Assi, Ameen Khudidah, and Nashwan Khudidah fearfully followed their family's journey as they fled. ISIS killed Plaintiff Babeir Khibil's grandfather and two of his cousins.  Plaintiff Babeir Khibil's sister died shortly after reaching Kurdistan.  Plaintiff Hiba Assi's grandmother did not reach Sinjar Mountain and is presumed dead.

553.    ISIS looted and destroyed Plaintiffs Babeir Khibil, Hiba Assi, Ameen Khudidah, and Nashwan Khudidah's real and personal property.

554.    As a result of ISIS's invasion, Plaintiffs Babeir Khibil, Hiba Assi, Ameen Khudidah, and Nashwan Khudidah have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Khudedah Murad, Umayah Murad, Miyo Murad, Adil Murad, and Khalaf Murad

555.    Plaintiffs Khudedah Murad, Umayah Murad, Miyo Murad, Adil Murad, and Khalaf Murad are citizens of the United States and domiciled in the state of Nebraska.   Plaintiffs Khudedah Murad, Umayah Murad, Miyo Murad, Adil Murad, and Khalaf Murad are siblings.

556.    Plaintiffs Khudedah Murad, Umayah Murad, Miyo Murad, Adil Murad, and Khalaf Murad have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

557.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khudedah Murad, Umayah Murad, and Miyo Murad fled to Kurdistan with their

parents and some of their siblings.  Plaintiffs Adil Murad and Khalaf Murad fearfully followed their family's journey as they fled.  ISIS captured Plaintiffs Khudedah Murad, Umayah Murad, Miyo Murad, Adil Murad, and Khalaf Murad's cousins, one of whom is still missing.

558.    ISIS looted and destroyed Plaintiffs Khudedah Murad, Umayah Murad, Miyo Murad, Adil Murad, and Khalaf Murad's real and personal property.

559.    As a result of ISIS's invasion, Plaintiffs Khudedah Murad, Umayah Murad, Miyo Murad, Adil Murad, and Khalaf Murad have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Majow Kaso, Fahad Qassim, Hadi Qassim, David Majo, and Khedir Qassim

560.    Plaintiffs Majow Kaso, Fahad Qassim, Hadi Qassim, David Majo, and Khedir Qassim are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Majow Kaso is Plaintiffs Fahad Qassim, Hadi Majow Qassim, David Majo, and Khedir Qassim's father.

561.    Plaintiffs Majow Kasso, Fahad Qassim, Hadi Majow Qassim, David Majo, and Khedir Qassim have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

562.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Majow Kaso's daughters (Plaintiffs Fahad Qassim, Hadi Majow Qassim, David Majo, and Khedir Qassim's sisters) fled to Kurdistan.  Plaintiffs Majow Kaso, Fahad Qassim, Hadi Qassim, David Majo, and Khedir Qassim fearfully followed their family's journey as they fled. Plaintiff Majow Kaso's sister was trapped by ISIS in her home for months until she was able to escape to Kurdistan.  Plaintiffs Fahad Qassim, Hadi Majow Qassim, David Majo, and Khedir Qassim's mother later died following the invasion.  ISIS captured over thirty of Plaintiffs Fahad

Qassim, Hadi Qassim, David Majo, and Khedir Qassim's cousins, beheaded some of their uncles and cousins, and enslaved some of their aunts and cousins.

563.    ISIS looted and destroyed Plaintiffs Majow Kasso, Fahad Qassim, Hadi Qassim, David Majo, and Khedir Qassim's real and personal property.

564.    As a result of ISIS's invasion, Plaintiffs Majow Kaso, Fahad Qassim, Hadi Qassim, David Majo, and Khedir Qassim have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Almas Alhainto**

565.    Plaintiff Almas Alhainto is a citizen of the United States and domiciled in the state of Nebraska.

566.    Plaintiff Almas Alhainto has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

567.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Almas Alhainto's brothers and sisters fled to Kurdistan.  Plaintiff Almas Alhainto fearfully followed her family's journey as they fled.  ISIS captured Plaintiff Almas Alhainto's father was too unwell to flee with the family, and he later died in ISIS captivity.  Plaintiff Almas Alhainto's sisters' cars crashed when fleeing from ISIS, killing and maiming multiple family members.  Another of Plaintiff Almas Alhainto's sisters died in a camp for internally displaced persons in Kurdistan.  Plaintiff Almas Alhainto's niece was captured by ISIS though she was later able to escape.

568.    ISIS looted and destroyed Plaintiff Almas Alhainto's real and personal property.

569.     As a result of ISIS's invasion, Plaintiff Almas Alhainto has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Izdihar Sheikh**

570.     Plaintiff Izdihar Sheikh is a citizen of the United States and domiciled in the state of Nebraska.

571.     Plaintiff Izdihar Sheikh has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

572.     In particular, on or about August 3, 2014, during ISIS's invasion of Sinjar, Iraq, Plaintiff Izdihar Sheikh was trapped in Sinjar with her mother, sisters, and brother.  Plaintiff Izdihar Sheikh and her family hid inside their home for over a week before they were able to escape, during which time they feared for their lives.

573.     ISIS looted and destroyed Plaintiff Izdihar Sheikh's real and personal property.

574.     As a result of ISIS's invasion, Plaintiff Izdihar Sheikh has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Khalid Juko, Jad Khurmish, and Ayad Khurmish**

575.     Plaintiffs Khalid Juko, Jad Khurmish, and Ayad Khurmish are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khalid Juko is Plaintiffs Jad Khurmish and Ayad Khurmish's father.

576.     Plaintiffs Khalid Juko, Jad Khurmish, and Ayad Khurmish have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

577.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khalid Juko, Jad Khurmish, and Ayad Khurmish fled to Kurdistan with Jad Khurmish and Ayad Khurmish's mother (Plaintiff Khalid Juko's wife), brothers, and sisters (Plaintiff Khalid Juko's children).   While fleeing to Kurdistan, Plaintiffs Khalid Juko, Jad Khurmish, and Ayad Khurmish and their family were shot at by ISIS.  Because of the large number of people that needed to fit in their car, Plaintiff Ayad Khurmish had to walk most of the way to Kurdistan.  ISIS captured Plaintiffs Jad Khurmish and Ayad Khurmish's cousins, many of whom were sold into captivity.  Following their escape from ISIS captivity, some of their cousins died by suicide.  Plaintiff Khalid Juko now suffers from mental health issues following the invasion, for which he has been prescribed medication.

578.     ISIS looted and destroyed Plaintiffs Khalid Juko, Jad Khurmish, and Ayad Khurmish real and personal property.

579.     As a result of ISIS's invasion, Plaintiffs Khalid Juko, Jad Khurmish, and Ayad Khurmish have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Haleema Khalaf**

580.     Plaintiff Haleema Khalaf is a citizen of the United States and domiciled in the state of Nebraska.

581.     Plaintiff Haleema Khalaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

582.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Haleema Khalaf's parents, sisters, brothers, cousins, and uncles fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Haleema

Khalaf fearfully followed her family's journey as they fled. ISIS killed two of Plaintiff Haleema Khalaf's cousins: one cousin was killed in front of his sisters, while the other cousin was captured and killed while trying to flee to Sinjar Mountain. ISIS captured Plaintiff Haleema Khalaf's uncle, who is still missing.

583.    ISIS looted and destroyed Plaintiff Haleema Khalaf's real and personal property.

584.    As a result of ISIS's invasion, Plaintiff Haleema Khalaf has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Samir Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, Adib Ayzden, and Joza Shikho**

585.    Plaintiffs Samir Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, Adib Ayzden, and Joza Shikho are citizens of the United States and domiciled in the state of Nebraska. Plaintiffs Samir Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, and Adib Ayzden are siblings. Plaintiff Adib Ayzden and Plaintiff Joza Shikho are married.

586.    Plaintiffs Samir Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, Adib Ayzden, and Joza Shikho have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

587.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Samir Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, Adib Ayzden, and Joza Shikho fled to Kurdistan with their families. Plaintiffs Samir Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, and Adib Ayzden's father died in Kurdistan, and their great-uncle died of starvation and dehydration while fleeing. Two of Plaintiffs Samir

Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, and Adib Ayzden's cousins are still missing.

588.   ISIS looted and destroyed Plaintiffs Samir Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, Adib Ayzden, and Joza Shikho's real and personal property.

589.   As a result of ISIS's invasion, Plaintiffs Samir Eizdin, Hussein Ezdeen, Hazim Ezdeen, Harbi Izdeen, Maha Izdeen, Adib Ayzden, and Joza Shikho have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Manji Dahhar**

590.   Plaintiff Manji Dahhar is a citizen of the United States and domiciled in the state of Nebraska.

591.   Plaintiff Manji Dahhar has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

592.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Manji Dahhar fled with her family, including three uncles, to Kurdistan.

593.   ISIS looted and destroyed Plaintiff Manji Dahhar's real and personal property.

594.   As a result of ISIS's invasion, Plaintiff Manji Dahhar has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Madina Aldakhi**

595.   Plaintiff Madina Aldakhi is a citizen of the United States and domiciled in the state of Nebraska.

596.     Plaintiff Madina Aldakhi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

597.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Madina Aldakhi fled to Kurdistan with her parents and siblings, at first by car and then, after their car broke down, by foot.  Plaintiff Madina Aldakhi's mother now suffers from high blood pressure and diabetes following the invasion, and Plaintiff Madina Aldakhi's father had a heart attack.

598.     ISIS looted and destroyed Plaintiff Madina Aldakhi's real and personal property.

599.     As a result of ISIS's invasion, Plaintiff Madina Aldakhi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Adool Abdi, Mirza Bakr, and Yousif Beeso**

600.     Plaintiffs Adool Abdi, Mirza Bakr, and Yousif Beeso are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Adool Abdi and Plaintiff Mirza Bakr are married.  Plaintiff Yousif Beeso is their son.

601.     Plaintiffs Adool Abdi, Mirza Bakr, and Yousif Beeso have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

602.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Adool Abdi and Mirza Bakr fled to Kurdistan with their sons, including Plaintiff Yousif Beeso, as well as their daughter and their children's families.  ISIS captured Plaintiff Adool Abdi's brother, though he was later able to escape.  ISIS captured Plaintiff Mirza Bakra's niece and her family.  They killed her niece's husband and held the remainder of the family in captivity for four years.

603.     ISIS looted and destroyed Plaintiffs Adool Abdi, Mirza Bakr, and Yousif Beeso's real and personal property.

604.     As a result of ISIS's invasion, Plaintiffs Adool Abdi, Mirza Bakr, and Yousif Beeso have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Omar Ismail, Aishan Bashar, Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso

605.     Plaintiffs Omar Ismail, Aishan Bashar, Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Omar Ismail and Plaintiff Aishan Bashar are married.  Plaintiffs Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso are their children.

606.     Plaintiffs Omar Ismail, Aishan Bashar, Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

607.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Omar Ismail's sisters and Plaintiff Aishan Bashar's brothers, sisters, their families, and cousins fled to Sinjar Mountain, where they were trapped until they were able to escape to Syria.  Plaintiffs Omar Ismail, Aishan Bashar, Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso fearfully followed their family's journey as they fled.  ISIS killed nine of Plaintiff Aishan Bashar's cousins, and her eight-year-old niece (Plaintiffs Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso's cousin) died of dehydration while fleeing.  Plaintiffs Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso's uncles later died in the fighting that followed the invasion.

Plaintiff Oras Osso now suffers from difficulty sleeping and Plaintiff Faisal Osso now suffers from post-traumatic stress disorder following the invasion.

608.    ISIS looted and destroyed Plaintiffs Omar Ismail, Aishan Bashar, Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso's real and personal property.

609.    As a result of ISIS's invasion, Plaintiffs Omar Ismail, Aishan Bashar, Oras Osso, Faeza Osso, Shahnaz Osso, and Faisal Osso have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Sam Lincoln

610.    Plaintiff Sam Lincoln is a citizen of the United States and domiciled in the state of Nebraska.

611.    Plaintiff Sam Lincoln has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

612.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sam Lincoln fled with his wife, children, parents, stepmother, brothers, and sisters to Sinjar Mountain, where they were trapped until they were able to escape to Turkey.  Plaintiff Sam Lincoln's father died while the family was trapped on Sinjar Mountain.

613.    ISIS looted and destroyed Plaintiff Sam Lincoln's real and personal property.

614.    As a result of ISIS's invasion, Plaintiff Sam Lincoln has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Diyana Khairo, Dalia Khairo, and Rana Khairo**

615.    Plaintiffs Diyana Khairo, Dalia Khairo, and Rana Khairo are citizens of the United States and domiciled in the state of Nebraska.  Plaintiffs Diyana Khairo, Dalia Khairo, and Rana Khairo are sisters.

616.    Plaintiffs Diyana Khairo, Dalia Khairo, and Rana Khairo have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

617.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Diyana Khairo, Dalia Khairo, and Rana Khairo fled to Sinjar Mountain with their brother, where they met their parents and other sisters, and where they were trapped until they were able to escape to Turkey.  Plaintiffs Diyana Khairo, Dalia Khairo, and Rana Khairo's maternal grandparents did not flee and are presumed dead.  ISIS captured Plaintiffs Diyana Khairo, Dalia Khairo, and Rana Khairo's uncle, aunt, and cousins but they escaped.

618.    ISIS looted and destroyed Plaintiffs Diyana Khairo, Dalia Khairo, and Rana Khairo's real and personal property.

619.    As a result of ISIS's invasion, Plaintiffs Diyana Khairo, Dalia Khairo, and Rana Khairo have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khero Edo, Nawaf Khalaf, Ismail Khalaf, and Haifaa Haji**

620.    Plaintiffs Khero Edo, Nawaf Khalaf, Ismail Khalaf, and Haifaa Haji are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khero Edo is Plaintiffs Nawaf Khalaf and Ismail Khalaf's father.  Plaintiff Ismail Khalaf and Plaintiff Haifaa Haji are married.

621.    Plaintiffs Khero Edo, Nawaf Khalaf, Ismail Khalaf, and Haifaa Haji have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

622.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khero Edo, Ismail Khalaf, and Haifaa Haji fled to Kurdistan with their family, including Plaintiff Khero Edo's wife and other sons and Plaintiffs Ismail Khalaf and Haifaa Haji's newborn son.  Plaintiff Khero Edo's daughter fled to Sinjar Mountain, where she was trapped until she was able to escape to Kurdistan.  Plaintiff Nawaf Khalaf fearfully followed his family's journey as they fled.  Plaintiff Haifaa Haji's parents and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  ISIS captured Plaintiff Khero Edo's uncle, who suffered injuries in captivity.  ISIS killed three of Plaintiff Khero Edo's cousins.  In addition, ISIS captured fourteen of his wife's aunts, of whom ten are missing or dead.  ISIS captured several of Plaintiff Haifaa Haji's parents' cousins and killed her father's cousin.  Plaintiff Khero Edo continues to suffer from emotional distress following the invasion.  Plaintiff Khero Edo's wife developed diabetes and impaired vision following the invasion, and she takes prescribed medication to manage her trauma.  Plaintiff Nawaf Khalaf now suffers from nightmares and Plaintiff Haifaa Haji now suffers from psychological effects, including difficulty sleeping, following the invasion.

623.     ISIS looted and destroyed Plaintiffs Khero Edo, Nawaf Khalaf, Ismail Khalaf, and Haifaa Haji's real and personal property.

624.     As a result of ISIS's invasion, Plaintiffs Khero Edo, Nawaf Khalaf, Ismail Khalaf, and Haifaa Haji have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Hanaa Khalaf and Shahab Bashar**

625.    Plaintiffs Hanaa Khalaf and Shahab Bashar are citizens of the United States and domiciled in the state of Nebraska.   Plaintiff Hanaa Khalaf and Plaintiff Shahab Bashar are married.

626.    Plaintiffs Hanaa Khalaf and Shahab Bashar have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

627.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Hanaa Khalaf and Shahab Bashar fled to Sinjar Mountain with their one-month-old daughter, where they were trapped until they were able to escape to Kurdistan.  ISIS killed Plaintiff Hanaa Khalaf's cousin, and another cousin is still missing.

628.    ISIS looted and destroyed Plaintiffs Hanaa Khalaf and Shahab Bashar's real and personal property.

629.    As a result of ISIS's invasion, Plaintiffs Hanaa Khalaf and Shahab Bashar have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khokhi Khudeeda, Ibrahim Zandinan, Maher Zandinan, and Dalya Zndinan**

630.    Plaintiffs Khokhi Khudeeda, Ibrahim Zandinan, Maher Zandinan, and Dalya Zndinan are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khokhi Khudeeda is Plaintiffs Ibrahim Zandinan, Maher Zandinan, and Dalya Zndinan's mother.

631.    Plaintiffs Khokhi Khudeeda, Ibrahim Zandinan, Maher Zandinan, and Dalya Zndinan have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

632.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khokhi Khudeeda, Ibrahim Zandinan, Maher Zandinan, and Dalya Zndinan fled to Wardia with Plaintiff Khokhi Khudeeda's husband and other children.  ISIS gathered Plaintiff Ibrahim Zandinan and his father, uncles, and grandfather and ordered them to convert to Islam, threatening them with weapons.  After three days, ISIS departed Wardia to fight elsewhere and Plaintiffs Khokhi Khudeeda, Ibrahim Zandinan, Maher Zandinan, and Dalya Zndinan were able to escape and flee to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Ibrahim Zandinan, Maher Zandinan, and Dalya Zndinan's great-grandfather was unable to flee with the family and was killed by ISIS.  ISIS captured Plaintiff Khokhi Khudeeda's brother (Plaintiffs Ibrahim Zandinan, Maher Zandinan and Dalya Zndinan's uncle), his son, and her cousins, and ISIS killed seven of Plaintiff Khokhi Khudeeda's cousins.  ISIS captured Plaintiff Khokhi Khudeeda's niece, who is still missing, and shot Plaintiff Khokhi Khudeeda's brother in the hand as he ran from ISIS.

633.    ISIS looted and destroyed Plaintiffs Khokhi Khudeeda, Ibrahim Khaleel Ghanim Zandinan, Maher Zandinan, and Dalya Zndinan's real and personal property.

634.    As a result of ISIS's invasion, Plaintiffs Khokhi Khudeeda, Ibrahim Zandinan, Maher Zandinan, and Dalya Zndinan have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Layla Karee**

635.    Plaintiff Layla Karee is a citizen of the United States and domiciled in the state of Nebraska.

636.     Plaintiff Layla Karee has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

637.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Layla Karee's parents and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Layla Karee fearfully followed her family's journey as they fled.

638.     ISIS looted and destroyed Plaintiff Layla Karee's real and personal property.

639.     As a result of ISIS's invasion, Plaintiff Layla Karee has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Hassan Hassan**

640.     Plaintiff Hassan Hassan is a citizen of the United States and domiciled in the state of Nebraska.

641.     Plaintiff Hassan Hassan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

642.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hassan Hassan fled to Sinjar Mountain with his wife, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Hassan Hassan's wife now suffers from depression following the invasion.

643.     ISIS looted and destroyed Plaintiff Hassan Hassan's real and personal property.

644.     As a result of ISIS's invasion, Plaintiff Hassan Hassan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Basam Aldakhi**

645.    Plaintiff Basam Aldakhi is a citizen of the United States and domiciled in the state of Nebraska.

646.    Plaintiff Basam Aldakhi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

647.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Basam Aldakhi fled to Kurdistan with his mother, sisters, brothers, and their families.  Another of Plaintiff Basam Aldakhi's sisters fled separately to Sinjar Mountain, where she was trapped until she was able to escape.  ISIS's invasion interrupted Plaintiff Basam Aldakhi's studies in law school.

648.    ISIS looted and destroyed Plaintiff Basam Aldakhi's real and personal property.

649.    As a result of ISIS's invasion, Plaintiff Basam Aldakhi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Hayder Murad and Fadwa Yousif**

650.    Plaintiffs Hayder Murad and Fadwa Yousif are citizens of the United States and domiciled in the state of Nebraska.  Plaintiffs Hayder Murad is Plaintiff Fadwa Yousif's father.

651.    Plaintiffs Hayder Murad and Fadwa Yousif have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

652.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, members of Plaintiffs Hayder Murad and Fadwa Yousif's family, including Plaintiff Hayder Murad's parents, brothers, and sisters (Plaintiff Fadwa Yousif's grandparents, aunts, and uncles)

and their families fled to Kurdistan.  Other members of their family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Hayder Murad and Fadwa Yousif fearfully followed their family's journey as they fled.  ISIS captured Plaintiff Fadwa Yousif's uncle and aunt and their twelve children, who spent several weeks in captivity until they were able to escape.  During the escape, ISIS shot Plaintiff Fadwa Yousif's aunt, uncle, and cousins.  ISIS also surrounded Plaintiff Fadwa Yousif's grandfather and other uncle's village and held them under siege until they were able to escape.  ISIS shot Plaintiff Hayder Murad's nephew (Plaintiff Fadwa Yousif's cousin) as he fled.  Plaintiff Hayder Murad's mother was injured travelling from Kurdistan to Turkey, and later died.  Plaintiff Hayder Murad's father died of a heart attack following the invasion.  ISIS captured Plaintiff Hayder Murad's sister and her family, though they were later able to escape.  Plaintiff Hayder Murad's uncle died of cancer in Kurdistan after the invasion.

653.    ISIS looted and destroyed Plaintiffs Hayder Murad and Fadwa Yousif's real and personal property.

654.    As a result of ISIS's invasion, Plaintiffs Hayder Murad and Fadwa Yousif have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Gulistan Haji**

655.    Plaintiff Gulistan Haji is a citizen of the United States and domiciled in the state of Nebraska.

656.    Plaintiff Gulistan Haji has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

657.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Gulistan Haji fled to Kurdistan with her parents and siblings.  Plaintiff Gulistan Haji's grandparents separately fled to Sinjar Mountain with their children, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Gulistan Haji's cousin was trapped in Mosul when ISIS invaded and is presumed dead.

658.    ISIS looted and destroyed Plaintiff Gulistan Haji's real and personal property.

659.    As a result of ISIS's invasion, Plaintiff Gulistan Haji has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Barakat Rasho

660.    Plaintiff Barakat Rasho is a citizen of the United States and domiciled in the state of Nebraska.

661.    Plaintiff Barakat Rasho has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

662.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Barakat Rasho's family fled Sinjar.  Plaintiff Barakat Rasho fearfully followed his family's journey as they fled.  ISIS killed Plaintiff Barakat Rasho's cousin.  ISIS captured Plaintiff Barakat Rasho's father-in-law, but he was able to escape.  Plaintiff Barakat Rasho now suffers from the psychological effects of the invasion, including flashbacks.

663.    ISIS looted and destroyed Plaintiff Barakat Rasho's real and personal property.

664.    As a result of ISIS's invasion, Plaintiff Barakat Hussein Rasho has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khawlah Maleko and Khudidah Maleko**

665.    Plaintiffs Khawlah Maleko and Khudidah Maleko are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khawlah Maleko and Plaintiff Khudidah Maleko are married.

666.    Plaintiffs Khawlah Maleko and Khudidah Maleko have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

667.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khawlah Maleko's parents and siblings and Plaintiff Khudidah Maleko's mother and siblings fled to Kurdistan.  Plaintiffs Khawlah Maleko and Khudidah Maleko fearfully followed their families' journeys as they fled.  ISIS captured Plaintiff Khudidah Maleko's father twice, but each time he was let go.  Plaintiff Khudidah Maleko's father later died after two years in the camps for internally displaced persons.  ISIS captured Plaintiff Khudidah Maleko's father's cousin's family and killed one of the sons.  The others are still missing.

668.    ISIS looted and destroyed Plaintiffs Khawlah Maleko and Khudidah Maleko's real and personal property.

669.    As a result of ISIS's invasion, Plaintiffs Khawlah Maleko and Khudidah Maleko have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Koulan Mourad and Nancy Khalil**

670.    Plaintiffs Koulan Mourad and Nancy Khalil are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Koulan Mourad is Plaintiff Nancy Khalil's mother.

671.     Plaintiffs Koulan Mourad and Nancy Khalil have suffered severe injuries as a result of ISIS's campaign targeting Yazidis in Iraq.

672.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Koulan Mourad and Nancy Khalil's family, including Plaintiff Koulan Mourad's son, daughter, grandchildren, and siblings fled to Kurdistan.  Plaintiffs Koulan Mourad and Nancy Khalil fearfully followed their family's journey as they fled.  Plaintiff Koulan Mourad's son committed suicide shortly after the invasion.  Plaintiff Koulan Mourad's four-year-old granddaughter was staying with her son-in-law's family in Sinjar at the time of the invasion.  She is still missing and is presumed dead.  Plaintiff Koulan Mourad's niece fled to Sinjar Mountain with her newborn baby during the invasion but was unable to make it up the mountain and is presumed dead.  Plaintiff Koulan Mourad's nephew was staying in a home in Sinjar that exploded during the invasion and is presumed dead.  ISIS killed two of Plaintiff Koulan Mourad's other nephews and sent photos of their bodies to their families.  Another of Plaintiff Koulan Mourad's nephews went missing while attempting to fight ISIS and is presumed dead.  One of Plaintiff Koulan Mourad's nephews was in Germany at the time of the invasion and was informed in error that ISIS had killed his entire family.  He committed suicide after hearing the news.  ISIS killed over ten of Plaintiff Koulan Mourad's cousins.  Plaintiff Koulan Mourad now suffers from the psychological effects of the invasion, for which she is receiving medication.

673.     ISIS looted and destroyed Plaintiff Koulan Mourad and Nancy Khalil's real and personal property.

674.     As a result of ISIS's invasion, Plaintiff Koulan Mourad and Nancy Khalil have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khoudeida Saadoon**

675.     Plaintiff Khoudeida Saadoon is a citizen of the United States and domiciled in the state of Nebraska.

676.     Plaintiff Khoudeida Saadoon has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

677.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khoudeida Saadoon's nephews and cousins fled to Kurdistan.  Plaintiff Khoudeida Saadoon fearfully followed his family's journey as they fled.  Plaintiff Khoudeida Saadoon's sister died as she was too unwell to flee her home when ISIS invaded.  Plaintiff Khoudeida Saadoon now suffers from extreme mental anguish following the invasion that often requires hospitalization.

678.     ISIS looted and destroyed Plaintiff Khoudeida Saadoon's real and personal property.

679.     As a result of ISIS's invasion, Plaintiff Khoudeida Saadoon has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Sharifa Khalil**

680.     Plaintiff Sharifa Khalil is a citizen of the United States and domiciled in the state of Arizona.

681.     Plaintiff Sharifa Khalil has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

682.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sharifa Khalil's grandmother and cousin fled to Sinjar Mountain, where they were

trapped until they were able to escape to Turkey.  Plaintiff Sharifa Khalil's aunt and other cousins fled directly to Kurdistan.  Plaintiff Sharifa Khalil fearfully followed her family's journey as they fled.  One of Plaintiff Sharifa Khalil's cousins, who had given birth shortly before ISIS's invasion, died in Turkey.  After living in the camps for internally displaced persons in Kurdistan, some of Plaintiff Sharifa Khalil's family returned to their hometown.  There, both her grandmother and aunt were killed when a bomb left in their house exploded.  Shortly after, Plaintiff Sharifa Khalil's brother committed suicide.

683.    ISIS looted and destroyed Plaintiff Sharifa Khalil's real and personal property.

684.    As a result of ISIS's invasion, Plaintiff Sharifa Khalil has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Murad Mousa, Kori Ahmed, Hussein Maroo, Isam Maroo, Sultan Maroo, Faeza Maroo, Madleen Maroo, and Alya Maroo

685.    Plaintiffs Murad Mousa, Kori Ahmed, Hussein Maroo, Isam Maroo, Sultan Maroo, Faeza Maroo, Madleen Maroo, and Alya Maroo are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Murad Mousa and Plaintiff Kori Ahmed are married.  Plaintiffs Hussein Maroo, Isam Maroo, Sultan Maroo, Faeza Maroo, Madleen Maroo, and Alya Maroo are their children.

686.    Plaintiffs Murad Mousa, Kori Ahmed, Hussein Maroo, Isam Maroo, Sultan Maroo, Faeza Maroo, Madleen Maroo, and Alya Maroo have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

687.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Murad Mousa, Kori Ahmed, Hussein Maroo, Isam Maroo, Faeza Maroo, Madleen

Maroo, and Alya Maroo fled to Kurdistan with another of Plaintiffs Murad Mousa and Kori Ahmed's children. Plaintiffs Murad Mousa and Kori Ahmed's siblings also fled Sinjar separately. ISIS captured several of Plaintiffs Murad Mousa and Kori Ahmed's relatives. Plaintiff Kori Ahmed's brother and Plaintiff Murad Mousa's brother both experienced severe emotional trauma during and after the invasion, and each died a few months after the invasion. Plaintiffs Kori Ahmed, Murad Mousa, and Isam Maroo now suffer from psychological effects following the invasion and are currently receiving treatment, including medication. Plaintiff Hussein Maroo developed diabetes following the invasion.

688. ISIS looted and destroyed Plaintiffs Murad Mousa, Kori Ahmed, Hussein Maroo, Isam Maroo, Sultan Maroo, Faeza Maroo, Madleen Maroo, and Alya Maroo's real and personal property.

689. As a result of ISIS's invasion, Plaintiffs Murad Mousa, Kori Ahmed, Hussein Maroo, Isam Maroo, Sultan Maroo, Faeza Maroo, Madleen Maroo, and Alya Maroo have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Hasan Fandi**

690. Plaintiff Hasan Fandi is a citizen of the United States and domiciled in the state of Michigan.

691. Plaintiff Hasan Fandi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

692. In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hasan Fandi fled to Kurdistan with his family. Plaintiff Hasan Fandi lived in the United States but was visiting family in Sinjar with his mother and was planning to return to the

United States the day ISIS invaded.  ISIS stopped Plaintiff Hasan Fandi and his mother at several checkpoints while they fled to the airport.

693.    ISIS looted and destroyed Plaintiff Hasan Fandi's real and personal property.

694.    As a result of ISIS's invasion, Plaintiff Hasan Fandi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Sarkawt Badeel and Salar Badeel

695.    Plaintiffs Sarkawt Badeel and Salar Badeel are citizens of the United States and domiciled in the state of Texas.  Plaintiffs Sarkawt Badeel and Salar Badeel are brothers.

696.    Plaintiffs Sarkawt Badeel and Salar Badeel have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

697.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Sarkawt Badeel and Salar Badeel fled to Kurdistan with their parents, sisters, and cousins.

698.    ISIS looted and destroyed Plaintiffs Sarkawt Badeel and Salar Badeel's real and personal property.

699.    As a result of ISIS's invasion, Plaintiffs Sarkawt Badeel and Salar Badeel have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Anwar Elias

700.    Plaintiff Anwar Elias is a citizen of the United States and domiciled in the state of Texas.

701.     Plaintiff Anwar Elias has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

702.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Anwar Elias fled to Sinjar Mountain with her parents and siblings, where they were trapped until they were able to escape.

703.     ISIS looted and destroyed Plaintiff Anwar Elias's real and personal property.

704.     As a result of ISIS's invasion, Plaintiff Anwar Elias has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Hamy Hamdan

705.     Plaintiff Hamy Hamdan is a citizen of the United States and domiciled in the state of Nebraska.

706.     Plaintiff Hamy Hamdan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

707.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hamy Hamdan's sisters, brothers, uncles, and cousins fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Hamy Hamdan fearfully followed his family's journey as they fled.  ISIS beheaded Plaintiff Hamy Hamdan's cousin. Plaintiff Hamy Hamdan now suffers from poor physical health following the invasion and has undergone many surgeries.

708.     ISIS looted and destroyed Plaintiff Hamy Hamdan's real and personal property.

709. As a result of ISIS's invasion, Plaintiff Hamy Hamdan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Eedo Khalaf and Sevi Mourad**

710. Plaintiffs Eedo Khalaf and Sevi Mourad are citizens of the United States and domiciled in the state of Nebraska. Plaintiff Eedo Khalaf and Plaintiff Sevi Mourad are married.

711. Plaintiffs Eedo Khalaf and Sevi Mourad have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

712. In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Eedo Khalaf's family and Sevi Mourad's aunts, uncles, and cousins fled to Kurdistan. Plaintiffs Eedo Khalaf and Sevi Mourad fearfully followed their families' journeys as they fled. Plaintiff Eedo Khalaf's uncle's car broke down on the way to Kurdistan, and the family, including his cousins, are still missing and presumed dead. ISIS beheaded Plaintiff Sevi Mourad's father's cousin.

713. ISIS looted and destroyed Plaintiffs Eedo Khalaf and Sevi Mourad's real and personal property.

714. As a result of ISIS's invasion, Plaintiffs Eedo Khalaf and Sevi Mourad have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khansa Hasan, Haifaa Osman, and Hadia Smoqi**

715.    Plaintiffs Khansa Hasan, Haifaa Osman, and Hadia Smoqi are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khansa Hasan is Plaintiff Haifaa Osman's mother and Plaintiff Hadia Smoqi's mother-in-law.

716.    Plaintiffs Khansa Hasan, Haifaa Osman, and Hadia Smoqi have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

717.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hadia Smoqi fled to Kurdistan and then continued by foot to Turkey with her parents and siblings.  Plaintiff Hadia Smoqi's father died shortly after reaching Turkey.  Plaintiffs Khansa Hasan and Haifaa Osman's family, including Plaintiff Khansa Hasan's mother and siblings, fled to Kurdistan.  Plaintiffs Khansa Hasan and Haifaa Osman fearfully followed their family's journey as they fled.

718.    ISIS looted and destroyed Plaintiffs Khansa Hasan, Haifa Osman, and Hadia Smoqi's real and personal property.

719.    As a result of ISIS's invasion, Plaintiffs Khansa Hasan, Haifaa Osman, and Hadia Smoqi have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Ubayd Nafkosh, Khunaf Salaja, Isam Nafkosh, Sahar Nafkhosh, Sarab Nafkosh, Suad Nafkosh, Sabri Nafkosh, and I.N.**

720.    Plaintiffs Ubayd Nafkosh, Khunaf Salaja, Isam Nafkosh, Sahar Nafkhosh, Sarab Nafkosh, Suad Nafkosh, Sabri Nafkosh, and I.N. are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Ubayd Nafkosh and Plaintiff Khunaf Salaja are married.

Plaintiffs Isam Nafkosh, Sahar Nafkhosh, Sarab Nafkosh, Suad Nafkosh, Sabri Nafkosh, and I.N. are their children.

721.    Plaintiffs Ubayd Nafkosh, Khunaf Salaja, Isam Nafkosh, Sahar Nafkhosh, Sarab Nafkosh, Suad Nafkosh, Sabri Nafkosh, and I.N. have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

722.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khunaf Salaja fled to Sinjar Mountain with her children, including Plaintiffs Sahar Nafkhosh, Sarab Nafkosh, Suad Nafkosh, Sabri Nafkosh, and I.N., where they were trapped until they were able to escape to Kurdistan.  Plaintiff Khunaf Salaja's siblings and their families and Plaintiff Ubayd Nafkhosh's parents, siblings, and their families also fled to Sinjar Mountain. Plaintiffs Ubayd Nafkosh and Isam Nafkosh fearfully followed their family's journey as they fled. Plaintiff Ubayd Nafkhosh's father was captured by ISIS, though he was later able to escape. Plaintiff Khunaf Salaja's sister died on Sinjar Mountain.  Plaintiff Ubayd Nafkhosh's mother died shortly after leaving Sinjar Mountain, and his father died in Kurdistan.

723.    ISIS looted and destroyed Plaintiffs Ubayd Nafkosh, Khunaf Salaja, Isam Nafkosh, Sahar Nafkhosh, Sarab Nafkosh, Suad Nafkosh, Sabri Nafkosh, and I.N.'s real and personal property.

724.    As a result of ISIS's invasion, Plaintiffs Ubayd Nafkosh, Khunaf Salaja, Isam Nafkosh, Sahar Nafkhosh, Sarab Nafkosh, Suad Nafkosh, Sabri Nafkosh, and I.N. have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Kolo Dahar**

725.    Plaintiff Kolo Dahar is a citizen of the United States and domiciled in the state of Nebraska.

726.    Plaintiff Kolo Dahar has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

727.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Kolo Dahar's sisters and uncles fled to Kurdistan.  Plaintiff Kolo Dahar fearfully followed his family's journey as they fled.  ISIS captured and tortured Plaintiff Kolo Dahar's uncle until he was able to escape.

728.    ISIS looted and destroyed Plaintiff Kolo Dahar's real and personal property.

729.    As a result of ISIS's invasion, Plaintiff Kolo Dahar has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Barvi Ali**

730.    Plaintiff Barvi Ali is a citizen of the United States and domiciled in the state of Nebraska.

731.    Plaintiff Barvi Ali has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

732.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Barvi Ali's parents and brother fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Barvi Ali fearfully followed her family's journey as they fled.  Plaintiff Barvi Ali's brother stepped on an IED, causing an explosion.  As a

result, Plaintiff Barvi Ali's brother has had to undergo several major surgeries.  Plaintiff Barvi Ali's nephew lost his leg.  Plaintiff Barvi Ali's mother died in Kurdistan.

733.    ISIS looted and destroyed Plaintiff Barvi Ali's real and personal property.

734.    As a result of ISIS's invasion, Plaintiff Barvi Ali has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Dahham Haji**

735.    Plaintiff Dahham Haji is a citizen of the United States and domiciled in the state of Nebraska.

736.    Plaintiff Dahham Haji has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

737.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Dahham Haji and his parents, siblings, and brother's family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  ISIS killed Plaintiff Dahham Haji's grandmother, two uncles, aunt, and two cousins.   Another of Plaintiff Dahham Haji's cousins died on Sinjar Mountain.

738.    ISIS looted and destroyed Plaintiff Dahham Haji's real and personal property.

739.    As a result of ISIS's invasion, Plaintiff Dahham Haji has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Ismaeil Hesso and Sari Meskin**

740.     Plaintiffs Ismaeil Hesso and Sari Meskin are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Ismaeil Hesso and Plaintiff Sari Meskin are married.

741.     Plaintiffs Ismaeil Hesso and Sari Meskin have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

742.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Ismaeil Hesso's brother and sister fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Ismaeil Hesso and Sari Meskin fearfully followed the family's journey as they fled.  ISIS killed two of Plaintiff Ismaeil Hesso's cousins. ISIS captured another of Plaintiff Ismaeil Hesso's cousins, who later died by suicide.  ISIS killed Plaintiff Sari Meskin's grandfather and uncles, and posted videos of their killings on social media, which Plaintiff Sari Meskin watched.  Plaintiff Sari Meskin now suffers from persistent abdominal pain following the invasion that requires medical attention.

743.     ISIS looted and destroyed Plaintiffs Ismaeil Hesso and Sari Meskin's real and personal property.

744.     As a result of ISIS's invasion, Plaintiffs Ismaeil Hesso and Sari Meskin have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Nadira Broka, Falah Rashoka, Hazim Rashawka, Ashwaq Rashawka, Khokhi Rashawka, Hala Rashoka, and Thawra Rashawka**

745.     Plaintiffs Nadira Broka, Falah Rashoka, Hazim Rashawka, Ashwaq Rashawka, Khokhi Rashawka, Hala Rashoka, and Thawra Rashawka are citizens of the United States and domiciled in the state of Nebraska.  Plaintiffs Falah Rashoka, Hazim Rashawka, Ashwaq

Rashawka, Khokhi Rashawka, Hala Rashoka, and Thawra Rashawka are siblings, and Plaintiff Nadira Broka is their mother.

746.   Plaintiffs Nadira Broka, Falah Rashoka, Hazim Rashawka, Ashwaq Rashawka, Khokhi Rashawka, Hala Rashoka, and Thawra Rashawka have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

747.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Nadira Broka, Falah Rashoka, Hazim Rashawka, Ashwaq Rashawka, Khokhi Rashawka, Hala Rashoka, and Thawra Rashawka fled to Sinjar Mountain with Plaintiff Nadira Broka's family, where they were trapped before they escaped to Kurdistan.  Plaintiffs Falah Rashoka, Hazim Rashawka, Ashwaq Rashawka, Khokhi Rashawka, Hala Rashoka, and Thawra Rashawka's father (Plaintiff Nadia Broka's husband) experienced a suspected heart attack as they fled and died during the trip.  ISIS captured more than twenty of Plaintiff Nadira Broka's relatives, with whom Plaintiff Nadira Broka was living in a family home, and killed nearly all of them.

748.   ISIS looted and destroyed Plaintiffs Nadira Broka, Falah Rashoka, Hazim Rashawka, Ashwaq Rashawka, Khokhi Rashawka, Hala Rashoka, and Thawra Rashawka's real and personal property.

749.   As a result of ISIS's invasion, Plaintiffs Nadira Broka, Falah Rashoka, Hazim Rashawka, Ashwaq Rashawka, Khokhi Rashawka, Hala Rashoka, and Thawra Rashawka have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Hussein Alisso and Laila Ayub**

750.   Plaintiffs Hussein Alisso and Laila Ayub are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Hussein Alisso and Plaintiff Laila Ayub are married.

751.     Plaintiffs Hussein Alisso and Laila Ayub have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

752.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Hussein Alisso and Laila Ayub fled to a camp for internally displaced persons in Kurdistan with their five children.  ISIS captured Plaintiff Hussein Alisso's aunt and her family and of them, two are presumed dead.  ISIS held Plaintiff Laila Ayub's father captive, though he was later able to escape.

753.     ISIS looted and destroyed Plaintiffs Hussein Alisso and Laila Ayub's real and personal property.

754.     As a result of ISIS's invasion, Plaintiffs Hussein Alisso and Laila Ayub have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Shaima Abrahim**

755.     Plaintiff Shaima Abrahim is a citizen of the United States and domiciled in the state of Nebraska.

756.     Plaintiff Shaima Abrahim has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

757.     In particular, on or about August 3, 2014, during ISIS's invasion of Sinjar, Iraq, ISIS captured and beheaded Plaintiff Shaima Abrahim's uncle and cousin.  ISIS posted photos of the beheadings on social media, where Plaintiff Shaima Abrahim saw them.

758.     ISIS looted and destroyed Plaintiff Shaima Abrahim's real and personal property.

759.    As a result of ISIS's invasion, Plaintiff Shaima Abrahim has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Khani Sharo and Naif Murad

760.    Plaintiffs Khani Sharo and Naif Murad are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khani Sharo and Plaintiff Naif Murad are married.

761.    Plaintiffs Khani Sharo and Naif Murad have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

762.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khani Sharo, who was pregnant at the time, and Naif Murad fled with Plaintiff Naif Murad's parents and siblings to Kurdistan and then to Turkey.  Plaintiff Naif Murad's mother was injured during the escape and died a month later due to the injury.  ISIS captured Plaintiff Khani Sharo's cousins and Plaintiff Naif Murad's brother, sister, and sister's family, though they were all later able to escape to Kurdistan.

763.    ISIS looted and destroyed Plaintiffs Khani Sharo and Naif Murad's real and personal property.

764.    As a result of ISIS's invasion, Plaintiffs Khani Sharo and Naif Murad have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Jamal Murad

765.    Plaintiff Jamal Murad is a citizen of the United States and domiciled in the state of Nebraska.

766.     Plaintiff Jamal Murad has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

767.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Jamal Murad's family, including his brothers, sisters, and uncles, fled to Sinjar Mountain, where they were trapped until they were able to escape to Syria and then to Kurdistan. Plaintiff Jamal Murad fearfully followed his family's journey as they fled. Plaintiff Jamal Murad's uncle stayed behind and was killed by ISIS.

768.     ISIS looted and destroyed Plaintiff Jamal Murad's real and personal property.

769.     As a result of ISIS's invasion, Plaintiff Jamal Murad has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Mayan Smoki and Khalaf Khalaf**

770.     Plaintiffs Mayan Smoki and Khalaf Khalaf are citizens of the United States and domiciled in the state of Nebraska. Plaintiff Mayan Smoki and Plaintiff Khalaf Khalaf are married.

771.     Plaintiffs Mayan Smoki and Khalaf Khalaf have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

772.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Mayan Smoki and Khalaf Khalaf fled with their children and Plaintiff Khalaf Khalaf's parents, siblings, and their families to Kurdistan. Plaintiffs Mayan Smoki and Khalaf Khalaf's daughter became sick on the day of the invasion and later died. ISIS killed Plaintiff Khalaf Khalaf's close relative.

773.     ISIS looted and destroyed Plaintiffs Mayan Smoki and Khalaf Khalaf's real and personal property.

774.     As a result of ISIS's invasion, Plaintiffs Mayan Smoki and Khalaf Khalaf have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khaleel Khalaf**

775.     Plaintiff Khaleel Khalaf is a citizen of the United States and domiciled in the state of Nebraska.

776.     Plaintiff Khaleel Khalaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

777.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khaleel Khalaf's family, including his mother, brothers, sisters, and cousins, fled to Kurdistan.  Plaintiff Khaleel Khalaf fearfully followed his family's journey as they fled.  ISIS killed Plaintiff Khaleel Khalaf's cousin.

778.     ISIS looted and destroyed Plaintiff Khaleel Khalaf's real and personal property.

779.     As a result of ISIS's invasion, Plaintiff Khaleel Khalaf has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Haidar Hesso**

780.     Plaintiff Haidar Hesso is a citizen of the United States and domiciled in the state of Nebraska.

781.     Plaintiff Haidar Hesso has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

782.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Haidar Hesso's brothers and their families fled to Sinjar Mountain.  ISIS stopped them on the way and stole all their belongings.  When ISIS was distracted, Plaintiffs Haidar Hesso's three brothers and their families were able to escape to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Haider Hesso fearfully followed his family's journey as they fled.

783.     ISIS looted and destroyed Plaintiff Haidar Hesso's real and personal property.

784.     As a result of ISIS's invasion, Plaintiff Haidar Hesso has experienced economic loss; severe mental anguish, extreme emotional pain and suffering; loss of property; and/or loss of his family's society and counsel.

**Khounaf Shammo, Khaled Mourad, and Bashar Mourad**

785.     Plaintiffs Khounaf Shammo, Khaled Mourad, and Bashar Mourad are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khounaf Shammo is Plaintiffs Khaled Mourad and Bashar Mourad's mother.

786.     Plaintiffs Khounaf Shammo, Khaled Mourad, and Bashar Mourad have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

787.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khounaf Shammo, Khaled Mourad, and Bashar Mourad's family, including Plaintiff Khounaf Shammo's siblings and their children, fled to Kurdistan.  Other members of their family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Khaled Mourad, Bashar Mourad, and Khounaf Shammo fearfully followed their family's journey as they fled.  Just before fleeing, one of Plaintiff Khounaf Shammo's sister (Plaintiffs Khaled Mourad and Bashar Mourad's aunt) underwent surgery, and she died shortly

after arriving in Kurdistan due to the difficult journey.  Plaintiff Khounaf Shammo developed depression and chronic back pain following the invasion.

788.    ISIS looted and destroyed Plaintiffs Khounaf Shammo, Khaled Mourad, and Bashar Mourad's real and personal property.

789.    As a result of ISIS's invasion, Plaintiffs Khounaf Shammo, Khaled Mourad, and Bashar Mourad have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Kawwal Hasan, Kamla Shammo, Laila Khoudeida, and Nafiya Khoudeida**

790.    Plaintiffs Kawwal Hasan, Kamla Shammo, Laila Khoudeida, and Nafiya Khoudeida are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Kawwal Hasan and Plaintiff Kamla Shammo are married.  Plaintiffs Laila Khoudeida, and Nafiya Khoudeida are their children.

791.    Plaintiffs Kawwal Hasan, Kamla Shammo, Laila Khoudeida, and Nafiya Khoudeida have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

792.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Kawwal Hasan and Kamla Shammo's son (Plaintiffs Laila Khoudeida and Nafiya Khoudeida's brother) fled to Kurdistan while their sisters, brothers, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Kawwal Hasan, Kamla Shammo, Laila Khoudeida, and Nafiya Khoudeida fearfully followed their family's journey as they fled.  ISIS killed eight of Plaintiff Kawwal Hasan's close relatives and captured Plaintiff Kamla Shammo's sister and her child.  Several of Plaintiff Kawwal Hasan's family members fought ISIS during and after the invasion.  Plaintiff Kamla Shammo's nephew died on

the mountain.  ISIS captured Plaintiff Kamla Shammo's pregnant niece and her niece's family.

Plaintiff Kamla Shammo's niece gave birth in captivity and was only able to escape after three

years.  Another of Plaintiff Kamla Shammo's nieces died from suicide by setting herself on fire

while she was trapped on Sinjar Mountain.  Two of Plaintiff Kamla Shammo's uncles and cousins

died in the camps for internally displaced persons.  Plaintiff Kamla Shammo subsequently needed

heart surgery and now has a pacemaker and suffers from depression and poor mental health

following the invasion.

793.    ISIS looted and destroyed Plaintiffs Kawwal Hasan, Kamla Shammo, Laila

Khoudeida, and Nafiya Khoudeida's real and personal property.

794.    As a result of ISIS's invasion, Plaintiffs Kawwal Hasan, Kamla Shammo, Laila

Khoudeida, and Nafiya Khoudeida have experienced economic loss, severe mental anguish,

extreme emotional pain and suffering, loss of property, and/or loss of their family's society and

counsel.


**Sardar Almahama and Naseema Dinai**

795.    Plaintiffs Sardar Almahama and Naseema Dinai are citizens of the United States

and domiciled in the state of Nebraska.  Plaintiff Sardar Almahama and Plaintiff Naseema Dinai

are married.

796.    Plaintiffs Sardar Almahama and Naseema Dinai have suffered severe injuries as a

result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

797.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar,

Iraq, Plaintiffs Sardar Almahama and Naseema Dinai fled to Sinjar Mountain with their four

children, including one disabled son, and other family members, where they were trapped until

they were able to escape to Kurdistan.  ISIS killed Plaintiff Naseema Dinai's grandmother, uncle, and four cousins.  ISIS killed Plaintiff Sardar Almahama's three cousins.  ISIS captured Plaintiff Sardar Almahama's grandmother, who escaped but died soon after.  Plaintiff Sardar Almahama's uncle is still missing.

798.    ISIS looted and destroyed Plaintiffs Sardar Almahama and Naseema Dinai's real and personal property.

799.    As a result of ISIS's invasion, Plaintiffs Sardar Almahama and Naseema Dinai have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Sabah Zaido**

800.    Plaintiff Sabah Zaido is a citizen of the United States and domiciled in the state of Nebraska.

801.    Plaintiff Sabah Zaido has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

802.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sabah Zaido's daughter fled to Kurdistan.  Plaintiff Sabah Zaido's extended family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan. Plaintiff Sabah Zaido fearfully followed his family's journey as they fled.  Plaintiff Sabah Zaido's cousin was injured and died on Sinjar Mountain.

803.    ISIS looted and destroyed Plaintiff Sabah Zaido's real and personal property.

804.    As a result of ISIS's invasion, Plaintiff Sabah Zaido has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Fahad Naif**

805.     Plaintiff Fahad Naif is a citizen of the United States and domiciled in the state of Nebraska.

806.     Plaintiff Fahad Naif has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

807.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Fahad Naif fled to Sinjar Mountain with his parents, sisters, and brothers, where they were trapped until they could escape to Kurdistan.

808.     ISIS looted and destroyed Plaintiff Fahad Naif's real and personal property.

809.     As a result of ISIS's invasion, Plaintiff Fahad Naif has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Qasim Samoqi**

810.     Plaintiff Qasim Samoqi is a citizen of the United States and domiciled in the state of Nebraska.

811.     Plaintiff Qasim Samoqi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

812.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Qasim Samoqi fled to Kurdistan with his mother, brother, uncle, and their families. Plaintiff Qasim Samoqi's mother developed depression and died following the invasion.

813.     ISIS looted and destroyed Plaintiff Qasim Samoqi's real and personal property.

814.     As a result of ISIS's invasion, Plaintiff Qasim Samoqi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Saleh Saleh**

815.     Plaintiff Saleh Saleh is a citizen of the United States and domiciled in the state of Nebraska.

816.     Plaintiff Saleh Saleh has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

817.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saleh Saleh's parents, brothers, sisters, and their families fled to Kurdistan.  Plaintiff Saleh Saleh fearfully followed his family's journey as they fled.  ISIS captured two of Plaintiff Saleh Saleh's brothers-in-law, though they were later able to escape.

818.     ISIS looted and destroyed Plaintiff Saleh Saleh's real and personal property.

819.     As a result of ISIS's invasion, Plaintiff Saleh Saleh has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Tahseen Osman**

820.     Plaintiff Tahseen Osman is a citizen of the United States and domiciled in the state of Texas.

821.     Plaintiff Tahseen Osman has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

822.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Tahseen Osman's siblings and their families fled to Kurdistan.  Plaintiff Tahseen Osman fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Tahseen Osman's uncle and cousin, who are still missing.  ISIS captured another of Plaintiff Tahseen Osman's uncles, but he managed to escape.

823.    ISIS looted and destroyed Plaintiff Tahseen Osman's real and personal property.

824.    As a result of ISIS's invasion, Plaintiff Tahseen Osman has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Saeed Kalo**

825.    Plaintiff Saeed Kalo is a citizen of the United States and domiciled in the state of Texas.

826.    Plaintiff Saeed Kalo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

827.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saeed Kalo's parents, siblings, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Saeed Kalo fearfully followed his family's journey as they fled.  Plaintiff Saeed Kalo's father, mother, and sister later developed health issues that required medical treatment.

828.    ISIS looted and destroyed Plaintiff Saeed Kalo's real and personal property.

829.    As a result of ISIS's invasion, Plaintiff Saeed Kalo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Mazen Suleiman**

830.    Plaintiff Mazen Suleiman is a citizen of the United States and domiciled in the state of Nebraska.

831.    Plaintiff Mazen Suleiman has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

832.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Mazen Suleiman fled to Kurdistan with his wife, children, and siblings.  Plaintiff Mazen Suleiman now suffers from severe stress and physical health issues following the invasion.

833.    ISIS looted and destroyed Plaintiff Mazen Suleiman's real and personal property.

834.    As a result of ISIS's invasion, Plaintiff Mazen Suleiman has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Munefah Murad**

835.    Plaintiff Munefah Murad is a citizen of the United States and domiciled in the state of Nebraska.

836.    Plaintiff Munefah Murad has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

837.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Munefah Murad's family, including her mother, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Munefah Murad fearfully followed her family's journey as they fled.  Plaintiff Munefah Murad's mother died on Sinjar Mountain.  ISIS captured and killed Plaintiff Munefah Murad's uncle and cousin.

838.    ISIS looted and destroyed Plaintiff Munefah Murad's real and personal property.

839.    As a result of ISIS's invasion, Plaintiff Munefah Murad has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Sabah Hasan**

840.    Plaintiff Sabah Hasan is a citizen of the United States and domiciled in the state of Nebraska.

841.    Plaintiff Sabah Hasan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

842.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, members of Plaintiff Sabah Hasan's family, including his wife, daughter, mother, and siblings, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Sabah Hasan fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Sabah Hasan's father, who is still missing.

843.    ISIS looted and destroyed Plaintiff Sabah Hasan's real and personal property.

844.    As a result of ISIS's invasion, Plaintiff Sabah Hasan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Aeid Hamo**

845.    Plaintiff Aeid Hamo is a citizen of the United States and domiciled in the state of Nebraska.

846.    Plaintiffs Aeid Hamo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

847.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Aeid Hamo fled to Kurdistan with his parents, siblings, grandparents, uncles, and cousins.

848.    ISIS looted and destroyed Plaintiff Aeid Hamo's real and personal property.

849.    As a result of ISIS's invasion, Plaintiff Aeid Hamo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Alex Ismail and Muhsin Holki**

850.    Plaintiffs Alex Ismail and Muhsin Holki are citizens of the United States and domiciled in the state of Texas.  Plaintiffs Alex Ismail and Muhsin Holki are brothers.

851.    Plaintiffs Alex Ismail and Muhsin Holki have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

852.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Muhsin Holki fled to Sinjar Mountain with his grandmother, parents, siblings, and their families, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Alex Ismail fearfully followed his family's journey as they fled.  ISIS captured and killed Plaintiffs Alex Ismail and Muhsin Holki's cousin.

853.    ISIS looted and destroyed Plaintiff Alex Ismail and Muhsin Holki's real and personal property.

854.     As a result of ISIS's invasion, Plaintiffs Alex Ismail and Muhsin Holki have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Ricky Namer**

855.     Plaintiff Ricky Namer is a citizen of the United States and domiciled in the state of Texas.

856.     Plaintiff Ricky Namer has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

857.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Ricky Namer's parents, brothers, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Ricky Namer fearfully followed his family's journey as they fled.  Plaintiff Ricky Namer's nephew died in Kurdistan. Plaintiff Ricky Namer now suffers from trauma, depression, and insomnia following the invasion.

858.     ISIS looted and destroyed Plaintiff Ricky Namer's real and personal property.

859.     As a result of ISIS's invasion, Plaintiff Ricky Namer has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Asinja Badeel**

860.     Plaintiff Asinja Badeel is a citizen of the United States and domiciled in the state of Texas.

861.     Plaintiff Asinja Badeel has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

862.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Asinja Badeel's parents and siblings fled to Kurdistan.  Plaintiff Asinja Badeel fearfully followed her family's journey as they fled.  Plaintiff Asinja Badeel's father suffered a stroke while escaping and half of his body is now permanently paralyzed.  Plaintiff Asinja Badeel now suffers from depression following the invasion.

863.    ISIS looted and destroyed Plaintiff Asinja Badeel's real and personal property.

864.    As a result of ISIS's invasion, Plaintiff Asinja Badeel has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Sinobar Badeel and Laith Saleem**

865.    Plaintiffs Sinobar Badeel and Laith Saleem are citizens of the United States and domiciled in the state of Texas.  Plaintiff Sinobar Badeel and Plaintiff Laith Saleem are married.

866.    Plaintiffs Sinobar Badeel and Laith Saleem have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

867.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Sinobar Badeel and Laith Saleem fled to Kurdistan with their children, parents, and siblings.  Plaintiff Sinobar Badeel's father suffered a stroke while escaping and half of his body is now permanently paralyzed.  Shortly before August 3, 2014, ISIS bombed Plaintiff Laith Saleem's store in Bashiqa, Iraq, and Plaintiff Laith Saleem barely survived.  Plaintiffs Sinobar Badeel and Laith Saleem now suffer from nightmares following the invasion.

868.    ISIS looted and destroyed Plaintiffs Sinobar Badeel and Laith Saleem's real and personal property.

869.     As a result of ISIS's invasion, Plaintiffs Sinobar Badeel and Laith Saleem has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Salih Saado**

870.     Plaintiff Salih Saado is a citizen of the United States and domiciled in the state of Virginia.

871.     Plaintiff Salih Saado has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

872.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Salih Saado's mother, brothers, and sisters fled to Kurdistan.  Plaintiff Salih Saado fearfully followed his family's journey as they fled.

873.     ISIS looted and destroyed Plaintiff Salih Saado's real and personal property.

874.     As a result of ISIS's invasion, Plaintiff Salih Saado has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property and/or loss of their family's society and counsel.

**Fakhri Kassem**

875.     Plaintiff Fakhri Kassem is a citizen of the United States and domiciled in the state of Washington.

876.     Plaintiff Fakhri Kassem has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

877.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Fakhri Kassem's uncles and their families fled to Sinjar Mountain, where they were

trapped until they were able to escape to Kurdistan.  Plaintiff Fakhri Kassem fearfully followed his family's journey as they fled.  ISIS killed two of Plaintiff Fakhri Kassem's cousins.  Plaintiff Fakhri Kassem now suffers from several health conditions, including high blood pressure, a stroke, diabetes, and difficulty sleeping following the invasion.

878.    ISIS looted and destroyed Plaintiff Fakhri Kassem's real and personal property.

879.    As a result of ISIS's invasion, Plaintiff Fakhri Kassem has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**James Abdy**

880.    Plaintiff James Abdy is a citizen of the United States and domiciled in the state of Texas.

881.    Plaintiff James Abdy has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

882.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff James Abdy's family, including his parents and siblings, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff James Abdy fearfully followed his family's journey as they fled.  ISIS fighters shot at Plaintiff James Abdy's family when they tried to leave the mountain.  Two of Plaintiff James Abdy's brothers now suffer from severe trauma that affects their functioning following the invasion.  Plaintiff James Abdy has experienced trouble focusing following the invasion, which has affected his livelihood and personal life, including by preventing him from maintaining his businesses in the United States.

883.    ISIS looted and destroyed Plaintiff James Abdy's real and personal property.

884.     As a result of ISIS's invasion, Plaintiff James Abdy has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Jndy Smoqi**

885.     Plaintiff Jndy Smoqi is a citizen of the United States and domiciled in the state of Nebraska.

886.     Plaintiff Jndy Smoqi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

887.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Jndy Smoqi fled to Kurdistan with his wife, wife's parents, brother, and sister-in-law.

888.     ISIS looted and destroyed Plaintiff Jndy Smoqi's real and personal property.

889.     As a result of ISIS's invasion, Plaintiff Jndy Smoqi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Nadima Mirza and Sami Smoqi**

890.     Plaintiffs Nadima Mirza and Sami Smoqi are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Nadima Mirza is Plaintiff Sami Smoqi's mother.

891.     Plaintiffs Nadima Mirza and Sami Smoqi have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

892.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Nadima Mirza and Sami Smoqi fled to Sinjar Mountain with their family, including

Plaintiff Sami Smoqi's siblings, where they were trapped until they were able to escape to Kurdistan.

893.    ISIS looted and destroyed Plaintiffs Nadima Mirza and Sami Smoqi's real and personal property.

894.    As a result of ISIS's invasion, Plaintiffs Nadima Mirza and Sami Smoqi have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Saadoon Smoqi and Sulaiman Hasan**

895.    Plaintiffs Saadoon Smoqi and Sulaiman Hasan are citizens of the United States and domiciled in the state of Indiana.  Plaintiffs Saadoon Smoqi and Sulaiman Hasan are brothers.

896.    Plaintiffs Saadoon Smoqi and Sulaiman Hasan have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

897.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Saadoon Smoqi and Sulaiman Hasan fled to Kurdistan with their sister and her family.  Other members of Plaintiffs Saadoon Smoqi and Sulaiman Hasan's family fled to Sinjar Mountain, where they were trapped until they were able to escape.

898.    ISIS looted and destroyed Plaintiffs Saadoon Smoqi and Sulaiman Hasan's real and personal property.

899.    As a result of ISIS's invasion, Plaintiffs Saadoon Smoqi and Sulaiman Hasan have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khani Rafo**

900.    Plaintiff Khani Rafo is a citizen of the United States and domiciled in the state of Indiana.

901.    Plaintiff Khani Rafo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

902.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khani Rafo fled to Kurdistan with her parents and siblings.

903.    ISIS looted and destroyed Plaintiff Khani Rafo's real and personal property.

904.    As a result of ISIS's invasion, Plaintiff Khani Rafo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Haneef Smoqi**

905.    Plaintiff Haneef Smoqi is a citizen of the United States and domiciled in the state of Indiana.

906.    Plaintiff Haneef Smoqi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

907.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Haneef Smoqi fled to Kurdistan with her brother and uncle.  Plaintiff Haneef Smoqi's parents, sisters, and brothers fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  ISIS captured Plaintiff Haneef Smoqi's father's cousin's families, and some of them are still in captivity.

908.    ISIS looted and destroyed Plaintiff Haneef Smoqi's real and personal property.

909.     As a result of ISIS's invasion, Plaintiff Haneef Smoqi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Saeed Issa**

910.     Plaintiff Saaed Issa is a citizen of the United States and domiciled in the state of Nebraska.

911.     Plaintiff Saaed Issa has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

912.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saaed Issa fled to Sinjar Mountain with his wife, children, mother, and brothers, where they were trapped until they could escape to Kurdistan.  Plaintiff Saaed Issa's aunt died on Sinjar Mountain.

913.     ISIS looted and destroyed Plaintiff Saaed Issa real and personal property.

914.     As a result of ISIS's invasion, Plaintiff Saaed Issa has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Sheren Auso and Serdar Auso**

915.     Plaintiffs Sheren Auso and Serdar Auso are citizens of the United States and domiciled in the state of Washington.  Plaintiff Sheren Auso and Plaintiff Serdar Auso are married.

916.     Plaintiffs Sheren Auso and Serdar Auso have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

917.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Sheren Auso and Serdar Auso fled to Kurdistan with their children, Plaintiff Sheren Auso's parents, and Plaintiff Serdar Auso's brothers.   ISIS captured and buried alive two of Plaintiff Serdar Auso's uncles.   ISIS killed Plaintiff Sheren Auso's parents' relatives.   Plaintiffs Sheren Auso and Serder Auso both have been diagnosed with depression and suffer from insomnia and anxiety following the invasion.

918.   ISIS looted and destroyed Plaintiffs Sheren Auso and Serdar Auso's real and personal property.

919.   As a result of ISIS's invasion, Plaintiffs Sheren Auso and Serdar Auso have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Basil Auso**

920.   Plaintiff Basil Auso is a citizen of the United States and domiciled in the state of Washington.

921.   Plaintiff Basil Auso has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

922.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Basil Auso's parents, grandmother, siblings, and their families fled to Kurdistan. Plaintiff Basil Auso fearfully followed his family's journey as they fled.   ISIS attacked Plaintiff Basil Auso's family while on their journey to Kurdistan.   ISIS captured and buried alive Plaintiff Basil Auso's two uncles.

923.   ISIS looted and destroyed Plaintiff Basil Auso's real and personal property.

924.    As a result of ISIS's invasion, Plaintiff Basil Auso has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Hassan Ali, Kori Sharro, Rose Osman, Basseh Osman, Ajaj Osman, Falah Osman, Amal Osman, Husein Osman, Sanaa Osman, Samerah Osman, and Salah Osman

925.    Plaintiffs Hassan Ali, Kori Sharro, Rose Osman, Basseh Osman, Ajaj Osman, Falah Osman, Amal Osman, Husein Osman, Sanaa Osman, Samerah Osman, and Salah Osman are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Hassan Ali and Kori Sharro are the parents of Plaintiffs Rose Osman, Basseh Osman, Ajaj Osman, Falah Osman, Amal Osman, Husein Osman, Sanaa Osman, Samerah Osman, and Salah Osman.

926.    Plaintiffs Hassan Ali, Kori Sharro, Rose Osman, Basseh Osman, Ajaj Osman, Falah Osman, Amal Osman, Husein Osman, Sanaa Osman, Samerah Osman, and Salah Osman have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

927.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hassan Ali's sisters, uncles, cousins, and wife's family fled to Kurdistan.  Plaintiffs Hassan Ali, Kori Sharro, Rose Osman, Basseh Osman, Ajaj Osman, Falah Osman, Amal Osman, Husein Osman, Sanaa Osman, Samerah Osman, and Salah Osman fearfully followed their family's journey as they fled.  ISIS captured Plaintiff Hassan Ali's cousin and his cousin's daughter.

928.    ISIS looted and destroyed Plaintiffs Hassan Ali, Kori Sharro, Rose Osman, Basseh Osman, Ajaj Osman, Falah Osman, Amal Osman, Husein Osman, Sanaa Osman, Samerah Osman, and Salah Osman's real and personal property.

929.    As a result of ISIS's invasion, Plaintiffs Hassan Ali, Kori Sharro, Rose Osman, Basseh Osman, Ajaj Osman, Falah Osman, Amal Osman, Husein Osman, Sanaa Osman, Samerah

Osman, and Salah Osman have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Ismael Khro**

930.    Plaintiff Ismael Khro is a citizen of the United States and domiciled in the state of Washington.

931.    Plaintiff Ismael Khro has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

932.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Ismael Khro's mother, siblings, and wife's family fled to Kurdistan. Plaintiff Ismael Khro fearfully followed his family's journey as they fled. ISIS captured Plaintiff Ismael Khro's wife's family and took the women into captivity. Plaintiff's Ismael Khro's wife's family members escaped after about three years in captivity. Plaintiff Ismael Khro has sought mental health treatment, including therapy and medication, following the invasion.

933.    ISIS looted and destroyed Plaintiff Ismael Khro's real and personal property.

934.    As a result of ISIS's invasion, Plaintiff Ismael Khro has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khairi Shammo**

935.    Plaintiff Khairi Shammo is a citizen of the United States and domiciled in the state of Virginia.

936.    Plaintiff Khairi Shammo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

937.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khairi Shammo's parents, brothers, grandparents, uncles, and cousins fled to Kurdistan and then to Turkey.  Plaintiff Khairi Shammo fearfully followed his family's journey as they fled.  Plaintiff Khairi Shammo's grandmother died in a camp for internally displaced persons in Turkey later that year.

938.     ISIS looted and destroyed Plaintiff Khairi Shammo's real and personal property.

939.     As a result of ISIS's invasion, Plaintiff Khairi Shammo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Wadhhah Alesou**

940.     Plaintiff Wadhhah Alesou is a citizen of the United States and domiciled in the state of Nebraska.

941.     Plaintiff Wadhhah Alesou has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

942.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Wadhhah Alesou fled to Kurdistan with her son and his family.  ISIS captured and killed several of Plaintiff Wadhhah Alesou's relatives.  Plaintiff Wadhhah Alesou has sought mental health treatment and has been prescribed medication following the invasion.

943.     ISIS looted and destroyed Plaintiff Wadhhah Alesou's real and personal property.

944.     As a result of ISIS's invasion, Plaintiff Wadhhah Alesou has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Khalid Khalaf**

945.     Plaintiff Khalid Khalaf is a citizen of the United States and domiciled in the state of Nebraska.

946.     Plaintiff Khalid Khalaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

947.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khalid Khalaf's mother and siblings fled to Kurdistan and then to Turkey and Germany.  Plaintiff Khalid Khalaf fearfully followed his family's journey as they fled.

948.     ISIS looted and destroyed Plaintiff Khalid Khalaf's real and personal property.

949.     As a result of ISIS's invasion, Plaintiff Khalid Khalaf has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Azeezah Arab**

950.     Plaintiff Azeezah Arab is a citizen of the United States and domiciled in the state of Nebraska.

951.     Plaintiff Azeezah Arab has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

952.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Azeezah Arab's family, including her uncles and cousins, fled to Turkey.  Plaintiff Azeezah fearfully followed her family's journey as they fled.  One of Plaintiff Azeezah Arab's cousins and his family went missing while fleeing to Turkey, and they are still missing.

953.     ISIS looted and destroyed Plaintiff Azeezah Arab's real and personal property.

954.     As a result of ISIS's invasion, Plaintiff Azeezah Arab has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Majjo Khalaf and Gharib Kheder**

955.     Plaintiffs Majjo Khalaf and Gharib Kheder are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Majjo Khalaf and Plaintiff Gharib Kheder are married.

956.     Plaintiffs Majjo Khalaf and Gharib Kheder have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

957.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Majjo Khalaf's family, including his siblings, nieces, and nephews, fled to Sinjar Mountain.  Plaintiff Gharib Kheder's sister and brothers fled to Kurdistan.  Plaintiffs Majjo Khalaf and Gharib Kheder fearfully followed their families' journeys as they fled.  ISIS captured one of Plaintiff Majjo Khalaf's brothers and one of his nieces with her family, and they are still missing. ISIS killed two of Plaintiff Majjo Khalaf's nephews and two of Plaintiff Gharib Kheder's nephews. ISIS shot Plaintiff Gharib Kheder's sister while she fled, causing her to lose her vision.  Plaintiff Gharib Kheder now suffers from psychological problems and difficulty sleeping following the invasion.

958.     ISIS looted and destroyed Plaintiffs Majjo Khalaf and Gharib Kheder's real and personal property.

959.     As a result of ISIS's invasion, Plaintiffs Majjo Khalaf and Gharib Kheder have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Abrahim Qaso and Sheren Qaso**

960.    Plaintiffs Abrahim Qaso and Sheren Qaso are citizens of the United States and domiciled in the state of Washington.  Plaintiff Abrahim Qaso and Plaintiff Sheren Qaso are married.

961.    Plaintiffs Abrahim Qaso and Sheren Qaso have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

962.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Abrahim Qaso and Sheren Qaso's families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Abrahim Qaso and Sheren Qaso fearfully followed their families' journeys as they fled.  ISIS captured Plaintiff Abrahim Qaso's maternal uncle with his wife and children.  Plaintiff Abrahim Qaso's uncle, uncle's wife, and all but one of their children are still missing.  ISIS captured Plaintiff Sheren Qaso's uncle, his wife, and their children.  Plaintiff Sheren Qaso's uncle's wife and three of their children are still missing.

963.    ISIS looted and destroyed Plaintiffs Abrahim Qaso and Sheren Qaso's real and personal property.

964.    As a result of ISIS's invasion, Plaintiffs Abrahim Qaso and Sheren Qaso have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Dawood Masto**

965.    Plaintiff Dawood Masto is a citizen of the United States and domiciled in the state of Texas.

966.    Plaintiff Dawood Masto has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

967.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Dawood Masto's parents and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Dawood Masto fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Dawood Masto's cousin and his cousin's son, both of whom are still missing.

968.    ISIS looted and destroyed Plaintiff Dawood Masto's real and personal property.

969.    As a result of ISIS's invasion, Plaintiff Dawood Masto has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Naji Majo**

970.    Plaintiff Naji Majo is a citizen of the United States and domiciled in the state of Nebraska.

971.    Plaintiff Naji Majo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

972.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Naji Majo's family, including his uncles and cousins, fled Sinjar.  Plaintiff Naji Majo fearfully followed his family's journey as they fled.  ISIS captured and killed Plaintiff Naji Majo's grandfather.  ISIS killed eleven of Plaintiff Naji Majo's other relatives.  Plaintiff Naji Majo has experienced symptoms of post-traumatic stress disorder and depression following ISIS's invasion.

973.    ISIS looted and destroyed Plaintiff Naji Majo's real and personal property.

974.    As a result of ISIS's invasion, Plaintiff Naji Majo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

## Murad Ismael and Mahabat Ali

975.    Plaintiffs Murad Ismael and Mahabat Ali are citizens of the United States and domiciled in the state of Texas.  Plaintiff Mahabat Ali is Plaintiff Murad Ismael's mother.

976.    Plaintiffs Murad Ismael and Mahabat Ali have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

977.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Murad Ismael and Mahabat Ali's relatives fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Murad Ismael and Mahabat Ali fearfully followed their family's journey as they fled.  ISIS killed Plaintiff Mahabat Ali's nephew (Plaintiff Murad Ismael's cousin).  ISIS captured Plaintiff Mahabat Ali's sister and sister's children (Plaintiff Murad Ismael's aunt and cousins) and held them captive.

978.    ISIS looted and destroyed Plaintiffs Murad Ismael and Mahabat Ali's real and personal property.

979.    As a result of ISIS's invasion, Plaintiffs Murad Ismael and Mahabat Ali have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

## Kuliar Jumaah

980.    Plaintiff Kuliar Jumaah is a citizen of the United States and domiciled in the state of Texas.

981.    Plaintiff Kuliar Jumaah has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

982.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Kuliar Jumaah fled to Kurdistan with her mother, brothers, sister, and their families.

983.    ISIS looted and destroyed Plaintiff Kuliar Jumaah's real and personal property.

984.    As a result of ISIS's invasion, Plaintiff Kuliar Jumaah has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Khaleel Assaf**

985.    Plaintiff Khaleel Assaf is a citizen of the United States and domiciled in the state of Nebraska.

986.    Plaintiff Khaleel Assaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

987.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khaleel Assaf fled to Kurdistan with his wife and children.  Plaintiff Khaleel Assaf's daughter has suffered lasting psychological harm following the invasion.  Plaintiff Khaleel Assaf and his wife now suffer from heart problems following the invasion.

988.    ISIS looted and destroyed Plaintiff Khaleel Assaf's real and personal property.

989.    As a result of ISIS's invasion, Plaintiff Khaleel Assaf has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khaleel Sulaiman**

990.     Plaintiff Khaleel Sulaiman is a citizen of the United States and domiciled in the state of Nebraska.

991.     Plaintiff Khaleel Sulaiman has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

992.     In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khaleel Sulaiman fled to Kurdistan with his wife, children, siblings, stepmother, and their families.

993.     ISIS looted and destroyed Plaintiff Khaleel Sulaiman's real and personal property.

994.     As a result of ISIS's invasion, Plaintiff Khaleel Sulaiman has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khudhur Ali**

995.     Plaintiff Khudhur Ali is a citizen of the United States and domiciled in the state of Nebraska.

996.     Plaintiff Khudhur Ali suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

997.     In particular, on or about August 3, 2014, fearing the impending ISIS's invasion of Sinjar, Iraq, Plaintiff Khudhur Ali, who is a former interpreter and cultural advisor to the U.S. Army, fled briefly to Sinjar Mountain with his wife and children, and then to Kurdistan.  His other family members, including his parents and siblings, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.

998.     ISIS looted and destroyed Plaintiffs Khudhur Ali's real and personal property.

999.    As a result of ISIS's invasion, Plaintiffs Khudhur Ali has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Mayan Ali, Miyasar Kalo, and Dalia Kalo**

1000.    Plaintiffs Mayan Ali, Miyasar Kalo, and Dalia Kalo are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Mayan Ali is Plaintiffs Miyasar Kalo and Dalia Kalo's mother.

1001.    Plaintiffs Mayan Ali, Miyasar Kalo, and Dalia Kalo have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1002.    In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Mayan Ali, Miyasar Kalo, and Dalia Kalo fled to Sinjar Mountain with their families, where they were trapped until they were able to escape to Kurdistan.  ISIS shot at Plaintiffs Mayan Ali, Miyasar Kalo, and Dalia Kalo during their escape.  ISIS captured two of Plaintiffs Miyasar Kalo and Dalia Kalo's cousins, one of whom was in captivity for nearly two years before she escaped.

1003.    ISIS looted and destroyed Plaintiffs Mayan Ali, Miyasar Kalo, and Dalia Kalo's real and personal property.

1004.    As a result of ISIS's invasion, Plaintiffs Mayan Ali, Miyasar Kalo, and Dalia Kalo have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Shawqi Sulaiman, Zaizo Ali, and Humoom Darweesh

1005.   Plaintiffs Shawqi Sulaiman, Zaizo Ali, and Humoom Darweesh are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Shawqi Sulaiman and Plaintiff Zaizo Ali are married.  Plaintiff Humoom Darweesh is their daughter.

1006.   Plaintiffs Shawqi Sulaiman, Zaizo Ali, and Humoom Darweesh have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1007.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Shawqi Sulaiman, Zaizo Ali, and Humoom Darweesh fled to Kurdistan with Plaintiff Shawqi Sulaiman's parents and siblings.

1008.   ISIS looted and destroyed Plaintiffs Shawqi Sulaiman, Zaizo Ali, and Humoom Darweesh's real and personal property.

1009.   As a result of ISIS's invasion, Plaintiffs Shawqi Sulaiman, Zaizo Ali, and Humoom Darweesh have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Zirvan Alaode

1010.   Plaintiff Zirvan Alaode is a citizen of the United States and domiciled in the state of California.

1011.   Plaintiff Zirvan Alaode has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1012.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Zirvan Alaode's family, including his parents and siblings, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Zirvan Alaode

fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Zirvan Alaode's sister and brother for several months, but they later escaped.

1013.   ISIS looted and destroyed Plaintiff Zirvan Alaode's real and personal property.

1014.   As a result of ISIS's invasion, Plaintiff Zirvan Alaode has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khairi Smoqy and Ghazal Smoqy**

1015.   Plaintiffs Khairi Smoqy and Ghazal Smoqy are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khairi Smoqy and Plaintiff Ghazal Smoqy are married.

1016.   Plaintiffs Khairi Smoqy and Ghazal Smoqy have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1017.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khairi Smoqy and Ghazal Smoqy fled to Kurdistan with Plaintiff Khairi Smoqy's brother and Plaintiff Ghazal Smoqy's parents, sister, and their families.

1018.   ISIS looted and destroyed Plaintiffs Khairi Smoqy and Ghazal Smoqy's real and personal property.

1019.   As a result of ISIS's invasion, Plaintiffs Khairi Smoqy and Ghazal Smoqy have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Hadji Kheder**

1020.   Plaintiff Hadji Kheder is a citizen of the United States and domiciled in the state of Nebraska.

1021.   Plaintiff Hadji Kheder has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1022.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hadji Kheder's sister and uncles fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Hadji Kheder fearfully followed his family's journey as they fled.  ISIS beheaded one of Plaintiff Hadji Kheder's cousins.

1023.   ISIS looted and destroyed Plaintiff Hadji Kheder's real and personal property.

1024.   As a result of ISIS's invasion, Plaintiff Hadji Kheder has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Klestan Alhasan**

1025.   Plaintiff Klestan Alhasan is a citizen of the United States and domiciled in the state of Nebraska.

1026.   Plaintiff Klestan Alhasan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1027.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Klestan Alhasan fled to Sinjar Mountain with her husband, son, brothers, and husband's parents, where they were trapped until they were able to escape to Kurdistan.  On their way to Sinjar Mountain, ISIS stopped and surrounded Plaintiff Klestan Alhasan and her family at the Jedali checkpoint for two hours, but they were able to escape.  At the checkpoint, ISIS killed

seven members of Plaintiff Klestan Alhasan's husband's family.  ISIS also killed Plaintiff Klestan Alhasan's brother-in-law and captured Plaintiff Klestan Alhasan's sister.  Plaintiff Klestan Alhasan's sister later managed to escape ISIS captivity.

1028.   ISIS looted and destroyed Plaintiff Klestan Alhasan's real and personal property.

1029.   As a result of ISIS's invasion, Plaintiff Klestan Alhasan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Sleman Smoqi**

1030.   Plaintiff Sleman Smoqi is a citizen of the United States and domiciled in the state of Nebraska.

1031.   Plaintiff Sleman Smoqi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1032.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sleman Smoqi fled to Sinjar Mountain with his parents and siblings. Plaintiff Sleman Smoqi lost his family and was trapped alone on the mountain for fifteen days. Once reunited with his family, they remained trapped on the mountain until they were able to escape to Kurdistan.

1033.   ISIS looted and destroyed Plaintiff Sleman Smoqi's real and personal property.

1034.   As a result of ISIS's invasion, Plaintiff Sleman Smoqi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

## Khalid Jendo

1035.   Plaintiff Khalid Jendo is a citizen of the United States and domiciled in the state of Nebraska.

1036.   Plaintiff Khalid Jendo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1037.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khalid Jendo fled to Sinjar Mountain with his wife, son, uncle, and uncle's family, where they were trapped until they were able to escape to Kurdistan.

1038.   ISIS looted and destroyed Plaintiff Khalid Jendo's real and personal property.

1039.   As a result of ISIS's invasion, Plaintiff Khalid Jendo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

## Husein Hesso

1040.   Plaintiff Husein Hesso is a citizen of the United States and domiciled in the state of Nebraska.

1041.   Plaintiff Husein Hesso has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1042.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Husein Hesso's family, including his brother and sister, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Husein Hesso fearfully followed his family's journey as they fled.

1043.   ISIS looted and destroyed Plaintiff Husein Hesso's real and personal property.

1044.   As a result of ISIS's invasion, Plaintiff Husein Hesso has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Sabah Qasim**

1045.   Plaintiff Sabah Qasim is a citizen of the United States and domiciled in the state of Nebraska.

1046.   Plaintiff Sabah Qasim has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1047.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sabah Qasim's parents, sister, brothers, and one brother's family fled to Kurdistan. Plaintiff Sabah Qasim fearfully followed his family's journey as they fled.  ISIS killed Plaintiff Sabah Qasim's aunt and cousins.

1048.   ISIS looted and destroyed Plaintiff Sabah Qasim's real and personal property.

1049.   As a result of ISIS's invasion, Plaintiff Sabah Qasim has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Naif Alsilo and Fawziya Hami**

1050.   Plaintiffs Naif Alsilo and Fawziya Hami are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Naif Alsilo and Plaintiff Fawziya Hami are married.

1051.   Plaintiffs Naif Alsilo and Fawziya Hami have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1052.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Naif Alsilo and Fawziya Hami fled to Kurdistan with their children and siblings. ISIS killed Plaintiff Fawziya Hami's brother.  Plaintiff Fawziya Hami's father died upon hearing of his son's death.  ISIS also killed Plaintiff Fawziya Hami's cousin.

1053.   ISIS looted and destroyed Plaintiffs Naif Alsilo and Fawziya Hami's real and personal property.

1054.   As a result of ISIS's invasion, Plaintiffs Naif Alsilo and Fawziya Hami have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Izdeen Smoqy

1055.   Plaintiff Izdeen Smoqy is a citizen of the United States and domiciled in the state of Nebraska.

1056.   Plaintiff Izdeen Smoqy has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1057.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Izdeen Smoqy fled to Kurdistan with his parents, siblings, and their families.

1058.   ISIS looted and destroyed Plaintiff Izdeen Smoqy's real and personal property.

1059.   As a result of ISIS's invasion, Plaintiff Izdeen Smoqy has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khairi Alpishimam and Falah Alpishimam**

1060.   Plaintiffs Khairi Alpishimam and Falah Alpishimam are citizens of the United States and domiciled in the state of Nebraska.  Plaintiffs Khairi Alpishimam and Falah Alpishimam are brothers.

1061.   Plaintiffs Khairi Alpishimam and Falah Alpishimam have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1062.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khairi Alpishimam and Falah Alpishimam fled to Sinjar Mountain with their parents and siblings and Plaintiff Khairi Alpishimam's wife and children, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Falah Alpishimam injured his ankle while fleeing and still suffers from the pain of this injury.

1063.   ISIS looted and destroyed Plaintiffs Khairi Alpishimam and Falah Alpishimam's real and personal property.

1064.   As a result of ISIS's invasion, Plaintiffs Khairi Alpishimam and Falah Alpishimam have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Faris Khether**

1065.   Plaintiff Faris Khether is a citizen of the United States and domiciled in the state of Nebraska.

1066.   Plaintiff Faris Khether has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1067.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Faris Khether's family, including his parents and siblings, fled to Sinjar Mountain,

where they were trapped until they were able to escape to Kurdistan.  Plaintiff Faris Khether fearfully followed his family's journey as they fled.  Plaintiff Faris Khether's father died from a heart attack shortly thereafter.  Plaintiff Faris Khether's mother suffered from a series of strokes following the invasion.

1068.   ISIS looted and destroyed Plaintiff Faris Khether's real and personal property.

1069.   As a result of ISIS's invasion, Plaintiff Faris Khether has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


### Shihab Hami, Suad Khalaf, G.A., W.A., J.A., W.S.A., and A.A.

1070.   Plaintiffs Shihab Hami, Suad Khalaf, G.A., W.A., J.A., W.S.A., and A.A. are citizens of the United States and domiciled in the state of California.  Plaintiff Shihab Hami and Plaintiff Suad Khalaf are married.  Plaintiffs G.A., W.A., J.A., W.S.A., and A.A. are Plaintiffs Shihab Hami and Suad Khalaf's children.

1071.   Plaintiffs Shihab Hami, Suad Khalaf, G.A., W.A., J.A., W.S.A., and A.A. have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1072.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Shihab Hami's family, including his parents, stepmother, siblings, and step-siblings, and Plaintiff Suad Khalaf's, family, including her mother and siblings, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Shihab Hami, Suad Khalaf, G.A., W.A., J.A., W.S.A., and A.A. fearfully followed their families' journeys as they fled.  ISIS captured Plaintiff Suad Khalaf's brother and killed Plaintiff Shihab Hami's close relatives.  Plaintiff Shihab Hami's father later suffered a stroke.  Plaintiffs Shihab Hami and Suad Khalaf have gone to psychiatric treatment numerous times following the invasion.

1073.   ISIS looted and destroyed Plaintiffs Shihab Hami, Suad Khalaf, G.A., W.A., J.A., W.S.A., and A.A.'s real and personal property.

1074.   As a result of ISIS's invasion, Plaintiffs Shihab Hami, Suad Khalaf, G.A., W.A., J.A., W.S.A., and A.A. have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Saeed Bakr**

1075.   Plaintiff Saeed Bakr is a citizen of the United States and domiciled in the state of Nebraska.

1076.   Plaintiff Saeed Bakr has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1077.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saeed Bakr's family, including his wife, children, mother, brothers, and their families, fled to Sinjar Mountain.  They attempted to flee to Kurdistan, but ISIS captured them. They escaped captivity and returned to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Saeed Bakr fearfully followed his family's journey as they fled.  Plaintiff Saeed Bakr's wife now suffers from severe depression following the invasion.

1078.   ISIS looted and destroyed Plaintiff Saeed Bakr's real and personal property.

1079.   As a result of ISIS's invasion, Plaintiff Saeed Bakr has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Nissani Jndo, Talal Rasho, Pasha Rasho, Abeer Kareem, Jalal Rasho, and Base Awsman**

1080.   Plaintiffs Nissani Jndo, Talal Rasho, Pasha Rasho, Abeer Kareem, Jalal Rasho, and Base Awsman are citizens of the United States and domiciled in the state of Nebraska.  Plaintiffs Talal Rasho, Pasha Rasho, and Jalal Rasho are the sons of Plaintiff Nissani Jndo.  Plaintiff Jalal Rasho and Plaintiff Base Awsman are married.  Plaintiff Pasha Rasho and Plaintiff Abeer Kareem are married.

1081.   Plaintiffs Nissani Jndo, Talal Rasho, Pasha Rasho, Abeer Kareem, Jalal Rasho, and Base Awsman have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1082.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Nissani Jndo, Pasha Rasho, Abeer Kareem, Jalal Rasho, and Base Awsman fled to Sinjar Mountain with their families, where they were trapped until they could escape to Kurdistan. Plaintiff Nissani Jndo's mother was left behind, and her whereabouts are still unknown.  Plaintiff Talal Rasho fearfully followed his family's journey as they fled.  Plaintiff Nissani Jndo's nephew (Plaintiffs Talal Rasho, Pasha Rasho, and Jalal Rasho's cousin) died while living in a camp for internally displaced persons.  Plaintiff Base Awsman's sister was captured by ISIS with her children.  She was sold as a slave multiple times until she managed to escape with her children.

1083.   ISIS looted and destroyed Plaintiffs Nissani Jndo, Talal Rasho, Pasha Rasho, Abeer Kareem, Jalal Rasho, and Base Awsman's real and personal property.

1084.   As a result of ISIS's invasion, Plaintiffs Nissani Jndo, Talal Rasho, Pasha Rasho, Abeer Kareem, Jalal Rasho, and Base Awsman have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Naam Simoqy and Nayif Ibrahim**

1085.   Plaintiffs Naam Simoqy and Nayif Ibrahim are citizens of the United States and domiciled in the state of Nebraska.   Plaintiff Naam Simoqy and Plaintiff Nayif Ibrahim are married.

1086.   Plaintiffs Naam Simoqy and Nayif Ibrahim have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1087.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Naam Simoqy and Nayif Ibrahim fled to Kurdistan with their family.

1088.   ISIS looted and destroyed Plaintiffs Naam Simoqy and Nayif Ibrahim's real and personal property.

1089.   As a result of ISIS's invasion, Plaintiffs Naam Simoqy and Nayif Ibrahim have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Nawfee Khadeeda**

1090.   Plaintiff Nawfee Khadeeda is a citizen of the United States and domiciled in the state of Nebraska.

1091.   Plaintiff Nawfee Khadeeda has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1092.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nawfee Khadeeda's family, including her daughter and son-in-law, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Nawfee Khadeeda fearfully followed her family's journey as they fled.   ISIS killed Plaintiff Nawfee

Khadeeda's uncle and aunt and captured her cousin, who died in captivity. ISIS blinded Plaintiff Nawfee Khadeeda's nephew and captured his family. Plaintiff Nawfee Khadeeda's nephew was eventually released but his wife is still missing. Plaintiff Nawfee Khadeeda now suffers from psychological problems following the invasion and is being treated for depression and anxiety.

1093. ISIS looted and destroyed Plaintiff Nawfee Khadeeda's real and personal property.

1094. As a result of ISIS's invasion, Plaintiff Nawfee Khadeeda has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Kiret Haji

1095. Plaintiff Kiret Haji is a citizen of the United States and domiciled in the state of Nebraska.

1096. Plaintiff Kiret Haji has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1097. In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Kiret Haji fled to Kurdistan with his children, grandchildren, and their families.

1098. ISIS looted and destroyed Plaintiff Kiret Haji's real and personal property.

1099. As a result of ISIS's invasion, Kiret Haji has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Guli Mahko, Eedo Khalaf, Barakat Mahko, and Turkia Mahko

1100. Plaintiffs Guli Mahko, Eedo Khalaf, Barakat Mahko, and Turkia Mahko are citizens of the United States and domiciled in the state of Nebraska. Plaintiff Guli Mahko and

Plaintiff Eedo Khalaf are married.  Plaintiff Guli Mahko and Plaintiff Turkia Mahko are Plaintiff Barakat Mahko's sisters.

1101.  Plaintiffs Guli Mahko, Eedo Khalaf, Barakat Mahko, and Turkia Mahko have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1102.  In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Guli Mahko, Plaintiff Eedo Khalaf, Barakat Mahko, and Turkia Mahko fled to Sinjar Mountain with Plaintiff Eedo Khalaf's family members, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Guli Mahko, Barakat Mahko, and Turkia Mahko's brother died while living in a camp for internally displaced persons in Kurdistan.

1103.  ISIS looted and destroyed Plaintiffs Guli Mahko, Eedo Khalaf, Barakat Mahko, and Turkia Mahko's real and personal property.

1104.  As a result of ISIS's invasion, Plaintiffs Guli Mahko, Eedo Khalaf, Barakat Mahko, and Turkia Mahko have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Kochar Mhko and Kamiran Choko**

1105.  Plaintiffs Kochar Mhko and Kamiran Choko are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Kochar Mkho is Plaintiff Kamiran Choko's mother.

1106.  Plaintiffs Kochar Mhko and Kamiran Choko have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1107.  In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Kochar Mhko and Kamiran Choko, Plaintiff Kochar Mhko's husband, and Plaintiff Kochar Mkho's other children walked on foot to Kurdistan.  Plaintiff Kochar Mhko was pregnant and suffered a miscarriage.  Plaintiff Kochar Mhko's son died in the camps for internally displaced

persons. Plaintiffs Kochar Mhko and Kamiran Choko now suffer from, and Plaintiff Kochar Mhko is medicated for, post-traumatic stress disorder following the invasion.

1108.   ISIS looted and destroyed Plaintiffs Kochar Mhko and Kamiran Choko's real and personal property.

1109.   As a result of ISIS's invasion, Plaintiffs Kochar Mhko and Kamiran Choko have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Omar Rashsho**

1110.   Plaintiff Omar Rashsho is a citizen of the United States and domiciled in the state of Nebraska.

1111.   Plaintiff Omar Rashsho has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1112.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Omar Rashsho's family, including his siblings and cousins, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan. Plaintiff Omar Rashsho fearfully followed his family's journey as they fled. Plaintiff Omar Rashsho now suffers from diabetes, depression, anxiety, and stress following the invasion. As a result of his condition, Plaintiff Omar Rashsho is unable to continue employment.

1113.   As a result of ISIS's invasion, Plaintiff Omar Rashsho has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Amal Kheder**

1114.   Plaintiff Amal Kheder is a citizen of the United States and domiciled in the state of Nebraska.

1115.   Plaintiff Amal Kheder has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1116.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Amal Kheder fled to Sinjar Mountain with her husband, children, and brother-in-law, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Amal Kheder's father died in a camp for internally displaced persons in Kurdistan shortly thereafter.  Plaintiff Amal Kheder's other family members, including her brothers and their children, fled to Turkey and then to Greece.  Plaintiff Amal Kheder's two brothers died on the way to Greece.

1117.   ISIS looted and destroyed Plaintiff Amal Kheder's real and personal property.

1118.   As a result of ISIS's invasion, Plaintiff Amal Kheder has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Murad Qizly and Misry Adi**

1119.   Plaintiffs Murad Qizly and Misry Adi are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Murad Qizly and Plaintiff Mizry Adi are married.

1120.   Plaintiffs Murad Qizly and Misry Adi have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1121.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Murad Qizly and Misry Adi's family, including Plaintiff Misry Adi's parents and

siblings, fled Sinjar.  Plaintiffs Murad Qizly's parents and siblings had fled a month before the invasion for fear of the impending attacks.  Plaintiffs Murad Qizly and Misry Adi had also fled Sinjar after receiving threats.  Some of Plaintiffs Murad Qizly and Misry Adi's family members fled directly to Kurdistan.  Others fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Murad Qizly and Misry Adi fearfully followed their family's journey as they fled.  Plaintiff Murad Qizly's cousin's leg was injured during the escape.  After the invasion, Plaintiff Misry Adi's brother attempted suicide and her sister-in-law died by suicide. Plaintiff Misry Adi's cousin had a heart attack the day that ISIS invaded.

1122.   ISIS looted and destroyed Plaintiffs Murad Qizly and Misry Adi's real and personal property.

1123.   As a result of ISIS's invasion, Plaintiffs Murad Qizly and Misry Adi have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Taalo Khudhur, Basee Naser, Fadi Pirali, and A.P.**

1124.   Plaintiffs Taalo Khudhur, Basee Naser, Fadi Pirali, and A.P. are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Taalo Khudhur and Plaintiff Basee Naser are married.  Plaintiffs Fadi Pirali and A.P. are their children.

1125.   Plaintiffs Taalo Khudhur, Basee Naser, Fadi Pirali, and A.P. have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1126.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Taalo Khudhur's family, including his brother and brother's family, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Taalo Khudhur, Basee Naser, Fadi Pirali, and A.P. fearfully followed their family's journey as they fled.

Plaintiffs Taalo Khudhur and Basee Naser now suffer from depression following the invasion, requiring medication and psychotherapy.

1127. ISIS looted and destroyed Plaintiffs Taalo Khudhur, Basee Naser, Fadi Pirali, and A.P.'s real and personal property.

1128. As a result of ISIS's invasion, Plaintiffs Taalo Khudhur, Basee Naser, Fadi Pirali, and A.P. have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Hadi Pir and Adula Mato**

1129. Plaintiffs Hadi Pir and Adula Mato are citizens of the United States and domiciled in the state of Nebraska. Plaintiff Hadi Pir and Plaintiff Adula Mato are married.

1130. Plaintiffs Hadi Pir and Adula Mato have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1131. In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Hadi Pir and Adula Mato's families fled Sinjar. Some family members fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan. Others fled directly to Kurdistan. Plaintiffs Hadi Pir and Adula Mato fearfully followed their families' journeys as they fled. Plaintiff Adula Mato's sister-in-law was pregnant at the time of the escape, and her baby was born prematurely. Plaintiff Adula Mato's cousin's son has been missing since the invasion. Plaintiff Adula Mato suffered post-partum depression due to the stress from the invasion.

1132. ISIS looted and destroyed Plaintiffs Hadi Pir and Adula Mato's real and personal property.

1133.   As a result of ISIS's invasion, Plaintiffs Hadi Pir and Adula Mato have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khairi Elias and Maysoon Borali**

1134.   Plaintiffs Khairi Elias and Maysoon Borali are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khairi Elias and Plaintiff Maysoon Borali are married.

1135.   Plaintiffs Khairi Elias and Maysoon Borali have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1136.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khairi Elias's mother, siblings, and nephews and Plaintiff Maysoon Borali's uncles and their families fled to Syria and then to Kurdistan.  Plaintiff Maysoon Borali's family first fled to Sinjar Mountain until they were able to escape to Kurdistan.  Plaintiffs Khairi Elias and Maysoon Borali fearfully followed their families' journeys as they fled.  Plaintiff Khairi Elias's sister now suffers from nightmares and Plaintiff Maysoon Borali's cousins now suffer from mental health issues following the invasion.  Plaintiffs Khairi Elias and Maysoon Borali continue to suffer from mental health conditions following the invasion.

1137.   ISIS looted and destroyed Plaintiffs Khairi Elias and Maysoon Borali's real and personal property.

1138.   As a result of ISIS's invasion, Plaintiffs Khairi Elias and Maysoon Borali have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Qasim Pir, Zaeeton Haji, and Hadeel Pirali**

1139.   Plaintiffs Qasim Pir, Zaeeton Haji, and Hadeel Pirali are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Qasim Pir and Plaintiff Zaeeton Haji are married.  Plaintiff Hadeel Pirali is their daughter.

1140.   Plaintiffs Qasim Pir, Zaeeton Haji, and Hadeel Pirali have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1141.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Qasim Pir's cousins and uncles and Plaintiff Zaeeton Haji's parents, siblings, and their families fled Sinjar.  Plaintiffs Zaeeton Haji's family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Qasim Pir, Zaeeton Haji, and Hadeel Pirali fearfully followed their families' journeys as they fled.  Plaintiff Zaetoon Haji now suffers from depression stemming from fear for her family's well-being following the invasion.

1142.   ISIS looted and destroyed Plaintiffs Qasim Pir, Zaeeton Haji, and Hadeel Pirali's real and personal property.

1143.   As a result of ISIS's invasion, Plaintiffs Qasim Pir, Zaeeton Haji, and Hadeel Pirali have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Faris Pirali and Kali Pirali**

1144.   Plaintiffs Faris Pirali and Kali Pirali are citizens of the United States and domiciled in the state of Washington.  Plaintiff Faris Pirali and Plaintiff Kali Pirali are married.

1145.   Plaintiffs Faris Pirali and Kali Pirali have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1146.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Faris Pirali and Kali Pirali's families fled Sinjar.  Some family members fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Others fled directly to Kurdistan.  Plaintiffs Faris Pirali and Kali Pirali fearfully followed their families' journeys as they fled.  ISIS killed Plaintiff Kali Pirali's aunt, and Plaintiff Kali Pirali's cousin is missing.

1147.   ISIS looted and destroyed Plaintiffs Faris Pirali and Kali Pirali's real and personal property.

1148.   As a result of ISIS's invasion, Plaintiffs Faris Pirali and Kali Pirali have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Basima Ali and Zaedo Ali**

1149.   Plaintiffs Basima Ali and Zaedo Ali are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Basima Ali and Plaintiff Zaedo Ali are married.

1150.   Plaintiffs Basima Ali and Zaedo Ali have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1151.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Basima Ali's uncles and their families and Plaintiff Zaedo Ali's mother, siblings and their families, and cousins fled Sinjar.  Some family members fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Basima Ali and Zaedo Ali fled Iraq before the invasion, after they received threats for cooperating with the U.S. military.  Plaintiffs Basima Ali and Zaedo Ali fearfully followed their families' journeys as they fled.  ISIS

killed Plaintiff Zaedo Ali's aunt and cousin's son.   Plaintiff Basima Ali now suffers from nightmares and anxiety, for which she takes medication, following the invasion.

1152.   ISIS looted and destroyed Plaintiffs Basima Pir Ali and Zaedo Ali's real and personal property.

1153.   As a result of ISIS's invasion, Plaintiffs Basima Pir Ali and Zaedo Ali have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Khaleel Ali

1154.   Plaintiff Khaleel Ali is a citizen of the United States and domiciled in the state of Nebraska.

1155.   Plaintiff Khaleel Ali has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1156.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khaleel Ali's family, including his son, mother, siblings, and their families, fled Sinjar.  Some family members fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Others fled directly to Kurdistan.  Plaintiff Khaleel Ali fearfully followed his family's journey as they fled.  ISIS attacked and shot at Plaintiff Khaleel Ali's family as they fled.  ISIS killed Plaintiff Khaleel Ali's aunt and cousin.

1157.   ISIS looted and destroyed Plaintiff Khaleel Ali's real and personal property.

1158.   As a result of ISIS's invasion, Plaintiff Khaleel Ali has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of this family's society and counsel.

**Khudhur Dnai**

1159.   Plaintiff Khudhur Dnai is a citizen of the United States and domiciled in the state of Nebraska.

1160.   Plaintiff Khudhur Dnai has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1161.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khudhur Dnai fled to Sinjar Mountain with his wife and children, where they were trapped until they were able to escape to Kurdistan.  ISIS killed Plaintiff Khudhur Dnai's brother. ISIS captured Plaintiff Khudhur Dnai's cousin, who escaped but then died because of injuries sustained during his capture.

1162.   ISIS looted and destroyed Plaintiff Khudhur Dnai's real and personal property.

1163.   As a result of ISIS's invasion, Plaintiff Khudhur Dnai has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Shaha Mohammed and Saeed Salo**

1164.   Plaintiffs Shaha Mohammed and Saeed Salo are citizens of the United States and domiciled in the state of Nebraska.   Plaintiff Shaha Mohammed and Plaintiff Saeed Salo are married.

1165.   Plaintiffs Shaha Mohammed and Saeed Salo have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1166.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Shaha Mohammed and Saeed Salo fled to Sinjar Mountain with their children and

Plaintiff Saeed Salo's family, where they were trapped until they were able to escape to Kurdistan. While on Sinjar Mountain, Plaintiff Shaha Mohammed sustained injuries from a scorpion bite and her sister-in-law had a stillborn birth.

1167.  ISIS looted and destroyed Plaintiffs Shaha Mohammed and Saeed Salo's real and personal property.

1168.  As a result of ISIS's invasion, Plaintiffs Shaha Mohammed and Saeed Salo have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Saeed Qasim**

1169.  Plaintiff Saeed Qasim is a citizen of the United States and domiciled in the state of Nebraska.

1170.  Plaintiff Saeed Qasim has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1171.  In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saeed Qasim and his wife and sons fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  ISIS killed Plaintiff Saeed Qasim's grandmother.

1172.  ISIS looted and destroyed Plaintiff Saeed Qasim's real and personal property.

1173.  As a result of ISIS's invasion, Plaintiff Saeed Qasim has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Tariq Qasim, Trko Omar, Y.T., and I.T.**

1174.   Plaintiffs Tariq Qasim, Trko Omar, Y.T., and I.T. are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Tariq Qasim and Plaintiff Trko Omar are married.  Plaintiffs Y.T. and I.T. are their children.

1175.   Plaintiffs Tariq Qasim, Trko Omar, Y.T., and I.T. have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1176.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Tariq Qasim's brother and his brother's family and Plaintiff Trko Omar's parents, siblings, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Tariq Qasim, Trko Omar, Y.T., and I.T. fearfully followed their families' journeys as they fled.  ISIS killed Plaintiff Tariq Qasim's grandmother because she refused to convert to Islam.  ISIS killed Plaintiff Trko Omar's aunt and cousins, including one cousin whose wife was pregnant.  ISIS captured Plaintiff Trko Omar's female cousins, killing one and disposing of her body in the street.  The rest of the cousins are still missing.  Several of Plaintiff Trko Omar's family members died by suicide following the invasion.

1177.   ISIS looted and destroyed Plaintiffs Tariq Qasim's, Trko Omar's, Y.T.'s, and I.T.'s real and personal property.

1178.   As a result of ISIS's invasion, Plaintiffs Tariq Qasim, Trko Omar, Y.T., and I.T. have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Kawry Omar**

1179.   Plaintiff Kawry Omar is a citizen of the United States and domiciled in the state of Nebraska.

1180.   Plaintiff Kawry Omar has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1181.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Kawry Omar fled to Sinjar Mountain with her parents, siblings, and cousins, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Kawry Omar's aunt, who was like a mother to her, was captured by ISIS and her whereabouts are still unknown.  Plaintiff Kawry Omar's cousin died by suicide.  ISIS captured and killed several of Plaintiff Kawry Omar's aunts, uncles, and their families.

1182.   ISIS looted and destroyed Plaintiff Kawry Omar's real and personal property.

1183.   As a result of ISIS's invasion, Plaintiff Kawry Omar has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Ammar Mato**

1184.   Plaintiff Ammar Mato is a citizen of the United States and domiciled in the state of Nebraska.

1185.   Plaintiff Ammar Mato has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1186.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Ammar Mato fled to Kurdistan with his parents and siblings.  Plaintiff Ammar Mato's father later died of illnesses which he suffered following the invasion.

1187.   ISIS looted and destroyed Plaintiff Ammar Mato's real and personal property.

1188.   As a result of ISIS's invasion, Plaintiff Ammar Mato has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Bahar Hamo**

1189.   Plaintiff Bahar Hamo is a citizen of the United States and domiciled in the state of Nebraska.

1190.   Plaintiff Bahar Hamo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1191.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Bahar Hamo's family, including her husband, children, husband's family, uncles, and aunts, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Bahar Hamo, who was then pregnant with twins, fearfully followed her family's journey as they fled.  ISIS captured Plaintiff Bahar Hamo's cousin and her cousin's children and held them captive for three years until they escaped.  In captivity, ISIS took videos of Plaintiff Bahar Hamo's cousin and cousin's children and used them as hostages for safe passage. ISIS killed Plaintiff Bahar Hamo's cousin-in-law.

1192.   ISIS looted and destroyed Plaintiff Bahar Hamo's real and personal property.

1193.   As a result of ISIS's invasion, Plaintiff Bahar Hamo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Hazim Aldakhi and Sanan Aldakhi**

1194.   Plaintiffs Hazim Aldakhi and Sanan Aldakhi are citizens of the United States and domiciled in the state of Nebraska.  Plaintiffs Hazim Aldakhi and Sanan Aldakhi are brothers.

1195.   Plaintiffs Hazim Aldakhi and Sanan Aldakhi have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1196.   In particular, on or about August 3, 2014, in response to ISIS's invasion Sinjar, Iraq, Plaintiffs Hazim Aldakhi and Sanan Aldakhi fled to Sinjar Mountain with their parents, brothers, and brothers' families, where they were trapped until they were able to escape to Kurdistan.  ISIS killed two of Plaintiffs Hazim Aldakhi and Sanan Aldakhi's uncles.

1197.   ISIS looted and destroyed Plaintiff Hazim Aldakhi and Sanan Aldakhi's real and personal property.

1198.   As a result of ISIS's invasion, Plaintiffs Hazim Aldakhi and Sanan Aldakhi have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Kozi Hussein and Mando Mtro**

1199.   Plaintiffs Kozi Hussein and Mando Mtro are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Kozi Hussein is Plaintiff Mando Mtro's mother.

1200.   Plaintiffs Kozi Hussein and Mando Mtro have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1201.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Kozi Hussein and Mando Mtro fled to Kurdistan with Plaintiff Kozi Hussein's other children (Plaintiff Mando Mtro's siblings).  ISIS captured Plaintiff Kozi Hussein's sister with her family until they were able to escape.  Plaintiff Kozi Hussein's brother-in-law later died following the capture.

1202.   ISIS looted and destroyed Plaintiff Kozi Hussein and Mando Mtro's real and personal property.

1203.   As a result of ISIS's invasion, Plaintiffs Kozi Hussein and Mando Mtro have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Basima Mtro**

1204.   Plaintiff Basima Mtro is a citizen of the United States and domiciled in the state of Nebraska.

1205.   Plaintiff Basima Mtro has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1206.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Basima Mtro fled to Kurdistan with her parents and siblings.  ISIS captured two of Plaintiff Basima Mtro's aunts with their families.  Plaintiff Basima Mtro's aunts were later released.  ISIS killed one of Plaintiff Basima Mtro's cousins.

1207.   ISIS looted and destroyed Plaintiff Basima Mtro's real and personal property.

1208.   As a result of ISIS's invasion, Plaintiff Basima Mtro has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Shafiq Abdullah**

1209.   Plaintiff Shafiq Abdullah is a citizen of the United States and domiciled in the state of Nebraska.

1210.   Plaintiff Shafiq Abdullah has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1211.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Shafiq Abdullah's parents, siblings, and sibling's families fled to Kurdistan. Plaintiff Shafiq Abdullah fearfully followed his family's journey as they fled.  ISIS captured several of Plaintiff Shafiq Abdullah's uncles and cousins.  One of Plaintiff Shafiq Abdullah's cousins is still missing.  Plaintiff Shafiq Abdullah's niece was held captive by ISIS for eight months.  ISIS likewise captured Plaintiff Shafiq Abdullah's sister and her family while they were fleeing to Syria.  Plaintiff Shafiq Abdullah's sister and her husband escaped, but ISIS killed the sister's uncle-in-law.

1212.   ISIS looted and destroyed Plaintiff Shafiq Abdullah's real and personal property.

1213.   As a result of ISIS's invasion, Plaintiff Shafiq Abdullah has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Sharro Khalaf and Hadiya Hadgi**

1214.   Plaintiffs Sharro Khalaf and Hadiya Hadgi are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Sharro Khalaf is Plaintiff Hadiya Hadgi's father.

1215.   Plaintiffs Sharro Khalaf and Hadiya Hadgi have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1216.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Sharro Khalaf and Hadiya Hadgi's family, including Plaintiff Sharro Khalaf's parents, siblings, and their families, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiffs Sharro Khalaf and Hadiya Hadgi fearfully followed their family's journey as they fled.   Plaintiff Sharro Khalaf's parents and sisters-in-law died while fleeing from ISIS.   ISIS killed Plaintiff Sharro Khalaf's uncle, cousin, and nephew.   ISIS captured Plaintiff Sharro Khalaf's young cousin and held her for several years until she managed to escape.

1217.   ISIS looted and destroyed Plaintiff Sharro Khalaf and Hadiya Hadgi's real and personal property.

1218.   As a result of ISIS's invasion, Plaintiffs Sharro Khalaf and Hadiya Hadgi have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Barakat Ali**

1219.   Plaintiff Barakat Ali is a citizen of the United States and domiciled in the state of Nebraska.

1220.   Plaintiff Barakat Ali has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1221.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Barakat Ali's mother, stepmother, siblings, and stepsiblings fled to Kurdistan. Plaintiff Barakat Ali fearfully followed his family's journey as they fled.   Plaintiff Barakat Ali's mother and stepmother were severely traumatized and died following the invasion.

1222.   ISIS looted and destroyed Plaintiff Barakat Ali's real and personal property.

1223.   As a result of ISIS's invasion, Plaintiff Barakat Ali has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Adoulla Matto and Jihad Khalaf**

1224.   Plaintiffs Adoulla Matto and Jihad Khalaf are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Adoulla Matto is Plaintiff Jihad Khalaf's mother.

1225.   Plaintiffs Adoulla Matto and Jihad Khalaf have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1226.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Adoulla Matto and Jihad Khalaf's family, including Plaintiff Adoulla Matto's daughters (Plaintiff Jihad Khalaf's sisters), father, and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Adoulla Matto and Jihad Khalaf fearfully followed their family's journey as they fled.  ISIS captured Plaintiff Adoulla Matto's son (Plaintiff Jihad Khalaf's brother).  He sustained a serious leg injury in captivity and escaped after about a year.

1227.   ISIS looted and destroyed Plaintiffs Adoulla Matto and Jihad Khalaf's real and personal property.

1228.   As a result of ISIS's invasion, Plaintiffs Adoulla Matto and Jihad Khalaf have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Ghazal Kassem**

1229.   Plaintiff Ghazal Kassem is a citizen of the United States and domiciled in the state of Nebraska.

1230.   Plaintiff Ghazal Kassem has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1231.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Ghazal Kassem's siblings and their families fled Sinjar.  Some initially fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Others fled directly to Kurdistan.  Plaintiff Ghazal Kassem fearfully followed her family's journey as they fled.  ISIS killed Plaintiff Ghazal Kassem's cousin.  ISIS captured two of Plaintiff Ghazal Kassem's nieces and their families, and they are still missing.

1232.   ISIS looted and destroyed Plaintiff Ghazal Kassem's real and personal property.

1233.   As a result of ISIS's invasion, Plaintiff Ghazal Kassem has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.


**Abas Zaghla**

1234.   Plaintiff Abas Zaghla is a citizen of the United States and domiciled in the state of Nebraska.

1235.   Plaintiff Abas Zaghla has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1236.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Abas Zaghla fled to Sinjar Mountain with his mother and father, where they were trapped until they were able to escape to Kurdistan.

1237.   ISIS looted and destroyed Plaintiff Abas Zaghla's real and personal property.

1238.   As a result of ISIS's invasion, Plaintiff Abas Zaghla has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.


**Sulaiman Sido and Rasmia Khalaf**

1239.   Plaintiffs Sulaiman Sido and Rasmia Khalaf are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Sulaiman Sido is Plaintiff Rasmia Khalaf's father.

1240.   Plaintiffs Sulaiman Sido and Rasmia Khalaf have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1241.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sulaiman Sido's brother and his family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Rasmia Khalaf's aunts and uncles likewise fled to the mountain, where they were trapped until they were able to escape to Kurdistan. Plaintiffs Sulaiman Sido and Rasmia Khalaf fearfully followed their family's journey as they fled. Plaintiff Rasima Khalaf's cousin was captured by ISIS until she managed to escape.

1242.   As a result of ISIS's invasion, Plaintiffs Sulaiman Sido and Rasmia Khalaf have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Nawaf Haskan**

1243.   Plaintiff Nawaf Haskan is a citizen of the United States and domiciled in the state of Nebraska.

1244.   Plaintiff Nawaf Haskan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1245.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nawaf Haskan's parents, siblings, and uncles fled to Kurdistan.  Plaintiff Nawaf Haskan fearfully followed his family's journey as they fled.  Plaintiff Nawaf Haskan now suffers from post-traumatic stress disorder and depression following the invasion.

1246.   ISIS looted and destroyed Plaintiff Nawaf Haskan's real and personal property.

1247.   As a result of ISIS's invasion, Plaintiff Nawaf Haskan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Laila Saleh**

1248.   Plaintiff Laila Saleh is a citizen of the United States and domiciled in the state of Nebraska.

1249.   Plaintiff Laila Saleh has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1250.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Laila Saleh fled to Kurdistan with her family, including her parents and siblings. ISIS killed Plaintiff Laila Saleh's father's cousin and captured his cousin's family.

1251.   ISIS looted and destroyed Plaintiff Laila Saleh's real and personal property.

1252.   As a result of ISIS's invasion, Plaintiff Laila Saleh has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Jamal Al Dakhi and Gawri Al Dakhi

1253.   Plaintiffs Jamal Al Dakhi and Gawri Al Dakhi are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Jamal Al Dakhi and Plaintiff Gawri Al Dakhi are married.

1254.   Plaintiffs Jamal Al Dakhi and Gawri Al Dakhi have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1255.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Jamal Al Dakhi and Gawri Al Dakhi fled to Kurdistan with their children, Plaintiff Gawri Al Dakhi's mother, sisters, and cousins, and Plaintiff Jamal Al Dakhi's mother.  Plaintiff Gawri Al Dakhi was pregnant at the time.  ISIS killed Plaintiff Jamal Al Dakhi's father and uncle and shot at his brother.  Plaintiff Jamal Al Dakhi, a former contractor for the U.S. Army, received death threats from ISIS due to his association with the U.S. military.

1256.   ISIS looted and destroyed Plaintiffs Jamal Al Dakhi and Gawri Al Dakhi's real and personal property.

1257.   As a result of ISIS's invasion, Plaintiffs Jamal Al Dakhi and Gawri Al Dakhi have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Alyas Aldakhi**

1258.   Plaintiffs Alyas Aldakhi are citizens of the United States and domiciled in the state of Nebraska.

1259.   Plaintiffs Alyas Aldakhi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1260.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Alyas Aldakhi fled to Kurdistan with his neighbors.  Some of Plaintiff Alyas Aldakhi's family members fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Others fled directly to Kurdistan.  ISIS killed Plaintiff Alyas Aldakhi's father and uncle and shot at his brother, who fled to Sinjar Mountain.

1261.   ISIS looted and destroyed Plaintiff Alyas Aldakhi's real and personal property.

1262.   As a result of ISIS's invasion, Plaintiff Alyas Aldakhi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Nofa Ismael**

1263.   Plaintiff Nofa Ismael is a citizen of the United States and domiciled in the state of Nebraska.

1264.   Plaintiff Nofa Ismael has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1265.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nofa Ismael fled to Sinjar Mountain with her husband, children, and family, where they were trapped until they were able to escape to Kurdistan.  ISIS captured Plaintiff Nofa

Ismael's mother-in-law, brothers-in-law, and sisters-in-law and their families. Plaintiff Nofa Ismael's mother-in-law and one young child managed to escape, but the whereabouts of the other family members are still unknown. Plaintiff Nofa Ismael's grandmother died while in a camp for internally displaced persons in Kurdistan.

1266.   ISIS looted and destroyed Plaintiff Nofa Ismael's real and personal property.

1267.   As a result of ISIS's invasion, Plaintiff Nofa Ismael has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Rifaah Hussein**

1268.   Plaintiff Rifaah Hussein is a citizen of the United States and domiciled in the state of Nebraska.

1269.   Plaintiff Rifaah Hussein has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1270.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Rifaah Hussein's parents, uncles, cousins, siblings, and their families fled to Kurdistan. Some of Plaintiff Rifaah Hussein's family fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan. Plaintiff Rifaah Hussein fearfully followed her family's journey as they fled. Plaintiff Rifaah Hussein's father had a stroke, and her mother began suffering from heart disease after the invasion, while in the camps for internally displaced persons in Kurdistan.

1271.   ISIS looted and destroyed Plaintiff Rifaah Hussein's real and personal property.

1272.   As a result of ISIS's invasion, Plaintiff Rifaah Hussein has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Hawri Jndo

1273.   Plaintiff Hawri Jndo is a citizen of the United States and domiciled in the state of Nebraska.

1274.   Plaintiff Hawri Jndo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1275.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hawri Jndo fled to Sinjar Mountain with her children, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Hawri Jndo fell while fleeing, resulting in permanent injury to her right hand.   ISIS killed Plaintiff Hawri Jndo's cousin.

1276.   ISIS looted and destroyed Plaintiff Hawri Jndo's real and personal property.

1277.   As a result of ISIS's invasion, Plaintiff Hawri Jndo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Khansa Khalaf and Asia Ali

1278.   Plaintiffs Khansa Khalaf and Asia Ali are citizens of the United States and domiciled in the state of Nebraska.   Plaintiff Khansa Khalaf is Plaintiff Asia Ali's mother.

1279.   Plaintiffs Khansa Khalaf and Asia Ali have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1280.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khansa Khalaf's family, including her husband (Plaintiff Asia Ali's father) and her sisters and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiffs Khansa Khalaf and Asia Ali fearfully followed their family's journey as they fled.   ISIS killed Plaintiff Khansa Khalaf's nephew.   Plaintiff Khansa Khalaf now suffers from depression that requires medication following the invasion.

1281.   ISIS looted and destroyed Plaintiffs Khansa Khalaf and Asia Ali's real and personal property.

1282.   As a result of ISIS's invasion, Plaintiffs Khansa Khalaf and Asia Ali have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Ibrahim Ali**

1283.   Plaintiff Ibrahim Ali is a citizen of the United States and domiciled in the state of Nebraska.

1284.   Plaintiff Ibrahim Ali has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1285.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Ibrahim Ali's father, stepmother, and stepsiblings fled to Kurdistan.   Plaintiff Ibrahim Ali fearfully followed his family's journey as they fled.   Plaintiff Ibrahim Ali's father now suffers from poor mental health following the invasion.

1286.   As a result of ISIS's invasion, Plaintiff Ibrahim Ali has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Dalal Semoqi**

1287.   Plaintiff Dalal Semoqi is a citizen of the United States and domiciled in the state of Nebraska.

1288.   Plaintiff Dalal Semoqi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1289.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Dalal Semoqi's parents and siblings fled to Kurdistan.  Plaintiff Dalal Semoqi fearfully followed her family's journey as they fled.  Plaintiff Dalal Semoqi's uncle, aunt, cousins, and grandmother fled onwards to Greece out of fear that ISIS would come to Kurdistan.  All but Plaintiff Dala Semoqi's uncle died on the boat to Greece.  Plaintiff Dalal Semoqi now suffers from chronic depression and anxiety following the invasion.

1290.   ISIS looted and destroyed Plaintiff Dalal Semoqi's real and personal property.

1291.   As a result of ISIS's invasion, Plaintiff Dalal Semoqi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Parween Chiyan and Qasim Guly**

1292.   Plaintiffs Parween Chiyan and Qasim Guly are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Parween Chiyan and Plaintiff Qasim Guly are married.

1293.   Plaintiffs Parween Chiyan and Qasim Guly have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1294.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Parween Chiyan, who was pregnant at the time, and Plaintiff Qasim Guly fled to Kurdistan with Plaintiff Qasim Guly's mother and siblings.  Plaintiff Parween Chiyan's mother and siblings fled separately to Kurdistan.  ISIS killed Plaintiff Parween Chiyan's cousin and Plaintiff Qasim Guly's cousin.

1295.   ISIS looted and destroyed Plaintiffs Parween Chiyan and Qasim Guly's real and personal property.

1296.   As a result of ISIS's invasion, Plaintiffs Parween Chiyan and Qasim Guly have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Salih Rashki, Wansa Rashki, Salah Omar, and Hanan Omar**

1297.   Plaintiffs Salih Rashki, Wansa Rashki, Salah Omar, and Hanan Omar are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Salih Rashki and Plaintiff Wasna Rashki are married.  Plaintiffs Salah Omar and Hanan Omar are their children.

1298.   Plaintiffs Salih Rashki, Wansa Rashki, Salah Omar, and Hanan Omar have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1299.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Salih Rashki's parents, uncles, siblings, and their children and Plaintiff Wansa Rashki's siblings and extended family fled to Kurdistan.  Plaintiffs Salih Rashki, Wansa Rashki, Salah Omar, and Hanan Omar fearfully followed their families' journeys as they fled.  ISIS captured and killed Plaintiff Salih Rashki's sister and brother-in-law—who are also Plaintiff Wansa Rashki's brother and sister-in-law—and their children.  Five of the children have since escaped, however the parents and the remaining two children are still missing.

1300.   ISIS looted and destroyed Plaintiffs Salih Rashki, Wansa Rashki, Salah Omar, and Hanan Omar's real and personal property.

1301.   As a result of ISIS's invasion, Plaintiffs Salih Rashki, Wansa Rashki, Salah Omar, and Hanan Omar have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Kudida Shamo and Gawry Shamo**

1302.   Plaintiffs Kudida Shamo and Gawry Shamo are citizens of the United States and domiciled in the state of Nebraska.   Plaintiff Kudida Shamo and Plaintiff Gawry Shamo are married.

1303.   Plaintiffs Kudida Shamo and Gawry Shamo have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1304.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, most of Plaintiff Kudida Shamo's siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Some of Plaintiff Gawry Shamo's siblings also fled to the mountain, whereas her parents and other siblings fled directly to Kurdistan.   Plaintiff Kudida Shamo and Plaintiff Gawry Shamo fearfully followed their families' journeys as they fled.   ISIS captured and tortured Plaintiff Kudida Shamo's brother for a month, until he was able to escape. Plaintiff Kudida Shamo's brother was traumatized by this experience and has attempted suicide multiple times.   Other members of Plaintiff Kudida Shamo's family, including an uncle and cousins, were captured by ISIS, and some are still missing.   Plaintiff Gawry Shamo's grandmother and cousin were left in the village and ISIS killed them.   Plaintiff Kudida Shamo had to stop education for one year, and Plaintiff Gawry Shamo now suffers from insomnia and other health issues following the invasion.

1305.  ISIS looted and destroyed Plaintiffs Kudida Shamo and Gawry Shamo's real and personal property.

1306.  As a result of ISIS's invasion, Plaintiffs Kudida Shamo and Gawry Shamo have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Wansa Aldkhi and Khalil Hakan**

1307.  Plaintiffs Wansa Aldkhi and Khalil Hakan are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Wansa Aldkhi and Plaintiff Khalil Hakan are married.

1308.  Plaintiffs Wansa Aldkhi and Khalil Hakan have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1309.  In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Wansa Aldkhi's father, siblings, uncles, and aunts and Plaintiff Khalil Hakan's father, siblings, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Wansa Aldkhi and Khalil Hakan fearfully followed their families' journeys as they fled.  ISIS captured Plaintiff Wansa Aldkhi's brother, but he escaped. Plaintiff Wansa Aldkhi's uncle, cousins, and their families disappeared.  Plaintiff Wansa Adkhi's father suffered from shock and memory loss because of what happened to her uncle.  Plaintiff Wansa Aldkhi now suffers from insomnia following the invasion.

1310.  ISIS looted and destroyed Plaintiffs Wansa Aldkhi and Khalil Hakan's real and personal property.

1311.  As a result of ISIS's invasion, Plaintiffs Wansa Aldkhi and Khalil Hakan have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Sam Mirza**

1312.   Plaintiff Sam Mirza is a citizen of the United States and domiciled in the state of Nebraska.

1313.   Plaintiff Sam Mirza has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1314.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sam Mirza's parents, brothers, sisters, including one who was pregnant, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Sam Mirza fearfully followed his family's journey as they fled.

1315.   ISIS looted and destroyed Plaintiff Sam Mirza's real and personal property.

1316.   As a result of ISIS's invasion, Plaintiff Sam Mirza has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Shahab Khudeeda**

1317.   Plaintiff Shahab Khudeeda is a citizen of the United States and domiciled in the state of Nebraska.

1318.   Plaintiff Shahab Khudeeda has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1319.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Shahab Khudeeda's aunts, uncles, and their families fled, some directly to Kurdistan, and some to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.

Plaintiff Shahab Khudeeda was already in Kurdistan at the time of the invasion.  Plaintiff Shahab Khudeeda fearfully followed his family's journey as they fled.

1320.   ISIS looted and destroyed Plaintiff Shahab Khudeeda's real and personal property.

1321.   As a result of ISIS's invasion, Plaintiff Shahab Khudeeda has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Kejjan Hesso**

1322.   Plaintiff Kejjan Hesso is a citizen of the United States and domiciled in the state of Nebraska.

1323.   Plaintiff Kejjan Hesso has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1324.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Kejjan Hesso's mother and siblings fled to Kurdistan.   Plaintiff Kejjan Hesso fearfully followed his family's journey as they fled.   Plaintiff Kejjan Hesso's brother suffered a heart attack when ISIS invaded and died.

1325.   ISIS looted and destroyed Plaintiff Kejjan Hesso's real and personal property.

1326.   As a result of ISIS's invasion, Plaintiff Kejjan Hesso has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Luis Kosa**

1327.   Plaintiff Luis Kosa is a citizen of the United States and domiciled in the state of Nebraska.

1328.   Plaintiff Luis Kosa has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1329.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Luis Kosa fled to Sinjar Mountain with his parents, brothers, sisters, and their children, where they were trapped until they were able to escape to Kurdistan.  ISIS captured Plaintiff Luis Kosa's uncle and aunt.  Plaintiff Luis Kosa's aunt later managed to escape from captivity, however the whereabouts of his uncle are still unknown.  Plaintiff Luis Kosa now suffers from poor mental health and memory loss following the invasion, which prevents him from studying.

1330.   ISIS looted and destroyed Plaintiff Luis Kosa's real and personal property.

1331.   As a result of ISIS's invasion, Plaintiff Luis Kosa has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Saifi Smouki and Haji Smouki**

1332.   Plaintiffs Saifi Smouki and Haji Smouki are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Saifi Smouki and Plaintiff Haji Smouki are married.

1333.   Plaintiffs Saifi Smouki and Haji Smouki have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1334.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saifi Smouki's parents and siblings and Plaintiff Haji Smouki's siblings fled to Kurdistan.  Plaintiffs Saifi Smouki and Haji Smouki fearfully followed their families' journeys as they fled.  ISIS captured Plaintiff Saifi Smouki's uncle, and he is still missing.

1335.   ISIS looted and destroyed Plaintiffs Saifi Smouki and Haji Smouki's real and personal property.

1336.   As a result of ISIS's invasion, Plaintiffs Saifi Smouki and Haji Smouki have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Mohsin Hasan**

1337.   Plaintiff Mohsin Hasan is a citizen of the United States and domiciled in the state of Nebraska.

1338.   Plaintiff Mohsin Hasan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1339.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Mohsin Hasan fled to Kurdistan with his parents, siblings, aunts, uncles, and other families.   Plaintiff Mohsin Hasan's aunt was captured by ISIS, together with her husband and children.   Plaintiff Mohsin Hasan's aunt and cousins were tortured during captivity.   Later they were able to escape.   Plaintiff Mohsin Hasan's aunt's husband and one of her sons are still missing. Plaintiff Mohsin Hasan now suffers from emotional harm following the invasion, which has negatively impacted his studies.

1340.   ISIS looted and destroyed Plaintiff Mohsin Ali Hasan's real and personal property.

1341.   As a result of ISIS's invasion, Plaintiff Mohsin Hasan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khawla Al Aisso**

1342.   Plaintiff Khawla Al Aisso is a citizen of the United States and domiciled in the state of Nebraska.

1343.   Plaintiff Khawla Al Aisso has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1344.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khawla Al Aisso fled to Kurdistan with her parents and siblings.  ISIS captured Plaintiff Khawla Al Aisso's aunt, uncle, and cousins.  Most of these relatives were later able to escape, though three of these cousins were in ISIS captivity for five years before escaping.  Plaintiff Khawla Al Aisso's uncle and one cousin are still missing.

1345.   ISIS looted and destroyed Plaintiff Khawla Al Aisso's real and personal property.

1346.   As a result of ISIS's invasion, Plaintiff Khawla Al Aisso has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Habeeb Mtro**

1347.   Plaintiff Habeeb Mtro is a citizen of the United States and domiciled in the state of Nebraska.

1348.   Plaintiff Habeeb Mtro has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1349.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Habeeb Mtro fled to Kurdistan with his mother, siblings, uncles, aunts, and

grandparents.  Plaintiff Habeeb Mtro suffered a broken leg that required surgery after falling from an overcrowded truck while escaping.

1350.   ISIS looted and destroyed Plaintiff Habeeb Mtro's real and personal property.

1351.   As a result of ISIS's invasion, Plaintiff Habeeb Mtro has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property and/or loss of his family's society and counsel.


**Heivi Khalaf and Baseh Shamo**

1352.   Plaintiffs Heivi Khalaf and Baseh Shamo are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Heivi Khalaf is Plaintiff Baseh Shamo's mother.

1353.   Plaintiffs Heivi Khalaf and Baseh Shamo have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1354.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Heivi Khalaf's siblings fled to Sinjar Mountain before they were able to escape to Kurdistan.  Plaintiffs Heivi Khalaf and Baseh Shamo fearfully followed their family's journey as they fled.  ISIS captured two of Plaintiff Heivi Khalaf's nieces and their families.  Plaintiff Heivi Khalaf's nieces survived but her nieces' husbands and their families are still missing and presumed dead.  ISIS captured a number of Plaintiff Baseh Shamo's cousins.  One of her female cousins was captured and enslaved along with her children and only able to escape after four years.  Another female cousin was also in captivity until she was able to escape and relocate overseas.  ISIS also captured Plaintiff Baseh Shamo's minor cousin.  Plaintiff Baseh Shamo's captured male cousins are all still missing.  ISIS shot Plaintiff Baseh Shamo's cousin's son in the leg.  As a result of the invasion, Plaintiff Heivi Khalaf developed depression.

1355.   ISIS looted and destroyed Plaintiffs Heivi Khalaf and Baseh Shamo's real and personal property.

1356.   As a result of ISIS's invasion, Plaintiffs Heivi Khalaf and Baseh Shamo have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Roza Shamo**

1357.   Plaintiff Roza Shamo is a citizen of the United States and domiciled in Canada.

1358.   Plaintiff Roza Shamo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1359.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Roza Shamo's grandparents, aunts, uncles, and cousins fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Roza Shamo fearfully followed her family's journey as they fled.   ISIS captured Plaintiff Roza Shamo's cousin and her cousin's children for four years, and her cousin's husband is presumed dead.   ISIS captured another of Plaintiff Roza Shamo's cousins, but she escaped.   Plaintiff Roza Shamo's uncles on her mother's side are still missing.

1360.   ISIS looted and destroyed Plaintiff Roza Shamo's real and personal property.

1361.   As a result of ISIS's invasion, Plaintiff Roza Shamo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Darweesh Qasim and Kori Omar**

1362.   Plaintiffs Darweesh Qasim and Kori Omar are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Darweesh Qasim and Plaintiff Kori Omar are married.

1363.   Plaintiffs Darweesh Qasim and Kori Omar have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1364.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Darweesh Qasim and Kori Omar fled to Sinjar Mountain with their children, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Darweesh Qasim and Kori Omar's two-month-old baby died on Sinjar Mountain.  Plaintiff Darweesh Qasim's father fled to the mountain with them, but returned to their village, where he died from a heart attack after seeing the destruction.  Plaintiff Kori Omar's sister was killed by ISIS as she was fleeing. ISIS captured Plaintiffs Darweesh Qasim and Kori Omar's nephews and niece.  Their nephews escaped, but their niece is still missing.

1365.   ISIS looted and destroyed Plaintiffs Darweesh Qasim and Kori Omar's real and personal property.

1366.   As a result of ISIS's invasion, Plaintiffs Darweesh Qasim and Kori Omar have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khaleel Samo and David Khaleel**

1367.   Plaintiffs Khaleel Samo and David Khaleel are citizens of the United States and domiciled in the state of Nebraska.

1368.   Plaintiffs Khaleel Samo and David Khaleel have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1369.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khaleel Samo fled to Sinjar Mountain with his wife, children, and sibling, where they were trapped until they were able to escape to Kurdistan.  Plaintiff David Khaleel fearfully followed his family's journey as they fled.  ISIS killed Plaintiff Khaleel Samo's nephew while he was fetching food and water from the villages to give to family members on the mountain.

1370.   ISIS looted and destroyed Plaintiffs Khaleel Samo and David Khaleel's real and personal property.

1371.   As a result of ISIS's invasion, Plaintiffs Khaleel Samo and David Khaleel have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Suriyah Haji

1372.   Plaintiff Suriyah Haji is a citizen of the United States and domiciled in the state of Nebraska.

1373.   Plaintiff Suriyah Haji has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1374.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Suriyah Haji fled to Sinjar Mountain with her brothers and sisters, where she was trapped until she managed to escape to Kurdistan.  Plaintiff Suriyah Haji's father had a stroke while fleeing, and her 12-year-old brother had a heart attack.  ISIS killed Plaintiff Suriyah Haji's grandparents and two uncles, and her aunts died in a car crash while fleeing from ISIS.

1375.   ISIS looted and destroyed Plaintiff Suriyah Haji's real and personal property.

1376.   As a result of ISIS's invasion, Plaintiff Suriyah Haji has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Kheder Kheder**

1377.   Plaintiff Kheder Kheder is a citizen of the United States and domiciled in the state of Nebraska.

1378.   Plaintiff Kheder Kheder has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1379.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Kheder Kheder's uncles and their children fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Kheder Kheder fearfully followed his family's journey as they fled.

1380.   ISIS looted and destroyed Plaintiff Kheder Kheder's real and personal property.

1381.   As a result of ISIS's invasion, Plaintiff Kheder Kheder has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Meser Haje and Savey Khro**

1382.   Plaintiffs Meser Haje and Savey Khro are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Meser Haje and Plaintiff Savey Khro are married.

1383.   Plaintiffs Meser Haje and Savey Khro have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1384.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Meser Haje and Savey Khro fled to Kurdistan with their children and some of Plaintiff Meser Haje's brothers, sisters, and nephews.  ISIS captured Plaintiff Meser Haje's cousin and cousin's family.  Plaintiff Meser Haje's cousin was later released but then died as a result of a heart attack.  One of Plaintiff Meser Haje's cousin's children was also released but the rest of the cousin's family is still missing.  Plaintiffs Meser Haje and Savey Khro developed several health problems following the invasion.  Plaintiff Savey Khro now suffers from post-traumatic stress disorder following the invasion.

1385.   ISIS looted and destroyed Plaintiffs Meser Haje and Savey Khro's real and personal property.

1386.   As a result of ISIS's invasion, Plaintiffs Meser Haje and Savey Khro have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Husayn Joko and Sarah Joko**

1387.   Plaintiffs Husayn Joko and Sarah Joko are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Husayn Joko and Plaintiff Sarah Joko are married.

1388.   Plaintiffs Husayn Joko and Sarah Joko have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1389.   In particular, on or about August 1, 2014, fearing that ISIS could come to Sinjar and concerned that Plaintiff Husayn Joko would be targeted, Plaintiffs Husayn Joko and Sarah Joko fled to Kurdistan and then Erbil.  On August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Husayn Joko's family, including his brothers and sisters, and Plaintiff Sarah Joko's

family, including her parents, brothers, sisters, and their families, fled to Kurdistan.  Plaintiffs Husayn Joko and Sarah Joko fearfully followed their families' journeys as they fled.  ISIS captured Plaintiff Sarah Joko's cousin.  Plaintiff Sarah Joko's father suffered from mental health issues following the invasion and died at a temporary camp for internally displaced persons.  ISIS captured Plaintiff Sarah Joko's cousin.

1390.  ISIS looted and destroyed Plaintiffs Husayn Joko and Sarah Joko's real and personal property.

1391.  As a result of ISIS's invasion, Plaintiffs Husayn Joko and Sarah Joko have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Fares Dahhar**

1392.  Plaintiff Fares Dahhar is a citizen of the United States and domiciled in the state of Nebraska.

1393.  Plaintiff Fares Dahhar has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1394.  In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Fares Dahhar's family, including his sisters and their families, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Fares Dahhar fearfully followed his family's journey as they fled.  Plaintiff Fares Dahhar now suffers from diabetes following the invasion.

1395.  ISIS looted and destroyed Plaintiff Fares Dahhar's real and personal property.

1396.   As a result of ISIS's invasion, Plaintiff Fares Dahhar has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.


**Sharro Gebbo**

1397.   Plaintiff Sharro Gebbo is a citizen of the United States and domiciled in the state of Nebraska.

1398.   Plaintiff Sharro Gebbo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1399.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sharro Gebbo's family, including his uncles, cousins, and their families, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Sharro Gebbo fearfully followed his family's journey as they fled.   ISIS captured Plaintiff Sharro Gebbo's cousins and their families.   One cousin escaped after four months, and another cousin was released by ISIS.   ISIS physically tortured Plaintiff Sharro Gebbo's niece.   Plaintiff Sharro Gebbo's niece escaped but later committed suicide.

1400.   ISIS looted and destroyed Plaintiff Sharro Gebbo's real and personal property.

1401.   As a result of ISIS's invasion, Plaintiff Sharro Gebbo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Hasso Bakr**

1402.   Plaintiff Hasso Bakr is a citizen of the United States and domiciled in the state of Nebraska.

1403.   Plaintiff Hasso Bakr has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1404.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hasso Bakr's family, including his wife, children (including a four-month-old infant), mother, and brothers and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Hasso Bakr fearfully followed his family's journey as they fled.   Some of Plaintiff Hasso Bakr's children were separated from their mother and fled to the mountain separately.   Plaintiff Hasso Bakr was unable to work during this period. Plaintiff Hasso Bakr's wife now suffers from extreme trauma following the invasion.

1405.   ISIS looted and destroyed Plaintiff Hasso Bakr's real and personal property.

1406.   As a result of ISIS's invasion, Plaintiff Hasso Bakr has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Bizi Misqri**

1407.   Plaintiff Bizi Misqri is a citizen of the United States and domiciled in the state of Nebraska.

1408.   Plaintiff Bizi Misqri has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1409.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Bizi Misqri fled to Sinjar Mountain with her husband, children, brothers, sisters, cousins, aunts, and uncles, where they were trapped until they were able to escape to Kurdistan. While fleeing, forty-three members of Plaintiff Bizi Misqri's family were captured, including her father, nephew, and aunts.  Plaintiff Bizi Misqri's father and other members of the family were killed by ISIS as they tried to escape from captivity.

1410.   ISIS looted and destroyed Plaintiff Bizi Misqri's real and personal property.

1411.   As a result of ISIS's invasion, Plaintiff Bizi Misqri has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Wlid Qaro**

1412.   Plaintiff Wlid Qaro is a citizen of the United States and domiciled in the state of Texas.

1413.   Plaintiff Wlid Qaro has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1414.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Wlid Qaro's mother, siblings, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Wlid Qaro fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Wlid Qaro's cousin and her family and killed Plaintiff Wlid Qaro's cousin's husband and son.  ISIS also captured another of Plaintiff Wlid Qaro's cousins.

1415.   ISIS looted and destroyed Plaintiff Wlid Qaro's real and personal property.

1416.   As a result of ISIS's invasion, Plaintiff Wlid Qaro has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property and/or loss of his family's society and counsel.

**Alias Aldakhi**

1417.   Plaintiff Alias Aldakhi is a citizen of the United States and domiciled in the state of New York.

1418.   Plaintiff Alias Aldakhi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1419.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Alias Aldakhi's mother, sisters, and cousins fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Alias Aldakhi fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Alias Aldakhi's cousin, who was later able to escape.

1420.   ISIS looted and destroyed Plaintiff Alias Aldakhi's real and personal property.

1421.   As a result of ISIS's invasion, Plaintiff Alias Aldakhi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property and/or loss of his family's society and counsel.

**Yusra Aldakhi**

1422.   Plaintiff Yusra Aldakhi is a citizen of the United States and domiciled in the state of New York.

1423.   Plaintiff Yusra Aldakhi has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1424.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Yusra Aldakhi's mother and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Yusra Aldakhi fearfully followed her family's journey as they fled.  ISIS captured Plaintiff Yusra Aldakhi's father and brother.  ISIS released a video of her brother in captivity.  Plaintiff Yusra Aldakhi's father and brother were later released.  ISIS captured Plaintiff Yusra Aldakhi's cousin, and he is still missing.

1425.   ISIS looted and destroyed Plaintiff Yusra Aldakhi's real and personal property.

1426.   As a result of ISIS's invasion, Plaintiff Yusra Aldakhi has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Ismael Hammo**

1427.   Plaintiff Ismael Hammo is a citizen of the United States and domiciled in the state of Texas.

1428.   Plaintiff Ismael Hammo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1429.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Ismael Hammo's family, including some of his siblings, fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Ismael Hammo fearfully followed his family's journey as they fled.  Plaintiff Ismael Hammo's niece died in the camps for internally displaced persons.  ISIS captured Plaintiff Ismael Hammo's uncle, who is still missing.

1430.   ISIS looted and destroyed Plaintiff Ismael Hammo's real and personal property.

1431.   As a result of ISIS's invasion, Plaintiff Ismael Hammo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Nofa Dena and Banas Dna**

1432.   Plaintiffs Nofa Dena and Banas Dna are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Nofa Dena is Plaintiff Banas Dna's mother.

1433.   Plaintiffs Nofa Dena and Banas Dna have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1434.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Nofa Dena's siblings (Plaintiff Banas Dna's aunts and uncles) fled to Turkey. Plaintiff Nofa Dena's daughter and son-in-law (Plaintiff Banas Dna's sister and brother-in-law) were doctors and travelled from Kurdistan to Sinjar Mountain to offer medical assistance to other Yazidis.  Plaintiffs Nofa Dena and Banas Dna's extended family members also fled their homes because of ISIS.  Plaintiffs Nofa Dena and Banas Dna fearfully followed their family's journey as they fled.

1435.  As a result of ISIS's invasion, Plaintiffs Nofa Dena and Banas Dna have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Bakir Murad and Paiman Dna**

1436.   Plaintiffs Bakir Murad and Paiman Dna are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Bakir Murad and Plaintiff Paiman Dna are married.

1437.   Plaintiffs Bakir Murad and Paiman Dna have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1438.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Bakir Murad's mother, brothers, and their families fled to Kurdistan and Plaintiff Paiman Dna's family fled to Turkey.  Plaintiffs Bakir Murad and Paiman Dna fearfully followed their families' journeys as they fled.  Plaintiff Bakir Murad was in Kurdistan during the invasion and joined his family once they arrived there.  Plaintiff Paiman Dna's sister, who was a doctor, travelled to Sinjar from Kurdistan to provide medical assistance following the invasion.  ISIS captured Plaintiff Paiman Dna's cousin, but she was able to escape after one day.

1439.   As a result of ISIS's invasion, Plaintiffs Bakir Murad and Paiman Dna have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, and/or loss of their family's society and counsel.

**Jallal Isa**

1440.   Plaintiff Jallal Isa is a citizen of the United States and domiciled in the state of Texas.

1441.   Plaintiff Jallal Isa has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1442.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Jallal Isa's parents, brothers, sisters, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Jallal Isa fearfully followed his family's journey as they fled.

1443.   ISIS looted and destroyed Plaintiff Jallal Isa's real and personal property.

1444.   As a result of ISIS's invasion, Plaintiff Jallal Isa has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**John Zalfow**

1445.   Plaintiff John Zalfow is a citizen of the United States and domiciled in the state of Texas.

1446.   Plaintiff John Zalfow has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1447.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff John Zalfow's parents, brothers, sisters, and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff John Zalfow fearfully followed his family's journey as they fled.   Plaintiff John Zalfow was diagnosed with post-traumatic stress disorder following the invasion.

1448.   ISIS looted and destroyed Plaintiff John Zalfow's real and personal property.

1449.   As a result of ISIS's invasion, Plaintiff John Zalfow has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Khalid Haider**

1450.   Plaintiff Khalid Haider is a citizen of the United States and domiciled in the state of Virginia.

1451.   Plaintiff Khalid Haider has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1452.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khalid Haider's parents, sisters, sister-in-law, and brothers fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Khalid Haider fearfully followed his family's journey as they fled.  ISIS threw grenades and shot at Plaintiff Khalid Haider's family as they fled to the mountain.

1453.   ISIS looted and destroyed Plaintiff Khalid Haider's real and personal property.

1454.   As a result of ISIS's invasion, Plaintiff Khalid Haider has experienced severe mental anguish; extreme emotional pain and suffering; loss of property; and/or loss of his family's society and counsel.

### Hazim Avdal

1455.   Plaintiff Hazim Avdal is a citizen of the United States and domiciled in the state of Ohio.

1456.   Plaintiff Hazim Avdal has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1457.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hazim Avdal's mother, grandmother, brother, sisters, and uncle fled to Kurdistan by car.  Plaintiff Hazim Avdal's maternal grandmother and uncles fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Hazim Avdal fearfully followed his family's journey as they fled.  Plaintiff Hazim Avdal and one of his brothers were already in Kurdistan at the time, and they met their family members there.  Plaintiff Hazim Avdal and his family then traveled to Turkey where they stayed in refugee camps.  Plaintiff Hazim Avdal spent approximately five months in the camps, whereas his family was there for over a year.

1458.   ISIS looted and destroyed Plaintiff Hazim Avdal's real and personal property.

1459.   As a result of ISIS's invasion, Plaintiff Hazim Avdal has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Saad Ibrahim**

1460.   Plaintiff Saad Ibrahim is a citizen of the United States and domiciled in the state of Nebraska.

1461.   Plaintiff Saad Ibrahim has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1462.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saad Ibrahim's brothers and sisters fled to Kurdistan.   Plaintiff Saad Ibrahim fearfully followed his family's journey as they fled.

1463.   ISIS looted and destroyed Plaintiff Saad Ibrahim's real and personal property.

1464.   As a result of ISIS's invasion, Plaintiff Saad Ibrahim has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Saado Ali and Fatima Ali**

1465.   Plaintiffs Saado Ali and Fatima Ali are citizens of the United States and domiciled in the state of Indiana.  Plaintiff Saado Ali and Plaintiff Fatima Ali are married.

1466.   Plaintiffs Saado Ali and Fatima Ali have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1467.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saado Ali and Plaintiff Fatima Ali, who were not married at the time, fled separately

with their families. Plaintiff Saado Ali fled to Kurdistan with his parents, brothers, and their families. Plaintiff Fatima Ali and her sister fled to Sinjar Mountain until they were able to escape to Kurdistan. Plaintiff Fatima Ali's parents and the remainder of her siblings fled directly to Kurdistan.

1468. ISIS looted and destroyed Plaintiff Saado Ali and Fatima Ali's real and personal property.

1469. As a result of ISIS's invasion, Plaintiff Saado Ali and Fatima Ali have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Qassim Chomer and Alifa Khalaf**

1470. Plaintiffs Qassim Chomer and Alifa Khalaf are citizens of the United States and domiciled in the state of Texas. Plaintiff Qassim Chomer and Plaintiff Alifa Khalaf are married.

1471. Plaintiffs Qassim Chomer and Alifa Khalaf have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1472. In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Qassim Chomer's parents, brothers, sisters, and sister-in-law fled to Kurdistan. Plaintiff Alifa Khalaf's parents, sister, sister-in-law, and her children fled to Kurdistan. Plaintiffs Qassim Chomer and Alifa Khalaf fearfully followed their family's journey as they fled. When ISIS invaded, Plaintiff Alifa Khalaf's other sister was unable to flee due to her disability. When Plaintiff Alifa Khalaf's family returned for her the next day, she was dead.

1473. ISIS looted and destroyed Plaintiffs Qassim Chomer and Alifa Khalaf's real and personal property.

1474.   As a result of ISIS's invasion, Plaintiffs Qassim Chomer and Alifa Khalaf have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khudayda Aldakhi and Fareeda Aldakhi**

1475.   Plaintiffs Khudayda Aldakhi and Fareeda Aldakhi are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Khudayda Aldakhi and Plaintiff Fareeda Aldakhi are married.

1476.   Plaintiffs Khudayda Aldakhi and Fareeda Aldakhi have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1477.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Khudayda Aldakhi and Fareeda Aldakhi and their children fled to Sinjar Mountain with Plaintiff Fareeda Aldakhi's sister and their nephew, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Fareeda Aldakhi and her daughter were burned while fleeing. Plaintiff Khudayda Aldakhi's sister-in-law died while fleeing, and his brother died shortly after.

1478.   ISIS looted and destroyed Plaintiffs Khudayda Aldakhi and Fareeda Aldakhi's real and personal property.

1479.   As a result of ISIS's invasion, Plaintiffs Khudayda Aldakhi and Fareeda Aldakhi have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Suaad Shamo, Khalaf Shammo, Ibrahim Oso, and Kamo Shammo**

1480.   Plaintiffs Ibrahim Oso, Suaad Shamo, Khalaf Shammo, and Kamo Shammo are citizens of the United States and domiciled in the state of Arizona.   Plaintiff Ibrahim Oso is Plaintiffs Suaad Shamo, Khalaf Shammo, and Kamo Shammo's father.

1481.   Plaintiffs Ibrahim Oso, Suaad Shamo, Khalaf Shammo, and Kamo Shammo have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1482.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Suaad Shamo, Khalaf Shammo, and Kamo Shammo's family, including their grandmother, and their sister (Plaintiff Ibrahim Oso's daughter) and her family fled to Kurdistan. Plaintiffs Ibrahim Oso, Suaad Shamo, Khalaf Shammo, and Kamo Shammo fearfully followed their family's journey as they fled.   Plaintiffs Suaad Shamo, Khalaf Shammo, and Kamo Shammo's grandmother died as a result of the journey.   Plaintiffs Ibrahim Oso, Suaad Shamo, Khalaf Shammo, and Kamo Shammo now suffer from depression and anxiety following the invasion.

1483.   ISIS looted and destroyed Plaintiffs Ibrahim Oso, Suaad Shamo, Khalaf Shammo, and Kamo Shammo's real and personal property.

1484.   As a result of ISIS's invasion, Plaintiffs Ibrahim Oso, Suaad Shamo, Khalaf Shammo, and Kamo Shammo have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Barack Abraham**

1485.   Plaintiff Barack Abraham is a citizen of the United States and domiciled in the state of Arizona.

1486.   Plaintiff Barack Abraham has suffered severe injuries as a result of ISIS's campaign targeting Yazidis in Iraq.

1487.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Barack Abraham's family, including his grandmother, uncles, and cousins, fled to Turkey.  Plaintiff Barack Abraham fearfully followed his family's journey as they fled.  Plaintiff Barack Abraham's grandmother died while fleeing to Turkey.  Plaintiff Barack Abraham now suffers from psychological issues following the invasion, for which he is receiving ongoing medical care.

1488.   ISIS looted and destroyed Plaintiff Barack Abraham's real and personal property.

1489.   As a result of ISIS's invasion, Plaintiff Barack Abraham has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Basima Auso and Faris Auso**

1490.   Plaintiffs Basima Auso and Faris Auso are citizens of the United States and domiciled in the state of Washington.  Plaintiff Basima Auso and Plaintiff Faris Auso are married.

1491.   Plaintiffs Basima Auso and Faris Auso have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1492.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Basima and Faris Auso fled with their child and Plaintiff Faris Auso's parents, brothers and sisters to Kurdistan.  ISIS shot at their car while fleeing.  ISIS captured and killed Plaintiff Faris Auso's cousins.  ISIS captured Plaintiff Basima Auso's uncle, aunt, and their family, and they are all still missing.

1493.   ISIS looted and destroyed Plaintiffs Basima Auso and Faris Auso's real and personal property.

1494.   As a result of ISIS's invasion, Plaintiffs Basima Auso and Faris Auso have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.


**Alan Ibrahim and Amsha Ali**

1495.   Plaintiffs Alan Ibrahim and Amsha Ali are citizens of the United States and domiciled in the state of Nebraska.  Plaintiff Alan Ibrahim and Plaintiff Amsha Ali are married.

1496.   Plaintiffs Alan Ibrahim and Amsha Ali have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1497.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Amsha Ali and her mother, brother, and sisters fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Amsha Ali's niece died of dehydration on Sinjar Mountain.  Plaintiff Amsha Ali's father and other brothers stayed to fight ISIS, until they were later able to join the family in Kurdistan.  ISIS captured Plaintiff Amsha Ali's cousin and her daughter, and the daughter is still missing.

1498.   Plaintiff Alan Ibrahim's mother, brothers, sisters, and their families fled to Kurdistan.  Plaintiff Alan Ibrahim fearfully followed his family's journey as they fled.  ISIS captured Plaintiff Alan Ibrahim's cousin and his family, and members of this family are still missing.

1499.   ISIS looted and destroyed Plaintiff Alan Ibrahim and Plaintiff Amshsa Ali's real and personal property.

281

1500.   As a result of ISIS's invasion, Plaintiffs Alan Ibrahim and Amsha Ali have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Kouli Khalaf**

1501.   Plaintiff Kouli Khalaf is a citizen of the United States and domiciled in the state of Virginia.

1502.   Plaintiff Kouli Khalaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1503.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Kouli Khalaf's mother and brothers and their families fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  While they were travelling to Sinjar Mountain, one of the cars being used by Plaintiff Kouli Khalaf's mother and brother was briefly captured by ISIS before being released.  ISIS shot at another car in which Plaintiff Kouli Khalaf's other brother and niece were fleeing, and her niece was injured.  ISIS shot at and severely injured one of Plaintiff Kouli Khalaf's nephews.

1504.   ISIS looted and destroyed Plaintiff Kouli Khalaf's real and personal property.

1505.   As a result of ISIS's invasion, Plaintiff Kouli Khalaf has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Shiri Khalaf**

1506.   Plaintiff Shiri Khalaf is a citizen of the United States and domiciled in the state of Virginia.

1507.   Plaintiff Shiri Khalaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1508.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Shiri Khalaf's daughter, grandchildren, and sisters fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Shiri Khalaf fearfully followed her family's journey as they fled.

1509.   As a result of ISIS's invasion, Plaintiff Shiri Elias Khalaf has experienced economic loss; severe mental anguish; extreme emotional pain and suffering, loss of property; and/or loss of her family's society and counsel.


**Tahsin Jihan**

1510.   Plaintiff Tahsin Jihan is a citizen of the United States and domiciled in the state of Nebraska.

1511.   Plaintiff Tahsin Jihan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1512.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Tahsin Jihan and his wife, child, mother, and brothers fled to Kurdistan.  ISIS killed Plaintiff Tahsin Jihan's cousin.  ISIS captured Plaintiff Tahsin Jihan's uncles and their families, but they were later released and fled to Kurdistan.

1513.   ISIS looted and destroyed Plaintiff Tahsin Jihan's real and personal property.

1514.   As a result of ISIS's invasion, Plaintiff Tahsin Jihan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Faris Bakr**

1515.   Plaintiff Faris Bakr is a citizen of the United States and domiciled in the state of Nebraska.

1516.   Plaintiff Faris Bakr has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1517.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Faris Bakr's mother and siblings fled to Sinjar Mountain.  One of Plaintiff Faris Bakr's brothers hid from ISIS for ten days in Khana Sor.  ISIS killed Plaintiff Faris Bakr's cousin. Plaintiff Faris Bakr's other cousin fell while on Sinjar Mountain and died.  Plaintiff Faris Bakr's aunt died while fleeing to Kurdistan.

1518.   ISIS looted and destroyed Plaintiff Faris Bakr's real and personal property.

1519.   As a result of ISIS's invasion, Plaintiff Faris Bakr has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Hassan Alassaf**

1520.   Plaintiff Hassan Alassaf is a citizen of the United States and domiciled in the state of Nebraska.

1521.   Plaintiff Hassan Alassaf has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1522.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hassan Alassaf's mother and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Hassan Alassaf fearfully followed his family's journey as they fled.

1523.   ISIS looted and destroyed Plaintiff Hassan Alassaf's real and personal property.

1524.   As a result of ISIS's invasion, Plaintiff Hassan Alassaf has experienced economic loss; severe mental anguish; extreme emotional pain and suffering, loss of property; and/or loss of his family's society and counsel.


**Riham Jndo**

1525.   Plaintiff Riham Jndo is a citizen of the United States and domiciled in the state of Nebraska.

1526.   Plaintiff Riham Jndo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1527.   In particular, on or about August 3, 2014, in response to ISIS's invasion Sinjar, Iraq, Plaintiff Riham Jndo and her mother and siblings fled to Kurdistan.

1528.   ISIS looted and destroyed Plaintiff Riham Jndo's real and personal property.

1529.   As a result of ISIS's invasion, Plaintiff Riham Jndo has experienced economic loss; severe mental anguish; extreme emotional pain and suffering, loss of property; and/or loss of her family's society and counsel.

**Sally Rashid and Dalshad Khudhur**

1530.   Plaintiffs Sally Rashid and Dalshad Khudhur are citizens of the United States and domiciled in the state of Virginia.   Plaintiff Sally Rashid and Plaintiff Dalshad Khudhur are married.

1531.   Plaintiffs Sally Rashid and Dalshad Khudhur have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1532.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Sally Rashid's parents and siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Dalshad Khudhur's parents and siblings also fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan. Plaintiffs Sally Rashid and Dalshad Khudhur fearfully followed their families' journeys as they fled.

1533.   ISIS looted and destroyed Plaintiff Sally Rashid and Plaintiff Dalshad Khudhur's real and personal property.

1534.   As a result of ISIS's invasion, Plaintiffs Sally Rashid and Dalshad Khudhur have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Laila Hesso**

1535.   Plaintiff Laila Hesso is a citizen of the United States and domiciled in the state of Nebraska.

1536.   Plaintiff Laila Hesso has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1537.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Laila Hesso's uncles, aunts, and cousins fled to Kurdistan.  Plaintiff Laila Hesso fearfully followed her family's journey as they fled.

1538.   As a result of ISIS's invasion, Plaintiff Laila Hesso has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

### Dejin Khidir

1539.   Plaintiff Dejin Khidir is a citizen of the United States and domiciled in the state of Virginia.

1540.   Plaintiff Dejin Khidir has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1541.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Dejin Khidir fled to Turkey with her mother and three sisters.

1542.   As a result of ISIS's invasion, Plaintiff Dejin Khidir has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Sulaiman Hamo, Tawaf Merza, Zeyed Khudhur, Amer Khudher, and Khairi Khudher

1543.   Plaintiffs Sulaiman Hamo, Tawaf Merza, Zeyed Khudhur, Amer Khudher, and Khairi Khudher are citizens of the United States and domiciled in the state of Arizona.  Plaintiff Sulaiman Hamo and Plaintiff Tawaf Merza are married.   Plaintiffs Zeyed Khudhur, Amer Khudher, and Khairi Khudher are their children.

1544.   Plaintiffs Sulaiman Hamo, Tawaf Merza, Zeyed Khudhur, Amer Khudher, and Khairi Khudher have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1545.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiffs Sulaiman Hamo, Tawaf Merza, Amer Khudher, Khairi Khudher fled with Plaintiffs Sulaiman Hamo and Tawaf Merza's siblings to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.   Plaintiff Zeyed Khudhur fearfully followed his family's journey as they fled.   ISIS killed Plaintiff Tawaf Merza's brother (Sulaiman Hamo's brother-in-law) and nephew (Plaintiffs Amer Khudher, Zeyed Khudher, and Khairi Khudur's uncle and cousin, respectively).   Plaintiffs Sulaiman Hamo and Tawaf Merza's daughter-in-law suffered a miscarriage on Sinjar Mountain.

1546.   ISIS looted and destroyed Plaintiffs Sulaiman Hamo, Tawaf Merza, Zeyed Khudhur, Amer Khudher, and Khairi Khudher's real and personal property.

1547.   As a result of ISIS's invasion, Plaintiffs Sulaiman Hamo, Tawaf Merza, Zeyed Khudhur, Amer Khudher, and Khairi Khudher have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Dilher Othman**

1548.   Plaintiff Dilher Othman is a citizen of the United States and domiciled in the state of Nebraska.

1549.   Plaintiff Dilher Othman has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1550.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Dilher Othman's father and siblings fled to Turkey.  Plaintiff Dilher Othman was in Turkey at the time of the invasion and fearfully followed his family's journey as they fled.  ISIS killed Plaintiff Dilher Othman's aunt and her family.  Plaintiff Dilher Othman's grandmother and several uncles are still missing.

1551.   As a result of ISIS's invasion, Plaintiff Dilher Othman has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

### Ahmed Ibrahim, Bahar Mourad, and George Ibrahim

1552.   Plaintiffs Ahmed Ibrahim, Bahar Mourad, and George Ibrahim are citizens of the United States and domiciled in the state of Pennsylvania.  Plaintiff Ahmed Ibrahim and Plaintiff Bahar Mourad are married.  Plaintiff George Ibrahim is their son.

1553.   Plaintiffs Ahmed Ibrahim, Bahar Mourad, and George Ibrahim have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1554.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, some of Plaintiff Ahmed Ibrahim's siblings fled to Sinjar Mountain, while others fled directly to Kurdistan.  Plaintiff Bahar Mourad's siblings fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiffs Ahmed Ibrahim, Bahar Mourad, and George Ibrahim fearfully followed their families' journeys as they fled.  Plaintiff Ahmed Ibrahim's cousin was killed in a car bombing.

1555.   ISIS looted and destroyed Plaintiffs Ahmed Ibrahim, Bahar Mourad real and personal property.

1556.   As a result of ISIS's invasion, Plaintiffs Ahmed Ibrahim, Bahar Mourad, and George Ibrahim have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

### Hajar Ali, Ziyad Faeedi, and Mazin Faeedi

1557.   Plaintiffs Hajar Ali, Ziyad Faeedi, and Mazin Faeedi are citizens of the United States and domiciled in the state of Virginia.  Plaintiff Hajar Ali and Plaintiff Ziyad Faeedi are married.  Plaintiff Mazin Faeedi is their son.

1558.   Plaintiffs Hajar Ali, Ziyad Faeedi, and Mazin Faeedi have suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1559.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Hajar Ali's brothers and their families fled to Turkey.  Plaintiff Ziyad Faeedi's brothers fled to Kurdistan.  Plaintiffs Hajar Ali, Ziyad Faeedi, and Mazin Faeedi fearfully followed their family's journey as they fled.  ISIS captured Plaintiff Hajar Ali's brother's daughter, and Plaintiff Hajar Ali's brother suffered a heart attack and died as a result.

1560.   ISIS looted and destroyed Plaintiffs Hajar Ali, Ziyad Faeedi, and Mazin Faeedi's real and personal property.

1561.   As a result of ISIS's invasion, Plaintiffs Hajar Ali, Ziyad Faeedi, and Mazin Faeedi have experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of their family's society and counsel.

**Khaleel Haskan**

1562.   Plaintiff Khaleel Haskan is a citizen of the United States and domiciled in the state of Nebraska.

1563.   Plaintiff Khaleel Haskan has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1564.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Khaleel Haskan fled to Kurdistan with his wife, son, mother, and siblings.

1565.   ISIS looted and destroyed Plaintiff Khaleel Haskan's real and personal property.

1566.   As a result of ISIS's invasion, Plaintiff Khaleel Haskan has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**Zahra Hamo**

1567.   Plaintiff Zahra Hamo is a citizen of the United States and domiciled in the state of Nebraska.

1568.   Plaintiff Zahra Hamo has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1569.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Zahra Hamo fled to Sinjar Mountain with her children, where she was trapped until she was able to escape to Kurdistan and then to Turkey.  Plaintiff Zahra Hamo's siblings also fled to Sinjar Mountain and then to Kurdistan when ISIS invaded Sinjar.

1570.   ISIS looted and destroyed Plaintiff Zahra Hamo's real and personal property.

1571.   As a result of ISIS's invasion, Plaintiff Zahra Hamo has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of her family's society and counsel.

**Saido Hesso**

1572.   Plaintiff Saido Hesso is a citizen of the United States and domiciled in the state of Nebraska.

1573.   Plaintiff Saido Hesso has suffered severe injuries as a result of ISIS's campaign of terrorism targeting Yazidis in Iraq.

1574.   In particular, on or about August 3, 2014, in response to ISIS's invasion of Sinjar, Iraq, Plaintiff Saido Hesso's brothers and their families—altogether totaling thirty people—fled to Sinjar Mountain, where they were trapped until they were able to escape to Kurdistan.  Plaintiff Saido Hesso fearfully followed his family's journey as they fled.  ISIS caught the families as they were fleeing and stole their jewelry.  Plaintiff Saido Hesso's family members managed to escape while their guard was distracted and fled to the mountain.

1575.   ISIS looted and destroyed Plaintiff Saido Hesso's real and personal property.

1576.   As a result of ISIS's invasion, Plaintiff Saido Hesso has experienced economic loss, severe mental anguish, extreme emotional pain and suffering, loss of property, and/or loss of his family's society and counsel.

**COUNT ONE: VIOLATION OF THE ATA, 18 U.S.C. § 2333(D)**
**(JASTA, Aiding and Abetting Liability)**

1577.   Plaintiffs incorporate their allegations above.

1578.   Lafarge and LCS pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

1579.   The United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq and, later, under the name of ISIS and associated aliases.

1580.   The United States has designated ANF as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2012.

1581.   ISIS and ANF committed violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, and that would be a criminal violation if committed within the jurisdiction of the United States or of any State, including genocide, murder, hostage taking, widescale sexual abuse including rape, forced labor, human trafficking, financing terrorism, use of weapons of mass destruction, the destruction of property by fire or explosive, and commission of acts of terrorism transcending national boundaries.  ISIS's and ANF's acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844, 1091, 1111, 1203, 1361, 1589, 1590, 2242, 2332a, 2339B, and 2339C(a)(1)(B).  Defendants, ISIS, and ANF structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A.  Defendants knew that their substantial assistance and material support would be used by FTOs in the preparation for, or in carrying out, the above acts.

1582.   ISIS's and ANF's acts appeared to be intended to intimidate or coerce civilian populations of Syria, Iraq, and the United States, among others, to influence the policy of the Syrian, Iraqi, Kurdish, American, and other governments by intimidation or coercion, and to affect the conduct of a government by mass destruction, assassination, rape, kidnapping, enslavement, pillage and other acts.

1583.   ISIS's and ANF's attacks occurred primarily outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

1584.   Defendants aided and abetted ISIS's and ANF's acts of international terrorism by knowingly providing substantial assistance, including by making cash and covert payments through the U.S. financial system and foreign shell companies and intermediaries to, purchasing raw material from, selling cement to, and making revenue-sharing agreements with the FTOs, and by failing to safely shut down and evacuate the Cement Plant, thereby placing tons of valuable cement and raw materials, including materials that can be used to make explosives, in the hands of ISIS.  Defendants knew that their material support was provided to FTOs and would be used to commit acts of international terrorism.

1585.   Defendants provided substantial support to ISIS and ANF, knowing that the reasonable and foreseeable risk—and occurrence in fact—was that the FTOs would in turn perform numerous wrongful acts, including the murder of thousands of civilians, among them U.S. citizens and relatives of Plaintiffs.  Defendants were generally and specifically aware of FTOs' tortious, terrorist scheme, and their role in it.  Defendants were generally and specifically aware that their actions would put further resources into FTOs' hands to commit further terrorist acts.  Defendants therefore knowingly and substantially aided and abetted the FTOs, including ISIS, in committing the acts of international terrorism that injured Plaintiffs.

1586.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.  Plaintiffs suffered economic, physical, and/or emotional injuries proximately caused by Defendants' conduct.

1587.  As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### COUNT TWO: VIOLATION OF THE ATA, 18 U.S.C. § 2333(D)
### (JASTA, Conspiracy Liability)

1588.  Plaintiffs incorporate their allegations above.

1589.  Lafarge and LCS pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

1590.  The United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

1591.  The United States has designated ANF as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2012.

1592.  Defendants conspired by making an agreement with FTOs to, among other activities and goals, provide material support for those organizations in violation of 18 U.S.C. § 2339B.  Defendants, ISIS, and ANF structured their transactions to disguise the nature of their support, in further violation of 18 U.S.C. § 2339A.  These FTOs foreseeably attacked civilians, including U.S. civilians, throughout the conspiracy, with Defendants' knowledge.  A foreseeable and indeed inevitable outcome of that conspiracy was the terrorist acts that caused Plaintiffs' injuries.

1593.  It was reasonable and foreseeable that, as part of the conspiracy and in furtherance of the scheme to support acts of international terrorism, ISIS and ANF would, and in fact did, commit acts of international terrorism, including violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, and that would be a criminal violation if committed within the jurisdiction of the United States or of any State, including the destruction of property by fire or explosive, genocide, murder, hostage taking, widescale sexual

abuse including rape, forced labor, human trafficking, financing terrorism, use of weapons of mass destruction, and commission of acts of terrorism transcending national boundaries.  ISIS's and ANF's acts violated the criminal laws of the United States, or would have violated those laws had they been committed within the jurisdiction of the United States, including 18 U.S.C. §§ 844, 1091, 1111, 1203, 1361, 1589, 1590, 2242, 2332a, 2339B, and 2339C(a)(1)(B).  Defendants knew that acts of international terrorism were part of the conspiracy and that FTOs were and would carry out the above acts.

1594.  Defendants, by conspiring with ISIS and ANF, unlawfully and willfully conspired with the persons who committed acts of international terrorism, knowing that ISIS and ANF had carried out and continued to carry out acts intended to cause death or serious bodily injury to civilians and/or others not taking an active part in the hostilities in a situation of armed conflict, and that the purpose of ISIS's and ANF's acts was to intimidate the Syrian, Iraqi, Kurdish, Yazidi, American, and other populations, and to compel the United States and other governments to retreat from territory in Syria, Iraq, and in other countries and take other action in line with ISIS's warped ideology.

1595.  ISIS's and ANF's acts appeared to be intended to intimidate or coerce a civilian population; to influence the policy of the Syrian, Iraqi, Kurdish, American, and other governments by intimidation or coercion; and to affect the conduct of a government by mass destruction, assassination, rape, kidnapping, enslavement, pillage, and other acts.

1596.  ISIS's and ANF's attacks occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of the means by which they are accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

1597.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of Defendants' conduct.   Plaintiffs suffered economic, physical, and emotional injuries proximately caused by Defendants' conduct.

1598.   As a result of Defendant's provision of funds and other assistance to ISIS in violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

1599.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs request that the Court:

> (a)   Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;
>
> (b)   Award Plaintiffs compensatory damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(d);
>
> (c)   Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(d);
>
> (d)   Award Plaintiffs prejudgment interest; and
>
> (e)   Award Plaintiffs any such further relief the Court deems just and proper.

Dated: December 14, 2023

JENNER & BLOCK LLP

By: */s/ Lee Wolosky*

Lee Wolosky
Andrew J. Lichtman
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 891-1628
Fax: (212) 891-1699
lwolosky@jenner.com
alichtman@jenner.com

Alyssa G. Bernstein (*pro hac vice*
forthcoming)
JENNER & BLOCK LLP
1099 New York Avenue
Washington, DC 20001
Telephone: (202) 639-6000
abernstein@jenner.com

Amal Clooney
Alisha Mathew
OFFICE OF AMAL CLOONEY
Telephone: (44) 20 4526 1185
YazidiUS@amalclooney.co.uk

*Attorneys for Plaintiffs*