**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JASON BLACK, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:24-cv-08901-NGG-PK |
| CHARISS FINAN, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:22-cv-07831-NGG-PK |
| DIANE FOLEY, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:23-cv-05691-NGG-PK |
| AVRAHAM GOLDMAN, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:24-cv-01043-NGG-PK |

| | |
|---|---|
| NADIA MURAD, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:23-cv-09186-NGG-PK |
| SUSAN SHIRLEY, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:25-cv-04248-NGG-PK |
| CHRISTINE STALLTER, *et al.*,<br>*Plaintiffs*,<br>v.<br>LAFARGE S.A., *et al.*,<br>*Defendants*. | Civil No. 1:25-cv-06749-NGG-PK |

# **JOINT STATUS REPORT REGARDING DISCOVERY**

Under the Court's March 4, 2026 Minute Entry and Order, the Parties submit this Joint Status Report. It includes a one-page checklist of outstanding discovery disputes, an update on the Parties' progress on document discovery, and the Parties' positions on disputed issues.

## I. Checklist of Open Discovery Disputes (set forth in more detail in Part III)

| Issue | Plaintiffs' Position | Defendants' Position |
|---|---|---|
| **A. *Murad* Plaintiffs' Request for a Bellwether for Written and Document Discovery**<br><br>(pp. 7-20) | The Court should impose a "bellwether" schedule in Murad for all discovery in this matter—including pretrial document and written discovery—wherein a select number of the 869 Plaintiffs' cases would proceed through full discovery in advance of a bellwether trial. | Each of the *Murad* Plaintiffs is seeking millions of dollars in damages based upon alleged individualized harm. Defendants need, and are entitled to, discovery from each Plaintiff to ascertain the nature and causes of their alleged unique injuries, particularized damages, and the individualized circumstances surrounding each of their claims. Plaintiffs cannot meet the stringent requirements for a stay of their discovery obligations, which would frustrate the efficient resolution of these cases. Only after Defendants obtain the discovery owed will they be able to discuss which depositions are necessary and, ultimately, whether a potential bellwether trial structure should be proposed. |
| **B. Plaintiffs' Request for a 30(b)(6) Deposition on Discovery "Without Prejudice" to a Second 30(b)(6) Deposition**<br><br>(pp. 20-35) | The Court should allow Plaintiffs to take a Rule 30(b)(6) deposition about Defendants' document-preservation efforts. This deposition is important for Plaintiffs to obtain information relevant to their forthcoming spoliation motion and to evaluate the sufficiency of Defendants' ongoing ESI searches. Interrogatories – through which Plaintiffs have tried and failed to obtain the answers – are not a substitute for a corporate deposition at this stage. This deposition should not preclude Plaintiffs from noticing a second Rule 30(b)(6) deposition on merits topics. | Plaintiffs' disfavored request for "discovery on discovery" through a 30(b)(6) deposition on Defendants' data collection and preservation efforts should be denied. Defendants have already provided extensive written interrogatory responses on these topics (and then supplemented them to respond to additional questions) based on a comprehensive review of their records, which were intended to capture all material non-privileged information in Defendants' possession on this topic. Plaintiffs are free to file a spoliation motion (which Defendants believe has no merit), but the issue here is whether there are deficiencies in the interrogatory response that could be addressed through a 30(b)(6) deposition. Plaintiffs have identified none, and if there are legitimate additional questions the parties should meet and confer, and the appropriate discovery vehicle would be further |

| | | |
|---|---|---|
| | | supplementation of the interrogatory responses. |
| **C. Plaintiffs' Responses to Defendants' Interrogatory Nos. 12, 13, 17-22**<br><br>(pp. 35-41) | The Court should not require Plaintiffs to answer Defendants' contention interrogatories while fact discovery is underway. These interrogatories do not seek facts within Plaintiffs' personal knowledge. Rather, they concern Defendants' conduct and hinge on information in Defendants' possession. Fact discovery and expert input are necessary to respond to the interrogatories. | Plaintiffs should provide at this time much-needed information in response to Defendants' Interrogatory Nos. 12, 13, and 17-22, which seek basic information about the allegations in Plaintiffs' Complaints. Defendants have been directed to respond to similar interrogatories before the close of fact discovery, and Plaintiffs should be held to the same standard and requirements. Plaintiffs' responses to these interrogatories will allow Defendants to better understand Plaintiffs' claims and direct their own discovery efforts to prepare their defense. |

## II. Update on Parties' Progress on Document Discovery

**Plaintiffs' Position:** Since the beginning of merits discovery, Plaintiffs have made eight productions on a rolling basis, encompassing over 1,200 documents responsive to agreed-upon requests. Most *Foley* Plaintiffs have now produced at least one record. Plaintiffs continue to diligently collect documents, including through the issuance of third-party subpoenas to federal government agencies and the submission of records requests to other third parties such as medical providers.

The parties have also agreed to an interim substantial-completion deadline of May 1, 2026 for many documents. Plaintiffs have agreed to the May 1 date for all discovery requests that the parties have reached agreement on about the substance of the request.[1] For responsive documents that are currently in the possession, custody, or control of a third party (e.g., certain medical records that are with a provider), Plaintiffs will make every effort to produce these documents by May 1 but cannot at this time make this guarantee.

[1] *Murad* Plaintiffs have not agreed to this substantial completion deadline.

Defendants have agreed to a May 1, 2026 substantial-completion deadline for targeted searches that are not dependent on the parties' ESI protocol, including for HR files of relevant employees, relevant communications with DOJ, remaining financial records, and documents (if any were preserved) from Lafarge Middle East & Africa Building Materials ("LMEA") files responsive to Plaintiffs' Requests for Production Nos. 44-50 and 99-100. Plaintiffs further understand that Defendants have further agreed to, by the week of April 6, 2026, offer a substantial-completion deadline for their TAR review for the remaining ESI materials.

Defendants' concern that the *Murad* plaintiffs are not proceeding with document collection is unfounded; counsel are actively corresponding with the large number of plaintiffs to collect documents in their possession, produced nearly 850 documents detailing plaintiffs' citizenship status just last week, and will produce those same documents for all but a handful of the remaining plaintiffs this week.

**Defendants' Position:** Since the Parties' February 13, 2026 joint status report, Defendants have made three more merits discovery productions, on February 25, 2026, March 11, 2026, and March 25, 2026,[2] consisting of an additional 18,820 documents and 94,258 pages, for a total of 54,202 documents and 249,060 pages produced since merits discovery began. At the same time, Defendants have worked diligently with Plaintiffs to finalize a Technology-Assisted Review ("TAR") protocol to expedite future productions and substantial completion, while also continuing to review substantial volumes of documents already in the review queue. After lengthy good-faith negotiations over the TAR protocol in which counsel for *Murad* Plaintiffs participated (and appeared to be leading on behalf of Plaintiffs in all related cases), on the precipice of final

[2] On March 18, 2026, Defendants also produced all prior jurisdictional and merits productions to the *Murad* Plaintiffs.

agreement, the *Murad* Plaintiffs proposed last-minute, expansive demands—including the addition of new search terms to be incorporated into the TAR corpus—which fundamentally altered the agreements that had been negotiated to this point and that Defendants thought were settled. These eleventh-hour changes materially expand the review universe, unreasonably increase burdens and costs, and jeopardize the Parties' ability to move discovery forward efficiently.[3] Nonetheless, in order to avoid an impasse, Defendants agreed to incorporate the new search terms and kicked off the TAR model on Friday, March 20, 2026. Given the uncertainties resulting from Plaintiffs' eleventh-hour changes, however, Defendants are not yet able to provide an estimated date for substantial completion of what will be further voluminous productions. Before such an estimate can be reliably offered, Defendants must first stand up the TAR model, train it on the agreed-upon corpus, conduct the required rounds of quality control and validation, and ensure that the model has stabilized. Defendants anticipate being able to provide an estimated substantial-completion date during the week of April 6, 2026, contingent on Plaintiffs not requesting the addition of further search terms or seeking any other changes to the TAR protocol. In the interim, Defendants will continue to collect targeted documents, conduct linear review of documents in the queue, and make rolling productions of responsive, non-privileged documents, which include LMEA documents Defendants are producing on March 26, despite Plaintiffs' suggestion, *supra* at 5, that no such documents exist.

---

[3] These new inputs require additional review cycles and quality-control processes, involving more reviewers and more time to ensure a reliable model. Moreover, Defendants cannot presently determine whether the material already reviewed will remain usable under Plaintiffs' newly proposed terms, creating a real risk of having to revisit or redo work already completed and thereby resetting the process entirely. This uncertainty also extends to documents that are not suitable for inclusion in the TAR workflow, such as spreadsheets, images, and other non-indexable file types, which cannot be processed by the model and therefore may require linear review.

Defendants are concerned that Plaintiffs' own document collection, review, and productions are proceeding too slowly to meet their substantial-completion date of May 1. *Finan* and *Shirley* Plaintiffs have not made any productions since January, and *Foley* and *Black* Plaintiffs have provided a single collective production of a mere 61 documents since the last hearing, comprised almost entirely of public records, a few autopsy reports, and identification information. Defendants continue to await key categories of documents from Plaintiffs, including documents supporting Plaintiffs' alleged economic damages, mental health injuries, and physical injuries. Defendants are also concerned that the *Murad* Plaintiffs apparently are not proceeding with document collection, review, and productions, as they now seek a unilateral stay of their discovery obligations for most of their plaintiffs under the guise of a "bellwether" approach to discovery. Finally, across all the cases, Plaintiffs have not produced a single medical record and Plaintiffs have stated that they cannot at this time guarantee substantial production of those medical records by May 1, which means that Defendants will not have the necessary Plaintiffs' documents to timely commence depositions.

While Defendants recognize that the Parties' respective volumes of documents and responsive materials may not be symmetrical, this does not mean that Plaintiffs can avoid the responsibility of timely collecting, reviewing, and producing their relevant emails, digital documents, hard copy documents, and other materials. The discovery schedule and rules apply equally to all Parties.

## III. <u>Disputes Regarding Discovery</u>

### A. *Murad* Plaintiffs' Bellwether Proposal for Written and Document Discovery

**Plaintiffs' Position:**

#### 1. Relevant Background

The 869 Plaintiffs in the *Murad* case are Yazidi-Americans who were injured by terrorist attacks carried out by the Islamic State in Iraq and Syria ("ISIS"). See Complaint ¶ 1. The number of plaintiffs in the *Murad* case alone vastly exceeds the number of plaintiffs in the eight other related Lafarge cases combined. The parties—and the Court—appear to agree that trial and even depositions will not encompass all 800-plus plaintiffs, leaving open the question of when and how the case will be narrowed in the lead-up to trial. Mar. 10 Tr. at 38:20-25.

Defendants mischaracterize the *Murad* plaintiffs' longstanding interest in imposing an efficient case management plan like that imposed in similar cases as a request for a stay of discovery. The *Murad* plaintiffs are not seeking a stay, and case law Defendants cite is inapposite. The Court should instead be guided by the example of other federal courts that have used bellwether structures to efficiently manage discovery in similar terrorism cases with large numbers of plaintiffs.

On February 25, 2026, Plaintiffs' counsel requested a meet and confer with Defendants' counsel to discuss a bellwether proposal across several related cases against Defendants, consistent with how other federal courts have handled similar cases. A. Goldstein Email (Feb. 25, 2026). Defendants' counsel has misinterpreted this request as a request to stay discovery—which Plaintiffs' counsel is not seeking. Although Defendants indicated they were open to discussing at a later time a bellwether structure for depositions and trial, they took the position that a bellwether structure was inappropriate for document and other written discovery and accused Plaintiffs' counsel of raising a bellwether structure in a bad faith attempt to obtain a stay of discovery. On Wednesday, March 18, 2026, the parties confirmed they were at an impasse on a bellwether structure that would apply to all stages of discovery for purposes of the *Murad* action.

**2. *Murad* Plaintiffs' Position**

"The Court possesses significant discretion . . . to modify the sequence or timing of discovery" pursuant to Rule 26(d). *Avila v. Target Corp.*, No. 21-CV-907, 2021 WL 4311142, at *3 (E.D.N.Y. Sept. 22, 2021) (citing 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2047 (3d ed. 2021) ("Upon a proper showing, however, the court could make whatever order about sequence and timing of discovery the necessities of a case required.")); *see also McCovey v. TJX Companies, Inc.*, No. 22-cv-2570, 2022 WL 18858976, at *1 (E.D.N.Y. July 13, 2022) (similar).

Courts routinely exercise this authority to phase pretrial discovery in ways that promote efficiencies, even over the objections of some parties. *See, e.g.*, *DMJ Assocs., L.L.C. v. Capasso*, 228 F. Supp. 2d 223, 232 (E.D.N.Y. 2002) (modifying phased discovery over defendant's objection); *see also Kwik Ticket Inc. by Shamah v. Spiewak*, No. 20-cv-01201, 2020 WL 5658723, at *1 (E.D.N.Y. Sept. 23, 2020) (denying motion for preliminary injunction to stay court order requiring defendant to participate in discovery for the purpose of advancing settlement); *Alli v. Steward-Bowden*, Case No. 11-cv- 4952, 2013 WL 5229995, at *2 (S.D.N.Y. Sept. 17, 2013) ("Staging discovery in this case, however, may make sense . . . The Magistrate Judge may also wish to consider whether discovery in this case may be coordinated with . . . discovery in other pending cases against [Defendant].").

Especially when it is clear that a bellwether structure is likely to be imposed for trial due to the numerosity of plaintiffs, courts have routinely exercised their discretion to authorize a corresponding approach for discovery, to allow the parties to focus on a select group of representative plaintiffs while temporarily deferring discovery of other plaintiffs. *See, e.g.*, *Fernandez v. Kinray, Inc.*, No. 13-cv-4938L, 2017 WL 744562, at *1 (E.D.N.Y. Feb. 23, 2017) (limiting discovery to 19 "bellwether" plaintiffs identified by stipulation of the parties); Order,

*HSBC Bank USA, N.A. v. NCUA*, Case No. 15-cv-02144, (S.D.N.Y. Aug. 11, 2020) (limiting discovery to bellwether trusts); *United States v. Afram Lines (USA), Ltd.*, 159 F.R.D. 408, 409 (S.D.N.Y. 1994) ("[T]he Court selected fifteen bellwether cases to proceed to trial. Discovery has been held in abeyance in the remaining cases in the expectation that resolution of the bellwether cases may encourage settlement of the rest."). This is true in terrorism cases in this circuit and elsewhere. Courts and parties have crafted bellwethers that allow the efficient prosecution of claims. *See, e.g.*, *King v. Habib Bank Ltd.*, 20-cv-4322 (S.D.N.Y) (case with similar ATA claims); *In Re: Chiquita Brands*, 08-md-01916 (S.D. Fla.) (case with claims under the Alien Tort Statute).

Consistent with this authority, the *Murad* Plaintiffs respectfully request that the Court impose a "bellwether" schedule for discovery in this matter, wherein a select number of plaintiffs' cases would proceed through full discovery in advance of trial. *See* Fed. R. Civ. P. 26(d); Plaintiffs propose that the choice of bellwethers be randomized in proportion to easily ascertainable types of injury already pled (e.g. hostages, injury, property damage, family member killed, captured, or injured), consistent with prior guidance from the Court. *See Foley v. Lafarge*, 23-cv-05691-NGG-PK (E.D.N.Y.), March 3, 2026 Tr. 72:23-24 ("Or you have a randomized process, where you just agree on things -- objective things like the attacks and then you just pick random people from that group. That to me seems a more doable thing. And I would encourage the parties to take that approach."). That would allow the parties and the Court to focus their resources efficiently on representative claims and ensure no asymmetrical advantage to Plaintiffs when choosing bellwether plaintiffs.

Adopting a bellwether structure for discovery would promote efficiency by avoiding the disproportionate expenditure of party and judicial resources that sprawling discovery of 869 plaintiffs would demand. Requiring full discovery from all 869 Plaintiffs simultaneously would

mean 869 sets of interrogatory responses, document productions from 869 individuals, 869 productions of highly sensitive medical, psychological, and financial records, and 869 depositions—all to be negotiated, reviewed, processed, and potentially disputed in parallel. Every individual discovery dispute that arises over scope, completeness, or privilege would require Court intervention, multiplied across hundreds of plaintiffs at once.

A bellwether discovery structure would streamline the Court's resolution of discovery disputes by focusing the parties' attention on disputes as to a more manageable number of parties, establishing a framework that can ultimately be applied to similar disputes among the non-bellwether plaintiffs, and promoting informed settlement discussions if the parties decide to engage in such discussions. These efficiencies are especially salient here, where the 869 Plaintiffs and claims arise out of ISIS's August 2014 attack on Sinjar Mountain, just shortly after Lafarge paid significant sums to ISIS, and Plaintiffs' discovery will primarily hinge on the different categories of injuries the *Murad* Plaintiffs suffered as a result of this genocidal attack.

Plaintiffs will be prepared at the status conference to discuss specific parameters of "bellwether" plaintiff selection, including intermediate measures such as proposed randomized selection in proportion to easily ascertainable types of injury and jointly drafted questionnaires of Plaintiffs, to ensure that the parties operate on an equal informational footing, that the selected Plaintiffs are representative of the plaintiffs as a whole, and that certain legal issues can be resolved on the basis of the bellwether cases. *Cf. Zito v. Leasecomm Corp.*, 233 F.R.D. 395, 399 (S.D.N.Y. 2006) (emphasizing these criteria but declining to impose bellwether structure where, unlike in Murad, they were lacking).

Defendants selectively quote the March 3, 2026 hearing transcript to suggest the Court foreclosed bellwether discovery in *Murad*, but the transcript does not support that reading. The

hearing focused on discovery disputes in *Foley*, and *Murad* was not discussed. At that hearing, the Court expressed concern about informational asymmetry: namely, that *Foley* Plaintiffs' counsel appeared to already have access to their clients' medical records while Defendants did not, making the theoretical discussion of a bellwether selection process that would be curated by Plaintiffs' counsel in *Foley* seem unfair. *See* Mar. 3 Tr. at 72:17–73:14. The Court expressed concern about one-sided selection of bellwether plaintiffs where "Plaintiffs have all the information and say, hey, how about these five people." *Id.* at 77:18–20. The Murad Plaintiffs' proposal addresses that concern directly by proposing jointly drafted questionnaires to Plaintiffs who have been randomly selected in proportion to legally pertinent categories of injuries, as pled. This structure would resolve concerns of information asymmetry and implement the "randomized" approach the Court endorsed. *Id.* at 74:4–6, 79:8–10.

Defendants' reliance on *Adams v. Deva Concepts, LLC*, 2023 WL 6518771 (S.D.N.Y. Oct. 4, 2023), actually supports the *Murad* Plaintiffs' position. The district court in *Adams* held that "plenary discovery must be conducted for now, pending later consideration of a possible bellwether trial process" because it lacked "sufficient information to identify . . . the pertinent characteristics and categorization of the plaintiffs, as different clusters of plaintiffs may have different attributes." *Id.* at *1. The jointly drafted questionnaires the *Murad* Plaintiffs propose are designed to supply exactly that information—organizing Plaintiffs by injury type and relationship to the August 2014 Sinjar attack—so that the Court will have precisely the "pertinent characteristics and categorization" that *Adams* identified as the prerequisite for a sound bellwether structure. Moreover, a targeted, jointly administered questionnaire will allow for the efficient implementation of a bellwether structure, without requiring full-scale document production and written discovery from all 869 Plaintiffs before that structure can be assessed. These types of

questionnaires are regularly used as a case management tool to streamline discovery, including in ATA cases. *See, e.g.*, *Linde v. Arab Bank*, No. 04-cv-2799 (E.D.N.Y. June 15, 2009) (Dkt. 565) (at direction of court in ATA case, submitting questionnaire for distribution to plaintiffs to collect information on damages five years in advance of trial, including information on direct physical injuries, direct and indirect emotional injuries, incident specifics, and other items); Order, *In re Gold King Mine Release in San Juan Cnty., Colorado*, No. 1:18-cv-00744-WJ-KK (D.N.M. Aug. 26, 2019) (Dkt. 282) (ordering completion of select plaintiff questionnaires designed "to alleviate the need for interrogatories" and to otherwise "streamline" the discovery process (quoting Mot., *In re Gold King Mine Release in San Juan Cnty., Colorado*, No. 1:18-cv-00744-WJ-KK (D.N.M. Nov. 8, 2019) (Dkt. 370)); *McClurg v. MI Holdings, Inc.*, No. 4:12-CV-00361-AGF, 2014 WL 13116969, at *1 (E.D. Mo. Sept. 24, 2014) (ordering use of party-drafted questionnaires to ascertain who among numerous plaintiffs should proceed to full discovery); The primary goal of the Plaintiff questionnaires is to enable Defendants to assess damages and assist the parties in meaningful settlement discussions—addressing exactly the concern Defendants claim to have.

Defendants frame this dispute as a choice between full discovery now and a stay, but that is a false dichotomy. The real choice is between structured, phased, and efficient discovery of a representative bellwether group and the unmanageable sprawl that would result from simultaneous plenary discovery of 869 individual Plaintiffs—something that makes little sense given the inevitability that trial will be conducted on a bellwether basis due to the number of Plaintiffs. Rule 26(d) expressly authorizes the Court to order discovery conducted in phases and to modify the sequence and timing of discovery in the interests of justice, and courts in this Circuit have exercised that authority to impose exactly the kind of structure the Murad Plaintiffs propose.

Defendants' request that this court apply the three-factor stay standard drawn from *United States v. Veeraswamy*, 347 F.R.D. 591 (E.D.N.Y. 2024), imports the wrong legal framework. As an initial matter, Defendants' insistence that this is a stay is a red herring. And *Veeraswamy* involved a request to stay proceedings indefinitely pending the resolution of a motion to vacate the defendant's default. In contrast here, a motion to phase or sequence discovery is governed by Rule 26(d)'s "convenience and interests of justice" standard, not by the test courts apply to an indefinite or permanent stay of discovery. Rule 26(d) expressly authorizes the Court to order discovery conducted in phases and to modify the sequence and timing of discovery in the interests of justice, reflecting that phased discovery is a routine case management tool, not an extraordinary remedy requiring any heightened showing. *See, e.g.*, *Avila*, 2021 WL 4311142, at *3 (E.D.N.Y. Sept. 22, 2021) ("[T]the Court is not convinced that Rule 26(c) is the appropriate vehicle when one seeks to alter the sequence of discovery rather than obtain a true protective order with conditions to avoid embarrassment, harassment, prejudice and the like.").

In any case, Defendants will suffer no cognizable prejudice from sequenced bellwether discovery. The information they need from individual *Murad* Plaintiffs—evidence of personal injuries, damages, and relationships to the Sinjar attack—will be fully available to them through the bellwether process, just on a sequenced rather than simultaneous basis. Moreover, the core facts that will determine liability in this case concern Defendants' own conduct: their alleged payments to ISIS, their alleged conspiracy with terrorist organizations, and the attacks that followed. That evidence resides with Defendants, not with individual Yazidi-American Plaintiffs, and it is being produced regardless of how Plaintiffs' discovery is sequenced. Defendants will have ample opportunity to obtain the individualized damages and injury information they seek; a bellwether structure simply ensures they do so in a manner that is efficient and proportionate to

the realities of this litigation rather than through a process designed to overwhelm the parties and the Court alike.

**Defendants' Position:** Each individual Plaintiff in *Murad* must provide written discovery responses and produce documents regarding his or her individual claims. Plaintiffs have exclusive access to such information and unless they produce it in discovery, Defendants will not have the information necessary to conduct depositions, develop and analyze relevant facts, brief summary judgment motions, engage in meaningful settlement discussions, prepare for and participate in a trial, and/or otherwise resolve these cases. Counsel to the *Murad* Plaintiffs have suggested it would be too burdensome to produce discovery regarding each individual Plaintiff, and it "was never [their] expectation that [they] would be … collecting full medical records for 900" Plaintiffs. Ex. A, Mar. 3, 2026 Motion Hr'g Tr. ("Mar. 3 Tr.") at 75:15-21. As the Court observed, however, "when Plaintiffs bring a case, it is Plaintiffs' counsel who has … the ability to have one Plaintiff or 900." *Id*. at 76:13-18. Plaintiffs made their choice to bring claims on behalf of nearly 900 individuals, *each* of whom seeks many millions of dollars in damages and collectively who seek billions of dollars in damages. Counsel cannot avoid producing necessary discovery by seeking a stay of their discovery obligations under the guise of a bellwether approach.

This is not to say that a bellwether approach is never appropriate. Defendants are open to discussing such an approach to trial, but only after they have obtained through discovery the information necessary to make an informed assessment. The Court was clear with the Parties: if Defendants are "not open to a bellwether discussion … that's it. Door closed." Ex. A, Mar. 3 Tr. at 81:16-21. Nor will the Court "force Defendants to be limited to [a bellwether discovery process] unless they also agree to it." *Id.* at 64:6-9. Although Defendants are open to a bellwether approach for trial and do not expect to depose every Plaintiff, Defendants informed the *Murad* Plaintiffs

multiple times, both in writing and during the Parties' March 12 and March 18 meet-and-confers, that they do not consent to any bellwether approach to discovery or to any stay of written and document discovery under the guise of such an approach. *See* Ex. B, A. Zureick Feb. 18, 2026 Email; Ex. C, E. Hughes Feb. 12, 2026 Email.

Plaintiffs claim Defendants have mischaracterized their proposal as an indefinite stay of discovery. But Plaintiffs themselves explained their proposal as an indefinite stay of discovery for the vast majority of Plaintiffs. *See* Ex. H, A. Goldstein Feb. 25, 2026 Email ("[o]nce we have a slate of bellwether attacks and plaintiffs, all discovery as to non-bellwether plaintiffs and all party-facing discovery as to non-bellwether attacks would be stayed"). That the proposed stay would continue through any trial (and subsequent appeals) makes it an indefinite stay for almost all Plaintiffs.

The party seeking a unilateral stay of discovery—here, Plaintiffs—faces a high burden. *See United States v. Veeraswamy*, 347 F.R.D. 591, 605 (E.D.N.Y. 2024) ("'The burden is on the movant to establish that a stay is warranted.'"). That party must: (1) make "a strong showing that the [nonmovant's] claim is unmeritorious"; (2) "demonstrate the breadth of discovery and the burden of responding to it"; and (3) establish that there is no "risk of unfair prejudice to the party opposing the stay." *Id.* The issuance of a stay is by no means automatic. *White v. UMG Recordings, Inc.*, 2021 WL 12284420, at *1 (S.D.N.Y. July 12, 2021).

These factors decisively weigh against staying discovery for the *Murad* Plaintiffs. In particular, the third factor is fatal to any request for a stay: allowing the *Murad* Plaintiffs to withhold critical information that only they possess would unfairly prejudice Defendants by depriving them of the information necessary to develop the facts, take depositions, brief summary judgment motions, engage in settlement discussions, and/or prepare for trial. More broadly, it

would impair Defendants' right to defend themselves against Plaintiffs' claims. *See Luxury Cars of Bayside, Inc. v. BMW of N. Am., LLC*, 2026 WL 592530, at *6 (E.D.N.Y. Mar. 3, 2026) (finding that a stay would prejudice the nonmoving party "because it would impair the right to prove the unlawful conduct"); *cf. Califano v. Roman Cath. Diocese of Rockville Ctr., N.Y.*, 751 F. Supp. 3d 42, 55 (E.D.N.Y. 2024) (holding that discovery was necessary to discern whether certain exceptions applied that would have neutralized plaintiff's allegations).

With respect to the burden of discovery, a stay of the *Murad* Plaintiffs' discovery obligations would have a lopsided, adverse impact on Defendants because only Plaintiffs would enjoy relief if a stay were granted. Finally, there is no pending dispositive motion before the Court such that the Parties would benefit from a complete stay of all discovery (not merely discovery directed at Plaintiffs) until that motion was resolved. *See Sharma v. Rent the Runway, Inc.*, 2025 WL 1425583, at *3 (E.D.N.Y. May 16, 2025) (finding this factor weighed in favor of the nonmoving party as the court had denied in part the moving party's motion to dismiss).

The *Murad* Plaintiffs' proposed bellwether approach to discovery also would not serve the interests of judicial economy. The burdens on the Court would remain more or less the same, in part because disputes that arise in a bellwether discovery process would still require discovery conferences, Court oversight, motions practice, and Court orders.

In addition, Plaintiffs' authorities do not support their bellwether discovery proposal. None of their cases concerning phased pretrial discovery over a party's objections involved a wholesale stay of discovery as to certain parties. And in *Kwik Ticket*, the court denied the motion to stay in part because it concluded that discovery would help the parties "evaluat[e] the possibility of settlement," 2020 WL 5658723, at *1, which is also true of ongoing discovery here. Plaintiffs' bellwether cases are also inapposite. *Fernandez* involved a bellwether structure that the "parties

[had] agreed" to, 2017 WL 744562, at *1 (E.D.N.Y. Feb. 23, 2017), imposed *only after plaintiffs had* "responded to [d]efendants' discovery requests," No. 13-cv-4938 (E.D.N.Y.), Dkt. 272. So, too, in *King Habib* the parties agreed on a bellwether approach to discovery that all parties proposed in the initial case management plan. No. 20-cv-4322 (S.D.N.Y), Dkt. 67. *Chiquita* involved not one case, but multiple cases that were consolidated in an MDL-proceeding for all pretrial purposes, from which the parties proposed certain bellwether cases. *See* No. 08-md-01916 (S.D. Fla.), Dkt. 1246, 1264. *Afram Lines* involved "fifty related … cases" that were consolidated for discovery, from which the court selected bellwether cases "[w]ith the cooperation of the parties." 159 F.R.D. at 409. And *HSBC Bank* similarly involved bellwether discovery imposed over two class actions and two other related actions, not among plaintiffs in a single action. No. 15-cv-02144, Dkt. 71 (S.D.N.Y.).

Defendants should not be forced to accept or reject any bellwether process before they have the discovery necessary to make an informed choice. As Plaintiffs' own authorities acknowledge, "nothing in Rule 26(d) contemplates sequencing discovery for tactical advantage to one party over another." *Avila v. Target Corp.*, 2021 WL 4311142, at *3 (E.D.N.Y. Sept. 22, 2021). Without document productions and written discovery responses from the *Murad* Plaintiffs, Defendants will remain at a severe information deficit regarding the *Murad* Plaintiffs' alleged circumstances, injuries, damages, and claims. The Court too needs such information to assess the possible use of any bellwether trial process. *See, e.g.*, *Adams v. Deva Concepts, LLC*, 2023 WL 6518771, at *1 (S.D.N.Y. Oct. 4, 2023) (holding that "plenary discovery must be conducted for now, pending later consideration of a possible bellwether trial process" because "the court requires sufficient information to identify … the pertinent characteristics and categorization of the plaintiffs, as different clusters of plaintiffs may have different attributes") (internal quotations omitted).

The *Murad* Plaintiffs have suggested that a randomized bellwether proposal could be used to mitigate the harm to Defendants from the lack of information, but the random selection of plaintiffs has other drawbacks. To begin, randomly selected plaintiffs likely would not be representative of all the other plaintiffs, which would mean that issues unique to certain plaintiffs would be left unaddressed and unresolved. Indeed, each of the nearly 900 *Murad* Plaintiffs is seeking millions of dollars in damages based on individualized allegations, claims, injuries, and damages. Shielding any individual Plaintiffs from discovery through a bellwether approach—even a randomized one—would be unfair and prejudicial to Defendants because it would deprive Defendants of the information necessary to assess the strengths and weaknesses of each Plaintiff's claims, not only for purposes of formulating further discovery but also for purposes of any settlement discussions, summary judgment motions, and trial. And in any event, the Court already stated that if Defendants "are not open to the discussion of negotiated randomized sampling in this case, then that's fine." Ex. A, Mar. 3 Tr. at 81:4-5.

Plaintiffs' suggestion that a "questionnaire" would ensure the Parties operate on an equal informational footing is not correct. Plaintiffs have far more information about their individual circumstances and claims than would be provided to Defendants in any short-form questionnaire. The Federal Rules make clear that discovery shall consist of interrogatories, requests for admissions, requests for the production of documents, and depositions. Short-form questionnaires are no substitute for the discovery to which Defendants are entitled under the Federal Rules. And Defendants have already served requests for written information about each individual Plaintiff—including the interrogatories and requests for the production of documents served in accordance with the Federal Rules—which Plaintiffs seek to avoid answering through their proposed short-form questionnaires coupled with an indefinite stay.

As the Court observed, discussion of bellwether trials is "obviously [] sometime off." Ex. D, Mar. 10, 2026 Premotion Conference Tr. at 38:16-19. Defendants must first receive sufficient information to determine who and how many Plaintiffs should be deposed, and which, if any, Plaintiffs are representative of other claimants.

The *Murad* Plaintiffs' request for a stay of discovery under the guise of a bellwether approach should be denied.

**B. Plaintiffs' Request for a 30(b)(6) Deposition on Discovery "Without Prejudice" to a Second 30(b)(6) Deposition**

**Plaintiffs' Position:**

The Court should order Defendants to produce promptly a Rule 30(b)(6) witness on the document-preservation topics in the attached deposition notice. *See* Ex. 1. Those topics relate to the decade-old "Database" Defendants are using as their near-exclusive source for document discovery. *Id.* at 3. Plaintiffs have serious concerns about the Database and the reams of evidence it failed to preserve. So Plaintiffs intend to seek spoliation sanctions. A deposition is warranted to provide Judge Garaufis with a full record on which to decide that motion. It will also clarify the corpus of ESI Defendants are searching, helping the Court determine whether Defendants are justified in using the Database as a substitute for normal custodial collections. Given similar concerns during jurisdictional discovery, this Court already ordered Defendants to describe the "[D]atabase" then. *Foley* Minute Entry & Order (May 13, 2024). Yet years later – over halfway through merits discovery – Plaintiffs have more questions than answers. A deposition now is the best way to elicit those answers. The Court should order one within two weeks of the March 30 conference. And given the context, this deposition should not preclude Plaintiffs from noticing another corporate deposition on merits topics.

Since the beginning of this case, Defendants have premised their discovery responses on the Database. They compiled it largely "in 2016 through 2017" and used it to house "nearly two dozen terabytes of data" they say are relevant to the allegations here. *Foley* Dkt. 55-1 at 2-3 (Ex. 2). They compiled the Database not to satisfy their discovery obligations in U.S. civil litigation, but to aid their internal investigation in connection with a French criminal inquiry. *Id.* at 2. Yet Defendants still insist on mostly limiting discovery to the Database. That limit may be born of necessity: it appears Defendants have lost (or destroyed) large swaths of relevant evidence they chose not to include in their Database. That is unsurprising. Defendants went to great lengths to conceal their criminal scheme, including by falsifying evidence and refusing to cooperate with DOJ.[4] Their apparent destruction of incriminating evidence fits the pattern.

The examples of apparent document destruction are legion. The current Database does not appear to contain – and Defendants apparently failed to preserve – text messages or WhatsApp messages associated with the employees who carried out Defendants' criminal conspiracy with ISIS.[5] Defendants also never collected those employees' personal emails, even after instructing

[4] *See* Statement of Facts ¶ 18, *United States v. Lafarge S.A.*, No. 1:22-cr-00444-WFK (E.D.N.Y. Oct. 18, 2022), Dkt. 10-1 ("SOF") ("LAFARGE and LCS executives actively attempted to conceal their conduct" in part by "create[ing] invoices with false descriptions"); *id.* ¶ 62 ("LAFARGE executives were also directly involved in falsifying records"); *id.* at 43 ("LAFARGE and LCS Executives Falsify Records"); Plea Agreement ¶ 7(f), *United States v. Lafarge S.A.*, No. 1:22-cr-00444-WFK (E.D.N.Y. Oct. 18, 2022), Dkt. 10 (DOJ finding that Defendants neither "self-reported" nor provided "timely and full cooperation with [its] investigation").

[5] *Compare* Ex. 3 at 7-10 (Lafarge Resp. & Objs. to Plfs.' Second Set of Interrogs. (Jan. 29, 2026)) (text messages not preserved for 55 custodians); Ex. 4 at 3 (Feb. 20, 2026 Ltr. from A. Zureick to K. Bolas) ("no mobile phone data exists for any other custodian"), *with* Ex. 5 (ATA-M00055766 at -766, -767 (discussing evidence of ISIS payments communicated both through "calls" and "Skype"); Ex. 6 (ATA-M00053154) (Frederic Jolibois relaying by email a "Skype message by Amro Taleb"); Ex. 7 (ATA-M00097277) (discussing use of "SMS" to discuss meeting with "ISIS" regarding "the new agreement" between Lafarge and ISIS).

them to use their personal email accounts to discuss the conspiracy.[6] Defendants likewise failed to collect records associated with the Egyptian affiliate ("LMEA") they used to hide their payments to terrorists.[7] And they failed to collect documents from several other custodians too.[8] Defendants' recent suggestion that there were gaps in the investigation that led them to plead guilty – the same investigation that created the Database – only magnifies the problem.[9] Plaintiffs are entitled to explore these and other ways Defendants used the Database to spoliate evidence bearing on the terrorist conspiracy they admittedly tried to hide.

That is more than enough to justify a Rule 30(b)(6) deposition on spoliation topics. Courts permit "discovery on discovery" when there is an "adequate factual basis to justify" it. *CBF Industria de Gusa S/A v. AMCI Hldgs., Inc.*, 2019 WL 3334503, at *17 (S.D.N.Y. July 25, 2019); *see Winfield v. City of New York*, 2018 WL 840085, at *4 (S.D.N.Y. Feb. 12, 2018) ("Once . . . an adequate factual basis for the collateral issue discovery has been shown, the burden falls on the responding party to justify curtailing discovery."). The factual basis here is strong.[10] As the Court

---

[6] *See* SOF ¶ 88; Ex. 8 at 4-6 (Lafarge's Suppl. Resp. to Interrog. No. 9 (May 20, 2024)).

[7] Defendants admitted they "are not in possession of, and did not collect, documents of former employees of LMEA" in compiling the Database. *Foley* Dkt. 51-8 at 3. LMEA is LCS's Egyptian affiliate that Lafarge used to hide its payments to ISIS. *See Foley* FAC ¶¶ 178-183. Beyond just employee documents, Plaintiffs recently learned that Defendants also may not have preserved the financial or bank records belonging to LMEA – and that, at a minimum, such documents were not included in the Database.

[8] *See* Ex. 9 at 1 n.1 (Jan. 23, 2026 Ltr. from A. Zureick to C. Robinett) (requested custodians cannot be added because their "emails were not included in the document repository created from prior investigative efforts"); Ex. 10 at 4 (Feb. 5, 2026 Ltr. from A. Zureick to C. Robinett) (proposed custodian "cannot be added" because "his documents were not retained for the relevant time period").

[9] *See* 2/13/26 Hr'g Tr. 8:15-21, *Fields* Dkt. 109 (Defendants asserting that Statement of Facts "was entered into more than three years ago and was based on what was known and believed at the time. Very significantly, it did not have the benefit of the kind of discovery that we are beginning to undertake here and a full opportunity to test those facts, including, for example, depositions").

[10] Conversely, there is no factual basis for Defendants' request – made for the first time in this status report – to take reciprocal Rule 30(b)(6) depositions of Plaintiffs regarding their

recognized in jurisdictional discovery, "if the database wasn't adequate, then that's a problem. And I don't know if it was adequate because I don't know what was in it and what wasn't." 5/10/24 Hr'g Tr. at 14:12-15, *Foley* Dkt. 54. Discovery now has revealed significant problems with the Database. Plaintiffs are entitled to probe those problems. *See id.* at 52:16-55:17 (this Court previously permitting discovery about Defendants' spoliation).

Plaintiffs also intend to use the deposition to clarify the universe of documents Defendants now claim to be searching in discovery, given the significant gaps in what Defendants have produced to date. *See* Ex. 11 (Mar. 19, 2026 Email from L. Wolosky to J. Paikin) (describing gaps in discovery). This is a crucial threshold issue. The parties need to reach a shared understanding of what ESI is being searched as soon as possible. *E.g.*, 5/2/24 Tr. at 35:21-23, *Foley* Dkt. 49 ("[T]he first step in embarking on electronic discovery is to agree on the universe against which you are going to search your search terms."). Without more information, Plaintiffs lack any confidence that Defendants have satisfied their discovery obligations in this litigation. The Court should order a corporate deposition as soon as possible so Plaintiffs have sufficient time to fold the answers into discovery moving forward.

Defendants argue (at 27-29) that a deposition is improper because they lack firsthand knowledge of how the Database was created. That assertion only heightens Plaintiffs' concerns. Defendants are using the Database as the near-exclusive basis for discovery in this litigation. Ex. 11 at 2. They cannot maintain that position while disclaiming knowledge of its contents or creation. That is especially true because Defendants' IT department apparently played a role in the Database's creation, which means Defendants should indeed have knowledge. Ex. 3 at 6, 20.

---

efforts to collect and preserve documents. There is no evidence, and Defendants have cited none, of any spoliation by Plaintiffs that would justify this request.

In any event, a lack of first-hand knowledge does not absolve Defendants of their duty to educate a witness. If no current employee knows the answers, Defendants must obtain them from their counsel and vendors. *See Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 2013 WL 1286078, at *3 (S.D.N.Y. Mar. 28, 2013) (information available to corporation through its membership on third-party board "falls within information known or available to [it]" for purposes of Rule 30(b)(6) deposition); *Great Am. Ins. Co. of New York v. Vegas Const. Co.*, 251 F.R.D. 534, 539 (D. Nev. 2008) ("The fact that an organization no longer has a person with knowledge on the designated topics does not relieve the organization of the duty to prepare a Rule 30(b)(6) designee."). And if Defendants truly do not know and are unable to obtain the answers to Plaintiffs' questions, then Plaintiffs are entitled to that admission in sworn testimony.

Defendants also object to this deposition because they say the information is better sought through interrogatories. But "courts have [] typically treated oral depositions as a means of obtaining discoverable information that is preferable to written interrogatories." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 n.2 (2d Cir. 2003); *see Power Home Solar, LLC v. Sigora Solar, LLC*, 339 F.R.D. 64, 81 (W.D. Va. 2021) (similar). That axiom holds true here. Plaintiffs already sought this information through interrogatories. *See* Ex. 3. But the answers were deficient, *id.*, forcing Plaintiffs to write a 5-page letter spelling out many of the gaps, Ex. 12 (Feb. 5, 2026 Ltr. from K. Bolas to A. Zureick). Defendants responded with a 4-page letter of their own, which answered some questions while ignoring others and raising new ones. Ex. 4 (Feb. 20, 2026 Ltr. from A. Zureick to K. Bolas). Continuing to exchange letters on these topics is not efficient. A deposition – where Plaintiffs can ask follow-up questions and examine an educated witness in real-time – is the best way for Plaintiffs to obtain answers.

The questions left unanswered by Defendants' interrogatory responses are too varied to capture exhaustively in this status report. But they include:

- Defendants have not explained why they failed to preserve mobile-phone data for 55 of the 60 custodians in the Database. Ex. 3 at 7-10. Plaintiffs intend to seek spoliation sanctions on this basis (and others), and they are entitled to crystallize the facts surrounding Defendants' apparent failure to preserve highly relevant evidence.

- Defendants collected from a "Global" custodial file that "includes financial records from the files of Defendants" but have not explained where those files came from or what they contained. Ex. 3 at 10. This matters because Defendants' productions appear to omit important bank records. Ex. 13 (Mar. 13, 2026 Email from E. Maier to Defs.' counsel).

- Defendants said they issued litigation-hold notices in May 2016 but have not identified who received the notices or when. Ex. 3 at 20. And although they state "additional notices were circulated to other potentially relevant employees" at a later date, they also do not identify who those individuals are or when the notices were issued. *Id.* The details of these litigation holds could be important for Plaintiffs' spoliation motion.

- The Database does not contain any ESI for at least eight relevant employees. Ex. 10. Based on Defendants' representations (at 31 & nn.16-17), they have "retained" incomplete data for those individuals, but they have not processed it, so it is not in the Database. Defendants have not explained why their documents were omitted.

- On a meet-and-confer call last week, Plaintiffs learned for the first time that the Database does not contain financial or bank records for the "LMEA" entity that Defendants used to hide their payments to ISIS. *Foley* FAC ¶¶ 178-90. Defendants have not explained that omission. And while Defendants told Plaintiffs two days ago they have found elsewhere some of LMEA's general ledger data and manual journal entries, they have not confirmed whether that information is complete nor whether additional LMEA data was preserved.

- On a meet-and-confer call last week, Plaintiffs also learned for the first time that the Database apparently does not contain original bank statements for the accounts Defendants used to funnel money to terrorists. Instead, it appears to contain *internal* Lafarge documents purporting to summarize or excerpt those statements. Given Defendants' history of falsifying records to hide their illegal payments, Plaintiffs' experts are entitled to examine the original bank statements for the relevant accounts.

Defendants below (at 31-33) purport to explain some of these gaps for the first time. That Plaintiffs are just now learning new information in the context of a joint status report – some of

which contradicts what Defendants represented earlier[11] – highlights why a deposition is warranted. Plaintiffs served interrogatories on these document-preservation issues more than three months ago and have not come close to obtaining all the information sought. Courts often order Rule 30(b)(6) depositions in such circumstances.[12] This Court should, too.

Last, this deposition should not foreclose Plaintiffs from conducting another Rule 30(b)(6) deposition on merits-related topics later. Courts routinely grant such relief. *E.g.*, *Capitol Records, LLC v. Mellerski*, 2024 WL 5433254, at *11 (S.D. Fla. Feb. 26, 2024) (permitting "initial Rule 30(b)(6) depositions" into spoliation topics and noting that these depositions "are without prejudice to Plaintiffs taking a second 30(b)(6) deposition later").[13] For good reasons: there are few efficiencies to be gained by preparing a Rule 30(b)(6) witness (or witnesses) on the disparate topics of document preservation and previous Syrian activities at the same time. It also makes sense to explore document-preservation issues earlier in discovery, when there is still time to

[11] For example, Defendants state (at 31 n.17) that they have "retained the data for seven" of eight custodians discussed above. If Defendants are saying they have the complete custodial files of each of these individuals, that contradicts what they previously told Plaintiffs. *See* Ex. 15 at 2-3 (Feb. 4, 2026 Ltr. from C. Robinett to A. Zureick). Nor did Plaintiffs ever agree that these individuals were of "tangential relevance." Plaintiffs explained that these individuals possessed key information but did not insist on their inclusion as custodians because we understood their custodial files were not preserved. *Id*.

[12] *See, e.g.*, *Korbel v. Extendicare Health Servs., Inc.*, 2015 WL 13651194, at *16 (D. Minn. Jan. 22, 2015) (compelling deposition of "a Rule 30(b)(6) deponent that is fully prepared to answer questions regarding Defendants' email system and related preservations efforts and searches" to facilitate "an informed spoliation analysis"); *Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 77 (D. Conn. 2010) ("to the extent that questions remain unanswered by the interrogatories and documents already produced," party was "entitled to question a 30(b)(6) witness about the underlying facts and assumptions of the documents and investigations").

[13] Defendants' only case, *State Farm Mutual Auto Insurance Co. v. New Horizont, Inc.*, does not address spoliation. *See generally* 254 F.R.D. 227 (E.D. Pa. 2008). And even then, the Court there did order a second Rule 30(b)(6) deposition. *Id.* at 230, 235 n.7. The court instead denied a request for a third deposition. *Id.*

address them. Nor should Plaintiffs have to sacrifice their limited Rule 30(b)(6) time on merits topics because of Defendants' spoliation and discovery deficiencies.[14]

**Defendants' Position:** Plaintiffs' request for "discovery on discovery" through a Rule 30(b)(6) deposition regarding Defendants' document database ("Database") "without prejudice to their ability to seek an additional 30(b)(6) deposition later in discovery" is without merit and should be denied. The Database is the product of a robust, counsel-directed, multi-year collection and preservation process initiated as part of an internal investigation into allegations that Defendants engaged in a conspiracy to make payments to FTOs in Syria, and supplemented over the years at the direction of counsel in these related actions. Defendants have been transparent with Plaintiffs about the data collection and preservation process and have provided detailed responses to Plaintiffs' interrogatories on these issues. Ex. 3, Defs.' Resps. & Objs. to Pls.' Second Set of Merits Interrogs. (Jan. 29, 2026); Ex. E, Defs.' Supp. Resps. & Objs. to Pls.' Second Set of Merits Interrogs. (Mar. 20, 2026). Especially given the comprehensive responses already made, Plaintiffs are not entitled to any further information on these issues. But even if they were, any such information is most efficiently and effectively provided through supplemental interrogatory responses, not a 30(b)(6) deposition of a corporate witness who would have no personal knowledge of the Database (because no current employees have any such knowledge) and would only be able to restate the information that Defendants already have provided to Plaintiffs in written answers to interrogatories.

---

[14] Willkie Farr & Gallagher asserts that Defendants, who have admitted to falsifying documents, inappropriately attempt to deflect spoliation concerns by raising a disqualification motion that is currently being briefed before the Court. The disqualification motion has no bearing on this dispute, and Defendants' misrepresent the record in claiming otherwise.

For context, it is important to understand the size and scope of the Database and how, why, and when it was amassed—all of which Defendants have disclosed in detail to Plaintiffs. As Defendants explained to Plaintiffs in interrogatory responses, the data collection and preservation process was initiated in 2016 as part of an internal investigation directed by outside counsel (at Baker McKenzie) and conducted with the assistance of third-party forensic accountants (at PwC). The investigation examined the same facts and circumstances that gave rise to the claims here. It was outside counsel at Baker McKenzie and forensic accountants at PwC—not Defendants' internal IT personnel or any of Defendants' now-former executives or employees who were involved in the events at issue in Syria—who were responsible for document collection and retention.[15] *See* Ex. 3 at 6. As further detailed in the interrogatory responses, Baker McKenzie initiated a process to interview custodians and forensically collect their data, which resulted in the collection of troves of data from over 60 custodians, including Defendants' senior executives at the time, Syria-based personnel, and employees with varied responsibilities, as well as enterprise-level financial and corporate records. *Id.* at 6-10. As further explained to Plaintiffs, Defendants collected corporate email accounts and associated repositories, physical computers, external media, mobile devices, and hard-copy materials from multiple locations. Ex. E at 4-6. Plaintiffs call the database "dated," but the 2016 collection and preservation efforts are even more reliable than if that process were beginning now precisely because it was undertaken closer in time to the events at issue in this litigation. This expansive collection effort resulted in the collection

[15] As Defendants explained, PwC provided "data collection and processing services"; Internal IT merely implemented technical preservation at the direction of outside counsel.

and preservation of massive volumes of data, including millions of documents equivalent to more than ten thousand banker's boxes of hard-copy documents.[16]

Baker McKenzie's collection was fully preserved and transferred from PwC to another third-party vendor, Consilio, at the direction of outside counsel when this litigation was initiated. Ex. 3 at 6. The collection was further supplemented during jurisdictional discovery by Defendants' former counsel at Loeb & Loeb and Skadden Arps. *Id.* at 14; Ex. E at 15-16. As further disclosed to Plaintiffs, Defendants' current counsel at WilmerHale are continuing to supplement the Database with additional data from backup repositories in response to Plaintiffs' discovery requests. Ex. E at 15-16. The full scope of this data has been gathered and preserved in the current Database hosted by Consilio, which is the baseline corpus of materials against which search terms are being run for purposes of responding to Plaintiffs' discovery requests. *See* Ex. I (a demonstrative illustrating the universe of documents being searched across various repositories). Again, all of this information has been disclosed to Plaintiffs through interrogatory responses; there are no additional material facts to be obtained through deposition testimony.

For the avoidance of doubt, and contrary to Plaintiffs' suggestion here, Defendants are *not* "insist[ing] on limiting discovery in this case to the Database." Plaintiffs know this. As disclosed to Plaintiffs and as noted above, Defendants are continuing to search for and collect additional data as they receive discovery requests from Plaintiffs. Ex. E at 15-16. The fact that additional data collection is underway is not evidence of any deficiency in the earlier processes, but rather a

[16] It bears mention, in light of issues that arose during jurisdictional discovery, that Defendants are not limiting their searches for responsive documents to the "PwC investigatory database"—which is a smaller subset of the raw data collected and preserved by Baker McKenzie during the internal investigation that was created using a set of search terms and date range limiters to identify the most relevant documents for the investigation. *See Foley* May 20, 2024 Hr'g Tr. at 36:13-23. As explained in the interrogatory responses, the Database being searched is the *entirety* of the processed data. Ex. 3 at 6-16.

reflection of just how tangential some of the information being sought by Plaintiffs is to the claims at issue. In any event, there is no basis for Plaintiffs' suggestion that Defendants should undertake to re-collect from backup tapes reams of data that were *already* previously collected through forensic means and preserved in the Database—a process that would be duplicative, costly, and time-consuming, resulting in unnecessary burden, expense, and delay.

Defendants learned for the first time in Plaintiffs' Joint Status Report submission that Plaintiffs seek deposition testimony on document preservation and collection as part of an effort to suggest spoliation by Defendants or their prior counsel. The charge of spoliation is unwarranted and, in any case, it is not the subject of this Joint Status Report. The relevant question here is whether Defendants possess any material non-privileged information regarding their document-collection efforts that has not already been disclosed or could not be provided through supplemental or new interrogatory responses. The answer is "no," as Defendants have explained, and that should dispose of Plaintiffs' request for a deposition on this topic.

Nonetheless, assertions of spoliation—meritless as they are—cannot be left unaddressed. Should Plaintiffs file any such motion, Defendants will be prepared to address it. But several points bear emphasis here. It is remarkable that Willkie Farr & Gallagher would make conclusory accusations regarding "destruction of incriminating" evidence by Defendants' former officers, including its own client, Bruno LaFont, who was *the CEO and/or Chairman* at the time of the conduct at issue and during Baker McKenzie's "Project Alpha" investigation. Willkie's spoliation accusations are thus directed at its own client. Willkie cannot simultaneously argue in the French criminal proceedings that Lafarge and Willkie's own client Lafont were together committed to a rule-of-law and compliance culture and at the same time be heard in this Court to make the opposite assertions, claiming that examples of "apparent document destruction are legion," and that

Defendants' purported conduct was undertaken "[a]t the specific direction of the companies' highest management levels—including the CEOs of both Lafarge [*i.e.*, Bruno Lafont] and LCS," *Shirley* Am. Compl. ¶ 14. Willkie's assertions of spoliation here are particularly suspect given its assertions on behalf of Lafont that Willkie itself was granted access by Lafarge to company documents, including Lafont's entire email file for the period 2010-2016 (consisting of some 283,000-plus emails and an unknown quantity of attachments and other files).

Moreover, Plaintiffs' ability to identify so-called "gaps" in the Database is the result of Defendants' extensive transparency in their interrogatory responses, and not any evidence of spoliation. For example, Plaintiffs complain that Defendants did not collect and preserve phones for certain custodians whose data was collected into the Database. Plaintiffs know this because Defendants disclosed in their interrogatory responses the custodians whose phones were collected. And, because Plaintiffs know exactly which custodians are in the Database and which are not, they purport to complain that "several other custodians" are not. But the reality is that these custodians are tangential at best, which is why their emails were not collected as part of the comprehensive investigation. Moreover, their emails either reside on backup tapes that would need to be restored at great expense or, in one instance, were so far outside the plausible universe of potential relevance (as in the case of an employee of an affiliate operating in a country not at issue in this litigation) that the information is no longer available.[17] Indeed, for the "eight relevant employees" that Plaintiffs identify as not being included in the Database, Plaintiffs have previously agreed that these individuals were of tangential relevance and withdrew their requests to add six of these eight

[17] This custodian whose data was not collected is Frederic Malis, an employee who served as a security coordinator for Lafarge *Iraq*, a different subsidiary company that is not a defendant here. Because no one contemplated that Malis could have information of any relevance to these underlying issues when the internal investigation took place, his documents were not retained for the relevant time period. *See* Ex. 10, Defendants' Feb. 5, 2026 Letter.

custodians.[18] Ex. 9, Defendants' Jan. 23, 2026 Letter at 1. While it should be apparent why information from these tangential custodians was not added to the Database, Plaintiffs' curiosity as to the counsel-directed decision whether and why to collect, or not collect, is subject to attorney-client privilege or work product protections. At bottom, there is no non-privileged information about collection efforts relating to these "several other custodians" that is not already known to Plaintiffs, and nothing about them supports Plaintiffs' accusations of spoliation.

Plaintiffs also repeat their past complaint that certain non-business personal electronic records were not collected, but this information was known to Plaintiffs even before Defendants provided their lengthy interrogatory responses reiterating that information. Plaintiffs have also served requests for production seeking information about Defendants' policies surrounding personal email use and phone use,[19] responses to which are due, per agreement, on March 30. A 30(b)(6) deposition would not add any material information that has not already been disclosed or will not soon be disclosed in response to the pending requests.

Plaintiffs also point to certain historical records they are seeking from a non-Defendant Egyptian affiliate ("LMEA"). Defendants have been transparent that they are searching the Database for the requested LMEA files and, in the meantime, are working to identify other available repositories where LMEA materials have been preserved. In fact, as Defendants have informed Plaintiffs, Defendants are making a production of LMEA files responsive to Plaintiffs'

---

[18] For the avoidance of doubt, however, Defendants have retained the data for seven of these eight custodians, so the suggestion of spoliation is plainly off-base. The eighth individual, Zeinab El-Orabi, is a legal counsel at Lafarge Egypt, another subsidiary company not a Defendant here.

[19] RFP 126 seeks: "All versions of Your mobile phone policy, or any other policy governing the use of mobile phones by Your Personnel, that were operative during the Relevant Time Period." RFP 128 seeks: "All versions of Your electronic, email, internet, or data use policies that were operative during the Relevant Time Period."

Requests for Production Nos. 99 and 100[20] by the date of this Joint Status Report. In short, Defendants are producing responsive, non-privileged materials in response to Plaintiffs' requests in a manner that further demonstrates that Plaintiffs' allegations of spoliation are unfounded.

In addition, Plaintiffs already have the answers to their other "fundamental questions" raised in their submission above, which further undercuts the charge of spoliation:

- Defendants have explained the origin of the files in the Global custodial file. The Global custodian functions as a catch-all custodian of well over one-million documents, including (but not limited to) certain financial and enterprise records. *See* Ex. E at 16. If Plaintiffs have specific questions, Defendants are willing to answer them.

- Defendants have already provided ample responsive, non-privileged information regarding document hold notices. Nevertheless, Defendants are willing to identify the recipients and timing of litigation hold notices. That information is appropriately provided by interrogatory, not deposition, and further details are privileged.

- Regarding LCS's bank-issued account statements, Defendants have never represented that original bank statements do not exist or were destroyed; rather, Defendants are actively reviewing a large enterprise level financial repository housed in the Database called the "Finance Folder" for responsive materials and are conducting outreach to relevant financial institutions as well. Defendants will produce responsive, nonprivileged materials as that review and outreach progresses. A 30(b)(6) deposition would not accelerate this process and would instead require a witness to speculate about documents still being identified and reviewed.

In short, no 30(b)(6) deposition is warranted here especially in light of Defendants' transparency with Plaintiffs, through extensive interrogatory responses, with respect to the Database and the data collection and preservation process that underlies it. To the extent Plaintiffs have additional questions to pose, the proper vehicle would be additional supplementation or

---

[20] Plaintiffs' RFP No. 99 seeks: "Complete general ledger data, including journal entry listings, and sub-ledger exports for Accounts Payable and Accounts Receivable, between January 1, 2011, and December 31, 2015, for LCS and LMEA." Plaintiffs' RFP No. 100 seeks: "All records of manual journal entries made by or on behalf of LCS and LMEA Personnel between January 1, 2011, and December 31, 2015, including supporting Documents, explanations, and authorizations."

written interrogatories, not a 30(b)(6) deposition. It would be wasteful and unduly burdensome to require a 30(b)(6) witness to gather and memorize the *same* information that is already provided in Defendants' interrogatory responses.[21] Furthermore, Plaintiffs' proposed topics also would require a corporate witness to recite lengthy lists of information (such as lists of personnel, responsibilities, dates of employment, and other such details) that are better suited to written responses. For example, Topic 4 seeks testimony regarding "the dates each individual listed in Your Response to Interrogatory No. 21(a) was employed by Defendants"—that topic covers dozens of individuals, many of whom are not even custodians in this litigation. Ex. 1 at 8. These types of requests constitute precisely the type of "memory contest" courts have held is ill-suited to Rule 30(b)(6) testimony and that instead favor written testimony.[22]

Finally, even if Plaintiffs were permitted to seek additional discovery on discovery through a 30(b)(6) deposition, they should not be allowed to notice only a subset of topics they would like to explore with a corporate witness now, while "reserving" their "right" to seek a *second* 30(b)(6) deposition at some point in the future. Given the burdens and inefficiency of any such

[21] Plaintiffs seek to explore many of the same topics that Defendants have thoroughly answered in response to interrogatories and have provided no basis to continue posing the same questions. For example, one of Plaintiffs' proposed deposition topics (Topic 3(e)) seeks testimony regarding: "[a]ny search terms, date ranges, or other limiters used in collecting or processing Data from those Repositories." Ex. 1 at 7. Defendants' response to Interrogatory No. 21(f) addressed this directly: "Defendants are not aware of date ranges, search terms, and other limiters that were used in collecting data from the identified custodians." Ex. E at 14. In other words, to Defendants' knowledge, no such limiters were applied. As explained, this was an exceptionally robust collection process. There is nothing further that could be elicited at a deposition.

[22] *See, e.g.*, *Wilmington Tr., Nat'l Ass'n v. Samcom 48*, 2022 WL 17977499, at 2 (E.D.N.Y. Dec. 28, 2022) ("a Rule 30(b)(6) deposition should not be a 'memory contest' of topics better suited to a written response or a supplemental document production.") (citation omitted); *see also U.S. ex rel Fago v. M & T Mort. Corp.*, 235 F.R.D. 11, 25 (D.D.C. 2006) (declining to compel Rule 30(b)(6) testimony, finding "no added benefit to compelling the same information through a Rule 30(b)(6) deposition because, like Rule 30(b)(6) deposition testimony, an interrogatory can be served on and answered by a corporation via its officers and agents").

fragmented approach, courts routinely deny such attempts at serial 30(b)(6) depositions without a showing of good cause, which is absent here. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 254 F.R.D. 227, 235 (E.D. Pa. 2008) ("Taking serial depositions of a single corporation may be as costly and burdensome, if not more so, as serial depositions of an individual."). It would be inefficient to require Defendants to prepare a corporate witness for two separate depositions, potentially months apart, particularly given the extensive resources that Defendants already are devoting to fulfilling their wide-ranging discovery obligations in this litigation. Alternatively, if the Court were to grant Plaintiffs' request for a 30(b)(6) deposition on the subjects of document preservation and collection, Defendants would respectfully request the opportunity to conduct a corresponding deposition of a representative of Plaintiffs in each of the cases in order to address the same types of questions regarding Plaintiffs' efforts to preserve and collect documents and information—including but not limited to contemporaneous emails and other digital communications—regarding their respective lawsuits, allegations, claims, injuries, and damages.

**C. Defendants' Interrogatory Nos. 12, 13, and 17–22**

**Defendants' Position:** Plaintiffs claim that Defendants are liable for injuries stemming from a wide variety of attacks by different armed groups over a years-long timespan and expansive geographic area covering several continents, on the theory that such attacks resulted from Defendants' alleged conspiracies with others. Defendants are entitled to information regarding the bases for those claims and allegations. Interrogatory Nos. 12, 13, and 17–22 seek information about the conspiracies alleged by Plaintiffs, including the nature, scope, and duration of the alleged conspiracies. *See* Ex. F, *Foley* and *Black* Pls.' Resps. & Objs. to Defs.' Second Set of Merits Interrogs. (Mar. 3, 2026). The interrogatories also seek information regarding whether the attacks

at issue were committed in furtherance of the alleged conspiracies, the identities of the perpetrators of the attacks, and information supporting Plaintiffs' claims that the Defendants' financial or other resources were used in connection with the attacks. Each interrogatory seeks information that relates directly to allegations and claims in the operative Complaints (or Amended Complaints) and thus is available to Plaintiffs.

There is no question that the requested information is (highly) relevant. Instead, Plaintiffs' primary objection seems to be that these interrogatories are premature. But Plaintiffs must have at least some information in their possession to support their allegations and claims. The litigations have been ongoing for several years and merits discovery has been ongoing for roughly six months. The time to produce merits-based discovery is now, not later. Providing responses to these interrogatories, at this stage of discovery, is necessary to "assist in clarifying plaintiffs' allegations and identifying witnesses." *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 234 (E.D.N.Y. 2007). In *Strauss*, the court ordered the plaintiffs to respond to contention interrogatories even though there—unlike here—document production had not yet begun. *Id.* Here, Defendants' Interrogatory No. 13 is nearly identical to the request that the *Strauss* court held was appropriate there, even at an earlier stage of discovery. *See id.* at 228-29; *see* Ex. F at 14. The *Strauss* court reasoned that it would "not be futile or burdensome" for the plaintiffs to respond, "because the interrogatories track the allegations in the complaint, upon which plaintiffs presumably have sufficient facts to plead," and, in any case, "plaintiffs are under an ongoing obligation to supplement their discovery responses." 242 F.R.D. at 235. Here, not only is Interrogatory No. 13 nearly identical to the interrogatory in *Strauss*, but Interrogatory Nos. 12 and 17–21 similarly track the allegations and claims in Plaintiffs' Complaints. By way of example, Interrogatory No. 21 requests the information supporting Plaintiffs' allegation that ISIS used Defendants' cement to build tunnels,

and that those particular tunnels were used to facilitate the attacks at issue. Plaintiffs must have at least some information that supports those claims, in which case now is the time to produce it.

Plaintiffs' second objection—that the interrogatories require expert input—fares no better. That experts may opine on a topic does not excuse Plaintiffs from providing the responsive information currently in their possession. *See In re Zyprexa State Att'y Gen. Cases*, 2008 WL 3200254, at *1 (E.D.N.Y. Aug. 5, 2008) (rejecting objection that that interrogatory "will be subject of expert testimony" and ordering the plaintiff to provide "information disclosing the [plaintiff's] theory of the case"). As discussed *supra*, these interrogatories seek information underlying Plaintiffs' own allegations: Interrogatory No. 12 asks Plaintiffs to describe "each conspiracy and/or conspiracies You allege Defendants entered into with any designated Foreign Terrorist Organization"—which seeks information at the heart of their claims. Seeking information about the allegations is precisely the purpose of such contention interrogatories. *See Porter v. Prop. Damage Control Grp., Inc.*, 2007 WL 2907403, at *12 (E.D.N.Y. Sept. 28, 2007) (noting that "to the extent that defendants seek more information as to the specific provisions of the Act that they allegedly violated, they may serve a contention interrogatory"). Interrogatory No. 19 asks Plaintiffs to identify the ISIS cell that allegedly used Defendants' payments and the evidence supporting Plaintiffs' allegation that Defendants' payments were funneled to that cell. This does not call for expert analysis; rather, it asks only for facts supporting Plaintiffs' allegations, including the identity of a terrorist cell and the evidence connecting Defendants' alleged payments to that cell. *See Doyle v. Turner,* 1993 WL 183788, at *8 (S.D.N.Y. May 27, 1993) (compelling response to interrogatories that requested "factual detail" about plaintiff's claims). This is an attempt to obtain information regarding the allegations in the Plaintiffs' Complaint, not an effort to "short-circuit the ordinary expert process."

Plaintiffs' refusal to respond to Defendants' Interrogatory No. 22—asking Plaintiffs to "[i]dentify every fact in the Statement of Facts that You contend is inaccurate and Identify all documents supporting that the fact is inaccurate"—is similarly untenable. This interrogatory corresponds to the same type of interrogatory to which the Court recently ordered Defendants to respond. *See Fields v. Lafarge*, No. 1:23-cv-00169 (E.D.N.Y.), Dkt. Nos. 107 and 109. While Plaintiffs must eventually supplement any responses if they later learn of any new information, the duty to supplement responses is not a basis to avoid producing requested information in their possession at this time. *See Fields v. Lafarge*, 23-cv-00169-NGG-PK (E.D.N.Y.), Feb. 13, 2026 Hr'g Tr. at 20:21-23 ("[Y]ou're in a position to answer, and you should be obligated, in the course of discovery, to answer the questions as you know it at that moment."). And Plaintiffs did not lodge any objection that this Interrogatory required expert input in their Responses and Objections. *See* Ex. G, *Foley* and *Black* Pls.' Resps. & Objs. to Defs.' Third Set of Merits Interrogs. (Mar. 16, 2026).

Responses to these interrogatories are critical to Defendants' ability to assess Plaintiffs' allegations and claims, prepare for depositions, and mount their defenses. Defendants are entitled to obtain information, for example, regarding the basis for Plaintiffs' claim that an attack committed on a different continent, years after Defendants ceased operating in Syria, was an act committed in furtherance of any alleged conspiracy involving Defendants. Obtaining such information may allow Defendants to identify additional witnesses or non-parties who may have relevant information and/or to identify appropriate experts to consider, analyze, and respond to such information.

Plaintiffs should be compelled to provide responses to these interrogatories by a date certain, and should comply with their ongoing obligation to supplement their responses.

**Plaintiffs' Position:** The Court should not require Plaintiffs to answer Defendants' contention interrogatories while fact discovery is underway. Interrogatories 12-13 and 17-22 ask Plaintiffs to "[i]dentify and Describe in as much detail as possible", "[e]xplain in detail the factual bases" for, or "[i]dentify all documents, facts, and evidence supporting" various allegations concerning Defendants' alleged conspiracies with terrorists. Ex. 14. These are classic "contention interrogatories" best "reserved for after discovery." *In re Facebook, Inc.*, 2016 WL 5080152, at *3 (S.D.N.Y. July 7, 2016).[23] Indeed, they concern *Defendants*' conduct and hinge on information in *Defendants*' possession. The Court should not require Plaintiffs to answer them until Defendants make far more progress fulfilling their discovery obligations.

These interrogatories are premature for two reasons. *First,* fact discovery is needed to answer them. The interrogatories here do not seek facts within Plaintiffs' personal knowledge (such as facts about their injuries, which Plaintiffs are separately providing). Instead, they ask Plaintiffs to identify facts and evidence about Defendants' conspiracies. *See, e.g.*, Ex. 14 at Interrogatory No. 12 (seeking "as much detail as possible" about "each conspiracy and/or conspiracies" Defendants "entered into with any designated Foreign Terrorist Organization"). The answers thus hinge on information that resides solely with Defendants and their employees. Yet Defendants' document productions are nowhere near complete. Nor have Plaintiffs had an

---

[23] SDNY's Local Civil Rule 33.3 limits contention interrogatories until the end of discovery. Although this Court has not adopted that principle, Courts in this district have sustained objections to contention interrogatories served early in discovery on the grounds that they are premature. *See*, *e.g.*, *Protex Int'l Corp. v. Vanguard Prods. Grp., Inc.*, 2006 WL 3827423, at *2 (E.D.N.Y. Dec. 27, 2006). Indeed, requiring a party to answer contention interrogatories "before prior discovery has established a reasonable factual predicate . . . may do more harm than good." *Facebook, Inc.*, 2016 WL 5080152, at *3. It can have the effect of "allow[ing] a party to fish" for issues by forcing the opposing party to summarize their positions before sufficient discovery has occurred. *Id.* Therefore, the "only logical exception to Rule 33(c)'s timeline would be in the rare event," untrue here, "that future discovery would be unhelpful or unlikely to elicit issues and establish a necessary factual foundation" in that litigation. *Id.* at *4.

opportunity to depose a single witness. Until that happens, any answers to these types of contention interrogatories will be inherently incomplete. *See*, *e.g.*, *Shannon v. New York City Transit Auth.*, 2001 WL 286727, at *3 (S.D.N.Y. Mar. 22, 2001) (denying motion to compel contention interrogatory response until "further discovery has occurred, including depositions" as only document discovery had occurred). Because Fed. R. Civ. P. 33(b) is intended to "protect[] the responding party from being hemmed into fixing [its] position without adequate information," *Roth v. Commonwealth*, 1988 WL 43963, at *4 (W.D.N.Y. May 4, 1988), the Court should not require Plaintiffs to answer these contention interrogatories at this stage of discovery.

*Second*, these contention interrogatories require extensive expert input. *See*, *e.g.*, Ex. 14 at Interrogatory No. 18 (probing whether each attack was "(a) committed in furtherance of the conspiracy identified in Interrogatory No. 12; or (b) a foreseeable outcome of the conspiracy"); *id.* at Interrogatory No. 19 (seeking information specific ISIS, ANF, or AQI units, cells, or operatives, including the ISIS Leadership Cell, Raqqa Cell, and ISIS Intelligence Cell). Details about how the terrorist cells operated – or whether individual attacks furthered the alleged conspiracies – will be at the heart of expert discovery. *See*, *e.g.*, *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 438 (E.D.N.Y. 2013) ("courts in this circuit have admitted testimony from experts" analyzing "terrorist organizations"). Under the Court's scheduling order, such discovery is still seven months away. *Foley* Dkt. 104. Defendants are not entitled to short-circuit the ordinary process by seeking Plaintiffs' expert opinions months in advance.

This Court has broad discretion to defer contention interrogatories "until designated discovery is complete, or until a pretrial conference or some other time." Fed. R. Civ. P. 33(a)(2). Courts in this district often do so. *See Nimkoff v. Dollhausen*, 262 F.R.D. 191, 195 (E.D.N.Y. 2009) (obligation to respond to contention interrogatories "should be postponed until the end of

the discovery period"). Indeed, courts in this district have sustained objections to contention interrogatories where the demanding party failed to show that the usefulness of the information sought outweighed the burden imposed in responding early in the litigation. *See*, *e.g.*, *Protex*, 2006 WL 3827423, at *2 (denying motion to compel contention interrogatory responses given early stage of discovery).

Compiling answers to these interrogatories at this stage would be unduly burdensome. They would require Plaintiffs' counsel to review Defendants' (incomplete) productions to identify "all" the various documents that counsel believes support the complaint's conspiracy allegations. There is no reason to go through that hassle now, if ever. Plaintiffs' experts will address all these issues at an appropriate time. But at minimum, the Court should defer any response until later in discovery – after Defendants have substantially completed their productions and given depositions a chance to occur.

Defendants misplace reliance on *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199 (E.D.N.Y. 2007). There, the Court found that answering the contention interrogatories would not be "futile" because plaintiffs presumably had facts – unknown to Defendants – to draft their complaint. *Id.* at 235. But requiring responses at this stage, based off what was known at the time of the complaint, provides minimal value to Defendants. Nor does answering these contention interrogatories assist Defendants in "identifying witnesses" when the responses concern Defendants' own conduct. *Strauss*, 242 F.R.D. at 234. The burden imposed on Plaintiffs in responding to these interrogatories outweighs the likelihood that any useful information will be provided to Defendants. *See Protex*, 2006 WL 3827423, at *2.

Dated: March 26, 2026

Respectfully submitted,


Alyson Zureick
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8875 (t)
(212) 230-8888 (t)
alyson.zureick@wilmerhale.com

/s/ *David W. Bowker*
David W. Bowker
Jonathan E. Paikin
Albinas Prizgintas (*pro hac vice*)
Michaela S. Wilkes Klein (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 663-6000 (t)
(202) 663-6363 (f)
david.bowker@wilmerhale.com
jonathan.paikin@wilmerhale.com
albinas.prizgintas@wilmerhale.com
michaela.wilkesklein@wilmerhale.com


*Attorneys for Lafarge S.A., Lafarge Cement Holding Limited, and Lafarge Cement Syria S.A.*


*/s/ Lee Wolosky*
Lee Wolosky
Andrew J. Lichtman
Kathryn Bolas
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
lwolosky@willkie.com
alichtman@willkie.com
kbolas@willkie.com

Todd C. Toral
JENNER & BLOCK LLP
2029 Century Park East
Ste 1450
Los Angeles, CA 90067-2901
213-239-2294
ttoral@jenner.com

Brent Caslin
JENNER & BLOCK LLP
515 S Flower Street
Suite 3300

*/s/ Joshua D. Branson*
Andrew E. Goldsmith
Joshua D. Branson (*pro hac vice*)
Lillian V. Smith (*pro hac vice*)
Christopher C. Goodnow (*pro hac vice*)
James A. Ruck (*pro hac vice*)
Eric J. Maier (*pro hac vice*)
Chase H. Robinett (*pro hac vice*)
KELLOGG, HANDSEN, TODD,
FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7945
agoldsmith@kellogghansen.com
jbranson@kellogghansen.com
lsmith@kellogghansen.com
cgoodnow@kellogghansen.com
jruck@kellogghansen.com
emaier@kellogghansen.com
crobinett@kellogghansen.com

Adam J. Goldstein
Ryan Sparacino (*pro hac vice*)
Stacey Wilson (*pro hac vice*)
SPARACINO PLLC

Los Angeles, CA 90071
213-239-5100
bcaslin@jenner.com

Jason P. Hipp
Sarah Ann Purtill
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
212-891-1600
jhipp@jenner.com
spurtill@jenner.com

Alyssa Bernstein (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
202-639-6029
abernstein@jenner.com
sariail@jenner.com

Kyle N. Tramonte (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, D.C. 20001
Tel: (202) 639-6000
ktramonte@jenner.com

*Attorneys for the Finan Plaintiffs*

1920 L Street, N.W., Suite 835
Washington, D.C. 20036
(202) 629-3530
adam.goldstein@sparacinopllc.com

Matthew Jason Fisher (*pro hac vice*)
SPARACINO PLLC
150 South Wacker Drive
Suite 2400
Chicago, IL 60606
312-216-5111
matt.fisher@sparacinopllc.com

*Attorneys for the Foley Plaintiffs*

*/s/ Joshua D. Branson*
Andrew E. Goldsmith
Joshua D. Branson (*pro hac vice*)
KELLOGG, HANDSEN, TODD,
FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7945
agoldsmith@kellogghansen.com
jbranson@kellogghansen.com

Adam J. Goldstein

*/s/ Lee Wolosky*
Lee Wolosky
Andrew J. Lichtman
Kathryn Bolas
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
lwolosky@willkie.com
alichtman@willkie.com
kbolas@willkie.com

SPARACINO PLLC
1920 L Street, N.W., Suite 835
Washington, D.C. 20036
(202) 629-3530
adam.goldstein@sparacinopllc.com

Matthew Jason Fisher (*pro hac vice*)
SPARACINO PLLC
150 South Wacker Drive
Suite 2400
Chicago, IL 60606
312-216-5111
matt.fisher@sparacinopllc.com

*Attorneys for the Black Plaintiffs*

Todd C. Toral
JENNER & BLOCK LLP
2029 Century Park East
Ste 1450
Los Angeles, CA 90067-2901
213-239-2294
ttoral@jenner.com

Brent Caslin (*pro hac vice*)
JENNER & BLOCK LLP
515 S Flower Street
Suite 3300
Los Angeles, CA 90071
213-239-5100
bcaslin@jenner.com

Jason P. Hipp
Sarah Ann Purtill
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
212-891-1600
jhipp@jenner.com
spurtill@jenner.com

Alyssa Bernstein (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
202-639-6029
abernstein@jenner.com

Kyle N. Tramonte (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, D.C. 20001
Tel: (202) 639-6000
ktramonte@jenner.com

Craig W. Carlson (*pro hac vice*)
Langdon D. Southworth (*pro hac vice*)
THE CARLSON LAW FIRM
100 East Central Texas Expressway
Killeen, TX 76541
254-526-5688

ccarlson@carlsonattorneys.com
lsouthworth@carlsonattorneys.com

*Attorneys for the Shirley Plaintiffs*

*/s/ Lee Wolosky*
Lee Wolosky
Andrew J. Lichtman
Kathryn Bolas
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000
Fax: (212) 728-8111
lwolosky@willkie.com
alichtman@willkie.com
kbolas@willkie.com

Todd C. Toral
JENNER & BLOCK LLP
2029 Century Park East
Ste 1450
Los Angeles, CA 90067-2901
213-239-2294
ttoral@jenner.com

Jason P. Hipp
Sarah Ann Purtill
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
212-891-1600
jhipp@jenner.com
spurtill@jenner.com
Alyssa Bernstein (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
202-639-6029
abernstein@jenner.com

Kyle N. Tramonte (*pro hac vice*)
JENNER & BLOCK LLP

*/s/ Kevin L. Attridge*
Kevin L. Attridge (*pro hac vice*)
Melissa Fox
Jonathan E. Missner (*pro hac vice*)
Robert B. Gilmore (*pro hac vice*)
STEIN MITCHELL BEATO
& MISSNER LLP
2000 K Street, NW, Suite 600
Washington, D.C. 20006
Tel: (202) 737-7777
Fax: (202) 296-8312
kattridge@steinmitchell.com
mfox@steinmitchell.com
jmissner@steinmitchell.com
rgilmore@steinmitchell.com

Gavriel Mairone
MM~LAW LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Tel: (312) 253-7444
Fax: (312) 275-8590
Ctlaw@mm-Law.com

Andrew E. Goldsmith
Joshua D. Branson (*pro hac vice*)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7945
agoldsmith@kellogghansen.com
jbranson@kellogghansen.com

*Attorneys for the Goldman Plaintiffs*

1099 New York Avenue NW
Washington, D.C. 20001
Tel: (202) 639-6000
ktramonte@jenner.com

Amal Clooney (*pro hac vice*)
Alisha Mathew (*pro hac vice*)
OFFICE OF AMAL CLOONEY
54 Doughty Street
London
United Kingdom of Great Britain and Northern Ireland
(44) 204 526 1185
YazidiUS@amalclooney.co.uk
am@officeofac.co.uk

*Attorneys for the Murad Plaintiffs*

*<u>/s/ Joshua D. Branson</u>*
Andrew E. Goldsmith
Joshua D. Branson (*pro hac vice*)
KELLOGG, HANDSEN, TODD, FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7945
agoldsmith@kellogghansen.com
jbranson@kellogghansen.com

Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice forthcoming*)
Matthew J. Fisher (*pro hac vice forthcoming*)
SPARACINO PLLC
1920 L Street, N.W., Suite 835
Washington, D.C. 20036
(202) 629-3530
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
matt.fisher@sparacinopllc.com

*Attorneys for the Stallter Plaintiffs*